## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |
|---|---|
| EDUCATION CREDITOR TRUST, AS LENDER, and U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, AS SUCCESSOR TO U.S. BANK NATIONAL ASSOCIATION, AS ADMINISTRATIVE AGENT AND COLLATERAL AGENT,<br><br>               Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>               Defendant. | Case No. <u>  24-775 C  </u><br><br>Judge  <u>         </u> |

## COMPLAINT

Plaintiffs (as defined below), bring this action against the United States for breach of an express or implied contract and/or unlawful taking of Plaintiffs' property in violation of the Fifth Amendment of the United States Constitution. Plaintiffs seek approximately $92 million in damages against the United States for the Government's breach of its contractual obligations, or unconstitutional taking, arising out of the United States Department of Education's violation of specific terms and conditions set forth in certain program participation agreements and related letters of credit, as described below. In support thereof, Plaintiffs allege as follows:

## INTRODUCTION

1. In May 2018, the United States, acting by and through the United States, acting through its federal agency the United States Department of Education (the "Department of Education" or "Department"), with whom Education Management II LLC, Education Management Corporation, Education Management Holdings II LLC, and certain subsidiaries

thereof (collectively, "EDMC") contracted, drew down on the BNP Letter of Credit,[1] a letter of credit issued by BNP Paribas and funded by EDMC's Lenders for the benefit of EDMC under the EDMC Credit Agreement.   The BNP Letter of Credit was one of several letters of credit obtained by EDMC to fulfill its obligations under the Higher Education Act, 20 U.S.C. ch. 28, § 1001 *et seq.* (the "Higher Education Act" or "HEA") and certain contracts, also known as program participation agreements ("PPAs") with the Department governing the EDMC schools' receipt of federal student aid funds.

2.      Plaintiffs now bring this action against the United States for breach of an express contract, breach of an implied-in-fact contract, or just compensation under the Takings Clause of the Fifth Amendment of the United States Constitution.

3.      As a condition to drawing on the BNP Letter of Credit, the Department affirmed in writing that, consistent with the terms of its contractual agreements with EDMC and the Lenders, it would "promptly" either apply those proceeds to satisfy certain discrete obligations of EDMC under the Higher Education Act or return those funds to EDMC and its Lenders.  It has done neither.  Instead, the United States has breached its agreement by retaining those funds for nearly six years and incorrectly asserts the ability to use the money to satisfy obligations for which EDMC is not and was never contractually obligated.

4.      Specifically, as a result of the Government's breach of contract or unlawful taking, the Plaintiffs seek monetary damages of approximately $92 million for all funds wrongfully obtained and applied for use or retained by the Department that do not fall within the following Permissible Use categories:   (a) up to $22 million of liabilities relating to the South Ongoing

---

[1] Capitalized terms used but not otherwise defined in this Introduction shall have the meanings ascribed to such terms in the body of the Complaint.

Schools and $6.5 million of liabilities relating to the AI Ongoing Schools, in each case arising on or before the closing of the EPF Transfer on January 7, 2019; (b) up to $14,884,804 of liabilities relating to schools not sold by EDMC in the Dream Center Sale arising prior to the May 18, 2018 Protective Draw (or within any applicable teach-out period thereafter); (c) Refunds and Teach-Out Expenses relating to all other schools arising prior to the May 18, 2018 Protective Draw (or within any applicable teach-out period thereafter); and (d) HEA Liabilities relating to all other schools arising on or before the expiration of the BNP Letter of Credit on May 31, 2018, that do not fall into one of the categories summarized below:

**Allocations of Permissible Uses for Letter of Credit Proceeds**

| Eligible Schools | Amount | Date Range for Liabilities |
|---|---|---|
| South Ongoing Schools | $22 million | On or before January 7, 2019 |
| AI Ongoing Schools | $6.5 million | On or before January 7, 2019 |
| Schools retained by EDMC – Teach-Out & Refunds | $14.9 million | On or before May 18, 2018 |
| Schools retained by EDMC – HEA Liabilities | | On or before May 31, 2018 |
| Schools sold to Dream Center[2] – Teach-Out & Refunds | $58.9 million[3] | On or before May 18, 2018 |
| Schools sold to Dream Center – HEA Liabilities | | On or before May 31, 2018 |

5.      For decades, EDMC owned and operated colleges, graduate schools, and other post-secondary institutions nationwide.  Like virtually all institutes of higher learning, EDMC's

---

[2] Other than South Ongoing Schools or AI Ongoing Schools.

[3] That is, the remainder after subtracting from the $102,168,215 of Letter of Credit Proceeds, the sum of (x) $22 million allocated for South Ongoing Schools, (y) $6.5 million allocated for AI Ongoing Schools, and (z) $14.9 million allocated to the schools retained by EDMC after the Dream Center Sale.

schools relied on student aid disbursed by the federal government to fulfill their educational mission, pay teacher salaries, and keep the lights on. The United States expressly conditioned EDMC's receipt of federal funds on EDMC posting collateral to secure certain potential liabilities to the government.

6.     Plaintiffs are certain of the Lenders under the EDMC Credit Agreement (constituting the "Requisite Lenders" with authority to direct enforcement actions under such credit agreement) that posted that collateral, as well as their Agent, U.S. Bank. EDMC provided collateral to the Department in the form of various letters of credit—including the BNP Letter of Credit—that the Department could draw upon in the event EDMC failed to perform or satisfy specific and discrete obligations to the U.S. Government as narrowly defined in the BNP Letter of Credit. The BNP Letter of Credit set forth on its face specific "Permissible Uses" for which the Department could use the funds drawn thereunder. And before the Department could draw on the BNP Letter of Credit, the Department was required to affirmatively certify in writing to BNP Paribas (as the Issuing Bank) that the Government only would use the proceeds for such Permissible Uses.

7.     EDMC's contract with the Department required that EDMC refresh its collateral each year by posting a new or amended letter of credit. If the letter of credit was not renewed by an issuing bank, EDMC was required to find a replacement letter of credit in order to continue receiving federal funding, though the government could draw on the letter of credit while EDMC sought a substitute. The fact that the government might exercise this right to make a protective draw would not relieve EDMC of its obligation to post a new letter of credit, nor could EDMC and the Department opt to use the Letter of Credit Proceeds as substitute collateral for obligations arising subsequent to the letter of credit's expiration.

8.      For many years, this arrangement functioned more or less as intended.  Then, in 2017, EDMC encountered financial problems that prompted a strategic decision to sell a substantial portion of its schools to Dream Center Education Holdings, LLC ("Dream Center" or "DCEH"), an unaffiliated, independent non-profit organization, to avert the precipitous closure of the EDMC schools.  The proposed sale to Dream Center was threatened, however, because Dream Center had difficulty obtaining a suitable letter of credit.  Absent a letter of credit, Dream Center's schools would not be able to receive necessary federal funds, and the proposed sale of assets would collapse.

9.      In order to facilitate the sale and ensure the schools' continued eligibility for federal financial aid, EDMC and its Lenders agreed that, among other things, the Department could utilize the BNP Letter of Credit issued for EDMC's benefit—set to expire in May 2018—to satisfy liabilities associated with the schools that were sold to Dream Center.  Lenders were informed that arrangements were in place with an entity called Education Credit Management Corporation to provide a replacement letter of credit within six months of closing.[4]  Consequently, the BNP Letter of Credit remained otherwise unchanged, and Dream Center still would be required to renew or replace it in advance of its maturity in May 2018.

10.     When Dream Center failed to replace the BNP Letter of Credit in advance of expiration, the Department exercised its right to make a Protective Draw thereunder.  When it did so, the Department's authorized employees expressly certified on behalf of the Department that the draw down of the proceeds would be utilized for Permissible Uses under the terms set forth in the BNP Letter of Credit.

---

[4] Education Credit Management Corporation had recently provided a similar letter of credit in connection with efforts to save another for-profit education enterprise, and the term sheets delivered to the Lenders reflected that Education Credit Management Corporation would do the same here.

11.     Contrary to the Department's express certification of compliance with the BNP Letter of Credit, the Department breached the contract when it distributed nearly $40 million of those funds to Dream Center.  Dream Center used these Letter of Credit Proceeds to pay the expenses for schools that had not yet closed (and some of which were not even scheduled to close). The Department further breached its contract by failing to "promptly" apply the remainder of the approximately $92 million of Letter of Credit Proceeds to Permissible Uses.

12.     Unfortunately, by late 2018, Dream Center informed the Department that it remained in financial trouble and, as a result, it was in talks with a buyer regarding a sale of certain of the schools to yet another "not for profit" entity.  Although the nominal purchaser was the non-profit Education Principle Foundation ("EPF") (at the time named the Colbeck Foundation), certain operations of the schools would be outsourced to Studio Enterprises.  Letter of Credit Proceeds still in hand, the Department agreed with Studio that a portion of the Letter of Credit Proceeds could be used to satisfy obligations associated with certain of the schools to be sold to EPF through the date the sale closed in January 2019 (though Studio was required to post its own letter of credit to cover obligations of certain schools for obligations arising thereafter).  Following the transfer of the schools, Dream Center was placed into a federal receivership proceeding.  EPF continued to operate the transferred schools, although it is unclear if EPF ever posted its own letters of credit, which was a condition of the transaction, or if EPF still relied on the Letter of Credit Proceeds as a substitute.

13.     In the Summer of 2022, certain of the Plaintiffs wrote to the Department, requesting that the Department account for the use of the Letter of Credit Proceeds drawn on the BNP Letter of Credit and provide a timeline for the return of any funds the Department used in a manner contrary to the BNP Letter of Credit, or that otherwise remained on account with the Department.

After exchanging considerable correspondence, the Department ultimately made its position clear: because of (some actual, and some potential) student loan discharges, alleged tuition refunds, and millions of dollars spent on non-Permissible Uses, the proceeds of the BNP Letter of Credit that had expired in May 2018 would be completely exhausted.

14.    In sum, Lenders agreed to fund the BNP Letter of Credit issued for the benefit of the Department on behalf of EDMC's schools for specific Permissible Uses.  When EDMC ran into financial difficulties, in order to facilitate a smooth landing for students enrolled at its schools, Lenders agreed that EDMC's successor Dream Center could benefit from the same BNP Letter of Credit for the same prescribed Permissible Uses until it expired.  When the BNP Letter of Credit expired, Dream Center was required to obtain a new one.

15.    Over the course of years during the financial difficulties of EDMC and its successors, the Department breached its contractual obligations under the BNP Letter of Credit and relevant PPAs by drawing on the BNP Letter of Credit and failing to promptly apply the proceeds only for Permissible Uses.  Plaintiffs have diligently attempted to negotiate the rightful return of these funds, but the Department has resisted repaying the funds while failing to justify how its financial drawdowns on the BNP Letter of Credit complied with the Permissible Uses stated therein.  Instead, the Department, in breach of its obligations under the contract, has utilized the funds for various purposes that are not Permissible Uses.

16.    The Defendant is liable to Plaintiffs for its breach of the agreement governing the use of the Letter of Credit Proceeds and/or its uncompensated taking of Plaintiffs' property. Plaintiffs are therefore entitled to recover monetary damages in the amount of the wrongfully retained or utilized Letter of Credit Proceeds drawn by the DOE under the BNP Letter of Credit.

## JURISDICTION AND VENUE

17.     The United States Court of Federal Claims (the "Court" or "Court of Federal Claims") has jurisdiction and is the proper venue for this action pursuant to 28 U.S.C. § 1491(a)(1), because this action asserts claims for monetary damages over $10,000 against the United States founded upon the Government's breach of an express and/or an implied-in-fact contract with the United States, and a taking of Plaintiffs' property in violation of the Fifth Amendment of the Constitution.

## PARTIES

18.     Plaintiff Education Creditor Trust is an express trust and a Delaware statutory trust. Education Creditor Trust is a Lender under the EDMC Credit Agreement and holds participations in the BNP Letter of Credit and revolving and term loans outstanding under the EDMC Credit Agreement and constitutes the "Requisite Lenders" as defined therein, with authority to, among other things, direct the Agent to take enforcement actions under the EDMC Credit Agreement.

19.     Plaintiff U.S. Bank Trust Company, National Association, as successor to U.S. Bank National Association ("U.S. Bank"), solely in its capacity as Administrative Agent and Collateral Agent for the Lenders, acting at the direction of the Lenders under and in accordance with the terms of the EDMC Credit Agreement (in such capacities, collectively, the "Agent" and along with Education Creditor Trust, the "Plaintiffs") is the Agent under the EDMC Credit Agreement, with the authority to act on behalf of the Lenders, including the BNP Letter of Credit participants thereunder, at the direction of the Requisite Lenders.  Pursuant to that certain Surrender of Collateral, Consent to Partial Strict Foreclosure, and Release Agreement, dated as of June 25, 2018 (the "Partial Strict Foreclosure Agreement"), the Credit Parties, including EDMC, conveyed to U.S. Bank, solely in its capacity as Agent for the Lenders, for the benefit of the

Lenders, all of their respective interests in the Surrendered Collateral (as defined in the Partial Strict Foreclosure Agreement), including all proceeds thereof, wherever located, in partial satisfaction of their obligations under the EDMC Credit Agreement. The Partial Strict Foreclosure Agreement defines the term "Surrendered Collateral" to include, among other things, EDMC's right, title, and interest in all (a) payment intangibles; (b) residual interests in any assets held by third parties as security, in trust, as collateral, or as surety; (c) commercial tort claims; and (d) all proceeds of the foregoing. Accordingly, the term Surrendered Collateral included EDMC's rights to recover funds under the PPAs its schools entered into with the Department and any reversionary rights previously possessed by EDMC under, and EDMC's interests in, the BNP Letter of Credit.

20.    The validity and enforceability of the Partial Strict Foreclosure Agreement—including but not limited to the conveyance of the Surrendered Collateral to the Agent for the benefit of the Lenders—was acknowledged and agreed to by EDMC's chapter 7 trustee appointed in connection with EDMC's liquidation proceeding under chapter 7 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "<u>Bankruptcy Code</u>"). That acknowledgement and agreement was memorialized in a stipulation approved by a final order of the United States Bankruptcy Court for the District of Delaware, where EDMC's chapter 7 proceedings remain pending.[5]

21.    Defendant is the United States, acting by and through the United States Department of Education.

---

[5] *See* Order Approving Stipulation Resolving Objection of George L. Miller, Chapter 7 Trustee, to Proofs of Claim Filed by U.S. Bank, National Association as Administrative Agent on Behalf of Itself and Each Secured Claimant, *In re Educ. Mgmt. II LLC*, Case No. 18-11494 (LSS), ECF No. 204 (Bankr. D. Del. Oct. 25, 2018); *see also* Stipulated Order Resolving Motion of U.S. Bank, National Association to Enforce Stipulation Against George L. Miller, Chapter 7 Trustee, *In re Art Inst. of Phila. LLC*, Case No. 18-11535 (LSS), ECF No. 102 (Bankr. D. Del. Sep. 19, 2019).

## FACTUAL ALLEGATIONS

### I.  EDMC's Participation in Title IV Funding Programs

22.     EDMC was founded in 1962, and for more than fifty years operated post-secondary educational institutions across North America.  The EDMC schools operated through five major groups: Argosy University, the Art Institutes, Brown Mackie College, South University, and the Western State University College of Law.

23.     Like many post-secondary schools, a substantial portion of EDMC's revenue consisted of funds administered by the Department pursuant to Title IV of the Higher Education Act.  Title IV of the HEA governs federal financial aid, and includes direct student loans, Perkins loans, Pell grants, federal work-study funds, and other financial assistance to students.

24.     On information and belief, EDMC entered into PPAs with the Department of Education that governed its participation in and receipt of funds under the various Title IV programs.[6]  On information and belief, as a condition to receiving Title IV funding, the PPAs required that EDMC's schools "post surety in the form of an irrevocable letter of credit" each year, in an amount equal to a certain percentage of Title IV funds received by the school in the prior fiscal year.  Exhibit 1, PPA Exemplar at 3.  The letter of credit was to "us[e] the form provided by the Secretary [of Education]," and schools had to renew the letter of credit "each year, not less than 10 days prior to its expiration."  *Id.*  If a school received Title IV funds in an amount not supported by an appropriate letter of credit, then the Department could elect to impose liability on the school and refer the school for administrative action.  *Id.*

---

[6] A PPA relating to the Brown Mackie College, which Plaintiffs, on information and belief, believe to be representative of the numerous PPAs entered into with the Department, is attached as **Exhibit 1** (the "PPA Exemplar").

## II.     The EDMC Credit Agreement

25.     Education Management II LLC, as Company, Education Management Corporation, as Parent, Education Management Holdings II LLC, as Holdings, and certain Subsidiaries of Holdings, as Guarantors and/or Grantors (collectively, the foregoing, the "Credit Parties"), various lenders party thereto from time to time ("Lenders"), and the Agent, together with their respective successors and permitted assigns, entered into that certain Credit and Guaranty Agreement, dated as of January 5, 2015 (as amended, amended and restated, modified, supplemented, or otherwise modified from time to time, the "EDMC Credit Agreement"), a copy of which is attached hereto as **Exhibit 2** and incorporated herein by reference.  EDMC and certain of its subsidiaries are and at all relevant times were borrowers or guarantors (as applicable) under the EDMC Credit Agreement.  Pursuant to the EDMC Credit Agreement, EDMC's Lenders, including, as relevant here, the predecessors to Plaintiff Education Creditor Trust and BNP Paribas New York Branch ("BNP Paribas"), provided EDMC with term loans and revolving loans.

26.     In addition to revolving and term loans, the EDMC Credit Agreement permitted EDMC to request the issuance of letters of credit.  EDMC regularly requested the issuance of new or amended letters of credit to fulfill the letter of credit obligations contained in its PPAs.  BNP Paribas acted as an "Issuing Bank" under the EDMC Credit Agreement responsible for issuing letters of credit requested by EDMC.[7]

27.     Upon the issuance of any "Letter of Credit" by BNP Paribas under the EDMC Credit Agreement, which included the BNP Letter of Credit, each of the Lenders "shall be deemed to have purchased, and [] agree[d] to irrevocably purchase, from [BNP Paribas] a participation in

---

[7] Although there were other Issuing Banks under the EDMC Credit Agreement, BNP Paribas was the Issuing Bank for the letter of credit at issue in this action.  For ease of reference we refer to BNP Paribas throughout, although the same mechanics would apply to other Issuing Banks in respect of letters of credit that they issued.

such Letter of Credit and any drawings honored thereunder . . . ."  Exhibit 2, EDMC Credit Agreement, § 2.3(e)*.*  Accordingly, each of the Lenders (including Plaintiff Education Creditor Trust) is the holder of a participation interest in its *pro rata* share of the BNP Letter of Credit, and a reversionary interest in any amounts drawn thereunder (including any Protective Draw).

28.    The EDMC Credit Agreement sets out detailed procedures for funding and making payment to a letter of credit's beneficiary (like the Department) when a draw request is received by the Issuing Bank.  The EDMC Credit Agreement required BNP Paribas to notify EDMC "immediately" after it determined to honor a request from a beneficiary to draw on a letter of credit issued under the EDMC Credit Agreement.  *Id.* § 2.3(d).  EDMC then had one business day to reimburse BNP Paribas for the amount of the draw honored.  *Id.*  In the event that EDMC did not reimburse BNP Paribas, EDMC would be deemed to have made a request for a revolving loan in the amount of the draw.  *Id.*  The Lenders were required to (and in the case of the BNP Letter of Credit did), fund their *pro rata* share of such loans to reimburse BNP Paribas for the amount of the draw honored.  *Id.*  As a result , BNP Paribas, as Issuing Bank, would be repaid in full for the amount drawn by the Department, and the Lenders became the parties with an economic interest in the repayment in respect of or recovery of the proceeds of the letter of credit from EDMC under the EDMC Credit Agreement (and BNP Paribas, by virtue of its reimbursement by the Lenders, would no longer have any interest in such proceeds in its capacity as Issuing Bank).

## III.    The BNP Letter of Credit

29.    On or about October 12, 2006, EDMC requested and BNP Paribas issued a letter of credit on behalf of Education Management, LLC to the Department, for the account of the EDMC schools, in the aggregate amount of $87,900,000 (as amended, amended and restated,

modified, supplemented, or otherwise modified from time to time, the "BNP Letter of Credit"),[8]. From time to time thereafter, the parties agreed to renew and modify the amount of the BNP Letter of Credit.  On or about April 3, 2017, BNP Paribas amended the BNP Letter of Credit for the last time—by then identified as letter of credit number 04141468 on behalf of Education Management II LLC —to reflect an amended amount of $102,168,215, and an expiration date of May 31, 2018.

30.     The BNP Letter of Credit secured certain obligations of the EDMC schools in connection with their participation in Title IV funding programs, as contemplated by its PPAs. Specifically, the BNP Letter of Credit could be drawn upon to satisfy the following specific categories of liabilities (referred to as "Permissible Uses") that might be owed by or on account of the EDMC institutions, as listed on the face of the BNP Letter of Credit:  (a) the payment of or reimbursement for refunds of student charges ("Refunds") owed to or on behalf of students; (b) eligible costs incurred to "teach out" students "enrolled at the time of the closure of" a school ("Teach-Out Expenses"); and (c) liabilities owing to the Secretary of Education under the HEA for conduct occurring on or before the expiration date of the BNP Letter of Credit ("HEA Liabilities"), in each case with respect to the schools identified on a schedule to the BNP Letter of Credit.  Exhibit 3, BNP Letter of Credit at 1.

31.     With respect to HEA Liabilities, the BNP Letter of Credit was explicit on its face that the proceeds of the BNP Letter of Credit (the "Letter of Credit Proceeds") could be applied only to liabilities arising "on or before the expiration of this letter of credit . . . ."  *Id.* at 2.  As to Refunds, by their very nature, the amount of any such liabilities could be definitively ascertained by no later than the end of the enrollment period in effect at the time of a draw on the BNP Letter

---

[8] A copy of the BNP Letter of Credit, including all amendments thereto through April 3, 2017, is attached hereto as **Exhibit 3** and incorporated herein by reference.

of Credit. Finally, Teach-Out Expenses represented a Permissible Use of the Letter of Credit Proceeds only after the school was closed.

32.     The BNP Letter of Credit permitted the Department to make a draw only under the following two scenarios: either (a) to pay for Permissible Uses identified by the Department at the time of such draw; or (b) to make a protective draw if the underlying schools failed to renew or replace the BNP Letter of Credit within ten days of its expiration (a "Protective Draw"). Upon making a Protective Draw, the Department is required to hold the Letter of Credit Proceeds "in an escrow account . . . pending a prompt determination of the extent to which those funds will be used." *Id.*

33.     As described below, on or about May 18, 2018, in breach of its contractual obligations, the Department made a Protective Draw in the full amount of the BNP Letter of Credit, and, while doing so, expressly certified that the Letter of Credit Proceeds would be used for Permissible Uses.

**IV.    The Dream Center Sale and Modifications to the BNP Letter of Credit**

34.     As a result of declining enrollment and adverse changes to the regulatory environment, by the mid-2010s EDMC had begun to experience financial difficulties. This led the company to pursue several operational restructuring transactions, including the closure or sale of a number of the EDMC schools.

35.     In or around January 2017, EDMC's management notified the Department of Education of a proposed sale of thirteen EDMC schools to the Dream Center Foundation, a non-profit organization, in order to obtain the Department's preliminary guidance regarding any concerns the Department might have with the transaction or conditions that it might impose on the parties in connection with the change in ownership of the schools. On or about October 17, 2017,

Dream Center purchased Argosy University, South University, Western State University College of Law, and eleven Art Institutes from EDMC (the "Dream Center Sale").  The actual transfer of four of these institutions—the Art Institute of Colorado, the Illinois Institute of Art, the Art Institute of Philadelphia, and the Art Institute of Pittsburgh—did not occur until on or about January 19, 2018.

36.    Dream Center was unable to obtain its own letter of credit to substitute for the BNP Letter of Credit.  Nonetheless, the Lenders were led to believe that the Department had facilitated an agreement for an institution named Education Credit Management Corporation, which had recently participated in rescue efforts associated with another for profit education institution, to provide a substitute letter of credit for the Dream Center schools.  According to the term sheets delivered to the Lenders by EDMC management, Education Credit Management Corporation would provide a new letter of credit either prior to the BNP Letter of Credit expiration or within six months after the closing of the sale to Dream Center.

37.    The delays in obtaining a replacement letter of credit from Education Credit Management Corporation left Dream Center in a quandary—it needed a bridge letter of credit. EDMC's Lenders were asked to step into the void.  In connection with the Dream Center Sale, EDMC and the Department agreed, with the consent of the Lenders, that in addition to continuing to support obligations associated with the schools that would remain with EDMC, the BNP Letter of Credit (together with a second letter of credit posted to the Department on behalf of EDMC by another bank, which letter of credit is not the subject of this action), could also be used for Permissible Uses associated with schools transferred to Dream Center as part of the Dream Center Sale.

38.     Originally, the Department requested that EDMC's existing letters of credit (including the BNP Letter of Credit) be cancelled and replacement letters of credit be issued on behalf of EDMC and Dream Center relating to each of their respective schools.  However, EDMC was informed this would not be possible, as the issuing banks would not agree to issue new letters of credit.  Ultimately, the Department acquiesced, and agreed to rely upon the existing letters of credit, including the BNP Letter of Credit, based upon EDMC's confirmation that the Lenders had agreed that the BNP Letter of Credit could be utilized to satisfy Permissible Uses associated with either EDMC or Dream Center schools, notwithstanding the fact that the face of BNP Letter of Credit confined its use to certain, enumerated schools owned by EDMC.

39.     The Department, EDMC, Dream Center, and the Lenders agreed to allocate the two existing letters of credit among the schools transferred to Dream Center and those schools that would remain with EDMC.  In correspondence among Department, EDMC, and Dream Center, including an October 15, 2017 letter from the Department to Brent Richardson, the Chief Executive Officer of Dream Center, the Department agreed to "continue to hold the EDMC LOCs on behalf of the [Dream Center] Institutions under their new ownership, in the amount of $92,624,329" and to "continue to hold a portion of the EDMC LOCs on behalf of the Non-DCF Institutions [i.e., those remaining with EDMC], to provide for payment of any amounts owed to the Department . . . . The Non-DCF LOC Amount is $14,884,804."[9]

40.     The agreement among EDMC and the Department was contained in emails between EDMC personnel and the Department between October 12 and October 15, 2017, with Mark McEachen, chairman of EDMC, ultimately delivering confirmation of the agreement in a letter

---

[9] *See* Letter from Joseph Smith to Brent Richardson (Oct. 5, 2017), a copy of which is attached hereto as **Exhibit 4** and incorporated herein by reference.

addressed to the Department of Education and dated as of the date of the closing of the Dream

Center Sale.  That agreement made clear that, with the exception of modifying the BNP Letter of

Credit to permit the Department to use the BNP Letter of Credit to satisfy liabilities of the schools

transferred to Dream Center, the Letter of Credit otherwise remained "unmodified as to amount,

maturity or otherwise until replaced/amended on or prior to May 1, 2018."  McEachen Letter at 1.[10]

41.    Following the Dream Center Sale, the agreed allocations were also incorporated

into the temporary PPAs entered into by Dream Center and its institutions.  Those temporary PPAs

expressly disclosed the agreement among EDMC, the Department, and Dream Center and the

agreed allocation of funds:

> The Department is currently holding the following LOCs posted by
> EDMC: BNP Paribas LOC #04141468 for $102,168,215 and Bank
> of America LOC# 68073794 for $5,340,918 ("EDMC LOCs").  By
> agreement among the Department DCF/DCED Holdings, and
> EDMC, the Department will continue to hold the EDMC LOCs in
> the amount of $92,624,329 on behalf of the DCF Institutions
> (including the additional locations of the DCF Institutions).  This
> amount is equal to 10% of the DCF institutions' Title IV funding for
> the 2016-2017 award year.  Additionally, the Department will
> continue to hold $14,884,804 of the EDMC LOCs on behalf of the
> EDMC institutions that were not conveyed to DCF/DCED Holdings
> ("Non-DCF Institutions").  This amount is being held to provide for
> payment of any amounts owed to the Department by the Non-DCF
> Institutions, including for any closed school loan discharges.  The
> Department will continue to hold this portion of the EDMC Letter
> of credit until after the Non-DCF Institutions have been closed for
> two years and the final audits for those institutions are completed.
> Pursuant to the agreement of the Department, EDMC and
> DCF/DCED Holdings, the entire amount of the EDMC LOCs
> (totaling $107,509,133) can be used to cover any liabilities for any
> of the DCF Institutions and Non-DCF Institutions, regardless of
> ownership.  The Department reserves the right to re-evaluate the
> amount of the EDMC LOCs once the locations are closed.  No later
> than May 1, 2018, DCF/DCED Holdings must post a Letter of

---

[10] *See* Letter from M. McEachen to M. Frola (Oct. 17, 2017), a copy of which is attached hereto as **Exhibit 5** and incorporated herein by reference.

Credit or extend the LOCs for the DCF Institutions until at least
March 31, 2019.

*See* Temporary PPA for The Art Institute of Seattle, at 2, a copy of which is attached hereto as

**Exhibit 6** and incorporated herein by reference.

42.    An addendum to the temporary PPAs for the Dream Center schools also contained

an acknowledgement by Dream Center that "any funds advanced or paid . . . in accordance with

the terms of this Addendum are part of the Proceeds from the LOC that the Department drew down

in May 2018." Addendum to Temporary Provisional Program Participation Agreements for

Institutions Owned by Dream Center Educational Holdings, LLC, referred to therein as "DCEH,"

a copy of which is attached hereto as **Exhibit 7** and incorporated by reference.  The addendum

went on to state that if the Department were "required by court order to return all or any portion

of the Proceeds, or [were to be] adjudged liable for damages as a result of the payments made

under this Addendum," then "DCEH and the Purchased Schools must pay the Department an

amount equal to the funds advanced or paid by the Department" to Dream Center.  *Id.*

43.    On or about June 25, 2018, Plaintiff U.S. Bank, solely in its capacity as Agent for

the Lenders, for the benefit of the Lenders, foreclosed on certain of EDMC's assets securing its

obligations under the EDMC Credit Agreement, including, among other things, any rights of

EDMC to recover funds under PPAs with the Department and any reversionary rights possessed

by EDMC under the BNP Letter of Credit.  Subsequently, on or about June 26, 2018, EDMC

commenced a proceeding pursuant to chapter 7 of the United States Bankruptcy Code, to liquidate

its remaining assets.

## V.    The Department's Protective Draw on the BNP Letter of Credit

44.    EDMC and Dream Center were unable to obtain replacement letters of credit in

advance of the BNP Letter of Credit's expiration in May 2018.  Accordingly, on or about May 18,

2018, the Department made a Protective Draw under the BNP Letter of Credit in the amount of

$102,168,215.[11]   The Department expressly certified, among other things, that the drawn funds

would be used for Permitted Uses, as follows:

> I further certify that the drafted funds will be used for one or more
> of the following purposes, as determined by the Secretary:
>
> l. To pay refunds of institutional or non-institutional charges owed
> to or on behalf of current or former students of the Institution,
> whether the Institution(s) remains open or has closed.
>
> 2. To provide for the "teach-out" of students enrolled at the time of
> the closure of the Institution(s).
>
> 3. To pay any liabilities owing to the Secretary arising from acts or
> omissions by the Institution(s), on or before the expiration of this
> Letter of Credit, in violation of the requirements set forth in the
> Higher Education Act of 1965, as amended ("HEA"), including the
> violation of any agreement entered into by the Institution(s) with the
> Secretary regarding the administration of programs under Title IV
> of the HEA.

Exhibit 8, Letter of Credit Draw Request at 1-2.

45.    Pursuant to the BNP Letter of Credit, the Department was required to "place the

[Letter of Credit Proceeds] in an escrow account . . . pending a prompt determination of the extent

to which those funds will be used" for Permissible Uses.  BNP Letter of Credit at 2.  In the interim,

the Department was required to hold the Letter of Credit Proceeds in trust for the benefit of

Plaintiffs.

46.    Following the Protective Draw, the Lenders funded revolving loans in the full

amount thereof.  The revolving loan proceeds were used to reimburse BNP Paribas for the

Protective Draw on the BNP Letter of Credit.  Each of the Lenders was "deemed to have

---

[11] A true and correct copy of the Department of Education's May 18, 2018 letter drawing upon the BNP Letter of Credit (which encloses the BNP Letter of Credit), is attached hereto as **Exhibit 8** and incorporated herein by reference (the "Letter of Credit Draw Request").

purchased . . . a participation" in the BNP Letter of Credit in an amount equal to its *pro rata* share of the overall revolving commitments under the EDMC Credit Agreement and, thereafter, to have funded a revolving loan in the same amount to reimburse BNP Paribas.  Thus, as a matter of contract and in economic substance, EDMC's Lenders funded the Protective Draw and have the right to receive any funds returned by the Department.  In turn, U.S. Bank acts as the Agent for the Lenders and in such capacity is authorized and has been directed by Requisite Lenders to act on behalf of the Lenders to recoup the BNP Letter of Credit Proceeds in full that were subject to the non-Permissible Uses by the Department in breach of the PPAs and the BNP Letter of Credit.

47.     The Office of Inspector General of the U.S. Department of Education ("OIG") released  an investigative report (the "OIG Report")[12] centered on the Dream Center sale of assets, which included findings that, upon making its Protective Draw (as described in greater detail below) and consistent with the agreements among the relevant parties, the Department allocated $14,884,804 of Letter of Credit Proceeds to cover the amount of any student loan discharges associated with the closure of the schools that were not sold by EDMC to Dream Center.  As described above, this allocation was also incorporated into the temporary PPAs under which the Dream Center schools would continue to operate and benefit from federal student aid funding. These funds were held as surety funds in a separate account from the funds allocated to the Dream Center institutions.  EDMC and the Lenders continued to expect that any portion of the Letter of Credit Proceeds allocated to the EDMC schools would be returned to the Lenders once required audits of these EDMC institutions were completed.[13] Ultimately, the Department returned

---

[12] *Inspection of the Department's Activities Surrounding the Sale of Postsecondary Schools to Dream Center Education Holdings*, U.S. Dep't of Ed., Office of Inspector General, June 29, 2021, a copy of which is attached hereto as **Exhibit 9** and incorporated herein by reference.

[13] In a presentation delivered to Lenders by EDMC's financial advisor on May 17, 2018, the day before the Protective Draw, EDMC estimated the liabilities of the EDMC institutions would be less than $5 million, and that the remaining $10 million or more could be released for the benefit of Lenders.

$14,500,000 of this allocated amount to the Agent for the benefit of the Lenders, based on the Department's representation that some portion of these Letter of Credit Proceeds were still needed to satisfy liabilities chargeable to the EDMC schools that were not transferred to Dream Center. On information and belief, at least a portion of the other $384,804 of Letter of Credit Proceeds allocated to the EDMC schools remains on account with the Department.

## VI.    Dream Center's Struggles and the Sale to EPF

48.    As Dream Center continued to struggle, its cash position began to dwindle and the Department responded.  On information and belief, between August and December 2018 the Department improperly released $39,586,989 of the Letter of Credit Proceeds to Dream Center for a non-Permissible Use: to pay for (or reimburse Dream Center for) administrative and operating expenses Dream Center incurred in operating its schools in violation of its certification that it would comply with the Permissible Uses of the BNP Letter of Credit.[14]

49.    In December 2018, Dream Center closed a number of Argosy University and Art Institute locations.[15]  Then, in or about January 2019, Dream Center transferred South University and three Art Institute locations to EPF (the "EPF Transfer").

50.    In connection with the EPF Transfer, consistent with the approach taken in connection with the Dream Center Sale, the Department agreed to allocate $28.5 million of the Letter of Credit Proceeds (which, at this point, were being held by the Department for the benefit of Plaintiffs, as discussed below) to satisfy certain potential liabilities associated with certain South University and the Art Institutes campuses designated in correspondence as "Ongoing Schools" and arising "prior to the [EPF] Transaction Date . . . resulting from the operation of the South

---

[14] *See* Exhibit 9, OIG Report, at 87-88 (showing disbursements to Dream Center beginning on August 28, 2018).

[15]    *See*    Department    of    Education's    Closed    School    Search    Page,    (available    at: https://www2.ed.gov/offices/OSFAP/PEPS/docs/closedschoolsearch.xls) (last visited May 12, 2024).

[University and Art Institutes] campuses by DCEH."  Exhibit 10, Jones Letter at 5[16]; Glass Letter,
[17] Attachment A (containing a list of the "Ongoing Schools").  That agreement was memorialized in correspondence from Diane Auer Jones, the Principal Deputy Under Secretary of Education, to counsel to certain of the Lenders (including certain of Plaintiff Education Creditor Trust's predecessors in interest) and to Studio Enterprises (the operator appointed by EPF to manage the schools it had purchased from Dream Center).

51.    Specifically, (a) $22 million of Letter of Credit Proceeds was permitted to be used to pay "Title IV liabilities resulting from pre-closing conduct" (that is, conduct prior to the January 7, 2019 closing of the EPF Transfer) associated with certain South University campuses designated as Ongoing Schools (the "<u>South Ongoing Schools</u>") and (b) $6.5 million was permitted to be used to pay such liabilities associated with certain Art Institute campuses designated as Ongoing Schools  (the "<u>AI Ongoing Schools</u>")(with a "matching" letter of credit in the amount of $6.5 million that was to be posted by the Art Institutes to cover post-closing liabilities).  Jones Letter at 5, 6; *see also* OIG Report at 105-106 (Department's letter responding to OIG's findings describing "what we did . . . was to allocate a portion of the surety for any liabilities of the Art Institutes and South that pre-dated the acquisition by EPF.").

52.    Subsequent to the EPF Transfer, on or about January 18, 2019, Dream Center was placed into federal receivership by the U.S. District Court for the Northern District of Ohio.  By March 2019, Dream Center had closed all of its remaining schools save for one Argosy University location, one Art Institute location, and Western State University College of Law (which remained

---

[16] *See* Letter from D. Jones to J. Glass & K. Casey (Jan. 7, 2019), a copy of which is attached hereto as **<u>Exhibit 10</u>** and incorporated herein by reference.

[17] *See* Letter from J. Glass to D. Jones (Dec. 31, 2018), a copy of which is attached hereto as **<u>Exhibit 11</u>** and incorporated herein by reference.

ny-2468484

open with a donation from certain of the Lenders through the end of the semester to allow graduating students to become eligible to sit for the bar exam).

## VII.    Final Allocations of the Letter of Credit Proceeds

53.    As a result of the agreements described above, the Department was only permitted to apply the Letter of Credit Proceeds to satisfy: (a) up to $22 million of liabilities relating to the South Ongoing Schools and $6.5 million of liabilities relating to the AI Ongoing Schools, in each case arising on or before the closing of the EPF Transfer on January 7, 2019; (b) up to $14,884,804 of liabilities relating to schools not sold by EDMC in the Dream Center Sale arising prior to the May 18, 2018 Protective Draw (or within any applicable teach-out period thereafter); (c) Refunds and Teach-Out Expenses relating to all other schools arising prior to the May 18, 2018 Protective Draw (or within any applicable teach-out period thereafter); and (d) HEA Liabilities relating to all other schools arising on or before the expiration of the BNP Letter of Credit on May 31, 2018, that do not fall into one of the categories enumerated above:

ny-2468484

**Allocations of Permissible Uses for Letter of Credit Proceeds**

| Eligible Schools | Amount | Date Range for Liabilities |
|---|---|---|
| South Ongoing Schools | $22 million | On or before January 7, 2019 |
| AI Ongoing Schools | $6.5 million | On or before January 7, 2019 |
| Schools retained by EDMC – Teach-Out & Refunds | $14.9 million | On or before May 18, 2018 |
| Schools retained by EDMC – HEA Liabilities | | On or before May 31, 2018 |
| Schools sold to Dream Center[18] – Teach-Out & Refunds | $58.9 million[19] | On or before May 18, 2018 |
| Schools sold to Dream Center – HEA Liabilities | | On or before May 31, 2018 |

54.     To the extent that the Letter of Credit Proceeds allocated to a particular category are not exhausted by expenditures in such category, then Plaintiffs are entitled to the return of the balance of the funds, as was done in connection with the return of excess funds allocated to remaining EDMC schools at the time of the Dream Center Sale.  In no event were the Letter of Credit Proceeds available to satisfy liabilities arising after January 7, 2019.

**VIII.    The OIG Report and Subsequent Correspondence with the Department**

55.     On June 29, 2021, OIG published the OIG Report containing the "results of [OIG's] inspection of the U.S. Department of Education's activities surrounding the sale of postsecondary schools to Dream Center."  The OIG Report contained, among other things, a description of certain of the Department's actions in connection with the transactions involving EDMC, Dream Center,

---

[18] Other than South Ongoing Schools or AI Ongoing Schools.

[19] That is, the remainder after subtracting from the $102,168,215 of Letter of Credit Proceeds, the sum of (x) $22 million allocated for South Ongoing Schools, (y) $6.5 million allocated for AI Ongoing Schools, and (z) $14.9 million allocated to the schools retained by EDMC after the Dream Center Sale.

ny-2468484

EPF, and Studio Enterprises described above, including a detailed timeline of those transactions. *See* OIG Report, at 67-84.  The Report also provided a limited amount of information relating to the use of Letter of Credit Proceeds by the Department.  *See* OIG Report, at 85-89.

56.     For example, the OIG Report detailed that the Department had allowed Dream Center to use approximately $39.6 million of Letter of Credit Proceeds to "pay the operating expenses of schools Dream Center planned to close," including some schools that had not ultimately closed.  OIG Report, at 46, 49.  In addition to this constituting a breach of the contract, the OIG Report found that the Department's use of Letter of Credit Proceeds in this manner was "unprecedented, and neither the Department nor [Federal Student Aid] had policies or procedures" providing for letter of credit funds to be used to pay operating expenses for schools that had not closed.  OIG Report at 46; *see also id.*, at 86 (government employees and attorneys "acknowledged that the terms of [EDMC's] letters of credit required the proceeds to be used only" for the Permitted Uses).  The Department on numerous occasions also released funds to Dream Center even where Dream Center's independent accounting firm (which it was required to retain pursuant to its PPAs) had not certified that the purported operating expenses were legitimate.  *See* OIG Report, at 87.

57.     Significantly, OIG determined that this use of funds by schools "before their closure" was contrary to the Permissible Uses listed on the BNP Letter of Credit.  *Id.*  The OIG Report also notes that this use of Letter of Credit Proceeds (in which Plaintiffs retain an interest) was negotiated directly among the Department and Dream Center, without the input of EDMC or Plaintiffs.  *See* OIG Report, at 86.

58.     The OIG Report also found that the approximately $14.9 million of Letter of Credit Proceeds allocated to EDMC schools not sold to Dream Center were kept in a separate account from the approximately $92.6 million of proceeds allocated to the Dream Center schools.  OIG

Report, at 88. As of June 2019, the Department still held about $384,800 of Letter of Credit Proceeds allocated to EDMC schools that were not sold to Dream Center, but had only identified approximately $168,000 of corresponding liabilities. OIG Report, at 88.

59.     The OIG Report also revealed that in February 2019, $6.5 million and $22 million of Letter of Credit Proceeds were moved by the Department from the "Dream Center" account to separate accounts established for the Art Institutes and South University, respectively. OIG Report, at 89. The establishment of separate accounts at the Department corresponding to the various groups of schools was consistent with the parties' agreement that these funds would be allocated and used only for specific purposes, as set forth in paragraph 51, *supra*, and their expectation (based on prior similar conduct and performance) that unused funds in a given group could not be repurposed to satisfy liabilities associated with other groups of schools.

60.     In light of the information contained in the OIG Report, on or about July 21, 2022 counsel to Education Creditor Trust wrote to the Department, requesting a detailed accounting as to the Department's use of Letter of Credit Proceeds and that all funds that had not been used for Permitted Uses in accordance with the allocations set forth in paragraph 51, *supra*, be returned to Plaintiffs. In a follow-up letter sent on or about September 16, 2022, counsel to Education Creditor Trust explained to the Department in greater detail the Permitted Uses for which the Letter of Credit Proceeds could be used, as well as the temporal limitations and agreements on allocation described herein.

61.     On or about December 8, 2022, a representative of the Department wrote to counsel to certain of the Plaintiffs explaining the Department's position with respect to the use of Letter of Credit Proceeds. Among other things, the Department asserted that it was not limited in its ability to use Letter of Credit Proceeds in accordance with the allocations set forth in paragraph 51, *supra*,

and denied that the use of Letter of Credit Proceeds to fund Dream Center's operating expenses was improper. Although the Department asserted that there could be in excess of $1.7 billion in HEA liabilities associated with the EDMC, Dream Center, and EPF schools, it acknowledged that this estimate was based solely on the maximum liability amounts that might arise (assuming all relevant students had and asserted claims) and included significant amounts of potential liabilities that had yet to be established. In fact, the Department was able to identify less than $15 million of actual, unsatisfied alleged liabilities arising to date from the closure or sale of EDMC, Dream Center, and EPF schools. But securing hypothetical future expenses is not a Permissible Use under the BNP Letter of Credit, which required that liabilities be determined and proceeds applied "promptly."

62. Subsequent correspondence from the Department did little to further explain what amounts the Department believed were properly chargeable against the BNP Letter of Credit. In a letter dated September 12, 2023, the Department admitted that it still held approximately $48.6 million of the Letter of Credit Proceeds, but contended that the amounts chargeable against the BNP Letter of Credit far exceeded that amount.[20] Many of the amounts identified in the Department's September 2023 letter relate to Dream Center schools that closed well after the closing of the EPF Transfer, including one which (according to the Department's own records[21]) did not close until December 2019. In fact, none of the amounts described in the charts contained in the Department's September 2023 letter are Permitted Uses of the Letter of Credit Proceeds,

---

[20] *See* Letter from M. Frola to J. Newton (Sept. 12, 2023), at 2-5, a copy of which is attached hereto as **Exhibit 12** and incorporated herein by reference.

[21] *See* Closed School Search File, available at: https://www2.ed.gov/offices/OSFAP/PEPS/docs/closedschoolsearch.xlsx (last visited May 12, 2024) (identifying closure date for The Art Institute of Las Vegas as December 13, 2019).

ny-2468484

because each related to obligations arising after the applicable deadlines described in paragraph 51, *supra*.

63.    Since receiving the Department's September 2023 letter, Plaintiffs and the Department have engaged in good faith discussions to attempt to resolve their dispute with respect to the BNP Letter of Credit and the Department's use and retention of proceeds drawn thereunder. Because those discussions did not result in a consensual resolution of the issues. Accordingly, in order to avoid any prejudice that might result from any further delay in asserting their rights, Plaintiffs seek relief from this Court.

## <u>COUNT 1</u>

### Breach of Express Contract

64.    Plaintiffs incorporate by reference each of the foregoing paragraphs as though set forth fully herein.

65.    To allege a breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach. Each of these elements is satisfied here.

66.    First, EDMC and the Department are party to various written contracts—*i.e.*, the PPAs—governing the EDMC schools' participation in Title IV of the HEA. These PPAs are valid and enforceable contracts, as they are predicated on offer, acceptance, and consideration, and the Department had actual authority to enter into and execute these PPAs with EDMC and other educational institutions relevant to this dispute. The PPAs require the schools to, among other things, post a letter of credit securing their HEA obligations, using the form provided by the Secretary of Education. Because the PPAs are otherwise silent as to the precise terms and conditions governing the Department's ability to draw down on and use the proceeds of a letter of credit posted in accordance with the PPAs, the Department and the Schools had a mutual

understanding that the terms of the PPAs are supplemented by the terms set forth in, among other things, the content of the BNP Letter of Credit, the McEachen Letter, and the Jones Letter, respectively.

67.     In accordance with the PPAs, EDMC obtained the BNP Letter of Credit which was funded by the Lenders.  The Department at all times understood that its ability to draw down on the BNP Letter of Credit was governed by the terms and conditions set forth in the BNP Letter of Credit.  The Department's understanding and acceptance of these terms is evidenced by its written certifications of compliance with the BNP Letter of Credit terms.  Further, the Department's employees were actually authorized to complete these certifications on behalf of the Department and to bind the Department to the terms of the BNP Letter of Credit.  The Department's OIG Report also found that, based on its review of certain documents, Department employees and attorneys were aware "that the terms of [EDMC's] letters of credit required the proceeds to be used only" for Permissible Uses.  Exhibit 9, OIG Report, at 86.   These documents, together, form a single, integrated agreement governing the Department's ability to draw on the BNP Letter of Credit and apply the Letter of Credit Proceeds.

68.     Second, the PPAs imposed duties on the parties by requiring EDMC to obtain the BNP Letter of Credit and the Department to apply Letter of Credit Proceeds only to satisfy specific Permissible Uses arising on or before certain dates.

69.     Third, although EDMC satisfied its contractual obligations by obtaining the BNP Letter of Credit as required under the PPAs, the Department failed to satisfy its contractual obligations by not applying Letter of Credit Proceeds only to satisfy specific Permissible Uses. Upon making a Protective Draw, the Department was to determine whether and to what extent to apply the Letter of Credit Proceeds to such Permissible Uses "promptly."   Until then, the

Department was required to hold the Letter of Credit Proceeds in "escrow" for the benefit of Plaintiffs. Consistent with these obligations, when the Department made its Protective Draw in May 2018, it affirmatively stated its commitment in writing to use the Letter of Credit Proceeds solely for Permissible Uses. Letter of Credit Draw Request at 1-2.

70.     Nevertheless, on information and belief, the Department has breached its duty on the PPAs by applying certain of the Letter of Credit Proceeds towards the satisfaction of liabilities that do not constitute Permissible Uses, including, but not limited to, the use of nearly $40 million to fund ordinary, day-to-day expenses incurred in connection with the operation of the Dream Center schools (which OIG found to be an "unprecedented decision" unsupported by any "policies or procedures" of the Department). Exhibit 9, OIG Report at 46.

71.     In addition, with respect to the remaining funds that have not been applied by the Department or returned to the Lenders (approximately $52 million), the Department has failed to make its determination with respect to such funds "promptly," as required by the contract; indeed, it has now been nearly six years since the Department made its Protective Draw.

72.     Accordingly, the United States has breached its contract with Plaintiffs.

## COUNT 2

### Breach of Implied-in-Fact Contract

73.     Plaintiffs incorporate by reference each of the foregoing paragraphs as though set forth fully herein.

74.     Even if the PPAs are deemed not to have integrated the terms and conditions set forth in such documents as the BNP Letter of Credit, the McEachen Letter, and the Jones Letter, EDMC and the Department had implied-in-fact contracts that EDMC and the Department would

comply with the terms and conditions set forth in those additional documents when drawing on the BNP Letter of Credit.

75.    An implied-in-fact contract is founded upon a meeting of minds and is inferred as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.

76.    As detailed above, the Department at all times understood that its ability to draw upon the BNP Letter of Credit was rooted not only in its contractual written PPAs with the educational institutions whose collateral has been purchased by the Requisite Lenders schools, including EDMC and Dream Center, but also by the terms and conditions set forth in the BNP Letter of Credit that specified Permissible Uses for the Letter of Credit Proceeds.    The Department's understanding, acceptance, and ratification of these terms is evidenced by the execution by the Department's authorized employees of the Department's written certifications of compliance with the BNP Letter of Credit terms and requirements of Permissible Uses for the Department to draw upon the BNP Letter of Credit.    These documents, collectively, comprise an implied-in-fact contract—supported by valid offer, acceptance, and consideration— between the Department and the educational institutions whose collateral is now owned for the benefit the Lenders.

77.    As noted above, EDMC satisfied its contractual obligations by obtaining the BNP Letter of Credit as required by the PPAs.

78.    The Department's failure to fulfill its contractual obligations has damaged EDMC by wrongfully applying at least $40 million Letter of Credit Proceeds to non-Permissible Uses and failing to "promptly" apply the balance of the Letter of Credit Proceeds (approximately $52 million) to Permissible Uses or return the balance to the Lenders.

79.    Accordingly, the United States has breached its contract with Plaintiffs.

## COUNT 3

**Just Compensation Under the Fifth Amendment of the U.S. Constitution**

80.    Plaintiffs incorporate by reference each of the foregoing paragraphs as though set forth fully herein.

81.    The Department's actions—wrongfully obtaining funds under the BNP Letter of Credit for uses that were not Permissible Uses under the contractual terms of the BNP Letter of Credit and failing to return these funds to Plaintiffs—constitute a deprivation and taking of Plaintiffs' property for public use without just compensation, in violation of the Fifth Amendment to the U.S. Constitution.

82.    Plaintiffs have a vested property interest in their contractual rights to have restored to them the funds wrongfully drawn on the BNP Letter of Credit by the Department.

83.    Plaintiffs had a reasonable investment-backed expectation of receiving the full and timely repayment approximately $92 million of Letter of Credit Proceeds based on the above-described express and/or implied-in-fact contract.

84.    The Department expressly and deliberately interfered with and has deprived Plaintiffs of their property interests in the Letter of Credit Proceeds and their reasonable investment-backed expectations to receive the economic benefit in these funds, in direct contravention of the PPA and BNP Letter of Credit terms.

85.    The Department's action in withholding, with no legitimate governmental purpose, the full and timely repayment of these Letter of Credit Proceeds to the Plaintiffs constitutes a deprivation and taking of Plaintiffs' property interests and requires payment to Plaintiffs of just compensation under the Fifth Amendment of the U.S. Constitution.

86.     Plaintiffs are entitled to just compensation in an amount of approximately $92 million, and not less than the amount of Letter of Credit Proceeds that (a) have been applied in a manner other than to satisfy Permissible Uses or (b) otherwise have not been returned to Plaintiffs, plus applicable interest, fees, and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request:

A.  An award of approximately $92 million in money damages for the wrongfully obtained Letter of Credit Proceeds in breach of an express or/implied-in-fact contract; or

B.  Just compensation for the United States' unlawful taking of Plaintiffs' property; and

C.  Any other relief to which Plaintiffs may justly be entitled.

ny-2468484

Dated: May 17, 2024

Respectfully submitted,

By:    s/ James A Newton

James A. Newton (NY Reg. No. 4855359)
Andrew Kissner (NY Reg. No. 5507652)
**MORRISON & FOERSTER LLP**
250 West 55th Street
New York, New York 10019-3201
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email:  JNewton@mofo.com
       AKissner@mofo.com

*Counsel of Record to Plaintiff Education*
*Creditor Trust*

- and –

By:    s/ Lawrence S. Sher

Lawrence S. Sher (D.C. Bar No. 430469)
**WINSTON & STRAWN LLP**
1901 L Street, NW
Washington, DC 20036
Telephone: 202-282-5022
Facsimile: 202-282-5100
Email: lsher@winston.com

T. Reed Stephens (D.C. Bar No. 440194)
**WINSTON & STRAWN LLP**
1901 L Street, NW
Washington, DC 20036
Telephone: 202-282-5795
Facsimile: 202-282-5100
Email: rstephens@winston.com

*Counsel of Record for Plaintiff U.S. Bank*

*Of Counsel to Plaintiff U.S. Bank:*

Carey D. Schreiber (NY Registration No.
2824662)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: 212-294-3547
Facsimile: 212-294-4700
Email: cschreiber@winston.com

ny-2468484