# EXHIBIT 2

EXECUTION VERSION

**CREDIT AND GUARANTY AGREEMENT**

**dated as of January 5, 2015**

**among**

**EDUCATION MANAGEMENT II LLC,**
**as Company,**

**EDUCATION MANAGEMENT CORPORATION,**

**EDUCATION MANAGEMENT HOLDINGS II LLC,**

**CERTAIN SUBSIDIARIES OF EDUCATION MANAGEMENT HOLDINGS II LLC,**
**as Guarantors,**

**VARIOUS LENDERS,**

**and**

**U.S. BANK NATIONAL ASSOCIATION,**
**as Administrative Agent and Collateral Agent**

---

**$656,440,701 Senior Secured Credit Facilities**

---

# TABLE OF CONTENTS

**Page**

SECTION 1.   DEFINITIONS AND INTERPRETATION ........................................... 1

1.1.   Definitions ............................................................................................... 1
1.2.   Accounting Terms ................................................................................. 39
1.3.   Interpretation, etc ................................................................................. 39

SECTION 2.   LOANS AND LETTERS OF CREDIT ........................................... 40

2.1.   Term Loans ........................................................................................... 40
2.2.   Revolving Loans ................................................................................... 40
2.3.   Issuance of Letters of Credit and Purchase of Participations Therein ................. 42
2.4.   Pro Rata Shares; Availability of Funds ............................................... 47
2.5.   Use of Proceeds .................................................................................... 47
2.6.   Evidence of Debt; Register; Lenders' Books and Records; Notes ...................... 48
2.7.   Interest on Loans .................................................................................. 48
2.8.   Conversion/Continuation ..................................................................... 51
2.9.   Default Interest ..................................................................................... 52
2.10.  Fees ....................................................................................................... 52
2.11.  Voluntary Prepayments/Commitment Reductions ............................. 53
2.12.  Mandatory Prepayments/Commitment Reductions ........................... 54
2.13.  Application of Prepayments/Reductions .............................................. 56
2.14.  General Provisions Regarding Payments .............................................. 57
2.15.  Ratable Sharing .................................................................................... 58
2.16.  Making or Maintaining Eurodollar Rate Loans .................................. 59
2.17.  Increased Costs; Capital Adequacy ..................................................... 61
2.18.  Taxes; Withholding, etc ....................................................................... 62
2.19.  Obligation to Mitigate ......................................................................... 66
2.20.  Defaulting Lenders ............................................................................... 66
2.21.  Removal or Replacement of a Lender .................................................. 68
2.22.  Incremental Facilities .......................................................................... 69

SECTION 3.   CONDITIONS PRECEDENT; CONDITIONS SUBSEQUENT ........................ 71

3.1.   Closing Date .......................................................................................... 71
3.2.   Conditions to Each Credit Extension .................................................. 73
3.3.   Conditions Subsequent ......................................................................... 74

SECTION 4.   REPRESENTATIONS AND WARRANTIES ................................. 74

4.1.   Existence, Qualification and Power; Compliance with Laws .............. 74
4.2.   Authorization; No Contravention ........................................................ 75
4.3.   Governmental Authorization; Other Consents .................................... 75
4.4.   Binding Effect ...................................................................................... 75
4.5.   Financial Statements; No Material Adverse Effect ............................. 75

4.6.    Litigation.................................................................................... 76
4.7.    No Default................................................................................. 76
4.8.    Ownership of Property; Liens.................................................... 76
4.9.    Environmental Compliance ....................................................... 76
4.10.   Taxes......................................................................................... 77
4.11.   ERISA Compliance.................................................................... 78
4.12.   Subsidiaries; Equity Interests.................................................... 78
4.13.   Margin Regulations; Investment Company Act .......................... 78
4.14.   Disclosure ................................................................................. 79
4.15.   Intellectual Property; Licenses, Etc .......................................... 79
4.16.   Solvency.................................................................................... 79
4.17.   Subordination of Junior Financing............................................ 79
4.18.   Labor Matters........................................................................... 79
4.19.   Collateral Documents................................................................ 80
4.20.   Patriot Act; OFAC; FCPA ........................................................ 80

SECTION 5.    AFFIRMATIVE COVENANTS ...................................................... 81

5.1.    Financial Statements ................................................................. 81
5.2.    Certificates; Other Information.................................................. 82
5.3.    Notices ..................................................................................... 84
5.4.    Payment of Obligations............................................................. 85
5.5.    Preservation of Existence, Etc .................................................. 85
5.6.    Maintenance of Properties........................................................ 85
5.7.    Maintenance of Insurance ......................................................... 85
5.8.    Compliance with Laws .............................................................. 85
5.9.    Books and Records ................................................................... 86
5.10.   Inspection Rights ...................................................................... 86
5.11.   Compliance with Environmental Laws....................................... 87
5.12.   Subsidiaries.............................................................................. 87
5.13.   Additional Material Real Estate Assets ..................................... 87
5.14.   Further Assurances................................................................... 87

SECTION 6.    NEGATIVE COVENANTS ............................................................ 88

6.1.    Liens......................................................................................... 88
6.2.    Investments .............................................................................. 91
6.3.    Indebtedness............................................................................. 93
6.4.    Fundamental Changes............................................................... 96
6.5.    Dispositions.............................................................................. 96
6.6.    Restricted Payments................................................................. 98
6.7.    Change in Nature of Business ................................................... 99
6.8.    Transactions with Affiliates...................................................... 99
6.9.    Burdensome Agreements .......................................................... 100
6.10.   Accounting Changes ................................................................. 101
6.11.   Prepayments, Etc. of Indebtedness; Amendment of Agreements...................... 101
6.12.   Equity Interests of Company and Subsidiaries ........................... 102

6.13.  Holding Company ................................................................. 102
6.14.  Capital Expenditures ............................................................ 102

SECTION 7.  GUARANTY ................................................................. 103

7.1.   Guaranty of the Obligations .................................................. 103
7.2.   Contribution by Guarantors ................................................. 103
7.3.   Payment by Guarantors ....................................................... 104
7.4.   Liability of Guarantors Absolute .......................................... 104
7.5.   Waivers by Guarantors ........................................................ 106
7.6.   Guarantors' Rights of Subrogation, Contribution, etc ............ 107
7.7.   Subordination of Other Obligations ...................................... 108
7.8.   Continuing Guaranty ........................................................... 108
7.9.   Authority of Guarantors or Company .................................... 108
7.10.  Financial Condition of Company .......................................... 108
7.11.  Bankruptcy, etc .................................................................. 108
7.12.  Discharge of Guaranty Upon Sale of Guarantor ..................... 109

SECTION 8.  EVENTS OF DEFAULT AND REMEDIES ........................... 109

8.1.   Events of Default ................................................................ 109
8.2.   Remedies Upon Event of Default .......................................... 112

SECTION 9.  AGENTS ..................................................................... 113

9.1.   Appointment of Agents ........................................................ 113
9.2.   Powers and Duties .............................................................. 113
9.3.   General Immunity ............................................................... 114
9.4.   Agents Entitled to Act as Lender .......................................... 116
9.5.   Lenders' and Issuing Banks' Representations, Warranties and
       Acknowledgment ................................................................ 116
9.6.   Right to Indemnity .............................................................. 117
9.7.   Successor Administrative Agent and Collateral Agent ............ 118
9.8.   Collateral Documents and Guaranty ..................................... 118
9.9.   Credit Agreement Controls ................................................... 120

SECTION 10.  MISCELLANEOUS ...................................................... 120

10.1.  Notices .............................................................................. 120
10.2.  Expenses ........................................................................... 121
10.3.  Indemnity .......................................................................... 122
10.4.  Set-Off .............................................................................. 123
10.5.  Amendments and Waivers .................................................... 123
10.6.  Successors and Assigns; Participations ................................. 125
10.7.  Independence of Covenants ................................................. 129
10.8.  Survival of Representations, Warranties and Agreements ........ 129
10.9.  No Waiver; Remedies Cumulative ......................................... 130
10.10. Marshalling; Payments Set Aside .......................................... 130

#4822-5623-8110v18

10.11.  Severability ................................................................................................. 130
10.12.  Obligations Several; Independent Nature of Lenders' Rights ........................... 130
10.13.  Headings ..................................................................................................... 131
10.14.  APPLICABLE LAW ..................................................................................... 131
10.15.  CONSENT TO JURISDICTION .................................................................... 131
10.16.  WAIVER OF JURY TRIAL ........................................................................... 131
10.17.  Confidentiality ............................................................................................ 132
10.18.  Usury Savings Clause ................................................................................... 133
10.19.  Counterparts ................................................................................................ 133
10.20.  Effectiveness ............................................................................................... 133
10.21.  Patriot Act .................................................................................................. 133
10.22.  Electronic Execution of Assignments ............................................................ 134
10.23.  Public-Side Lenders .................................................................................... 134
10.24.  No Fiduciary Duty ....................................................................................... 134

**APPENDICES:**      A-1      Term Loan Commitments

A-2      Revolving Commitments

B      Notice Addresses

**SCHEDULES:**      2.3(k)      Existing Letters of Credit

3.3      Control Agreements

4.1      Jurisdictions of Organization

4.6      Litigation

4.9      Environmental Matters

4.10      Taxes

4.11(b)      ERISA Compliance

4.12      Subsidiaries and Other Equity Investments

6.1(b)      Existing Liens

6.2(f)      Existing Investments

6.3(b)      Existing Indebtedness

6.5(l)      Dispositions

6.8      Transactions with Affiliates

6.9      Existing Restrictions

**EXHIBITS:**      A-1      Form of Funding Notice

A-2      Form of Conversion/Continuation Notice

A-3      Form of Issuance Notice

B-1      Form of Tranche A Term Loan Note

B-2      Form of Tranche B Term Loan Note

B-3      Form of Revolving Loan Note

C      Form of Compliance Certificate

D      Form of Assignment Agreement

E-1      Form of Closing Date Certificate

E-2      Form of Solvency Certificate

F      Form of Pledge and Security Agreement

G      Form of Counterpart Agreement

H      Form of Joinder Agreement

I-1 to I-4      Form of U.S Tax Compliance Certificates

#4822-5623-8110v18

# CREDIT AND GUARANTY AGREEMENT

This **CREDIT AND GUARANTY AGREEMENT**, dated as of January 5, 2015, is entered into by and among **EDUCATION MANAGEMENT II LLC**, a Delaware limited liability company ("**Company**"), **EDUCATION MANAGEMENT CORPORATION**, a Pennsylvania corporation ("**Parent**"), **EDUCATION MANAGEMENT HOLDINGS II LLC**, a Delaware limited liability company ("**Holdings**"), **CERTAIN SUBSIDIARIES OF HOLDINGS**, as Guarantors, the Lenders party hereto from time to time and **U.S. BANK NATIONAL ASSOCIATION** ("**U.S. Bank**"), as Administrative Agent (in such capacity and together with its permitted successors in such capacity, "**Administrative Agent**") and as Collateral Agent (in such capacity and together with its permitted successors in such capacity, "**Collateral Agent**").

## RECITALS:

**WHEREAS**, capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS**, Revolving Lenders have agreed to provide revolving commitments to Company, in an aggregate amount not to exceed $256,440,701, the proceeds of which will be used for working capital and other general corporate purposes;

**WHEREAS**, Term Loan Lenders are hereby deemed to have extended term loans to Company, in an aggregate principal amount not to exceed $400,000,000, the proceeds of which shall be applied as consideration by Company as the purchaser in, to and under the Intercompany Sale (as defined in the RSA) and for the Debt Discharge;

**WHEREAS**, Company has agreed to secure all of its Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a First Priority Lien on substantially all of its assets, including a pledge of all of the Equity Interests in each of its Included Domestic Subsidiaries and 66% of all the Equity Interests in each of its Foreign Subsidiaries; and

**WHEREAS**, Guarantors have agreed to guarantee the obligations of Company hereunder and to secure their respective Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a First Priority Lien on substantially all of their respective assets, including a pledge of all of the Equity Interests in each of their respective Included Domestic Subsidiaries (including Company) and 66% of all the Equity Interests in each of their respective Foreign Subsidiaries;

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1.  DEFINITIONS AND INTERPRETATION

### 1.1.    Definitions.

The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**2013 Indenture**" has the meaning set forth in the definition of "Debt Discharge."

"**Adjusted Eurodollar Rate**" means, for any Interest Rate Determination Date with respect to an Interest Period for a Eurodollar Rate Loan, the rate per annum obtained by dividing (and rounding upward to the next whole multiple of 1/16 of 1%) (a) (i) the rate per annum (rounded to the nearest 1/100 of 1%) equal to the rate determined by Administrative Agent to be the London interbank offered rate administered by ICE for deposits in Dollars and the relevant Interest Period, as published by Reuters (or other commercially available source providing quotations of such rate as designated by Administrative Agent from time to time in its reasonable discretion) at approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (ii) in the event the rate referenced in the preceding clause (i) is not available, the rate per annum (rounded to the nearest 1/100 of 1%) equal to the rate determined by the Administrative Agent to be the offered rate on such other page or other service which displays an average London interbank offered rate administered by ICE (or any other person which takes over the administration of that rate) for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, by (b) an amount equal to (i) one minus (ii) the Applicable Reserve Requirement.  Notwithstanding the foregoing, with respect to any determination of the Adjusted Eurodollar Rate with respect to any Loans, the Adjusted Eurodollar Rate shall not be less than 1.00% per annum.

"**Administrative Agent**" has the meaning set forth in the preamble hereto.

"**Affected Lender**" has the meaning set forth in Section 2.16(b).

"**Affected Loans**" has the meaning set forth in Section 2.16(b).

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 10% or more of the Securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise; provided that no Lender shall be deemed an Affiliate of any Credit Party or their Subsidiaries as a result of this Agreement or such Lender holding any Equity Interest of Parent.

"**Agent**" means each of Administrative Agent and Collateral Agent.

"**Aggregate Amounts Due**" has the meaning set forth in Section 2.15.

"**Aggregate Payments**" has the meaning set forth in Section 7.2.

"**Agreement**" means this Credit and Guaranty Agreement dated as of January 5, 2015, as it may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Applicable Margin**" means (a) with respect to Revolving Loans and Tranche A Term Loans that are Eurodollar Rate Loans, 4.50% per annum, (b) with respect to Revolving Loans and Tranche A Term Loans that are Base Rate Loans, 3.50% per annum, (c) with respect to Tranche B Term Loans that are Eurodollar Rate Loans, 7.50% per annum, and (d) with respect to Tranche B Term Loans that are Base Rate Loans, 6.50% per annum.

"**Applicable Reserve Requirement**" means, at any time, for any Eurodollar Rate Loan, the maximum rate, expressed as a decimal, at which reserves (including, without limitation, any basic marginal, special, supplemental, emergency or other reserves) are required to be maintained with respect thereto against "Eurocurrency liabilities" (as such term is defined in Regulation D) under regulations issued from time to time by the Board of Governors or other applicable banking regulator.  Without limiting the effect of the foregoing, the Applicable Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (i) any category of liabilities which includes deposits by reference to which the applicable Adjusted Eurodollar Rate or any other interest rate of a Loan is to be determined, or (ii) any category of extensions of credit or other assets which include Eurodollar Rate Loans. A Eurodollar Rate Loan shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender.  The rate of interest on Eurodollar Rate Loans shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

"**Applicable Revolving Commitment Fee Percentage**" means with respect to Revolving Commitments, 0.375% per annum.

"**Asset Sale**" means a sale, lease or sub-lease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer or other disposition to, or any exchange of property with, any Person (other than a Credit Party), in one transaction or a series of transactions, of all or any part of Parent's, Holdings, Company's or any of the Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including, without limitation, the Equity Interests in any of the Subsidiaries, other than (i) inventory (or other assets) sold or leased in the ordinary course of business (excluding any such sales by operations or divisions discontinued or to be discontinued), (ii) sales of assets in one transaction or a series of related transactions for consideration of less than $2,500,000, and (iii) sales of other assets for aggregate consideration of less than $10,000,000 in the aggregate during the term of this Agreement.

"**Asset Sale Reinvestment Deferred Amount**" has the meaning set forth in Section 2.12(a).

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit D, with such amendments or modifications as may be approved by Administrative Agent.

"**Assignment Effective Date**" has the meaning set forth in Section 10.6(b).

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Bank of America**" means Bank of America, N.A.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Base Rate**" means, for any day, a rate per annum equal to the highest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day <u>plus</u> ½ of 1% and (c) the Adjusted Eurodollar Rate for an interest period of one month <u>plus</u> 1.00%. Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"**Base Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"**Beneficiary**" means each Agent, Issuing Bank, Lender and Lender Counterparty.

"**Bilateral LC Facilities**" means (a) the Amended and Restated Letter of Credit Facility Agreement, dated as of November 30, 2011 and as amended and restated as of January 5, 2015 (as further amended, modified or amended and restated from time to time), among Company, Holdings, the guarantors party thereto and Bank of America and (b) the Amended and Restated Letter of Credit Facility Agreement, dated as of March 9, 2012 and as amended and restated as of January 5, 2015 (as further amended, modified or amended and restated from time to time), among Company, Holdings, the guarantors party thereto and BNPP.

"**BNPP**" means BNP Paribas.

"**Board of Governors**" means the Board of Governors of the Federal Reserve System of the United States, or any successor thereto.

"**Business Day**" means (a) any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close and (b) with respect to all notices, determinations, fundings and payments in connection with the Adjusted Eurodollar Rate or any Eurodollar Rate Loans, the term "**Business Day**" shall mean any day which is a Business Day described in clause (a) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures of Parent, Holdings, Company and the Subsidiaries during such period determined on a consolidated basis that, in accordance with GAAP, are or should be included in "purchase of property, plant and equipment" or similar items reflected in the consolidated statement of cash flows of Parent, Holdings, Company and the Subsidiaries; <u>provided</u> that the term "Capital Expenditures" shall not include (i) expenditures made in connection with the replacement,

substitution, restoration or repair of assets to the extent financed with (x) insurance proceeds paid on account of the loss of or damage to the assets being replaced, restored or repaired or (y) awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced, (ii) the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for the equipment being traded in at such time, (iii) expenditures that constitute any part of Consolidated Lease Expense, (iv) expenditures that are accounted for as capital expenditures by Parent, Holdings, Company or any of the Subsidiaries and that actually are paid for by a Person other than Parent, Holdings, Company or any of the Subsidiaries and for which none of Parent, Holdings, Company or any of the Subsidiaries has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such Person or any other Person (whether before, during or after such period), (v) the book value of any asset owned by Parent, Holdings, Company or any of the Subsidiaries prior to or during such period to the extent that such book value is included as a capital expenditure during such period as a result of such Person reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period, provided that (A) any expenditure necessary in order to permit such asset to be reused shall be included as a Capital Expenditure during the period in which such expenditure actually is made and (B) such book value shall have been included in Capital Expenditures when such asset was originally acquired, (vi) expenditures that constitute Permitted Acquisitions or (vii) the purchase of plant, property or equipment to the extent financed with the proceeds of Dispositions that are not required to be applied to prepay Term Loans pursuant to Section 2.12.

"**Capitalized Leases**" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP as in effect on the Closing Date.

"**Cash Equivalents**" means, as at any date of determination, (a) marketable securities (i) issued or directly and unconditionally guaranteed as to interest and principal by the United States government or any member nation of the European Union or (ii) issued by any agency of the United States or any member nation of the European Union, the obligations of which are backed by the full faith and credit of the United States or such member nation of the European Union, in each case maturing within one year after such date; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof or by any foreign government having an investment grade rating from either S&P or Moody's, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-2 from S&P or at least P-2 from Moody's; (c) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-2 from S&P or at least P-2 from Moody's; (d) certificates of deposit or bankers' acceptances maturing within one year after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development that (i) is at least "adequately capitalized" (as defined in the regulations of its primary federal banking regulator) and (ii) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (e) shares of any money market mutual fund that (i) has

substantially all of its assets invested continuously in the types of investments referred to in clauses (a) and (b) above, (ii) has net assets of not less than $500,000,000, and (iii) has the highest rating obtainable from either S&P or Moody's.

"**Cash Management Obligations**" means obligations owed by Parent, Holdings, Company or any of the Subsidiaries to any Lender or any Affiliate of a Lender in respect of any overdraft and related liabilities arising from treasury, depository and cash management services or any automated clearing house transfers of funds.

"**Casualty Event**" means any event that gives rise to the receipt by Parent, Holdings, Company or any of the Subsidiaries of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as subsequently amended.

"**CERCLIS**" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"**CFC**" means a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code.

"**Change of Control**" means, at any time, (a) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) (i) shall have acquired beneficial ownership of 35% or more on a fully diluted basis of the voting interest in the Equity Interests of Parent or (ii) shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of directors (or similar governing body) of Parent, (b) the majority of the seats (other than vacant seats) on the board of directors (or similar governing body) of Parent shall cease to be occupied by Persons who either (i) were members of the board of directors of Parent on the Closing Date (after giving effect to the Closing Date Transactions) or (ii) were nominated for election by the board of directors of Parent, a majority of whom were directors on the Closing Date (after giving effect to the Closing Date Transactions) or whose election or nomination for election was previously approved by a majority of such directors or (c) Parent shall cease to beneficially own and control, directly or indirectly, 100% on a fully diluted basis of the voting interests in the Equity Interests of Company; <u>provided</u> that neither the effectuation of any Restructuring Change of Control, nor any change in the composition of the board of directors of Parent in connection therewith shall constitute a Change of Control (it being understood that any directors appointed in connection with any Restructuring Change of Control shall be deemed to be members of the board of directors of Parent on the Closing Date). Notwithstanding the foregoing, ownership or acquisition by the Sponsors of Equity Interests in the Parent in any amount shall not constitute a Change of Control prior to the mandatory conversion to common equity of Parent of the Preferred A-2 Stock.

"**CIP Regulations**" has the meaning set forth in Section 9.5(c).

"**Class**" means (a) with respect to Lenders, each of the following classes of Lenders, (i) Lenders having Tranche A Term Loan Exposure, (ii) Lenders having Tranche B

Term Loan Exposure and (iii) Lenders having Revolving Exposure and (b) with respect to Loans, each of the following classes of Loans, (i) Tranche A Term Loans, (ii) Tranche B Term Loans and (iii) Revolving Loans.

"**Closing Date**" means January 5, 2015.

"**Closing Date Certificate**" means a Closing Certificate substantially in the form of Exhibit E-1.

"**Closing Date Transactions**" means, collectively, (a) the transactions contemplated by this Agreement and the other Credit Documents consummated on the Closing Date, (b) the transactions contemplated by the RSA (other than any Restructuring Change of Control), including, without limitation, the issuance of the Preferred Stock and the Warrants and the Intercompany Sale, (c) the consummation of all other transactions in connection with the foregoing, (d) the payment of the fees and expenses incurred in connection with any of the foregoing and (e) the payment in cash of $150,000,000 of revolving loans (including the permanent reduction of the underlying revolving commitments) under the Existing Credit Agreement.

"**Code**" means the Internal Revenue Code of 1986.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Equity Interests) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations.

"**Collateral Agent**" has the meaning set forth in the preamble hereto.

"**Collateral Documents**" means the Pledge and Security Agreement and all other instruments, documents and agreements delivered by any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to Collateral Agent, for the benefit of Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

"**Commitment**" means any Revolving Commitment or Term Loan Commitment.

"**Company**" has the meaning set forth in the preamble hereto.

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit C.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consolidated EBITDA**" means, for any period, the Consolidated Net Income for such period, plus:

(a)    without duplication and to the extent already deducted (and not added back) in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)    total interest expense and, to the extent not reflected in such total interest expense, any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations, and costs of surety bonds in connection with financing activities,

(ii)    provision for taxes based on income, profits or capital of Parent, Holdings, Company and the Subsidiaries, including state, franchise and similar taxes (such as the Pennsylvania capital tax) and foreign withholding taxes paid or accrued during such period,

(iii)    depreciation and amortization,

(iv)    other non-cash charges, including non-cash asset impairment charges and write-offs (but excluding any non-cash charge to the extent that it represents an accrual or reserve for potential cash items in any future period or amortization of a prepaid cash item that was paid in a prior period),

(v)    severance, relocation costs and curtailments or modifications to pension and post-retirement employee benefit plans,

(vi)    restructuring charges or reserves (including restructuring costs related to acquisitions after the Closing Date and to closure or consolidation of educational facilities),

(vii)    other unusual or non-recurring charges during such period identified in reasonable detail in the applicable Compliance Certificate,

(viii)    any losses attributable to minority interests,

(ix)    any costs or expenses incurred by Parent, Holdings, Company or any of the Subsidiaries pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of Parent or net cash proceeds of an issuance of Equity Interests of Parent (other than Disqualified Equity Interests),

(x)    cash fees and expenses incurred in connection with the Transactions,

(xi)    any non-cash purchase accounting adjustment and any step-ups with respect to re-valuing assets and liabilities in connection with the Transactions or any Investment permitted under Section 6.2, and

(xii)    any non-cash compensation costs or expenses under Statement of Financial Accounting Standards No 123(R), "Share Based payment", pursuant to any

#4822-5623-8110v18

management equity plan or stock option plan or any other employee benefit plan or agreement or any stock or shareholder agreement, <u>less</u>

(b)    without duplication and to the extent included in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)    unusual or non-recurring gains,

(ii)    non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period),

(iii)    gains on asset sales (other than asset sales in the ordinary course of business),

(iv)    any net after-tax income from the early extinguishment of Indebtedness or hedging obligations or other derivative instruments, and

(v)    all gains attributable to minority interests.

"**Consolidated Excess Cash Flow**" means, for any period, an amount (not less than zero in any period) equal to:  (a) the sum, without duplication, of the amounts for such period of (i) Consolidated EBITDA (other than the portion of Consolidated EBITDA attributable to clause (a)(v), (vi), (vii), (ix) and (x) to the extent such charges, costs, expenses and other items are paid in cash), <u>plus</u> (ii) the Consolidated Working Capital Adjustment, <u>minus</u> (b) the sum, without duplication, of the amounts for such period of (i) repayments of Indebtedness for borrowed money (including (A) the principal component of payments in respect of Capitalized Leases and (B) the amount of any mandatory prepayment of Term Loans pursuant to Section 2.12(a) to the extent required due to a Disposition that resulted in an increase to Consolidated Net Income and not in excess of the amount of such increase, but excluding (1) all other prepayments of Term Loans and (2) all repayments of Revolving Loans except to the extent the Revolving Commitments are permanently reduced in connection with such repayments), (ii) Capital Expenditures (net of any proceeds of any related financings with respect to such expenditures), other than Capital Expenditures financed with Cumulative Excess Cash Flow that is Not Otherwise Applied pursuant to Section 6.14(a)(y), (iii) Consolidated Interest Expense, (iv) provisions for current taxes based on income of Parent, Holdings, Company and the Subsidiaries and payable in cash with respect to such period, (v) the amount of Investments and acquisitions made during such period pursuant to Section 6.2 (other than Section 6.2(a)) to the extent that such Investments and acquisitions were financed with internally generated cash flow of Parent, Holdings, Company and the Subsidiaries, (vi) cash payments by Parent, Holdings, Company and the Subsidiaries during such period in respect of long-term liabilities of Parent, Holdings, Company and the Subsidiaries other than Indebtedness, and (vii) the aggregate amount of any premium, make-whole or penalty payments actually paid in cash by Parent, Holdings, Company and the Subsidiaries during such period that are required to be made in connection with any prepayment of Indebtedness.

"**Consolidated Interest Expense**" means, for any period, total interest expense (including that portion attributable to Capitalized Leases in accordance with GAAP and

capitalized interest), net of cash interest income, of Parent, Holdings, Company and the Subsidiaries on a consolidated basis with respect to all outstanding Indebtedness of Parent, Holdings, Company and the Subsidiaries (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with the Transactions or any Permitted Acquisition), including all commissions, discounts and other fees and charges owed with respect to letters of credit and net costs under Swap Agreements, but excluding, however, (a) any amount not payable in cash and (b) any amounts referred to in Section 2.10(d) payable on or before the Closing Date.

"**Consolidated Lease Expense**" means, for any period, all rental expenses of Parent, Holdings, Company and the Subsidiaries during such period under operating leases for real or personal property, excluding real estate taxes, insurance costs and common area maintenance charges and net of sublease income, other than (a) obligations under vehicle leases entered into in the ordinary course of business, (b) all such rental expenses associated with assets acquired pursuant to a Permitted Acquisition to the extent such rental expenses relate to operating leases in effect at the time of (and immediately prior to) such acquisition and related to periods prior to such acquisition and (c) all obligations under Capitalized Leases, all as determined on a consolidated basis in accordance with GAAP.

"**Consolidated Net Income**" means, for any period, (a) the net income (or loss) of Parent, Holdings, Company and the Subsidiaries (or such other Person and its Subsidiaries as expressly stated) on a consolidated basis for such period taken as a single accounting period determined in conformity with GAAP, <u>minus</u> (b) (i) the income (or loss) of any entity (other than a Subsidiary of Holdings (or such other Person)) in which any other Person (other than Parent, Holdings, Company (or such other Person) or any of the Subsidiaries) has a joint interest to the extent that the declaration or payment of dividends or similar distributions by such entity of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule, governmental regulation or Education Law applicable to such entity, (ii) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of Holdings (or such other Person) or is merged into or consolidated with Parent, Holdings, Company or any of the Subsidiaries (or such other Person or any of its Subsidiaries) or that Person's assets are acquired by Parent, Holdings, Company or any of the Subsidiaries (or such other Person or any of its Subsidiaries), (iii) the income of any Subsidiary of Holdings (or such other Person) to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule, governmental regulation or Education Law applicable to that Subsidiary, and (iv) (to the extent not included in clauses (i) through (iii) above) any net extraordinary gains or net extraordinary losses.

"**Consolidated Total Assets**" means the total assets of Parent, Holdings, Company and the Subsidiaries (or such other Person and its Subsidiaries as expressly stated) on a consolidated basis, as shown on the most recent balance sheet of Parent, Holdings, Company and the Subsidiaries (or such other Person and its Subsidiaries) delivered to Administrative Agent pursuant to Section 5.1.

"**Consolidated Total Debt**" means, as of any date of determination, (a) the aggregate principal amount of Indebtedness of Parent, Holdings, Company and the Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with the Transactions or any Permitted Acquisition), consisting of Indebtedness for borrowed money, obligations in respect of Capitalized Leases and debt obligations evidenced by promissory notes or similar instruments, <u>minus</u> (b) the aggregate amount of cash and Cash Equivalents (in each case, free and clear of all Liens, other than nonconsensual Liens permitted by Section 6.1 and Liens permitted by Section 6.1(s) and clauses (i) and (ii) of Section 6.1(t)) that are included in the consolidated balance sheet of Parent, Holdings, Company and the Subsidiaries as of such date.

"**Consolidated Working Capital**" means, at any date, the excess of (a) the sum of all amounts (other than cash and Cash Equivalents) that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of Parent, Holdings, Company and the Subsidiaries at such date, including long-term student loan receivables, over (b) the sum of all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of Parent, Holdings, Company and the Subsidiaries on such date, including deferred revenue but excluding, without duplication, (i) the current portion of any Funded Debt, (ii) all Indebtedness consisting of Loans and Letter of Credit Usage to the extent otherwise included therein, (iii) the current portion of interest, (iv) the current portion of current and deferred income taxes and (v) the effect of any non-cash balance sheet adjustments.

"**Consolidated Working Capital Adjustment**" means, for any period on a consolidated basis, the amount (which may be a negative number) by which Consolidated Working Capital as of the beginning of such period exceeds (or is less than) Consolidated Working Capital as of the end of such period.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Contributing Guarantors**" has the meaning set forth in Section 7.2.

"**Control**" as set forth in the definition of "Affiliate."

"**Conversion/Continuation Date**" means the effective date of a continuation or conversion, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"**Conversion/Continuation Notice**" means a Conversion/Continuation Notice substantially in the form of Exhibit A-2.

"**Counterpart Agreement**" means a Counterpart Agreement substantially in the form of Exhibit G delivered by a Credit Party pursuant to Section 5.12.

"**Credit Date**" means the date of a Credit Extension.

"**Credit Document**" means any of this Agreement, the Notes, if any, the Collateral Documents, any documents or certificates executed by Company in favor of Issuing Bank relating to Letters of Credit, and all other documents, instruments or agreements executed and delivered by a Credit Party for the benefit of any Agent, Issuing Bank or any Lender in connection herewith.

"**Credit Extension**" means the making of a Loan or the issuing of a Letter of Credit.

"**Credit Party**" means Parent, Holdings, Company and the other Guarantor Subsidiaries.

"**Cumulative Excess Cash Flow**" means, at any date of determination, the sum of Consolidated Excess Cash Flow (but not less than zero in any period) for the fiscal year ending on June 30, 2015 and Consolidated Excess Cash Flow for each succeeding and completed fiscal year.

"**Debt Discharge**" means (a) all Indebtedness under the Existing Credit Agreement, (b) all Indebtedness under that certain Indenture dated as of March 5, 2013 (the "2013 Indenture"), pursuant to which Education Management LLC and Education Management Finance Corp. issued Senior Cash Pay/PIK Notes due July 1, 2018 (other than up to $14,400,000 aggregate principal amount of Senior Cash Pay//PIK Notes due July 1, 2018 outstanding under the 2013 Indenture as of the Closing Date, plus any PIK Interest (as defined in the 2013 Indenture) from time to time on such notes, plus any other premium required to be paid in respect of such notes pursuant to the terms and conditions of the 2013 Indenture and such notes, in each case, as in effect on the Closing Date (collectively, the "Remaining Notes Indebtedness")), and (c) all Indebtedness under that certain Indenture dated as of September 5, 2014, pursuant to which Education Management LLC and Education Management Finance Corp. issued Senior PIK Toggle Notes due July 1, 2018 (other than $6.00 aggregate principal amount of Senior Cash PIK Toggle Notes due July 1, 2018), in each case, shall have been discharged in full pursuant to the Intercompany Sale and all commitments in respect thereof shall have been terminated and all Guarantees (as defined in the Existing Credit Agreement) shall have been discharged.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event or condition that, with the giving of any notice, the passage of time specified therein, or both, would be an Event of Default.

"**Defaulting Lender**" means any Lender that has (a) failed to fund any portion of Loans or participations in any Letter of Credit within two Business Days of the date required to be funded by it hereunder, unless such Lender notifies Administrative Agent (with a copy to Company) in writing that such failure is the result of such Lender's determination that one or

more conditions precedent to funding (which conditions precedent, together with the applicable default, if any, shall be specifically identified in writing) have not been satisfied, (b) notified Company, Administrative Agent or any Issuing Bank in writing that it does not intend to comply with any of its obligations to fund any portion of Loans or participations in any Letter of Credit under this Agreement or has made a public statement to the effect that it does not intend to comply with such funding obligations under this Agreement or under any other agreement in which it commits to extend credit, (c) failed, within five Business Days after a request by Administrative Agent or any Issuing Bank (with a copy to Company) to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans and participations in then outstanding Letters of Credit (provided that such request may not be sent unless Administrative Agent or relevant Issuing Bank are aware that such Lender has recently failed to comply with its funding obligations under another syndicated loan facility or otherwise has a reasonable, good faith belief that such Lender will not comply with its funding obligations under this Agreement), (d) otherwise failed to pay over to Administrative Agent, any Issuing Bank or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due or (e) become or is insolvent or has a parent company that has become or is insolvent or become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or has indicated its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or has indicated its consent to, approval of or acquiescence in any such proceeding or appointment.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Designated Non-Cash Consideration**" means the fair market value of non-cash consideration received by Parent, Holdings, Company or any of the Subsidiaries in connection with a Disposition pursuant to Section 6.5(k) that is designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the non-cash consideration converted to cash within 180 days following the consummation of the applicable Disposition).

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale of Equity Interests) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith; provided that "Disposition" and "Dispose" shall not be deemed to include any issuance by Parent of any of its Equity Interests to another Person.

"**Disqualified Equity Interests**" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking

13

fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 180 days after the Tranche A Term Loan Maturity Date.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Domestic Subsidiary**" means any Subsidiary that is not a Foreign Subsidiary.

"**Education Laws**" has the meaning set forth in Section 5.8.

"**Eligible Assignee**" means (i) any Lender, any Affiliate of any Lender and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof) and (ii) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans; <u>provided</u> that neither Parent nor any of the Subsidiaries of Parent shall be an Eligible Assignee.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all federal, state, local, and foreign statutes, Laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution, the protection of the environment, natural resources, or, to the extent relating to exposure to Hazardous Materials, human health or to the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

14

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is under common control with any Credit Party within the meaning of Section 414 of the Internal Revenue Code or Section 4001 of ERISA.

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Credit Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (within the meaning set forth in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Credit Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the failure of any Pension Plan to meet the minimum funding standard of Section 412 or Section 430 of the Internal Revenue Code or Section 302 or 303 of ERISA, in each case whether or not waived, or the failure to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure of a Credit Party or any of its ERISA Affiliates to make any required contribution to a Multiemployer Plan; (g) a determination that any Pension Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Internal Revenue Code or Section 303 of ERISA) or a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Internal Revenue Code or Section 305 of ERISA, or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Credit Party or any ERISA Affiliate.

"**Eurodollar Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Adjusted Eurodollar Rate.

"**Event of Default**" means each of the conditions or events set forth in Section 8.1.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Subsidiary**" means (a) any Subsidiary that is prohibited by applicable Laws (including Education Laws) or by contractual obligations existing on the Closing Date from guaranteeing the Obligations or as to which guaranteeing the Obligations would require governmental, regulatory or accrediting body consent, approval, license or authorization (including any Subsidiary that directly owns or operates a school and as such is restricted by Education Laws or accreditation requirements from guaranteeing the Obligations) (in each case, only for so long as such consent, approval, license or authorization is not obtained), (b) any Domestic Subsidiary that is a direct or indirect Subsidiary of a Foreign Subsidiary that is a CFC,

(c) any Subsidiary that, for United States federal income tax purposes, owns no material assets other than Equity Interests of one or more direct or indirect Foreign Subsidiaries that are CFCs and (d) any Subsidiary as to which the burden or cost of obtaining a Guarantee outweighs the benefit to the Lenders (as reasonably determined by the Requisite Lenders and Company), including any inactive Subsidiary having less than $100,000 of assets; provided that the aggregate amount of assets of all such inactive Subsidiaries shall not exceed $1,000,000 at any time.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by Company under Section 2.21) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.18, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.18(f) and (g), and (d) any U.S. federal withholding Taxes imposed under FATCA.

"**Executive Order**" has the meaning set forth in Section 4.20(c).

"**Existing Credit Agreement**" means that certain Third Amended and Restated Credit and Guaranty Agreement dated as of September 4, 2014, by and among Parent, the other credit parties party thereto, the lenders party thereto and the agents party thereto.

"**Existing Letter of Credit**" has the meaning set forth in Section 2.3(k).

"**Fair Share Contribution Amount**" has the meaning set forth in Section 7.2.

"**Fair Share**" has the meaning set forth in Section 7.2.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"**Federal Funds Effective Rate**" means for any day, the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to a whole multiple of 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided

that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate charged to Administrative Agent, in its capacity as a Lender, on such day on such transactions as determined by Administrative Agent.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the only Lien to which such Collateral is subject, other than any Lien permitted pursuant to Section 6.1.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Parent and its Subsidiaries ending on June 30 of each calendar year, subject to Section 6.10.

"**Foreign Lender**" means (a) if Company is a U.S. Person, a Lender that is not a U.S. Person, and (b) if Company is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which Company is resident for tax purposes.

"**Foreign Subsidiary**" means any Subsidiary that is not organized under the laws of the United States or any jurisdiction within the United States and any direct or indirect Subsidiary thereof.

"**Funded Debt**" means all Indebtedness of Parent, Holdings, Company and the Subsidiaries on a consolidated basis for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including Indebtedness in respect of the Loans.

"**Funding Guarantor**" has the meaning set forth in Section 7.2.

"**Funding Notice**" means a notice substantially in the form of Exhibit A-1.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**Governmental Acts**" means any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or Governmental Authority.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Grantor**" has the meaning set forth in the Pledge and Security Agreement.

"**Guarantee**" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or monetary other obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or monetary other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); <u>provided</u> that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning set forth in Section 7.1.

"**Guarantor Subsidiary**" means each Guarantor other than Parent.

"**Guarantors**" means Parent, Holdings and each Domestic Subsidiary of Holdings (other than Company and Excluded Subsidiaries).

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"**Historical Financial Statements**" means as of the Closing Date, (i) the audited financial statements of Parent and its Subsidiaries, for the immediately preceding three full Fiscal Years, consisting of a consolidated balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Years, and (ii) the unaudited financial statements of Parent and its Subsidiaries as of the Fiscal Quarter ended September 30, 2014, consisting of a consolidated balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for the three-, six- or nine-month period, as applicable, ending on such date, and, in the case of clauses (i) and (ii), certified by the chief financial officer or treasurer of Parent that they fairly present, in all material respects, the financial condition of Parent and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"**Holdings**" has the meaning set forth in the preamble hereto.

"**Included Domestic Subsidiary**" means a Domestic Subsidiary that is not an Excluded Subsidiary.

"**Increased Amount Date**" has the meaning set forth in Section 2.22(a).

"**Increased-Cost Lenders**" has the meaning set forth in Section 2.21.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)      net obligations of such Person under any Swap Agreement;

(d)      all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts payable in the ordinary course of business and (ii) any earn-out obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP);

(e)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)      all Attributable Indebtedness;

(g)      all obligations of such Person in respect of Disqualified Equity Interests; and

(h)      all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall (i) include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated Total Debt and (ii) in the case of Parent, Holdings, Company and the Subsidiaries, exclude all Indebtedness of a Credit Party having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary of business consistent with past practice.  The amount of any net obligation under any Swap Agreement on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), actions, judgments, suits, costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred

by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Credit Extensions or the use or intended use of the proceeds thereof, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)) or (ii) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Parent or any of its Subsidiaries.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Indemnitee**" has the meaning set forth in Section 10.3.

"**Insurance/Condemnation Reinvestment Deferred Amount**" has the meaning set forth in Section 2.12(b).

"**Interest Payment Date**" means with respect to (i) any Base Rate Loan, each March 31, June 30, September 30 and December 31 of each year, commencing on the first such date to occur after the Closing Date, and the final maturity date of such Loan and (ii) any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan; provided that in the case of each Interest Period of longer than three months, "Interest Payment Date" shall also include each date that is three months, or an integral multiple thereof, after the commencement of such Interest Period.

"**Interest Period**" means, in connection with a Eurodollar Rate Loan, an interest period of one-, two-, three- or six-months (or nine- or twelve-months if available to all Lenders), as selected by Company in the applicable Funding Notice or Conversion/Continuation Notice, (a) initially, commencing on the Credit Date or Conversion/Continuation Date thereof, as the case may be and (b) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided that (i) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day, (ii) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clauses (iii) and (iv), of this definition, end on the last Business Day of a calendar month, (iii) no Interest Period with respect to any portion of any Class of Term Loans shall extend beyond such Class's Term Loan Maturity Date and (iv) no Interest Period with respect to any Revolving Loans shall extend beyond the Revolving Commitment Termination Date.

"**Interest Rate Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with Parent's, Holdings', Company's and the Subsidiaries' operations and not for speculative purposes.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of Parent and its Subsidiaries, loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made to a Credit Party in the ordinary course of business consistent with past practice) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person; <u>provided</u> that student loan receivables originated by a Credit Party in the ordinary course of business shall not constitute Investments.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"**IRS**" means the United States Internal Revenue Service.

"**Issuance Notice**" means an Issuance Notice substantially in the form of Exhibit A-3.

"**Issuing Bank**" shall mean, as the context may require, any or each of (a) BNPP as Issuing Bank hereunder, together with its permitted successors and assigns in such capacity, with respect to Letters of Credit issued by BNPP, (b) Bank of America as Issuing Bank hereunder, together with its permitted successors and assigns in such capacity, with respect to Letters of Credit issued by Bank of America and (c) any other financial institution that has or may become an Issuing Bank pursuant to Section 2.3(h), with respect to Letters of Credit issued by such financial institution and its successors and assigns in such capacity.

"**Joinder Agreement**" means an agreement substantially in the form of Exhibit H.

"**Junior Financing**" has the meaning set forth in Section 6.11(a).

"**Junior Financing Documentation**" means any documentation governing any Junior Financing.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and

permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"**Lender**" means each financial institution with a Term Loan, Revolving Commitment or a Term Loan Commitment on the Closing Date, and any other Person that becomes a party hereto pursuant to an Assignment Agreement or a Joinder Agreement.

"**Lender Counterparty**" means each Lender or any Affiliate of a Lender counterparty to a Swap Agreement (including any Person who is a Lender (and any Affiliate thereof) as of the Closing Date but subsequently, whether before or after entering into a Swap Agreement, ceases to be a Lender).

"**Letter of Credit**" means any letter of credit issued hereunder, including the Existing Letters of Credit. A Letter of Credit may be a commercial letter of credit or a standby letter of credit.

"**Letter of Credit Obligations**" means, as at any date of determination, the sum of (a) the aggregate amount available to be drawn under all outstanding Letters of Credit and (b) the aggregate amount of all unreimbursed drawings under all outstanding Letters of Credit.

"**Letter of Credit Sublimit**" means the sum of: (a) the aggregate face amount of the Existing Letters of Credit as in effect on the Closing Date; provided that such amount shall be reduced by the amount of any Existing Letters of Credit that is terminated or reduced (and, in each case, not replaced by a Letter of Credit hereunder within five Business Days); and (b) (i) prior to and including the second anniversary of the Closing Date, $101,000,000, and (ii) after the second anniversary of the Closing Date, the greater of (A) $50,000,000 and (B) the Letter of Credit Usage with respect to the Letters of Credit (excluding the Existing Letters of Credit) as determined on such second anniversary date.

"**Letter of Credit Usage**" means, as at any date of determination, the sum of (a) the maximum aggregate amount which is, or at any time thereafter may become, available for drawing under all Letters of Credit then outstanding and (b) the aggregate amount of all drawings under Letters of Credit honored by an Issuing Bank and not theretofore reimbursed by or on behalf of Company.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing).

"**Loan**" means a Tranche A Term Loan, a Tranche B Term Loan and a Revolving Loan.

"**Majority Revolving Lenders**" means Lenders holding a majority of the Revolving Exposure.

"**Management Incentive Plan**" means the equity incentive plan(s) to be implemented by Parent's board of directors and allocated to individual managers on or after the Closing Date, to be reasonably agreed and negotiated by the Restructuring Support Parties (as defined in the RSA) and Parent's management in good faith, and any amendments thereto or replacements thereof that are duly adopted by Parent's board of directors.

"**Margin Stock**" has the meaning set forth in Regulation U of the Board of Governors as in effect from time to time.

"**Material Adverse Effect**" means (a) a material adverse effect on the business, operations, assets, liabilities (actual or contingent) or financial condition of Parent and its Subsidiaries, taken as a whole, (b) a material adverse effect on the ability of Company or the Credit Parties (taken as a whole) to perform their respective payment obligations under any Credit Document to which Company or any of the Credit Parties is a party or (c) a material adverse effect on the rights and remedies of the Lenders under any Credit Document.

"**Material Company**" means (a) Company, (b) any Guarantor and (c) any Subsidiary of Company that, together with its Subsidiaries accounts for (i) 2.0% or more of Consolidated Total Assets or (ii) 2.0% or more of Consolidated EBITDA, in each case, determined based on the most recently delivered financial statements pursuant to Section 5.1 of Parent (it being understood that if the share of Consolidated Total Assets or Consolidated EBITDA accounted for by all non-Material Companies so determined shall exceed 5.0% of Consolidated Total Assets or Consolidated EBITDA, as applicable, Company shall designate one or more of such non-Material Companies as a Material Company in order to eliminate such excess).

"**Material Real Estate Asset**" means any fee interest owned by any Credit Party in any real property having a fair market value in excess of $2,500,000 as of the date of the acquisition thereof.

"**Moody's**" means Moody's Investor Services, Inc.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Credit Party or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Mutual Release**" means the Release dated as of January 5, 2015, among Parent, Education Management Holdings LLC, Education Management LLC, Education Management Finance Corp. the Subsidiary Guarantors, the Consenting Creditors (each as defined therein) and Agent.

"**NAIC**" means The National Association of Insurance Commissioners, and any successor thereto.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to (a) cash payments (including any cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received

24

by Parent or any of its Subsidiaries from such Asset Sale, <u>minus</u> (b) any bona fide direct costs incurred in connection with such Asset Sale, including (i) Taxes payable by the seller (or a direct or indirect parent of such seller) as a result of any gain recognized in connection with such Asset Sale, (ii) any additional Taxes paid, reasonably estimated by Parent in good faith to be payable (pending a final determination of the amount of such Taxes by a Governmental Authority), or reserved against as a result of the repatriation of such Net Asset Sale Proceeds to the United States, (iii) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale and (iv) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by Parent or any of its Subsidiaries in connection with such Asset Sale.

"**Net Cash Proceeds**" means, (a) with respect to any Asset Sale, the Net Asset Sale Proceeds, (b) with respect to any Casualty Event, the Net Insurance/Condemnation Proceeds, and (c) with respect to any issuance of Equity Interests or any incurrence of Indebtedness, the cash proceeds from such issuance or incurrence, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to (a) any cash payments or proceeds received by Parent or any of its Subsidiaries (i) under any casualty insurance policy in respect of a covered loss thereunder or (ii) as a result of the taking of any assets of Parent or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, <u>minus</u> (b) (i) any actual and reasonable costs incurred by Parent or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Parent or such Subsidiary in respect thereof (ii) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (a)(ii) of this definition, including Taxes payable as a result of any gain recognized in connection therewith and (iii) any additional Taxes paid, reasonably estimated by Parent in good faith to be payable (pending a final determination of the amount of such Taxes by a Governmental Authority), or reserved against as a result of the repatriation of such Net Insurance/Condemnation Proceeds to the United States.

"**New Revolving Commitments**" has the meaning set forth in Section 2.22(a).

"**New Revolving Lender**" has the meaning set forth in Section 2.22(a).

"**New Revolving Loans**" has the meaning set forth in Section 2.22(b).

"**New Term Loan Commitments**" has the meaning set forth in Section 2.22(a).

"**New Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the New Term Loans of such Lender.

"**New Term Loan Lender**" has the meaning set forth in Section 2.22(a).

"**New Term Loan Maturity Date**" means the earlier of (a) July 2, 2020 and (b) the date that all New Term Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"**New Term Loans**" has the meaning set forth in Section 2.22(c).

"**Non-Consenting Lender**" means any Lender that does not approve any consent, waiver or amendment that (i) requires the approval of all or all affected Lenders in accordance with the terms of Section 10.5 and (ii) has been approved by the Requisite Lenders.

"**Non-Priority Lender**" means each Lender to the extent of the Non-Priority Obligations owing to such Lender.

"**Non-Priority Obligations**" means (a) all advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party and its Subsidiaries arising under any Credit Document or otherwise, with respect to any Tranche B Term Loan, (b) the obligations of any Credit Party and its Subsidiaries arising under any Swap Agreement and (c) the Cash Management Obligations, in each case whether absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Credit Party or Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding. Without limiting the generality of the foregoing, the Non-Priority Obligations of the Credit Parties under the Credit Documents (and of their Subsidiaries to the extent they have obligations under the Credit Documents) include (i) the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, indemnities and other amounts payable by any Credit Party or its Subsidiaries under any Credit Document to a Non-Priority Lender and (ii) the obligation of any Credit Party or any of its Subsidiaries to reimburse any amount in respect of any of the foregoing that any Non-Priority Lender, in its sole discretion, may elect to pay or advance on behalf of such Credit Party or such Subsidiary.

"**Nonpublic Information**" means information which has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD.

"**Note**" means a Tranche A Term Loan Note, a Tranche B Term Loan Note or a Revolving Loan Note.

"**Notice**" means a Funding Notice, an Issuance Notice or a Conversion/ Continuation Notice.

"**Not Otherwise Applied**" means, with reference to any amount of Net Cash Proceeds of any transaction or event or of Consolidated Excess Cash Flow, that such amount (a) was not required to be applied to prepay the Loans pursuant to Section 2.12(d), and (b) was not previously applied in determining the permissibility of Capital Expenditures pursuant to Section 6.14. Company shall promptly notify Administrative Agent in writing of any application of such amount as contemplated by (b) above.

"**NPL**" means the National Priorities List under CERCLA.

"**Obligations**" means the Priority Obligations and the Non-Priority Obligations. Without limiting the generality of the foregoing, the Obligations of the Credit Parties under the Credit Documents (and of their Subsidiaries to the extent they have obligations under the Credit Documents) include all obligations (including payments for fees, expenses (including fees and expenses of attorneys, agents and advisors), indemnification or otherwise) of every nature of each Credit Party from time to time owed to any Agent (including any former Agent).

"**Obligee Guarantor**" has the meaning set forth in Section 7.7.

"**OFAC**" has the meaning set forth in Section 4.20.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Credit Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.21).

"**Parent**" has the meaning set forth in the preamble hereto.

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001).

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Credit Party or any ERISA Affiliate or to which

any Credit Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"**Perfection Certificate**" means a certificate in form reasonably satisfactory to the Requisite Lenders that provides information relating to UCC filings of each Credit Party.

"**Permitted Acquisition**" means any acquisition by Company or any of its Wholly Owned Subsidiaries, whether by purchase, merger or otherwise, of all or substantially all of the assets of, 90% or more of the Equity Interests in or a business line or unit or a division of, any Person; provided,

(a)    immediately prior to, and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing or would result therefrom;

(b)    all transactions in connection therewith shall be consummated, in all material respects, in accordance with all applicable laws and in conformity with all applicable Governmental Authorizations;

(c)    in the case of the acquisition of Equity Interests, 90% or more of the Equity Interests (except for any such Securities in the nature of directors' qualifying shares required pursuant to applicable law not to exceed 5% of the outstanding Equity Interests) acquired or otherwise issued by such Person or any newly formed Subsidiary of Company in connection with such acquisition shall be owned by Company or a Guarantor Subsidiary thereof (any such Person or newly formed Subsidiary that is not Wholly Owned by Company after such acquisition is referred to as an "**Acquired Non-Wholly-Owned Subsidiary**"), and Company shall have taken, or caused to be taken, as of the date such Person becomes a Subsidiary of Company, each of the actions set forth in Sections 5.12 and 5.13, as applicable;

(d)    Company shall have delivered to Administrative Agent (i) on or prior to the date such proposed acquisition is consummated, with respect to any acquisition with consideration exceeding $15,000,000, all relevant financial information with respect to such acquired assets to the extent available to the Credit Parties, including, without limitation, the aggregate consideration proposed for such acquisition and (ii) promptly upon request by Administrative Agent (acting at the direction of the Requisite Lenders), a copy of the purchase agreement related to the proposed Permitted Acquisition (and any related documents reasonably requested by Administrative Agent at the request of the Requisite Lenders) (in each case, to the extent not expressly prohibited by the terms of such purchase agreement and related documents); and

(e)    any Person or assets or division as acquired in accordance herewith shall be in same business or lines of business in which Company or its Subsidiaries are engaged as of the Closing Date.

"**Permitted Equity Issuance**" means any sale or issuance of any Qualified Equity Interests of Parent to the extent permitted hereunder.

"**Permitted Liens**" has the meaning set forth in Section 6.1.

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 6.3(e), such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the remaining Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended, (c) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 6.3(e), at the time thereof, no Event of Default shall have occurred and be continuing and (d) if such Indebtedness being modified, refinanced, refunded, renewed or extended is Indebtedness permitted pursuant to Section 6.3(b) or 6.11(a), (i) to the extent such Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended, (ii) the terms and conditions (including, if applicable, as to collateral but excluding as to subordination, interest rate and redemption premium) of any such modified, refinanced, refunded, renewed or extended Indebtedness, taken as a whole, are not materially less favorable to Credit Parties or Lenders than the terms and conditions of the Indebtedness being modified, refinanced, refunded, renewed or extended; provided that a certificate of a Responsible Officer delivered to Administrative Agent at least five Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that Company has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless Administrative Agent notifies Company within such five Business Day period that the Requisite Lenders disagree with such determination (including a reasonable description of the basis upon which they disagree) and (iii) such modification, refinancing, refunding, renewal or extension is incurred by the Person who is the obligor of the Indebtedness being modified, refinanced, refunded, renewed or extended.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**PIK Interest**" has the meaning set forth in Section 2.7(h).

"**PIK Loans**" has the meaning set forth in Section 2.7(h).

"**PIK Period**" means the period beginning on the Closing Date up to but not including the second anniversary of the Closing Date.

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by any Credit Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"**Platform**' has meaning set forth in Section 5.2.

"**Pledge and Security Agreement**" means the Pledge and Security Agreement dated as of the date hereof, among Grantors party thereto and Collateral Agent, substantially in the form of Exhibit F, as it may be amended, supplemented or otherwise modified from time to time.

"**Preferred Stock**" means the Preferred A-1 Stock and Preferred A-2 Stock.

"**Preferred A-1 Stock**" means 1,999,909 shares of optionally convertible preferred stock of Parent with an aggregate initial liquidation preference of $199,990,900 issued on the Closing Date.

"**Preferred A-2 Stock**" means 5,670,027 shares of mandatorily convertible preferred stock of Parent with an aggregate initial liquidation preference of $567,002,700 issued on the Closing Date.

"**Preferred Stock Documentation**" means (a) with respect to the Preferred A-1 Stock, Statement with Respect to Shares of Series A-1 Optionally Convertible Preferred Stock of Education Management Corporation, and (b) with respect to the Preferred A-2 Stock, Statement with Respect to Shares of Series A-2 Mandatory Convertible Preferred Stock of Education Management Corporation, each in form and substance reasonably satisfactory to Requisite Lenders.

"**Prime Rate**" means the rate of interest quoted in *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75% of the nation's 30 largest banks), as in effect from time to time. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Administrative Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Principal Office**" means, for each of Administrative Agent and Issuing Bank, such Person's "Principal Office" as set forth on Appendix B, or such other office or office of a third party or sub-agent, as appropriate, as such Person may from time to time designate in writing to Company, Administrative Agent and each Lender.

"**Priority Lender**" means each Lender to the extent of the Priority Obligations owing to such Lender.

"**Priority Loan**" means (a) the Tranche A Term Loans and (b) the Revolving Loans.

"**Priority Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party and its Subsidiaries arising under any Credit Document or otherwise, with respect to any Priority Loan and all Letter of Credit Obligations, in each case whether absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Credit Party or Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding. Without limiting the generality of the foregoing, the Priority Obligations of the Credit Parties under the Credit Documents (and of their Subsidiaries to the extent they have obligations under the Credit Documents) include (i) the obligation (including guarantee obligations) to pay principal, interest, Letter of Credit commissions, reimbursement obligations, charges, expenses, fees, indemnities and other amounts payable by any Credit Party or its Subsidiaries under any Credit Document, but solely in the case of this clause (i), to the extent such obligation relates to or arises from Priority Loans or Letter of Credit Obligations and (ii) the obligation of any Credit Party or any of its Subsidiaries to reimburse any amount in respect of any of the foregoing that any Priority Lender, in its sole discretion, may elect to pay or advance on behalf of such Credit Party or such Subsidiary.

"**Projections**" has the meaning set forth in Section 5.1(c).

"**Pro Rata Share**" means: (a) with respect to all payments, computations and other matters relating to the Tranche A Term Loan of any Lender, the percentage obtained by dividing (i) the Tranche A Term Loan Exposure of that Lender by (ii) the aggregate Tranche A Term Loan Exposure of all Lenders; (b) with respect to all payments, computations and other matters relating to the Tranche B Term Loan of any Lender, the percentage obtained by dividing (i) the Tranche B Term Loan Exposure of that Lender by (ii) the aggregate Tranche B Term Loan Exposure of all Lenders; and (c) with respect to all payments, computations and other matters (including the matters in Section 2.5 and Section 9.6) relating to the Revolving Commitment or Revolving Loans of any Lender or any Letters of Credit issued or participations purchased therein by any Revolving Lender, the percentage obtained by dividing (i) the Revolving Exposure of that Lender by (ii) the aggregate Revolving Exposure of all Lenders. For all other purposes with respect to each Lender, "Pro Rata Share" means the percentage obtained by dividing (A) an amount equal to the sum of the Tranche A Term Loan Exposure, the Tranche B Term Loan Exposure and the Revolving Exposure of that Lender, by (B) an amount equal to the sum of the aggregate Tranche A Term Loan Exposure, the aggregate Tranche B Term Loan Exposure and the aggregate Revolving Exposure of all Lenders.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Qualified Non-Wholly-Owned Subsidiary**" means (a) any Acquired Non-Wholly-Owned Subsidiary (as defined in clause (iii) of the definition of "Permitted Acquisitions"); provided that (i) such Subsidiary is acquired after the Closing Date in accordance with Section 6.2(i) and (ii) Company and its Wholly Owned Subsidiaries own no less than the percentage of the outstanding Equity Interests of such Subsidiary owned by them on the date such Subsidiary is acquired pursuant to Section 6.2(i) and (b) any Subsidiary that is formed by Company or any of its Subsidiaries after the Closing Date, provided that (i) Company and its

Wholly Owned Subsidiaries own at least 90% of the outstanding Equity Interests of such Subsidiary (except for any such Securities in the nature of directors' qualifying shares required pursuant to applicable law not to exceed 5% of the outstanding Equity Interests of such Subsidiary) and (ii) such Subsidiary is not formed in connection with, or used in, the acquisition (whether by purchase, merger or otherwise) of all or substantially all of the assets of, 90% or more of the Equity Interests in or a business line or unit or a division of, any Person.

"**Recipient**" means (a) Administrative Agent, (b) any Lender or (c) any Issuing Bank, as applicable.

"**Register**" has the meaning set forth in Section 2.6(b).

"**Regulation D**" means Regulation D of the Board of Governors, as in effect from time to time.

"**Regulation FD**" means Regulation FD as promulgated by the US Securities and Exchange Commission under the Securities Act and Exchange Act as in effect from time to time.

"**Reimbursement Date**" has the meaning set forth in Section 2.3(d).

"**Related Fund**" means, with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Remaining Notes Indebtedness**" has the meaning set forth in the definition of "Debt Discharge."

"**Replacement Lender**" has the meaning set forth in Section 2.21.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the 30 day notice period has been waived.

"**Required Prepayment Date**" has the meaning set forth in Section 2.13(c).

"**Requisite Lenders**" means one or more Lenders having or holding Tranche A Term Loan Exposure, Tranche B Term Loan Exposure and Revolving Exposure and representing more than 50% of the sum of (a) the aggregate Tranche A Term Loan Exposure of all Lenders, (b) the aggregate Tranche B Term Loan Exposure of all Lenders and (c) the aggregate Revolving Exposure of all Lenders; provided that the Tranche A Term Loan Exposure, Tranche B Term Loan Exposure and  Revolving Exposure of, and the portion of the aggregate Tranche  A Term

Loan Exposure, aggregate Tranche B Term Loan Exposure and aggregate Revolving Exposure held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Requisite Lenders; provided further that to the extent the Letter of Credit Obligations are cash collateralized in an amount equal to 103% of such obligation in a manner reasonably satisfactory to the respective Issuing Bank, the amount of such Letter of Credit Obligation so cash collateralized shall be excluded in the calculation of Revolving Exposure for purposes of determining Requisite Lenders.

"**Responsible Officer**" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer or other similar officer of a Credit Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Credit Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership or other action on the part of such Credit Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Credit Party.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest in Parent, Holdings, Company or any of the Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to Parent or Holdings' or Company's stockholders, partners or members (or the equivalent Persons thereof); provided that, Restricted Payments shall not include accruals of liquidation preference or preferred dividends in respect of the Preferred Stock or any other class of preferred stock of Parent, in each case, to the extent not paid in cash.

"**Restructuring Change of Control**" means each conversion of the Preferred Stock into common stock of Parent pursuant to the Preferred Stock Documentation and each exercise of the Warrants pursuant to the Warrant Documentation.

"**Revolving Commitment**" means the commitment of a Revolving Lender to make or otherwise fund any Revolving Loan and to acquire participations in Letters of Credit hereunder, and "**Revolving Commitments**" means such commitments of all Revolving Lenders in the aggregate.  The amount of each Revolving Lender's Revolving Commitment is set forth on Appendix A-2 under the caption "Revolving Commitment" or in the applicable Assignment Agreement or Joinder Agreement, as applicable, subject to any adjustment or reduction pursuant to the terms and conditions hereof.

"**Revolving Commitment Period**" means the period from the Closing Date to but excluding the Revolving Commitment Termination Date.

"**Revolving Commitment Termination Date**" means the earliest to occur of (i) March 31, 2019, (ii) the date the Revolving Commitments are permanently reduced to zero pursuant to Section 2.11(b) and (iii) the date of the termination of the Revolving Commitments pursuant to Section 8.1.

"**Revolving Exposure**" means, with respect to any Revolving Lender as of any date of determination, (a) prior to the termination of the Revolving Commitments, that Lender's

Revolving Commitment and (b) after the termination of the Revolving Commitments, the sum of (i) the aggregate outstanding principal amount of the Revolving Loans of that Lender and (ii) the aggregate amount of all participations by that Revolving Lender in any outstanding Letters of Credit or any unreimbursed drawing under any Letter of Credit.

"**Revolving Lender**" means a Lender with a Revolving Commitment, or if the Revolving Commitments have terminated or expired, a Lender with Revolving Exposure.

"**Revolving Loan**" means a Loan made by a Revolving Lender pursuant to its Revolving Commitment.

"**Revolving Loan Note**" means a promissory note substantially in the form of Exhibit B-3, as it may be amended, supplemented or otherwise modified from time to time.

"**Revolving Percentage**" means, with respect to any Lender, the percentage of the total Revolving Commitments represented by such Lender's Revolving Commitment.

"**Rollover Amount**" has the meaning set forth in Section 6.14(b).

"**RSA**" means that certain Restructuring Support Agreement (including all exhibits attached thereto) dated as of September 4, 2014, as it may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc., and any successor thereto.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Secured Parties**" has the meaning assigned to that term in the Pledge and Security Agreement.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Series**" has the meaning set forth in Section 2.22(a).

"**Settlement Service**" has the meaning set forth in Section 10.6(d).

"**Solvency Certificate**" means a Solvency Certificate of the chief financial officer or treasurer of Parent substantially in the form of Exhibit E-2.

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature and (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital.  The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**Specified Non-Consenting Lenders**" means Magnolia Road Global Credit Master Fund LP and such other Person designated in writing by the foregoing.

"**Sponsors**" means Goldman Sachs Capital Partners, Providence Equity Partners Inc., Leeds Equity Partners, and their respective affiliates, but not including, however, any portfolio companies of any of the foregoing.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.  Unless otherwise expressly provided, all references herein to a "Subsidiary" shall mean a Subsidiary of Holdings.

"**Supermajority Lenders**" means one or more Lenders having or holding (a) until the Tranche A Term Loans are paid in full, (i) at least 66-2/3% of the Tranche A Term Exposure and (ii) at least 66-2/3% of the Revolving Exposure, and (b) after the Tranche A Term Loans are paid in full, (i) at least 66-2/3% of the Revolving Exposure and (ii) a majority of the Tranche B Term Exposure; provided that the Tranche A Term Loan Exposure, Tranche B Term Loan Exposure and Revolving Exposure of, and the portion of the aggregate Tranche  A Term Loan Exposure, aggregate Tranche B Term Loan Exposure and aggregate Revolving Exposure held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Supermajority Lenders; provided further that to the extent any Letter of Credit Obligation is cash collateralized in an amount equal to 103% of such obligation in a manner

reasonably satisfactory to the respective Issuing Bank, such amount shall not be included for the purposes of calculating Revolving Exposure for purposes of determining Supermajority Lenders.

"**Swap Agreement**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Termination Value**" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Agreements (which may include a Lender or any Affiliate of a Lender).

"**Taxes**" means all present or future taxes, levies, imposts, duties, assessments, charges, fees, deductions or withholdings (including backup withholding) imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Loan**" means a Tranche A Term Loan, a Tranche B Term Loan and a New Term Loan.

"**Term Loan Lenders**" means the Tranche A Term Loan Lenders and Tranche B Term Loan Lenders.

"**Terminated Lender**" has the meaning set forth in Section 2.21.

"**Test Period**" means, for any determination under this Agreement, the four consecutive Fiscal Quarters of Company then last ended.

"**Threshold Amount**" means $50,000,000.

"**Total Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated Total Debt as of the last day of such Test Period to (b) Consolidated EBITDA for such Test Period .

36

"**Total Utilization of Revolving Commitments**" means, as at any date of determination, the sum of (i) the aggregate principal amount of all outstanding Revolving Loans (other than Revolving Loans made for the purpose of reimbursing an Issuing Bank for any amount drawn under any Letter of Credit, but not yet so applied) and (ii) the Letter of Credit Usage.

"**Tranche A Term Loan**" means a Loan deemed made pursuant to Section 2.1(a) or converted from a Tranche B Term Loan pursuant to Section 2.3(l).

"**Tranche A Term Loan Commitment**" means, with respect to any Lender, the commitment of such Lender to accept Tranche A Term Loans in the amount set forth on Appendix A-1 pursuant to the RSA.

"**Tranche A Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Tranche A Term Loans of such Lender.

"**Tranche A Term Loan Lender**" means a Lender with a Tranche A Term Loan Commitment or, following the acceptance of the Tranche A Term Loans pursuant to Section 2.1(a) on the Closing Date, a Lender with Tranche A Term Loan Exposure.

"**Tranche A Term Loan Maturity Date**" means the earlier of (a) July 2, 2020 and (b) the date that all Tranche A Term Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"**Tranche A Term Loan Note**" means a promissory note substantially in the form of Exhibit B-1, as it may be amended, supplemented or otherwise modified from time to time.

"**Tranche B Term Loan**" means a Loan deemed made pursuant to Section 2.1(b) or converted from a Tranche A Term Loan pursuant to Section 2.3(l).

"**Tranche B Term Loan Commitment**" means, with respect to any Lender, the commitment of such Lender to accept Tranche B Term Loans in the amount set forth on Appendix A-2 pursuant to the RSA.

"**Tranche B Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Tranche B Term Loans of such Lender.

"**Tranche B Term Loan Lender**" means a Lender with a Tranche B Term Loan Commitment or, following the acceptance of the Tranche B Term Loans pursuant to Section 2.1(b) on the Closing Date, a Lender with Tranche B Term Loan Exposure.

"**Tranche B Term Loan Maturity Date**" means the earlier of (a) July 2, 2020 and (b) the date that all Tranche B Term Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

#4822-5623-8110v18

"**Tranche B Term Loan Note**" means a promissory note substantially in the form of Exhibit B-2, as it may be amended, supplemented or otherwise modified from time to time.

"**Transactions**" means, collectively, (a) the Closing Date Transactions, (b) each Restructuring Change of Control, (c) the consummation of all other transactions in connection with the foregoing and (d) the payment of the fees and expenses incurred in connection with any of the foregoing.

"**Transaction Documents**" means, collectively, the Credit Documents, the RSA, the Preferred Stock Documentation, the Warrant Documentation and all other material documents, instruments and certificates contemplated by the foregoing.

"**Transaction Expenses**" means any fees or expenses incurred or paid by Parent, Holdings, Company or any of the Subsidiaries in connection with the Transactions.

"**Type of Loan**" means with respect to either Term Loans or Revolving Loans, a Base Rate Loan or a Eurodollar Rate Loan.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**U.S. Bank**" has the meaning set forth in the preamble hereto.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**" has the meaning specified in Section 2.18.

"**Waivable Mandatory Prepayment**" has the meaning set forth in Section 2.13(c).

"**Warrants Type A**" means warrants to purchase a number of shares of common stock of Parent equal to 10.0% of the fully diluted (exclusive of the Management Incentive Plan) shares of common stock of Parent, exercisable at a strike price based on a $1,250,000,000 total enterprise value of Parent.

"**Warrants Type B**" means warrants to purchase a number of shares of common stock of Parent equal to 5.0% of the fully diluted (exclusive of the Management Incentive Plan) shares of common stock of Parent, exercisable at a strike price based on a total enterprise value of Parent that would imply a par return on the Cash Pay/PIK Notes and PIK Notes (each as defined in the RSA).

"**Warrant Agent**" means American Stock Transfer & Company, LLC, or any successor thereto.

"**Warrant Documentation**" means, collectively, (a) the Warrant Agreement dated as of January 5, 2015, between Parent and Warrant Agent, governing the issuance of the

Warrants Type A and (b) the Warrant Agreement dated as of January 5, 2015, between Parent and Warrant Agent, governing the issuance of the Warrants Type B.

"**Warrants**" means the Warrants Type A and Warrants Type B.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (b) the then outstanding principal amount of such Indebtedness.

"**Wholly Owned**" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person or by one or more wholly owned Subsidiaries of such Person.

"**Withholding Agent**" means Company and Administrative Agent.

### 1.2.    Accounting Terms.

Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Financial statements and other information required to be delivered by Parent to Lenders pursuant to Section 5.1(a) and 5.1(b) shall be prepared in accordance with GAAP as in effect at the time of such preparation, except as otherwise specifically prescribed herein. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Credit Document, and either Company or Requisite Lenders shall so request, Lenders, Administrative Agent and Company shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of Requisite Lenders); provided that until so amended, such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein. Subject to the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements.

### 1.3.    Interpretation, etc.

Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided. The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used

with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

## SECTION 2.  LOANS AND LETTERS OF CREDIT

### 2.1.  **Term Loans**.

(a)    <u>Tranche A Term Loan Commitments</u>. Subject to the terms and conditions set forth herein, upon the satisfaction of the conditions precedent contained in Section 3 on the Closing Date, each Term Loan A Lender severally shall be automatically deemed to have made a Tranche A Term Loan to Company in an amount equal to such Term Loan A Lender's Tranche A Term Loan Commitment.  Company shall not be entitled to any further borrowing or actual cash advances under the Tranche A Term Loan Commitment.  Any amount deemed borrowed under this Section 2.1(a) and subsequently repaid or prepaid may not be reborrowed.  Subject to Sections 2.11(a) and 2.12, all amounts owed hereunder with respect to the Tranche A Term Loans shall be paid in full no later than the Tranche A Term Loan Maturity Date.  Each Tranche A Term Lender's Tranche A Term Loan Commitment shall terminate immediately and without further action on the Closing Date after giving effect to the deemed funding of such Tranche A Term Lender's Tranche A Term Loan Commitment on such date.

(b)    <u>Tranche B Term Loan Commitments</u>. Subject to the terms and conditions set forth herein, upon the satisfaction of the conditions precedent contained in Section 3 on the Closing Date, each Tranche B Term Lender shall be automatically deemed to have made a Tranche B Term Loan to Company in an amount equal to such Tranche B Term Lender's Tranche B Term Loan Commitment.  Company shall not be entitled to any further borrowing or actual cash advances under the Tranche B Term Loan Commitment.  Any amount deemed borrowed under this Section 2.1(b) and subsequently repaid or prepaid may not be reborrowed. Subject to Sections 2.11(a) and 2.12, all amounts owed hereunder with respect to the Tranche B Term Loans shall be paid in full no later than the Tranche B Term Loan Maturity Date.  Each Tranche B Term Lender's Tranche B Term Loan Commitment shall terminate immediately and without further action on the Closing Date after giving effect to the deemed funding of such Tranche B Term Lender's Tranche B Term Loan Commitment on such date.

(c)    <u>Deemed Funding of Terms Loans</u>.  Each Credit Party and each Lender agrees that, notwithstanding any other provisions contained in this Agreement, the Tranche A Term Loans and the Tranche B Term Loans are being issued by Credit Parties as consideration by Company as the purchaser in, to and under the Intercompany Sale and in satisfaction of the obligations under the Existing Credit Agreement and related loan documents.  The Tranche A Terms Loans and Tranche B Terms Loans shall be deemed to have been funded on the Closing Date in the amounts set forth in this Agreement without any actual funding thereof.  Each Credit Party acknowledges and agrees that fair consideration for the Tranche A Term Loans and the Tranche B Term Loans has been provided by the Term Loan Lenders to Company on the Closing Date.

### 2.2.  **Revolving Loans**

#4822-5623-8110v18

(a)    <u>Revolving Commitments</u>.    During the Revolving Commitment Period, subject to the terms and conditions hereof, each Revolving Lender severally agrees to make Revolving Loans to Company in an aggregate amount up to but not exceeding such Revolving Lender's Revolving Commitment; <u>provided</u> that after giving effect to the making of any Revolving Loans in no event shall the Total Utilization of Revolving Commitments exceed the Revolving Commitments then in effect. Amounts borrowed pursuant to this Section 2.2(a) may be repaid and reborrowed during the Revolving Commitment Period. Each Revolving Lender's Revolving Commitment shall expire on the Revolving Commitment Termination Date and all Revolving Loans and all other amounts owed hereunder with respect to the Revolving Loans and the Revolving Commitments shall be paid in full no later than such date. Notwithstanding anything to the contrary in this Agreement, it is agreed and understood that no amount of the Revolving Commitments attributable to Existing Letters of Credit shall be used to make Revolving Loans hereunder.

(b)    <u>Borrowing Mechanics for Revolving Loans</u>.

(i)    Except pursuant to Section 2.3(d), Revolving Loans that are Base Rate Loans shall be made in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount, and Revolving Loans that are Eurodollar Rate Loans shall be in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount.

(ii)    Whenever Company desires that Revolving Lenders make Revolving Loans, Company shall give notice to Administrative Agent, which may be given by telephone, no later than 12:00 p.m. (New York City time) at least three Business Days in advance of the proposed Credit Date in the case of a Eurodollar Rate Loan, and at least one Business Day in advance of the proposed Credit Date in the case of a Revolving Loan that is a Base Rate Loan. Except as otherwise provided herein, a notice for a Revolving Loan that is a Eurodollar Rate Loan shall be irrevocable on and after the related Interest Rate Determination Date, and Company shall be bound to make a borrowing in accordance therewith. Each telephonic notice by Company pursuant to this Section 2.2(b) must be confirmed promptly by delivery to Administrative Agent of a fully executed Funding Notice. Neither Administrative Agent nor any Revolving Lender shall incur any liability to Company in acting upon any telephonic notice referred to above that Administrative Agent believes in good faith to have been given by a Responsible Officer or other person authorized to borrow on behalf of Company or for otherwise acting in good faith under this Section 2.2(b), and upon funding of Loans by Revolving Lenders in accordance with this Agreement pursuant to any such telephonic notice Company shall have effected Loans hereunder.

(iii)    Notice of receipt of each Funding Notice in respect of Revolving Loans, together with the amount of each Revolving Lender's Revolving Percentage thereof, if any, together with the applicable interest rate, shall be provided by Administrative Agent to each applicable Revolving Lender by telefacsimile with reasonable promptness.

(iv)    Each Revolving Lender shall make the amount of its Revolving Loan available to Administrative Agent not later than 12:00 p.m. (New York City time) on the applicable Credit Date by wire transfer of same day funds in Dollars, at the Principal Office designated by Administrative Agent.  Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of such Revolving Loans available to Company on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Revolving Loans received by Administrative Agent from Revolving Lenders to be credited to the account of Company at the Principal Office designated by Administrative Agent or such other account as may be designated in writing to Administrative Agent by Company.

## 2.3.    Issuance of Letters of Credit and Purchase of Participations Therein.

(a)    Letters of Credit.  During the Revolving Commitment Period, subject to the terms and conditions hereof, each Issuing Bank agrees to issue Letters of Credit for the account of Parent, Holdings, Company and the Subsidiaries in the aggregate amount for Parent, Holdings,  Company and the Subsidiaries up to but not exceeding the Letter of Credit Sublimit; provided that (i) BNPP as Issuing Bank (or its permitted successors and assigns in such capacity) shall only be required to issue Letters of Credit for the account of Parent, Holdings, Company and the Subsidiaries in an aggregate amount for Parent, Holdings, Company and the Subsidiaries up to but not exceeding $111,000,000, and (ii) Bank of America as Issuing Bank (or its permitted successors and assigns in such capacity) shall only be required to issue Letters of Credit for the account of Parent, Holdings, Company and the Subsidiaries in an aggregate amount for Parent, Holdings, Company and the Subsidiaries up to but not exceeding $63,000,000; provided further (I) each Letter of Credit shall be denominated in Dollars, (II) the stated amount of each Letter of Credit shall not be less than $25,000 or such lesser amount as is acceptable to Issuing Bank, (III) after giving effect to such issuance, in no event shall the Total Utilization of Revolving Commitments exceed the Revolving Commitments then in effect, (IV) after giving effect to such issuance, in no event shall the Letter of Credit Usage exceed the Letter of Credit Sublimit then in effect and (V) in no event shall any Letter of Credit have an expiration date later than the earlier of (1) five Business Days prior to the Revolving Commitment Termination Date and (2) unless otherwise agreed by the Issuing Bank, the date which is one year from the date of issuance of such Letter of Credit.  Subject to the foregoing, Issuing Bank may agree that a standby Letter of Credit will automatically be extended for one or more successive periods not to exceed one year each unless Issuing Bank elects not to extend for any such additional period; provided that Issuing Bank shall not extend any such Letter of Credit if it has received written notice that an Event of Default has occurred and is continuing at the time Issuing Bank must elect to allow such extension.

(b)    Notice of Issuance.  Whenever Company desires the issuance of a Letter of Credit, it shall deliver to Administrative Agent an Issuance Notice no later than 12:00 p.m. (New York City time) at least two Business Days, or in each case such shorter period as may be agreed to by Issuing Bank in any particular instance, in advance of the proposed date of issuance. Upon satisfaction or waiver of the conditions set forth in Section 3.2, Issuing Bank shall issue the requested Letter of Credit only in accordance with Issuing Bank's standard operating procedures. Upon the issuance of any Letter of Credit or amendment or modification to a Letter of Credit,

Issuing Bank shall promptly notify each Lender with a Revolving Commitment of such issuance, which notice shall be accompanied by a copy of such Letter of Credit or amendment or modification to a Letter of Credit and the amount of such Lender's respective participation in such Letter of Credit pursuant to Section 2.3(e).

(c)     <u>Responsibility of Issuing Bank With Respect to Requests for Drawings and Payments</u>.  In determining whether to honor any drawing under any Letter of Credit by the beneficiary thereof, Issuing Bank shall be responsible only to examine the documents delivered under such Letter of Credit with reasonable care so as to ascertain whether they appear on their face to be in accordance with the terms and conditions of such Letter of Credit.  As between Company and Issuing Bank, Company assumes all risks of the acts and omissions of, or misuse of the Letters of Credit issued by Issuing Bank, by the respective beneficiaries of such Letters of Credit.  In furtherance and not in limitation of the foregoing, Issuing Bank shall not be responsible for:  (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) failure of the beneficiary of any such Letter of Credit to comply fully with any conditions required in order to draw upon such Letter of Credit; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of Issuing Bank, including any Governmental Acts; none of the above shall affect or impair, or prevent the vesting of, any of Issuing Bank's rights or powers hereunder.  Without limiting the foregoing and in furtherance thereof, any action taken or omitted by Issuing Bank under or in connection with the Letters of Credit or any documents and certificates delivered thereunder, if taken or omitted in good faith, shall not give rise to any liability on the part of Issuing Bank to Company.  Notwithstanding anything to the contrary contained in this Section 2.3(c), Company shall retain any and all rights they may have against Issuing Bank for any liability arising solely out of the gross negligence or willful misconduct of Issuing Bank.

(d)     <u>Reimbursement by Company of Amounts Drawn or Paid Under Letters of Credit</u>.  In the event Issuing Bank has determined to honor a drawing under a Letter of Credit, it shall immediately notify Company and Administrative Agent, and Company shall reimburse Issuing Bank on or before the Business Day immediately following the date on which such drawing is honored (the "**Reimbursement Date**") in an amount in Dollars and in same day funds equal to the amount of such honored drawing; <u>provided</u> that anything contained herein to the contrary notwithstanding, (i) unless Company shall have notified Administrative Agent and Issuing Bank prior to 10:00 a.m. (New York City time) on the Reimbursement Date that Company intends to reimburse Issuing Bank for the amount of such honored drawing with funds other than the proceeds of Revolving Loans, Company shall be deemed to have given a timely Funding Notice to Administrative Agent requesting Revolving Lenders to make Revolving

43

Loans that are Base Rate Loans on the Reimbursement Date in an amount in Dollars equal to the amount of such honored drawing, and (ii) subject to satisfaction or waiver of the conditions specified in Section 3.2, Revolving Lenders shall, on the Reimbursement Date, make Revolving Loans that are Base Rate Loans in the amount of such honored drawing, the proceeds of which shall be applied directly by Administrative Agent to reimburse Issuing Bank for the amount of such honored drawing; provided further, if for any reason proceeds of Revolving Loans (or such other source of funds as designated in a notice provided by Company pursuant to clause (i) above) are not received by Issuing Bank on the Reimbursement Date in an amount equal to the amount of such honored drawing, Company shall reimburse Issuing Bank, on demand, in an amount in same day funds equal to the excess of the amount of such honored drawing over the aggregate amount of such Revolving Loans (or such other funds), if any, which are so received. Nothing in this Section 2.3(d) shall be deemed to relieve any Revolving Lender from its obligation to make Revolving Loans on the terms and conditions set forth herein, and Company shall retain any and all rights it may have against any such Revolving Lender resulting from the failure of such Revolving Lender to make such Revolving Loans under this Section 2.3(d).

(e)    Lenders' Purchase of Participations in Letters of Credit.  Immediately upon the issuance of each Letter of Credit, each Revolving Lender shall be deemed to have purchased, and hereby agrees to irrevocably purchase, from Issuing Bank a participation in such Letter of Credit and any drawings honored thereunder in an amount equal to such Lender's Revolving Percentage of the maximum amount which is or at any time may become available to be drawn thereunder (it being understood, for the avoidance of doubt, that any Revolving Lender's purchase of such a participation shall be attributable to such Lender's Revolving Commitment).  In the event that Company shall fail for any reason to reimburse Issuing Bank as provided in Section 2.3(d), Issuing Bank shall promptly notify each Revolving Lender of the unreimbursed amount of such honored drawing and of such Lender's respective participation therein based on such Lender's Revolving Percentage.  Each Revolving Lender shall make available to Issuing Bank an amount equal to its respective participation, in Dollars and in same day funds, at the office of Issuing Bank specified in such notice, not later than 12:00 p.m. (New York City time) on the first business day (under the laws of the jurisdiction in which such office of Issuing Bank is located) after the date notified by Issuing Bank.  In the event that any Revolving Lender fails to make available to Issuing Bank on such business day the amount of such Lender's participation in such Letter of Credit as provided in this Section 2.3(e), Issuing Bank shall be entitled to recover such amount on demand from such Lender together with interest thereon for three Business Days at the rate customarily used by Issuing Bank for the correction of errors among banks and thereafter at the Base Rate.  Nothing in this Section 2.3(e) shall be deemed to prejudice the right of any Revolving Lender to recover from Issuing Bank any amounts made available by such Lender to Issuing Bank pursuant to this Section in the event that it is determined that the payment with respect to a Letter of Credit in respect of which payment was made by such Lender constituted gross negligence or willful misconduct on the part of Issuing Bank.  In the event Issuing Bank shall have been reimbursed by other Lenders pursuant to this Section 2.3(e) for all or any portion of any drawing honored by Issuing Bank under a Letter of Credit, such Issuing Bank shall distribute to each Lender which has paid all amounts payable by it under this Section 2.3(e) with respect to such honored drawing such Lender's Revolving Percentage of all payments subsequently received by Issuing Bank from Company in reimbursement of such honored drawing when such payments are received.  Any such

distribution shall be made to a Lender at its primary address set forth below its name on Appendix B or at such other address as such Lender may request.

(f)    <u>Obligations Absolute</u>.  The obligation of Company to reimburse Issuing Bank for drawings honored under the Letters of Credit issued by it and to repay any Revolving Loans made by Lenders pursuant to Section 2.3(d) and the obligations of Lenders under Section 2.3(e) shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms hereof under all circumstances including any of the following circumstances:  (i) any lack of validity or enforceability of any Letter of Credit; (ii) the existence of any claim, set-off, defense or other right which Company or any Lender may have at any time against a beneficiary or any transferee of any Letter of Credit (or any Persons for whom any such transferee may be acting), Issuing Bank, Lender or any other Person or, in the case of a Lender, against Company, whether in connection herewith, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between Parent, Holdings, Company or one of the Subsidiaries and the beneficiary for which any Letter of Credit was procured); (iii) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (iv) payment by Issuing Bank under any Letter of Credit against presentation of a draft or other document which does not substantially comply with the terms of such Letter of Credit; (v) any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of Parent or any of its Subsidiaries; (vi) any breach hereof or any other Credit Document by any party thereto; (vii) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing; or (viii) the fact that an Event of Default or a Default shall have occurred and be continuing; <u>provided</u> that, in each case, that payment by Issuing Bank under the applicable Letter of Credit shall not have constituted gross negligence or willful misconduct of Issuing Bank under the circumstances in question.

(g)    <u>Indemnification</u>.  Without duplication of any obligation of Company under Section 10.2 or 10.3, in addition to amounts payable as provided herein, Company hereby agrees to protect, indemnify, pay and save harmless Issuing Bank from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable fees, expenses and disbursements of counsel and allocated costs of internal counsel) which Issuing Bank may incur or be subject to as a consequence, direct or indirect, of (i) the issuance of any Letter of Credit for the account of Parent, Holdings, Company or any of the Subsidiaries by Issuing Bank, other than as a result of (1) the gross negligence or willful misconduct of Issuing Bank or (2) the wrongful dishonor by Issuing Bank of a proper demand for payment made under any Letter of Credit issued by it, or (ii) the failure of Issuing Bank to honor a drawing under any such Letter of Credit as a result of any Governmental Act.

(h)    <u>Additional Issuing Banks</u>.  Company may, at any time and from time to time with the consent of Administrative Agent (acting at the direction of the Majority Revolving Lenders) and such financial institution, designate one or more additional financial institutions to act as an issuing bank under the terms of this Agreement, subject to reporting requirements reasonably satisfactory to the Majority Revolving Lenders with respect to issuances, amendments, extensions and terminations of Letters of Credit by such additional issuing bank, and with such other procedures and requirements with respect to the issuance of Letters of Credit that such additional issuing bank may reasonably require with the consent of Administrative

Agent (acting at the direction of the Majority Revolving Lenders).  Any Lender designated as an issuing bank pursuant to this Section 2.3(h) shall be deemed to be an "Issuing Bank" (in addition to being a Lender) in respect of Letters of Credit issued or to be issued by such Lender, and, with respect to such Letters of Credit, such term shall thereafter apply to such Lender.

(i)  <u>Mitigating Arrangements</u>.  Parent, Holdings, Company and the Subsidiaries agree that, with respect to any Issuing Bank (other than BNPP and Bank of America), neither Parent, Holdings, Company nor any of the Subsidiaries shall mitigate such Issuing Bank's fronting risk with respect to any other Lender (the "**Mitigating Arrangements**"), unless Company shall have offered to mitigate each of BNPP's and Bank of America's risk, as Issuing Bank, on terms that are no less favorable to BNPP or Bank of America, as applicable, in respect of its fronting risk than the Mitigating Arrangements are in respect of such other Issuing Bank's fronting risk.

(j)  <u>Replacement of Issuing Bank</u>.  Any Issuing Bank may be replaced at any time by written agreement among Company, Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank.  Administrative Agent shall notify Lenders of any such replacement of such Issuing Bank.  At the time any such replacement shall become effective, Company shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 2.10(b).  From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of such Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require.  After the replacement of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

(k)  <u>Existing Letters of Credit</u>.  All letters of credit issued for the account of Company or any other Credit Party that are outstanding on the Closing Date and issued by an entity that is an Issuing Bank under this Agreement, which by its execution of this Agreement, has agreed to act as an Issuing Bank hereunder, and listed on Schedule 2.3(k) (each, an "**Existing Letter of Credit**"), shall automatically be continued hereunder on the Closing Date by the Issuing Bank, and as of the Closing Date the Lenders shall acquire a participation therein as if such Existing Letter of Credit were issued hereunder, and each such Existing Letter of Credit shall be deemed a Letter of Credit for all purposes of this Agreement as of the Closing Date without any further action by Company; <u>provided</u> that the aggregate face amount of all such Existing Letters of Credit shall not exceed $106,440,701.

(l)  <u>Unreimbursed Draws</u>. To the extent honored draws are not reimbursed by Company in accordance with Section 2.3(d), Tranche B Term Loans in an amount equal to the amount of any such draw not so reimbursed shall be automatically converted to Tranche A Term Loans in a manner and with mechanics to be mutually agreed upon between Company and Administrative Agent (acting at the direction of the Requisite Lenders); <u>provided</u> that (i) the aggregate amount of Tranche B Term Loans converted to Tranche A Term Loans pursuant to this Section 2.3(l) shall not exceed $106,440,701 and (ii) to the extent any such draws giving rise

to such conversion are subsequently reimbursed by Company, Tranche A Term Loans shall in an amount equal to the amount so reimbursed automatically revert back to Tranche B Term Loans in a manner and with mechanics to be mutually agreed upon between Company and Administrative Agent (acting at the direction of the Requisite Lenders).

**2.4.    Pro Rata Shares; Availability of Funds**.

(a)    <u>Pro Rata Shares</u>.    All Loans shall be made, and all participations purchased, by Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby nor shall any Term Loan Commitment or any Revolving Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby.

(b)    <u>Availability of Funds</u>.    Unless Administrative Agent shall have been notified by any Lender prior to the applicable Credit Date that such Lender does not intend to make available to Administrative Agent the amount of such Lender's Loan requested on such Credit Date, Administrative Agent may assume that such Lender has made such amount available to Administrative Agent on such Credit Date and Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to Company a corresponding amount on such Credit Date.  If such corresponding amount is not in fact made available to Administrative Agent by such Lender, Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the customary rate set by Administrative Agent for the correction of errors among banks for three Business Days and thereafter at the Base Rate.  If such Lender does not pay such corresponding amount forthwith upon Administrative Agent's demand therefor, Administrative Agent shall promptly notify Company and Company shall immediately pay such corresponding amount to Administrative Agent together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the rate payable hereunder for Base Rate Loans for such Class of Loans.  Nothing in this Section 2.4(b) shall be deemed to relieve any Lender from its obligation to fulfill its Term Loan Commitments and Revolving Commitments hereunder or to prejudice any rights that  Company may have against any Lender as a result of any default by such Lender hereunder.

**2.5.    Use of Proceeds**.

The proceeds of (a) the Term Loans deemed to be made on the Closing Date shall be applied as consideration by Company as the purchaser in, to and under the Intercompany Sale and with respect to the Debt Discharge and (b) each of the Term Loans, if any, Revolving Loans and Letters of Credit made after the Closing Date shall be applied by Company for working capital and other general corporate purposes (including Permitted Acquisitions) of Holdings and the Subsidiaries.  No portion of the proceeds of any Credit Extension shall be used in any manner that causes or might cause such Credit Extension or the application of such proceeds to violate

Regulation T, Regulation U or Regulation X of the Board of Governors or any other regulation thereof or to violate the Exchange Act.

**2.6.    Evidence of Debt; Register; Lenders' Books and Records; Notes**.

(a)    <u>Lenders' Evidence of Debt</u>.  Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Company to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on Company, absent manifest error; <u>provided</u> that the failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Revolving Commitments or Company's Obligations in respect of any applicable Loans; and <u>provided</u> <u>further</u>, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)    <u>Register</u>.  Administrative Agent (or its agent or sub-agent appointed by it) on behalf of Company shall maintain at the Principal Office a register for the recordation of the names and addresses of Lenders and the Revolving Commitments and Loans of each Lender from time to time (the "**Register**").  The Register shall be available for inspection by Company or any Lender (with respect to any entry relating to such Lender's Loans) at any reasonable time and from time to time upon reasonable prior notice.  Administrative Agent shall record, or shall cause to be recorded, in the Register the Revolving Commitments and the Loans in accordance with the provisions of Section 10.6, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on Company and each Lender, absent manifest error; <u>provided</u> that failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Revolving Commitments or Company's Obligations in respect of any Loan.  Company hereby designates U.S. Bank to serve as Company's agent solely for purposes of maintaining the Register as provided in this Section 2.6, and Company hereby agrees that, to the extent U.S. Bank serves in such capacity, U.S. Bank and its officers, directors, employees, agents, sub-agents and affiliates shall constitute "**Indemnitees**."

(c)    <u>Notes</u>.  If so requested by any Lender by written notice to Company (with a copy to Administrative Agent) at least two Business Days prior to the Closing Date, or at any time thereafter, Company shall execute and deliver to such Lender (or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to Section 10.6) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after Company's receipt of such notice) a Note or Notes to evidence such Lender's Tranche A Term Loan, Tranche B Term Loan or Revolving Loan, as the case may be.

**2.7.    Interest on Loans**.

(a)    Except as otherwise set forth herein, each Class of Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof, (i) if a Base Rate Loan, at the Base Rate <u>plus</u> the Applicable Margin applicable to such Class of Loans, or (ii) if a Eurodollar Rate Loan, at the Adjusted Eurodollar Rate <u>plus</u> the Applicable Margin applicable to such Class of Loan.

#4822-5623-8110v18

(b)    The basis for determining the rate of interest with respect to any Loan, and the Interest Period with respect to any Eurodollar Rate Loan, shall be selected by Company and notified to Administrative Agent and Lenders pursuant to the applicable Funding Notice or Conversion/Continuation Notice, as the case may be.  If on any day a Loan is outstanding with respect to which a Funding Notice or Conversion/Continuation Notice has not been delivered to Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then for that day such Loan shall be a Base Rate Loan.

(c)    In connection with Eurodollar Rate Loans there shall be no more than 10 Interest Periods outstanding at any time.  In the event Company fails to specify between a Base Rate Loan or a Eurodollar Rate Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Loan (if outstanding as a Eurodollar Rate Loan) will be automatically converted into a Base Rate Loan on the last day of the then-current Interest Period for such Loan (or if outstanding as a Base Rate Loan will remain as, or (if not then outstanding) will be made as, a Base Rate Loan).  In the event Company fails to specify an Interest Period for any Eurodollar Rate Loan in the applicable Funding Notice or Conversion/Continuation Notice, Company shall be deemed to have selected an Interest Period of one month.  As soon as practicable after 10:00 a.m. (New York City time) on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to Company and each Lender.

(d)    Interest payable pursuant to Section 2.7(a) shall be computed (i) in the case of Base Rate Loans on the basis of a 365-day or 366-day year, as the case may be, and (ii) in the case of Eurodollar Rate Loans, on the basis of a 360-day year, in each case for the actual number of days elapsed in the period during which it accrues.  In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Term Loan, the last Interest Payment Date with respect to such Term Loan or, with respect to a Base Rate Loan being converted from a Eurodollar Rate Loan, the date of conversion of such Eurodollar Rate Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a Eurodollar Rate Loan, the date of conversion of such Base Rate Loan to such Eurodollar Rate Loan, as the case may be, shall be excluded; provided that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(e)    Except as otherwise set forth herein, interest on each Loan (i) shall accrue on a daily basis and shall be payable in arrears on each Interest Payment Date with respect to interest accrued on and to each such payment date, (ii) shall accrue on a daily basis and shall be payable in arrears upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid and (iii) shall accrue on a daily basis and shall be payable in arrears at maturity of the Loans, including final maturity of the Loans; provided that with respect to any voluntary prepayment of a Base Rate Loan, accrued interest shall instead be payable on the applicable Interest Payment Date.

(f)      Company agrees to pay to Issuing Bank, with respect to drawings honored under any Letter of Credit, interest on the amount paid by Issuing Bank in respect of each such honored drawing from the date such drawing is honored to but excluding the date such amount is reimbursed by or on behalf of Company at a rate equal to (i) for the period from the date such drawing is honored to but excluding the applicable Reimbursement Date, the rate of interest otherwise payable hereunder with respect to Revolving Loans that are Base Rate Loans and (ii) thereafter, in each case, a rate which is 2% per annum in excess of the rate of interest otherwise payable under the immediately preceding clause (f)(i) of this Section.

(g)      Interest payable pursuant to Section 2.7(f) shall be computed on the basis of a 365/366-day year for the actual number of days elapsed in the period during which it accrues, and shall be payable on demand or, if no demand is made, on the date on which the related drawing under a Letter of Credit is reimbursed in full.  Promptly upon receipt by Issuing Bank of any payment of interest pursuant to Section 2.7(f), Issuing Bank shall distribute to each Lender, out of the interest received by Issuing Bank in respect of the period from the date such drawing is honored to but excluding the date on which Issuing Bank is reimbursed for the amount of such drawing (including any such reimbursement out of the proceeds of any Revolving Loans), the amount that such Lender would have been entitled to receive in respect of the letter of credit fee that would have been payable in respect of such Letter of Credit for such period if no drawing had been honored under such Letter of Credit.  In the event Issuing Bank shall have been reimbursed by Lenders for all or any portion of such honored drawing, Issuing Bank shall distribute to each Lender which has paid all amounts payable by it under Section 2.3(e) with respect to such honored drawing such Lender's Revolving Percentage of any interest received by Issuing Bank in respect of that portion of such honored drawing so reimbursed by Lenders for the period from the date on which Issuing Bank was so reimbursed by Lenders to but excluding the date on which such portion of such honored drawing is reimbursed by Company.

(h)      Notwithstanding anything to the contrary contained herein, during the PIK Period Company shall (unless it notifies Administrative Agent in writing that it intends to make any such payment in cash) pay the amount of interest with respect to the Tranche B Term Loans (i) that are Eurodollar Rate Loans, in excess of the Adjusted Eurodollar Rate plus 1.0%, and (ii) that are Base Rate Loans, in excess of the Base Rate, in each case, "in kind" by capitalizing such interest and thereby increasing the outstanding principal amount of the applicable Tranche B Term Loan on the applicable Interest Payment Date (such interest paid "in kind," "**PIK Interest**," and such Tranche B Term Loans for which Company elects to partially pay PIK Interest thereon, a "**PIK Loan**"); provided that, in the case of any voluntary or mandatory prepayment of any PIK Loan or payment on maturity, including final maturity, of any PIK Loan, any accrued but not yet capitalized interest thereon will be deemed to have been so capitalized immediately prior to the prepayment or maturity of such PIK Loan.  Such PIK Interest shall be deemed paid, and the principal amount of the PIK Loans as so increased shall be deemed "Loans" hereunder and under the other Credit Documents for all purposes on the applicable Interest Payment Date, and shall thereafter accrue interest in accordance with the terms of this Agreement.

(i)      Notwithstanding anything to the contrary contained herein, during the PIK Period, to the extent Company pays any PIK Interest in accordance with Section 2.7(h), at the

written request of any Lender that would otherwise receive such PIK Interest, such Lender may elect to receive any such PIK Interest as a funding fee on the applicable Interest Payment Date payable in accordance with the last sentence of this paragraph and such fee shall accrue interest in accordance with the terms of this Agreement otherwise applicable to "Loans," subject to the right contained in this Section 2.7(i) to elect to receive such additional interest as a funding fee. At any time interest is being paid in cash, interest shall also be paid in cash with respect to any amount elected to paid as a funding fee pursuant to this Section 2.7(i) and on the amount of any funding fees accrued at such time pursuant to this Section 2.7(i). Each such fee shall be fully earned and non-refundable as of the applicable Interest Payment Date and shall be paid in cash on the earlier of (i) the optional prepayment of the Tranche B Term Loans and (ii) the Tranche B Term Loan Maturity Date.

Additionally, each such fee shall be payable in cash upon any prepayment, repayment, payment, satisfaction (whether in whole or in part), distribution or discharge of the Tranche B Term Loans (including, without limitation, by foreclosure (whether by power of judicial proceeding) or by any other means), irrespective of whether such prepayment, repayment, payment, satisfaction, distribution or discharge occurs following any earlier maturity of the Tranche B Term Loans, any voluntary or involuntary acceleration of the Tranche B Term Loans, or the commencement of any insolvency proceeding or other proceeding pursuant to any Debtor Relief Laws, or pursuant to a plan of reorganization, and including, without limitation any prepayment, repayment, payment, satisfaction, distribution or discharge of the Tranche B Term Loans.

### 2.8. Conversion/Continuation.

(a)    Subject to Section 2.16 and so long as no Default or Event of Default shall have occurred and then be continuing, Company shall have the option:

(i)    to convert at any time all or any part of any Term Loan or Revolving Loan equal to $1,000,000 and integral multiples of $500,000 in excess of that amount from one Type of Loan to another Type of Loan; provided that a Eurodollar Rate Loan may only be converted on the expiration of the Interest Period applicable to such Eurodollar Rate Loan unless Company shall pay all amounts due under Section 2.16 in connection with any such conversion; or

(ii)    upon the expiration of any Interest Period applicable to any Eurodollar Rate Loan, to continue all or any portion of such Loan equal to $1,000,000 and integral multiples of $500,000 in excess of that amount as a Eurodollar Rate Loan.

(b)    Company shall deliver a Conversion/Continuation Notice to Administrative Agent no later than 10:00 a.m. (New York City time) at least one Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan) and at least three Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan). Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any Eurodollar Rate Loans (or telephonic notice in lieu thereof) shall be irrevocable on and after the related

Interest Rate Determination Date, and Company shall be bound to effect a conversion or continuation in accordance therewith.

### 2.9. Default Interest.

If any principal of or interest on any Loan or any fee or other amount payable by Company hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment (and including post-petition interest in any proceeding under the Bankruptcy Code or other applicable bankruptcy laws) payable on demand (a) in the case of overdue principal of any Loan, at a rate that is 2% per annum in excess of the interest rate otherwise payable hereunder with respect to such Loan and (b) in the case of any such fees and other amounts, at a rate which is 2.00% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans that are Revolving Loans. Payment or acceptance of the increased rates of interest provided for in this Section 2.9 is not a permitted alternative to timely payment and shall not constitute a waiver of any Default or Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender.

### 2.10. Fees.

(a)    Company agrees to pay:

(i)    to Revolving Lenders, fees equal to (A) the average daily difference between (1) the Revolving Commitments and (2) the aggregate principal amount of (x) all outstanding Revolving Loans plus (y) the Letter of Credit Usage attributable to the Revolving Commitments, times (B) the Applicable Revolving Commitment Fee Percentage applicable to Revolving Loans; and

(ii)    to Revolving Lenders having Revolving Exposure, letter of credit fees equal to (A) the Applicable Margin for Revolving Loans that are Eurodollar Rate Loans, times (B) the average aggregate daily maximum amount available to be drawn under all such Letters of Credit attributable to the Revolving Commitments (regardless of whether any conditions for drawing could then be met and determined as of the close of business on any date of determination).

All fees referred to in this Section 2.10(a) shall be paid to Administrative Agent at its Principal Office and upon receipt, Administrative Agent shall promptly distribute to each Lender its Pro Rata Share of the applicable fees payable to each Class of Lenders.

(b)    Company agrees to pay directly to Issuing Bank, for its own account, the following fees:

(i)    a fronting fee equal to 0.125% per annum, times the average aggregate daily maximum amount available to be drawn under all Letters of Credit (determined as of the close of business on any date of determination); and

(ii)    such documentary and processing charges for any issuance, amendment, transfer or payment of a Letter of Credit as are in accordance with Issuing

52

Bank's standard schedule for such charges and as in effect at the time of such issuance, amendment, transfer or payment, as the case may be.

(c)     All fees referred to in Section 2.10(a) and 2.10(b)(i) shall be calculated on the basis of a 360-day year and the actual number of days elapsed and shall be payable quarterly in arrears on March 31, June 30, September 30 and December 31 of each year during the Revolving Commitment Period, commencing on the first such date to occur after the Closing Date, and on each Revolving Commitment Termination Date.

(d)     In addition to any of the foregoing fees, Company agrees to pay to Agents such other fees in the amounts and at the times separately agreed upon.

### 2.11.    Voluntary Prepayments/Commitment Reductions.

(a)     Voluntary Prepayments.

(i)     Any time and from time to time:

(A)     with respect to Base Rate Loans, Company may prepay any such Loans on any Business Day in whole or in part, in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount; and

(B)     with respect to Eurodollar Rate Loans, Company may prepay any such Loans on any Business Day in whole or in part in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount.

(ii)     All such prepayments shall be made:

(A)     upon not less than one Business Day's prior written or telephonic notice in the case of Base Rate Loans; and

(B)     upon not less than three Business Days' prior written or telephonic notice in the case of Eurodollar Rate Loans,

in each case given to Administrative Agent by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to Administrative Agent (and Administrative Agent will promptly transmit such telephonic or original notice for Term Loans or Revolving Loans, as the case may be, by telefacsimile or telephone to each Lender). Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein; provided that such prepayment obligation may be conditioned on the occurrence of any subsequent event (including a Change of Control or refinancing event). Any such voluntary prepayment shall be applied as specified in Section 2.13(a).

(b)     Voluntary Commitment Reductions.

(i)     Company may, upon not less than three Business Days' prior written or telephonic notice confirmed in writing to Administrative Agent (which original written or telephonic notice Administrative Agent will promptly transmit by telefacsimile or telephone to each applicable Lender), at any time and from time to time terminate in whole or permanently reduce in part, without premium or penalty, the Revolving Commitments in an amount up to the amount by which the Revolving Commitments exceed the Total Utilization of Revolving Commitments at the time of such proposed termination or reduction; provided, any such partial reduction of the Revolving Commitments shall be in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount; provided further that any voluntary reduction in the amount of the Revolving Commitments shall be accompanied by a ratable prepayment of the principal amount of the Tranche A Term Loans.

(ii)     Company's notice to Administrative Agent shall designate the date (which shall be a Business Day) of such termination or reduction and the amount of any partial reduction, and such termination or reduction of the Revolving Commitments shall be effective on the date specified in Company's notice and shall reduce the Revolving Commitment of each Lender proportionately to its Revolving Percentage thereof.

## 2.12.    **Mandatory Prepayments/Commitment Reductions**.

(a)     Asset Sales.    No later than three Business Days following the date of receipt by Parent, Holdings, Company or any of the Subsidiaries of any Net Asset Sale Proceeds, Company shall prepay the Loans (or cash collateralize or permanently reduce the Revolving Commitments, as applicable) in an aggregate amount equal to such Net Asset Sale Proceeds; provided that so long as no Default or Event of Default shall have occurred and be continuing, Company shall have the option, directly or through one or more of its Subsidiaries, to invest Net Asset Sale Proceeds (x) within 365 days following receipt of such Net Asset Sale Proceeds or (y) if a Credit Party enters into a legally binding commitment to reinvest such Net Asset Sale Proceeds within 365 days following receipt thereof (and such commitment remains in effect), within 180 days of the date of such legally binding commitment, in assets useful to the business of Parent and its Subsidiaries (such Net Asset Sale Proceeds so reinvested or committed to be reinvested, "**Asset Sale Reinvestment Deferred Amount**").

(b)     Insurance/Condemnation Proceeds.    No later than three Business Days following the date of receipt by Parent, Holdings, Company or any of the Subsidiaries, or Administrative Agent as loss payee, of any Net Insurance/Condemnation Proceeds, Company shall prepay the Loans (or cash collateralize or permanently reduce the Revolving Commitments, as applicable) in an aggregate amount equal to such Net Insurance/Condemnation Proceeds; provided that so long as no Default or Event of Default shall have occurred and be continuing, Company shall have the option, directly or through one or more of its Subsidiaries to invest such Net Insurance/Condemnation Proceeds (x) within 365 days following receipt of such Net Insurance/Condemnation Proceeds or (y) if a Credit Party enters into a legally binding commitment to reinvest such Net Insurance/Condemnation Proceeds within 365 days following receipt thereof (and such commitment remains in effect), within 180 days of the date of such legally binding commitment, in assets useful to the business of Parent, Holdings, Company and the Subsidiaries, which investment may include the repair, restoration or replacement of the

applicable assets thereof (such Net Insurance/Condemnation Proceeds so reinvested or committed to be reinvested, "**Insurance/Condemnation Reinvestment Deferred Amount**").

(c)     Issuance of Debt.  No later than three Business Days following the date of receipt by Parent, Holdings, Company or any of the Subsidiaries of any Net Cash Proceeds from the incurrence of any Indebtedness of Parent, Holdings, Company or any of the Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 6.3), Company shall prepay the Loans (or cash collateralize or permanently reduce the Revolving Commitments, as applicable) in an aggregate amount equal to 100% of such Net Cash Proceeds.

(d)     Consolidated Excess Cash Flow.  In the event that (x) there shall be Consolidated Excess Cash Flow for any Fiscal Year (commencing with the Fiscal Year ending June 30, 2016) and (y) the Total Leverage Ratio as of the last day of such Fiscal Year (determined for any such period by reference to the Compliance Certificate delivered pursuant to Section 5.2(a) calculating the Total Leverage Ratio as of the last day of such Fiscal Year) shall be greater than 3:00:1:00, Company shall, no later than 90 days after the end of such Fiscal Year, prepay the Loans (or cash collateralize or permanently reduce the Revolving Commitments, as applicable) in an aggregate amount equal to (i) 50% of such Consolidated Excess Cash Flow minus (ii) voluntary repayments of the Loans during such Fiscal Year (including repayments of Revolving Loans to the extent the Revolving Commitments are permanently reduced in connection with such repayments).

(e)     Revolving Loans.  (i) Company shall from time to time prepay the Revolving Loans to the extent necessary so that the Total Utilization of Revolving Commitments shall not at any time exceed the Revolving Commitments then in effect, (ii) the Revolving Commitments shall be permanently reduced by (x) the amount of any Existing Letter of Credit that is terminated (and not replaced with a Letter of Credit hereunder within five Business Days) and (y) the amount any Existing Letter of Credit is reduced (and not replaced with a Letter of Credit hereunder within five Business Days), in each case, five Business Days after the occurrence of such termination or reduction, as applicable, and (iii) upon the occurrence of a termination or reduction of any Existing Letter of Credit, any excess cash collateral attributable to such terminated or reduced Existing Letter of Credit shall be returned to Company to be used solely for liquidity purposes.

(f)     Letter of Credit Usage Exceeds Revolving Commitments.  If for any reason at any time during the five Business Day period immediately preceding the Revolving Commitment Termination Date, the aggregate Revolving Exposure exceeds the aggregate Revolving Commitments of Revolving Lenders at such time, then Company shall promptly prepay or cause to be promptly prepaid Revolving Loans or cash collateralize Letters of Credit to the satisfaction of the applicable Issuing Bank in an aggregate amount necessary to eliminate such excess.

(g)     Prepayment Certificate.  Concurrently with any prepayment of the Loans pursuant to Sections 2.12(a) through 2.12(d), Company shall deliver to Administrative Agent a certificate of a Responsible Officer demonstrating the calculation of the amount of the applicable net proceeds or Consolidated Excess Cash Flow, as the case may be.  In the event that Company shall subsequently determine that the actual amount received exceeded (an "excess") or was less

than (a "deficit") the amount set forth in such certificate, (x) in the case of an excess, Company shall promptly make an additional prepayment of the Term Loans and (y) in the case of a deficit which resulted in an overpayment of the Term Loans, the amount of such overpayment shall be credited to the next mandatory prepayment made hereunder, and in each case Company shall deliver to Administrative Agent a certificate of its Responsible Officer demonstrating the derivation of such excess or deficit, as the case may be.

(h)     Amortization.  Company shall not be required to make any amortization payments in respect of the Loans.

### 2.13.  Application of Prepayments/Reductions.

(a)     Application of Prepayments by Type of Loans.  Any prepayment of any Loan pursuant to Section 2.11(a) shall be applied as specified by Company in the applicable notice of prepayment; provided that with respect to prepayments made under Section 2.11(a), (i) each prepayment of the Tranche A Term Loans shall be accompanied by a ratable permanent reduction in the Revolving Commitments by the amount of such prepayment, (ii) no voluntary prepayments of the Tranche B Term Loans shall be permitted until each of the Tranche A Term Loans and the Revolving Loans have been paid in full in cash and all Letters of Credit have been terminated or the Letters of Credit Obligations have been cash collateralized in an amount equal to 103% of such obligation in a manner reasonably satisfactory to the respective Issuing Bank and (iii) subject to clause (ii), any voluntary prepayment of the Tranche B Term Loans shall be accompanied by the cash collateralization of the Revolving Commitment in an amount equal to such voluntary prepayment of Tranche B Term Loans (with no permanent reduction in the Revolving Commitment unless so directed by Company) until the Revolving Commitment is fully cash collateralized.

(b)     Application of Mandatory Prepayments.  Any amount required to be paid pursuant to Sections 2.12(a) through 2.12(d), shall be applied as follows: *first*, to prepay on a dollar for dollar basis the Priority Obligations such that 50% of such aggregate amount is paid to Revolving Lenders or applied to cash collateralize the Revolving Commitment, as applicable, and 50% of such aggregate amount is paid to Tranche A Term Loan Lenders; provided that with respect to the Revolving Commitment, such proceeds shall be applied (i) *first*, to cash collateralize the Letter of Credit Obligations in an amount equal to 103% of such obligation in a manner reasonably satisfactory to the respective Issuing Bank (with such cash collateral to be held at a depositary institution that is a Revolving Lender) until all Letters of Credit have been terminated or fully cash collateralized and (ii) thereafter, prepay the Revolving Loans to the extent necessary to permanently reduce the Revolving Commitments to $125,000,000; *second*, to prepay the remainder of the Tranche A Term Loans in full in cash; *third*, to prepay on a dollar for dollar basis the Tranche B Term Loan and cash collateralize the remaining Revolving Commitments (with no permanent reduction in the Revolving Commitment unless so directed by Company) such that, until such time as the Revolving Commitment is fully cash collateralized, 50% of such aggregate amount is paid to Tranche B Term Loans Lenders and 50% of such aggregate amount is applied to cash collateralize the Revolving Commitment; and *fourth*, to prepay the remainder of the Tranche B Term Loans in full in cash.

(c)    Waivable Mandatory Prepayment.    Anything contained herein to the contrary notwithstanding (but subject to Section 2.13(b)), in the event Company is required to make any mandatory prepayment (a "**Waivable Mandatory Prepayment**") of the Term Loans, not less than three Business Days prior to the date (the "**Required Prepayment Date**") on which Company is required to make such Waivable Mandatory Prepayment, Company shall notify Administrative Agent of the amount of such prepayment, the Classes of Term Loans to be repaid and Administrative Agent will promptly thereafter notify each Lender holding an outstanding Tranche A Term Loan or Tranche B Term Loan, as applicable, of the amount of such Lender's Pro Rata Share of such Waivable Mandatory Prepayment with respect to such Class and such Lender's option to refuse such amount.    Each such Lender may exercise such option by giving written notice to Company and Administrative Agent of its election to do so on or before the first Business Day prior to the Required Prepayment Date (it being understood that any Lender which does not notify Company and Administrative Agent of its election to exercise such option on or before the first Business Day prior to the Required Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option).    On the Required Prepayment Date, Company shall pay to Administrative Agent an amount equal to that portion of the Waivable Mandatory Prepayment payable to those Lenders that have elected not to exercise such option, which shall be applied to prepay the Tranche A Term Loans and Tranche B Term Loans, as applicable, of such Lenders.    Company shall be entitled to retain an amount equal to that portion of the Waivable Mandatory Prepayment otherwise payable to those Lenders that have elected to exercise such option, to be used for general business purposes.

(d)    Application of Prepayments of Loans to Base Rate Loans and Eurodollar Rate Loans.    Considering each Class of Loans being prepaid separately, any prepayment thereof shall be applied first to Base Rate Loans to the full extent thereof before application to Eurodollar Rate Loans, in each case in a manner which minimizes the amount of any payments required to be made by Company pursuant to Section 2.16(c).

## 2.14.    **General Provisions Regarding Payments**.

(a)    Subject to Section 2.7(h), all payments by Company of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to Administrative Agent not later than 1:00 p.m. (New York City time) on the date due at the Principal Office designated by Administrative Agent for the account of Lenders; for purposes of computing interest and fees, funds received by Administrative Agent after that time on such due date shall be deemed to have been paid by Company on the next succeeding Business Day.

(b)    All payments in respect of the principal amount of any Loan (other than voluntary prepayments of Revolving Loans) shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid, and all such payments (and, in any event, any payments in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest then due and payable before application to principal.

(c)    Administrative Agent (or its agent or sub-agent appointed by it) shall promptly distribute to each Lender at such address as such Lender shall indicate in writing, such

57

Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including, without limitation, all fees payable with respect thereto, to the extent received by Administrative Agent.

(d)    Notwithstanding the foregoing provisions hereof, if any Conversion/ Continuation Notice is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any Eurodollar Rate Loans, Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(e)    Subject to the provisos set forth in the definition of "Interest Period" as they may apply to Revolving Loans, whenever any payment to be made hereunder with respect to any Loan shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and, with respect to Revolving Loans only, such extension of time shall be included in the computation of the payment of interest hereunder or of the Revolving Commitment fees hereunder.

(f)    Administrative Agent shall deem any payment by or on behalf of Company hereunder that is not made in same day funds prior to 1:00 p.m. (New York City time) to be a non-conforming payment (it being understood, for the avoidance of doubt, that a payment shall not be deemed non-conforming because it is payable in kind pursuant to Section 2.7(h)). Any such payment shall not be deemed to have been received by Administrative Agent until the later of (i) the time such funds become available funds and (ii) the applicable next Business Day. Administrative Agent shall give prompt telephonic notice to Company and each applicable Lender (confirmed in writing) if any payment is non-conforming. Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.1(a). Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.9 from the date such amount was due and payable until the date such amount is paid in full.

(g)    If an Event of Default shall have occurred and not otherwise been waived, and the maturity of the Obligations shall have been accelerated pursuant to Section 8.2, all payments or proceeds received by Agents hereunder in respect of any of the Obligations, shall be applied in accordance with the application arrangements described in Section 7.2 of the Pledge and Security Agreement.

**2.15.    Ratable Sharing**.

Lenders hereby agree among themselves that if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, amounts payable in respect of Letters of Credit, fees and other amounts then due and owing to such Lender hereunder or under the other Credit Documents (collectively, the

"**Aggregate Amounts Due**" to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, in each case other than as explicitly set forth in this Agreement or any other Credit Document (including without limitation Section 7.2 of the Pledge and Security Agreement) and excluding the proceeds of any assignment or participation of any Obligations owing to such Lender, then the Lender receiving such proportionately greater payment shall (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; <u>provided</u> that if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of Company or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. Company expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set-off or counterclaim with respect to any and all monies owing by Company to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder. Notwithstanding anything to the contrary contained herein, the provisions of this Section 2.15 shall be subject to the express provisions of this Agreement which require, or permit, differing payments to be made to non-Defaulting Lenders as opposed to Defaulting Lenders.

### 2.16. **Making or Maintaining Eurodollar Rate Loans**.

(a)    <u>Inability to Determine Applicable Interest Rate</u>.    In the event that Administrative Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any Eurodollar Rate Loans, that by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of Adjusted Eurodollar Rate, Administrative Agent shall on such date give notice (by telefacsimile or by telephone confirmed in writing) to Company and each Lender of such determination, whereupon so long as such circumstance is continuing (i) no Loans may be made or continued as, or converted to, Eurodollar Rate Loans until such time as Administrative Agent notifies Company and Lenders that the circumstances giving rise to such notice no longer exist and (ii) any Funding Notice or Conversion/Continuation Notice given by Company with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by Company.

(b)    <u>Illegality or Impracticability of Eurodollar Rate Loans</u>.  In the event that on any date any Lender shall have determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with Company and Administrative Agent) that the making, maintaining or continuation of its Eurodollar Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) has become impracticable, as a result

of contingencies occurring after the Closing Date which materially and adversely affect the London interbank market or the position of such Lender in that market, then, and in any such event, such Lender shall be an "**Affected Lender**" and it shall on that day give notice (by telefacsimile or by telephone confirmed in writing) to Company and Administrative Agent of such determination (which notice Administrative Agent shall promptly transmit to each other Lender). Thereafter (A) the obligation of Affected Lender to make or continue Loans as, or to convert Loans to, Eurodollar Rate Loans shall be suspended until such notice shall be withdrawn by Affected Lender, (B) to the extent such determination by Affected Lender relates to a Eurodollar Rate Loan then being requested by Company pursuant to a Funding Notice or a Conversion/Continuation Notice, Affected Lender shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) a Base Rate Loan, (C) Affected Lender's obligation to maintain its outstanding Eurodollar Rate Loans (the "**Affected Loans**") shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (D) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Rate Loan then being requested by Company pursuant to a Funding Notice or a Conversion/Continuation Notice, Company shall have the option, subject to the provisions of Section 2.16(c), to rescind such Funding Notice or Conversion/Continuation Notice as to all Lenders by giving notice (by telefacsimile or by telephone confirmed in writing) to Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission Administrative Agent shall promptly transmit to each other Lender). Except as provided in the immediately preceding sentence, nothing in this Section 2.16(b) shall affect the obligation of any Lender other than an Affected Lender to make or continue Loans as, or to convert Loans to, Eurodollar Rate Loans in accordance with the terms hereof.

(c)    <u>Compensation for Breakage or Non-Commencement of Interest Periods</u>. Company shall compensate each Lender, upon written request by such Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid by such Lender to Lenders of funds borrowed by it to make or carry its Eurodollar Rate Loans and any loss, expense or liability sustained by such Lender in connection with the liquidation or re-employment of such funds but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender) a borrowing of any Eurodollar Rate Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for borrowing, or a conversion to or continuation of any Eurodollar Rate Loan does not occur on a date specified therefor in a Conversion/Continuation Notice or a telephonic request for conversion or continuation; (ii) if any prepayment or other principal payment of, or any conversion of, any of its Eurodollar Rate Loans occurs on a date prior to the last day of an Interest Period applicable to that Loan; or (iii) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of prepayment given by Company.

(d)    <u>Booking of Eurodollar Rate Loans</u>.  Any Lender may make, carry or transfer Eurodollar Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Lender.

(e)    <u>Assumptions Concerning Funding of Eurodollar Rate Loans</u>.  Calculation of all amounts payable to a Lender under this Section 2.16 and under Section 2.17 shall be made as though such Lender had actually funded each of its relevant Eurodollar Rate Loans through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant to clause (a) of the definition of Adjusted Eurodollar Rate in an amount equal to the amount of such Eurodollar Rate Loan and having a maturity comparable to the relevant Interest Period and through the transfer of such Eurodollar deposit from an offshore office of such Lender to a domestic office of such Lender in the United States of America; <u>provided</u> that each Lender may fund each of its Eurodollar Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.16 and under Section 2.17.

## 2.17.   Increased Costs; Capital Adequacy.

(a)    <u>Compensation For Increased Costs and Taxes</u>.  Subject to the provisions of Section 2.18 (which shall be controlling with respect to the matters covered thereby), in the event that any Lender (which term shall include Issuing Bank for purposes of this Section 2.17(a)) shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that any law, treaty or governmental rule, regulation or order, or any change therein or in the interpretation, administration or application thereof (including the introduction of any new law, treaty or governmental rule, regulation or order), or any determination of a court or governmental authority, in each case that becomes effective after the Closing Date, or compliance by such Lender with any guideline, request or directive issued or made after the Closing Date by any central bank or other governmental or quasi-governmental authority (whether or not having the force of law):  (i) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender (other than any such reserve or other requirements with respect to Eurodollar Rate Loans that are reflected in the definition of Adjusted Eurodollar Rate) or any Issuing Bank; (ii) subjects any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or (iii) imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or any Issuing Bank or its obligations hereunder or the London interbank market; and the result of either of the foregoing is to increase the cost to such Lender or such other Recipient of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) or other Recipient, as the case may be, with respect thereto; then, in any such case, Company shall promptly pay to such Lender or such other Recipient, upon request of such Lender or other Recipient, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder.  Such Lender shall deliver to Company (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this

Section 2.17(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

        (b)       <u>Capital Adequacy Adjustment</u>.  In the event that any Lender (which term shall include Issuing Bank for purposes of this Section 2.17(b)) shall have determined that the adoption, effectiveness, phase-in or applicability after the Closing Date of any law, rule or regulation (or any provision thereof) regarding capital adequacy or any change therein or in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender (or its applicable lending office) with any guideline, request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of, or with reference to, such Lender's Loans or Revolving Commitments or Letters of Credit, or participations therein or other obligations hereunder with respect to the Loans, Revolving Commitments or the Letters of Credit to a level below that which such Lender or such controlling corporation could have achieved but for such adoption, effectiveness, phase-in, applicability, change or compliance (taking into consideration the policies of such Lender or such controlling corporation with regard to capital adequacy), then from time to time, within five Business Days after receipt by Company from such Lender of the statement referred to in the next sentence, Company shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling corporation on an after-tax basis for such reduction. Such Lender shall deliver to Company (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section 2.17(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

### 2.18.    **Taxes; Withholding, etc**.

        (a)       <u>Payments to Be Free and Clear</u>.  All sums payable by or on account of any obligation of any Credit Party hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by Company and any Credit Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.18) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

        (b)       <u>Payment of Other Taxes by Company</u>.  Company and any Credit Party shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    Indemnification by Company.  Company and any Credit Party shall jointly and severally indemnify each Recipient, within ten Business Days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.18) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Company by a Lender (with a copy contemporaneously delivered to Administrative Agent), or by Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    Indemnification by the Lenders.  Each Lender shall severally indemnify Administrative Agent, within ten Business Days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that Company and any Credit Party has not already indemnified Administrative Agent for such Indemnified Taxes and without limiting the obligation of Company and any Credit Party to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6 relating to the maintenance of a Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Administrative Agent in connection with any Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by Administrative Agent to such Lender from any other source against any amount due to Administrative Agent under this Section 2.18(d).

(e)    Evidence of Payments.  As soon as practicable after any payment of Taxes by Company and any Credit Party to a Governmental Authority pursuant to this Section 2.18, Company and any Credit Party shall deliver to Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Administrative Agent.

(f)    Status of Lenders.  Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to Company and Administrative Agent, at the time or times reasonably requested by Company or Administrative Agent, such properly completed and executed documentation reasonably requested by Company or Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by Company or Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by Company or Administrative Agent as will enable Company or Administrative Agent, as the case may be, to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 2.18(g)(i), (ii) and (iv) below) shall not be required if in such Lender's

reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(g)    Evidence of Exemption From U.S. Withholding Tax.  Without limiting the generality of Section 2.18(f):

(i)    Any Lender that is a U.S. Person shall deliver to Company and Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Company or Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(ii)    Any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Company and Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Company or Administrative Agent), whichever of the following is applicable:

(A)    In the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Credit Document, executed copies of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Credit Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(B)    Executed copies of IRS Form W-8ECI;

(C)    In the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit I-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of Company within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a **U.S. Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN;

(D)    To the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of Exhibit I-

64

2 or Exhibit I-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; <u>provided</u> that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit I-4 on behalf of each such direct and indirect partner;

(iii)    Any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Company and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Company or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Company or the Administrative Agent to determine the withholding or deduction required to be made; and

(iv)    If a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Company and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Company or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Company or the Administrative Agent as may be necessary for Company and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any material respect, it shall update such form or certification or promptly notify Company and the Administrative Agent in writing of its legal inability to do so.

(h)    <u>Treatment of Certain Refunds</u>.  If Administrative Agent or Lender determines, in its reasonable discretion, that it has received a refund of any Tax as to which it has been indemnified by Company or other applicable Credit Party or with respect to which Company or such other applicable Credit Party has paid additional amounts pursuant to this Section 2.18, it shall pay to Company or such other applicable Credit Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by Company or such other applicable Credit Party under this Section 2.18 with respect to any Tax giving rise to such refund), net of all out-of-pocket expenses of Administrative Agent, or such

Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Notwithstanding anything to the contrary in this paragraph, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)    Survival. Each party's obligations under this Section 2.18 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.

### 2.19.    Obligation to Mitigate.

If any Lender requests compensation under Section 2.16 or 2.17, or requires Company to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.18, then such Lender shall (at the request of Company) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or materially reduce amounts payable pursuant to Section 2.16, 2.17 or 2.18, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. Company hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

### 2.20.    Defaulting Lenders.

Anything contained herein to the contrary notwithstanding, in the event that any Lender becomes a Defaulting Lender hereunder, then, so long as such Lender is a Defaulting Lender, (a) such Defaulting Lender shall be deemed not to be a "Lender" for purposes of voting on any matters (including the granting of any consents or waivers) with respect to any of the Credit Documents; provided that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which adversely affects such Defaulting Lender differently than other affected Lenders shall require the consent of such Defaulting Lender, (b) to the extent permitted by applicable law, any amount payable to such Defaulting Lender hereunder (whether on account of principal, interest, fees or otherwise) shall, in lieu of being distributed to such Defaulting Lender, be retained by Administrative Agent in a segregated account and subject to any applicable requirements of law, be applied (i) *first*, to the payment of any amounts owing by such Defaulting Lender to Administrative Agent hereunder, (ii) *second*, to the payment of any amounts owing by such Defaulting Lender to the Issuing Banks hereunder (pro rata in accordance with such amounts), (iii) *third*, to the funding of cash collateralization of any participating interest in any Letter of Credit in respect of which such Defaulting Lender has

#4822-5623-8110v18

failed to fund its portion thereof as required by this Agreement, as determined by Administrative Agent or the applicable Issuing Bank, (iv) *fourth*, if so determined by Administrative Agent, the Issuing Banks and Company, held in such account as cash collateral for future funding obligations of any Defaulting Lender under this Agreement, (v) *fifth*, pro rata, to the payment of any amounts owing to Company or Lenders as a result of any judgment of a court of competent jurisdiction obtained by Company or any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement and (vi) *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that, to the extent permitted by applicable law, if such payment is a payment of the principal amount of any Revolving Loan and Company so directs, such payment shall be applied solely to Revolving Loans of the other Lenders of the same Class as if such Defaulting Lender had no Revolving Loans outstanding and the Revolving Exposure of such Defaulting Lender were zero prior to being applied pursuant to the foregoing waterfall; (c) fees under Section 2.10 shall cease to accrue on that portion of such Defaulting Lender's Commitment that remains unfunded or which has not been included in any determination of Letter of Credit Usage pursuant to this Section 2.20; (d) if any Letter of Credit Usage exists at the time a Lender becomes a Defaulting Lender then: (i) such Letter of Credit Usage shall be reallocated among the non-Defaulting Lenders of the applicable Class in accordance with their respective Pro Rata Share but only to the extent the sum of the Revolving Exposure of all non-Defaulting Lenders of such Class plus such Defaulting Lender's Pro Rata Share of the Letter of Credit Usage does not exceed the total of all Commitments of all non-Defaulting Lenders of such Class, (ii) if the reallocation described in clause (i) above cannot, or can only partially, be effected, Company shall, promptly following a request by Administrative Agent or any Issuing Bank having issued outstanding Letters of Credit, cash collateralize such Defaulting Lender's Pro Rata Share of the Letter of Credit Usage (after giving effect to any partial reallocation pursuant to clause (i) above and only to the extent not covered by any cash collateral provided pursuant to clause (b) of this Section) in a manner and amount reasonably acceptable to Administrative Agent and any applicable Issuing Bank, (iii) if Company cash collateralizes any portion of such Defaulting Lender's Pro Rata Share of the Letter of Credit Usage pursuant to this Section, Company shall not be required to pay any fees to such Defaulting Lender pursuant to Section 2.10 with respect to such cash collateralized portion of the Defaulting Lender's Pro Rata Share of the Letter of Credit Usage during the period such Defaulting Lender's Pro Rata Share of the Letter of Credit Usage is cash collateralized, (iv) if that portion of the Letter of Credit Usage attributable to all Defaulting Lenders is reallocated to non-Defaulting Lenders pursuant to this Section 2.20, then the fees payable to the Lenders pursuant to Section 2.10 shall be adjusted in accordance with such non-Defaulting Lenders' Revolving Percentages determined in accordance with such reallocation, and (v) if any Defaulting Lender's Pro Rata Share of the Letter of Credit Usage is neither cash collateralized nor reallocated pursuant to this Section 2.20, then, without prejudice to any rights or remedies of Administrative Agent, any Issuing Bank or any Lender hereunder, all fees payable to the Lenders pursuant to Section 2.10 with respect to such Defaulting Lender's Pro Rata Share of the Letter of Credit Usage that is neither cash collateralized nor reallocated shall be payable to the applicable Issuing Bank until such portion of the Letter of Credit Usage is fully cash collateralized or reallocated; and (e) so long as any Lender is a Defaulting Lender, no Issuing Bank shall be required to issue, amend, renew or extend any Letter of Credit unless it is satisfied, it its sole discretion, that the related exposure will be 100% covered by the Commitments of the non-Defaulting Lenders or cash collateralized. No Revolving Commitment of any Lender shall

be increased or otherwise affected, and, except as otherwise expressly provided in this Section 2.20, performance by Company of its obligations hereunder and the other Credit Documents shall not be excused or otherwise modified as a result of any Lender becoming a Defaulting Lender or the operation of this Section 2.20.  The rights and remedies against a Defaulting Lender under this Section 2.20 are in addition to other rights and remedies which Company, Administrative Agent, Issuing Banks and Lenders may have against such Defaulting Lender.  In the event that each of Administrative Agent, Company and Issuing Banks agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then such Lender shall cease to be a Defaulting Lender hereunder and the Letter of Credit Usage shall be readjusted to reflect the inclusion of such Lender's Commitment.  On such date such Lender shall purchase at par such of the Loans and Letter of Credit participations of the other Lenders as Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its Revolving Percentage.

### 2.21.  Removal or Replacement of a Lender.

If any Lender requests compensation under Section 2.16 or 2.17, or if Company is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.18 and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 2.19, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then Company may, at its sole expense and effort, upon notice to such Lender and Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.5), all of its interests, rights (other than its existing rights to payments pursuant to Section 2.16, 2.17 or 2.18) and obligations under this Agreement and the related Credit Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if such Lender accepts such assignment); provided that:

(i)     Company shall have paid to Administrative Agent the assignment fee (if any) specified in Section 10.6;

(ii)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and without duplication participations in Letters of Credit, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Credit Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Company (in the case of all other amounts);

(iii)     in the case of any such assignment resulting from a claim for compensation under Section 2.16 or 2.17 or payments required to be made pursuant to Section 2.18, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)     such assignment does not conflict with applicable Law;

(v)     in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent; and

(v)     after giving effect to such assignment, no Default or Event of Default shall have occurred and be continuing.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Company to require such assignment and delegation cease to apply.

**2.22.    Incremental Facilities**.

(a)     Company may by written notice to Administrative Agent elect to request (i) from and after the Closing Date and prior to the Revolving Commitment Termination Date, an increase to the Revolving Commitments (any such increase, the "**New Revolving Commitments**") or (ii) the establishment of one or more new term loan commitments (the "**New Term Loan Commitments**"), in an amount not to exceed $50,000,000 (treating any New Revolving Commitment hereunder as fully drawn and utilized) (as reduced by the amount of Indebtedness incurred under Section 6.3(q) (treating any revolving commitment thereunder as fully drawn and utilized)) in the aggregate for all such New Revolving Commitments and New Term Loan Commitments; underline provided that any amount Company requests to borrow in excess of $25,000,000 pursuant to this Section 2.22 shall be subject to the consent of the Requisite Lenders.  Each such notice shall specify (A) the date (each, an "**Increased Amount Date**") on which Company proposes that the New Revolving Commitments or New Term Loan Commitments, as applicable, shall be effective, which shall be a date not less than 10 Business Days after the date on which such notice is delivered to Administrative Agent and (B) the identity of each Lender or other Person that is an Eligible Assignee (each, a "**New Revolving Lender**" or "**New Term Loan Lender**," as applicable) to whom Company proposes any portion of such New Revolving Commitments or New Term Loan Commitments, as applicable, be allocated and the amounts of such allocations; underline provided that any Lender approached to provide all or a portion of the New Revolving Commitments or New Term Loan Commitments may elect or decline, in its sole discretion, to provide a New Revolving Commitment or a New Term Loan Commitment.  Such New Revolving Commitments or New Term Loan Commitments shall become effective, as of such Increased Amount Date; underline provided that (1) no Default or Event of Default shall exist on such Increased Amount Date before or after giving effect to such New Revolving Commitments or New Term Loan Commitments, as applicable, (2) both before and after giving effect to the making of any Series of New Term Loans, each of the conditions set forth in Section 3.2 shall be satisfied, (3) the New Revolving Commitments or New Term Loan Commitments, as applicable, shall be effected pursuant to one or more Joinder Agreements executed and delivered by Company, the New Revolving Lender or New Term Loan Lender, as applicable, and Administrative Agent, and each of which shall be recorded in the Register and each New Revolving Lender and New Term Loan Lender shall be subject to the requirements set forth in Section 2.18(f) and (g), (4) Company shall make any payments required pursuant to Section 2.16(c) in connection with the New Revolving Commitments or New Term Loan Commitments, as applicable, (5) Company shall deliver or cause to be delivered any legal

opinions or other documents reasonably requested by Administrative Agent (at the direction of the Requisite Lenders) in connection with any such transaction.  Any New Term Loans made on an Increased Amount Date shall be designated a separate series (a "**Series**") of New Term Loans for all purposes of this Agreement, (6) each of Revolving Lenders and Tranche A Term Lenders shall have a ratable right of first refusal (but no obligation) with respect to providing such New Revolving Commitment or New Term Commitment and (7) no proceeds of any such New Terms Loans or New Revolving Loans shall be used to repay or prepay Tranche B Term Loans or any other Junior Financing.

(b)    On any Increased Amount Date on which New Revolving Commitments are effected, subject to the satisfaction of the foregoing terms and conditions, (i) each of the Revolving Lenders shall assign to each of the New Revolving Lenders, and each of the New Revolving Lenders shall purchase from each of the Revolving Lenders, at the principal amount thereof (together with accrued interest), such interests in the Revolving Loans outstanding on such Increased Amount Date as shall be necessary in order that, after giving effect to all such assignments and purchases, such Revolving Loans will be held by existing Revolving Loan Lenders and New Revolving Lenders ratably in accordance with their Revolving Loan Commitments after giving effect to the addition of such New Revolving Commitments to the Revolving Loan Commitments, (ii) each New Revolving Commitment shall be deemed for all purposes a Revolving Commitment and each Loan made thereunder (a "**New Revolving Loan**") shall be deemed, for all purposes, a Revolving Loan and (iii) each New Revolving Lender shall become a Revolving Lender with respect to the New Revolving Commitment and all matters relating thereto.

(c)    On any Increased Amount Date on which any New Term Loan Commitments of any Series are effective, subject to the satisfaction of the foregoing terms and conditions, (i) each New Term Loan Lender of any Series shall make a Loan to Company (a "**New Term Loan**") in an amount equal to its New Term Loan Commitment of such Series, and (ii) each New Term Loan Lender of any Series shall become a Lender hereunder with respect to the New Term Loan Commitment of such Series and the New Term Loans of such Series made pursuant thereto.

(d)    Administrative Agent shall notify Lenders promptly upon receipt of Company's notice of each Increased Amount Date and in respect thereof (y) the New Revolving Commitments and the New Revolving Lenders or the Series of New Term Loan Commitments and the New Term Loan Lenders of such Series, as applicable, and (z) in the case of each notice to any Revolving Lender, the respective interests in such Revolving Lender's Revolving Loans, in each case subject to the assignments contemplated by this Section.

(e)    The terms and provisions of the New Term Loans and New Term Loan Commitments of any Series shall be, except as otherwise set forth herein or in the Joinder Agreement, identical to the Tranche A Term Loans.  The terms and provisions of the New Revolving Loans shall be, except as otherwise set forth herein or in the Joinder Agreement, identical to the Revolving Loans.  In any event (i) the applicable New Term Loan Maturity Date of each Series shall be no shorter than the final maturity of the Tranche A Term Loans, and (ii) the rate of interest applicable to the New Term Loans of each Series shall be determined by Company and the applicable new Lenders and shall be set forth in each applicable Joinder

Agreement. The New Term Loans and New Revolving Loans shall constitute Priority Obligations for all purposes hereunder. Each Joinder Agreement may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Credit Documents as may be necessary or appropriate in the opinion of Administrative Agent (in consultation with the Requisite Lenders) to effect the provision of this Section 2.22.

**SECTION 3.  CONDITIONS PRECEDENT; CONDITIONS SUBSEQUENT**

> **3.1.    Closing Date**.

The obligation of each Lender to make a Credit Extension on the Closing Date is subject to the satisfaction, or waiver in accordance with Section 10.5, of the following conditions on or before the Closing Date:

(a)    <u>Credit Documents</u>.  Administrative Agent shall have received copies of each Credit Document, executed and delivered by a duly authorized officer of each Credit Party as of the Closing Date.

(b)    <u>Organization Documents; Incumbency</u>.  Administrative Agent shall have received (i) copies of each Organization Document executed and delivered by each Credit Party, and, to the extent applicable, certified as of a recent date by the appropriate governmental official, each dated the Closing Date or a recent date prior thereto; (ii) signature and incumbency certificates of the officers of each Credit Party executing the Credit Documents to which it is a party; (iii) resolutions of the Board of Directors or similar governing body of each Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; and (iv) a good standing certificate from the applicable Governmental Authority of each Credit Party's jurisdiction of incorporation, organization or formation dated a recent date.

(c)    <u>Consummation of the Transactions</u>.  Prior to or simultaneously with the initial Credit Extension, each of the Preferred Stock and Warrants shall have been issued. Administrative Agent shall have received a fully executed copy of each Transaction Document and the Closing Date Transactions shall have been fully consummated.

(d)    <u>Payment of Fees and Expenses</u>.  Company shall have paid all accrued reasonable fees and properly documented out-of-pocket expenses of any Agent and the ad hoc group of term loan lenders and the ad hoc group of revolving lenders for which invoices have been presented (including the reasonable fees and properly documented out-of-pocket expenses of counsel for Administrative Agent, the ad hoc group of term loan lenders and the ad hoc group of revolving lenders and those fees payable on the Closing Date referred to in Section 2.10(d)).

(e)    <u>Personal Property Collateral</u>.  In order to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid, perfected First Priority security interest in the personal property Collateral, the Credit Parties shall have delivered to Collateral Agent and the Lenders:

(i)      evidence reasonably satisfactory to the Requisite Lenders of the compliance by each Credit Party of their obligations under the Pledge and Security Agreement and the other Collateral Documents (including, without limitation, their obligations to deliver UCC financing statements and originals of securities and instruments as provided therein); and

(ii)      a completed Perfection Certificate dated the Closing Date and executed by a Responsible Officer of Company.

(f)      <u>Warrants</u>.  On or before the Closing Date, Parent and the Warrant Agent shall have executed and delivered the Warrant Documentation to the holders of the Warrants.

(g)      <u>Preferred Stock</u>.  On or before the Closing Date, Parent shall have executed and delivered the applicable Preferred Stock Documentation in respect of each of the Preferred A-1 Stock and Preferred A-2 Stock.

(h)      <u>Financial Statements; Projections</u>.  Administrative Agent and the Lenders shall have received from Parent the Historical Financial Statements.

(i)      <u>Opinions of Counsel to Credit Parties</u>.  Administrative Agent shall have received executed copies of the favorable written legal opinions of (i) Wachtell, Lipton, Rosen & Katz, special counsel to the Credit Parties, (ii) Morgan, Lewis & Bockius LLP, Pennsylvania counsel to the Credit Parties, and (iii) J. Devitt Kramer, general counsel of Parent, in each case addressed to Administrative Agent, Collateral Agent, each Lender and each Issuing Bank dated the Closing Date, which opinions shall be in form and substance reasonably satisfactory to Administrative Agent (in consultation with the Requisite Lenders).

(j)      <u>Solvency Certificate</u>.  On the Closing Date, Administrative Agent shall have received a Solvency Certificate substantially in the form of Exhibit E-2 from Company dated the Closing Date and addressed to Administrative Agent and Lenders, demonstrating that after giving effect to the consummation of the Closing Date Transactions, Parent, Holdings, Company and their Subsidiaries, on a consolidated basis, are and will be Solvent.

(k)      <u>Closing Date Certificate</u>.  Parent, Holdings and Company shall have delivered to Administrative Agent an executed Closing Date Certificate substantially in the form of Exhibit E-1, together with all attachments thereto.

(l)      <u>Patriot Act</u>.  Administrative Agent and the Lenders shall have received, at least three Business Days prior to the Closing Date, all documentation and other information about the Credit Parties as shall have been reasonably requested in writing at least ten Business Days prior to the Closing Date by Administrative Agent (at the direction of the Requisite Lenders) that it shall have reasonably determined is required by regulatory officials under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act.

Each Lender, by delivering its signature page to this Agreement and, if applicable, funding a Loan on the Closing Date, hereby acknowledges receipt of, and consents to and approves, each

Credit Document and each other document, agreement, instrument, certificate or opinion required to be approved by such Lender on the Closing Date.

### 3.2.    Conditions to Each Credit Extension.

(a)    Conditions Precedent.  The obligation of each Lender to make any Loan, or Issuing Bank to issue any Letter of Credit, on any Credit Date, including the Closing Date, is subject to the satisfaction, or waiver in accordance with Section 10.5, of the following conditions precedent:

(i)    Administrative Agent shall have received a fully executed and delivered Funding Notice or Issuance Notice, as the case may be;

(ii)    after making the Credit Extensions requested on such Credit Date, the Total Utilization of Revolving Commitments shall not exceed the Revolving Commitments then in effect;

(iii)    as of such Credit Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified by materiality in the context thereof) on and as of that Credit Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified by materiality in the context thereof) on and as of such earlier date;

(iv)    as of such Credit Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Credit Extension that would constitute an Event of Default or a Default;

(v)    as of such Credit Date, the Requisite Lenders have determined that no event, circumstance or change has occurred since June 30, 2014 (in the case of a Credit Extension on the Closing Date) or the Closing Date (in the case of a Credit Extension after the Closing Date) with respect to Parent and its Subsidiaries taken as a whole, that has caused or evidences, or could reasonably be expected to have a Material Adverse Effect, excluding in all cases any event, development or circumstance in connection with, arising from or related to (A) the adoption and enforcement of gainful employment regulations or (ii) the settlement of the matters set forth on Schedule 4.6; provided that this condition shall be deemed satisfied unless the Requisite Lenders have delivered a written notice to Company to the contrary prior to such Credit Date;

(vi)    as of such Credit Date, there is no regulatory fine, penalty, judgment, settlement, writ, order or injunction in an amount, individually or in the aggregate, in excess of $300,000,000 (to the extent not adequately covered by independent third-party insurance as to which the insurer has been notified of such fine, penalty, judgment, settlement, writ, order or injunction) that has not been satisfied,

vacated, discharged or stayed or bonded pending an appeal for a period of 60 consecutive days;

(vii)    on or before the date of issuance of any Letter of Credit, Administrative Agent shall have received all other information required by the applicable Issuance Notice, and such other documents or information as Issuing Bank may reasonably require in connection with the issuance of such Letter of Credit.

(b)    Notices.  Any Notice shall be executed by a Responsible Officer in a writing delivered to Administrative Agent.  In lieu of delivering a Notice, Company may give Administrative Agent telephonic notice by the required time of any proposed borrowing, conversion/continuation or issuance of a Letter of Credit, as the case may be; provided that each such notice shall be promptly confirmed in writing by delivery of the applicable Notice to Administrative Agent on or before the applicable date of borrowing, continuation/conversion or issuance.  Neither Administrative Agent nor any Lender shall incur any liability to Company in acting upon any telephonic notice referred to above that Administrative Agent believes in good faith to have been given by a duly authorized officer or other person authorized on behalf of Company or for otherwise acting in good faith.

### 3.3.    Conditions Subsequent.

(a)    As promptly as practicable and in any event within 30 days of the Closing Date, Parent and Company shall (and shall cause each of their Subsidiaries to) execute control agreements, in form and substance reasonably satisfactory to Requisite Lenders with respect to the accounts set forth on Schedule 3.3.

(b)    As promptly as practicable and in any event within 30 days of the Closing Date, Company shall deliver to Administrative Agent in form and substance reasonably satisfactory to Requisite Lenders a lenders' loss payable endorsement with respect to Company's property insurance policies.

## SECTION 4.  REPRESENTATIONS AND WARRANTIES

Each Credit Party represents and warrants to Agents and Lenders that:

### 4.1.    Existence, Qualification and Power; Compliance with Laws.

Each Credit Party and each of its Subsidiaries (a) is a Person duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization as identified in Schedule 4.1, (b) has all requisite power and authority to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Credit Documents to which it is a party, (c) is duly qualified and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, writs, injunctions and orders and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted, except in each case referred to in clause (c), (d) or (e), to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect.

### 4.2. Authorization; No Contravention.

The execution, delivery and performance by each Credit Party of each Credit Document to which such Person is a party, and the consummation of the transactions contemplated hereunder, are within such Credit Party's corporate or other powers, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents, (b) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 6.1), or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject or (c) violate any material Law, except with respect to any conflict, breach, contravention or payment (but not creation of Liens) referred to in clause (b) and any violation referred to in clause (c) to the extent that such conflict, breach, contravention, payment or violation would not reasonably be expected to have a Material Adverse Effect on the consummation of the Transactions.

### 4.3. Governmental Authorization; Other Consents.

No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Credit Party of this Agreement or any other Credit Document, or for the consummation of the transactions contemplated hereunder, (b) the grant by any Credit Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or (d) the exercise by Administrative Agent or any Lender of its rights under the Credit Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) filings necessary to perfect the Liens on the Collateral granted by Credit Parties in favor of Secured Parties, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

### 4.4. Binding Effect.

This Agreement and each other Credit Document has been duly executed and delivered by each Credit Party that is party thereto. This Agreement and each other Credit Document constitutes, a legal, valid and binding obligation of such Credit Party, enforceable against each Credit Party that is party thereto in accordance with its terms, except as may be limited by Debtor Relief Laws and by general principles of equity.

### 4.5. Financial Statements; No Material Adverse Effect.

(a)    The Historical Financial Statements fairly present in all material respects the financial condition of Parent and its Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein.  During the period from June 30, 2014 to and including the Closing Date (but prior to giving effect to the Closing Date Transactions), there has been (A) no sale, transfer or other disposition by Parent or any of its Subsidiaries of any material part of the business or property of Parent or any of its Subsidiaries, taken as a whole and (B) no purchase or other acquisition by Parent or any of its Subsidiaries of any business or property (including any Equity Interests of any other Person) material in relation to the consolidated financial condition of Parent and its Subsidiaries, in each case, which is not reflected in the foregoing financial statements or in the notes thereto or has not otherwise been disclosed in writing to the Lenders prior to the Closing Date.

(b)    Since the Closing Date there has been no event, development or circumstance that has had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, excluding in all cases any event, development or circumstance in connection with, arising from or related to (i) the adoption and enforcement of gainful employment regulations or (ii) the settlement of the matters set forth on Schedule 4.6.

### 4.6.    Litigation.

Except as specifically disclosed in Schedule 4.6, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of any Credit Party, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against Parent or any of its Subsidiaries or against any of their properties or revenues that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

### 4.7.    No Default.

Neither Parent nor any of its Subsidiaries is in default under or with respect to, or a party to, any Contractual Obligation that would, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

### 4.8.    Ownership of Property; Liens.

Each Credit Party and each of its Subsidiaries has good and legal title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all real property necessary in the ordinary conduct of its business, free and clear of all Liens except for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted by Section 6.1 and except where the failure to have such title would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

### 4.9.    Environmental Compliance.

(a)    There are no claims, actions, suits, or proceedings alleging potential liability or responsibility for violation of, or otherwise relating to, any Environmental Law that

would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)      Except as specifically disclosed in Schedule 4.9(b) or except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) none of the properties currently or formerly owned, leased or operated by any Credit Party or any of its Subsidiaries is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property, (ii) there are no and never have been any underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned, leased or operated by any Credit Party or any of its Subsidiaries or, to its knowledge, on any property formerly owned or operated by any Credit Party or any of its Subsidiaries, (iii) there is no asbestos or asbestos-containing material on any property currently owned or operated by any Credit Party or any of its Subsidiaries and (iv) Hazardous Materials have not been released, discharged or disposed of by any Person on any property currently or formerly owned, leased or operated by any Credit Party or any of its Subsidiaries and Hazardous Materials have not otherwise been released, discharged or disposed of by any of the Credit Parties and their Subsidiaries at any other location.

(c)      The properties owned, leased or operated by Parent and its Subsidiaries do not contain any Hazardous Materials in amounts or concentrations which (i) constitute, or constituted a violation of, (ii) require remedial action under or (iii) could give rise to liability under, Environmental Laws, which violations, remedial actions and liabilities, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

(d)      Except as specifically disclosed in Schedule 4.9(d), neither Parent nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law except for such investigation or assessment or remedial or response action that would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(e)      All Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Credit Party or any of its Subsidiaries have been disposed of in a manner that would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(f)      Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, none of the Credit Parties and their Subsidiaries has contractually assumed any liability or obligation under or relating to any Environmental Law.

**4.10.   Taxes**.

Except as set forth in Schedule 4.10, Parent and its Subsidiaries have filed all income tax returns and other material Federal, state and local tax returns and reports required to

be filed, and have paid all income taxes and other material Federal, state and local taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those (a) which are not overdue by more than 30 days or (b) which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.

**4.11.    ERISA Compliance**.

(a)    Except as set forth in Schedule 4.11(a) or as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, each Plan is in compliance in with the applicable provisions of ERISA, the Internal Revenue Code and other Federal or state Laws.

(b)    (i) No ERISA Event has occurred during the five year period prior to the date on which this representation is made or deemed made with respect to any Pension Plan, (ii) neither any Credit Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA), (iii)  neither any Credit Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan, and (iv) neither any Credit Party nor any ERISA Affiliate has engaged in a transaction that could reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA, except, with respect to each of the foregoing clauses of this Section 4.11(b), as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

**4.12.    Subsidiaries; Equity Interests**.

As of the Closing Date, no Credit Party has any Subsidiaries other than those specifically disclosed in Schedule 4.12, and all of the outstanding Equity Interests in material Subsidiaries have been validly issued, are fully paid and nonassessable and all Equity Interests owned by a Credit Party are owned free and clear of all Liens except (a) those created under the Collateral Documents and (b) any nonconsensual Lien that is permitted under Section 6.1.  As of the Closing Date, Schedule 4.12 (i) sets forth the name and jurisdiction of each Subsidiary, (ii) sets forth the ownership interest of Parent, Holdings, Company and any other Subsidiary thereof, including the percentage of such ownership and (iii) identifies each Subsidiary that is a Subsidiary the Equity Interests of which are required to be pledged on the Closing Date pursuant to Section 3.1(g).

**4.13.    Margin Regulations; Investment Company Act**.

(a)    Company is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Loans or drawings under any Letter of Credit will be used for any purpose that violates Regulation U of the Board of Governors.

(b)     None of Parent, any Person controlling Parent or any Subsidiary of Parent is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

### 4.14.   Disclosure.

No report, financial statement, certificate or other written information furnished by or on behalf of any Credit Party to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Credit Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; <u>provided</u> that, with respect to projected financial information and pro forma financial information (if any), each Credit Party represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation, it being understood that such projections may vary from actual results and that such variances may be material.

### 4.15.   Intellectual Property; Licenses, Etc.

Each of the Credit Parties and their Subsidiaries own, license or possess the right to use, all of the trademarks, service marks, trade names, domain names, copyrights, patents, licenses, technology, software, know-how database rights, design rights and other intellectual property rights (collectively, "**IP Rights**") that are reasonably necessary for the operation of their respective businesses as currently conducted, and, without conflict with the rights of any Person, except to the extent such conflicts would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  To the knowledge of any Credit Party no IP Rights used by any Credit Party or any Subsidiary thereof in the operation of their respective businesses as currently conducted infringes upon any intellectual property rights held by any Person except for such infringements which would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  No claim or litigation regarding any of the IP Rights, is pending or, to the knowledge of any Credit Party, threatened against any Credit Party or Subsidiary thereof, which, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

### 4.16.   Solvency.  On the Closing Date after giving effect to the Closing Date Transactions, Parent, Holdings, Company and their Subsidiaries, on a consolidated basis, are Solvent.

### 4.17.   Subordination of Junior Financing.

The Obligations are "Senior Debt," "Senior Indebtedness," "Guarantor Senior Debt" or "Senior Secured Financing" (or any comparable term) under, and as defined in, any Junior Financing Documentation.

### 4.18.   Labor Matters.

Except as would not reasonably be expected to have, in the aggregate, a Material Adverse Effect: (a) there are no strikes or other labor disputes against any of Parent, Holdings, Company or their Subsidiaries pending or, to the knowledge of any Credit Party, threatened; (b) hours worked by and payment made to employees of each of Parent, Holdings, Company or their Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with such matters; and (c) all payments due from any of Parent, Holdings, Company or their Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party.

### 4.19.  Collateral Documents.

The provisions of the Collateral Documents are effective to create in favor of Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable First Priority Lien (subject to Liens permitted by Section 6.1) on all right, title and interest of the respective Credit Parties in the Collateral described therein.  Except for filings completed prior to the Closing Date and as contemplated hereby and by the Collateral Documents, no filing or other action will be necessary to perfect or protect such Liens.

### 4.20.  Patriot Act; OFAC; FCPA.

(a)      To the extent applicable, each Credit Party is in compliance in all material respects with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (ii) the Patriot Act.

(b)      No part of the proceeds of the Loans or drawings under any Letter of Credit will be used, directly or, to the knowledge of any Credit Party or any of their Subsidiaries, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(c)      No Credit Party nor any of their respective officers or directors nor, to their knowledge, any of their respective employees, agents or Affiliates is any of the following:

(i)      a Person that is listed in the annex to, or it otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing effective September 24, 2001 (the "**Executive Order**");

(ii)      a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)      a Person that commits, threatens or conspires to commit or supports "terrorism" (as defined in the Executive Order); or

(iv)    a Person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control ("**OFAC**") at its official website or any replacement website or other replacement official publication of such list.

## SECTION 5.  AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder which is accrued and payable shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding, each of Parent, Holdings and Company shall, and shall (except in the case of the covenants set forth in Sections 5.1, 5.2 and 5.3) cause each of the Subsidiaries to:

### 5.1.    Financial Statements.

Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    as soon as available, but in any event within 90 days after the end of each Fiscal Year (commencing with the Fiscal Year ending on June 30, 2015), (i) a consolidated balance sheet of Parent, Holdings, Company and their Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, (ii) with respect to such consolidated financial statements, audited and accompanied by a report and opinion of Ernst & Young LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to a "going concern" emphasis paragraph or a qualification or disclaimer related to generally accepted accounting principles or generally accepted auditing standards or other material qualification or exception (provided that a paragraph in the audit report emphasizing a change in accounting as the result of new accounting rules promulgated by regulatory bodies such as the Financial Accounting Standards Board, the SEC or the American Institute of Certified Public Accountants shall be permitted) and (iii) a Management's Discussion and Analysis of Financial Condition and Results of Operation of Parent and its consolidated Subsidiaries that complies in all material respects with the requirements of Item 303 of Regulation S-K under the Securities Act (the "**MD&A**");

(b)    as soon as available, but in any event within 45 days (75 days in the case of the Fiscal Quarter ended on December 31, 2014) after the end of each of the first three Fiscal Quarters of each Fiscal Year (beginning with the Fiscal Quarter ended on December 31, 2014), a consolidated balance sheet of Parent, Holdings, Company and their Subsidiaries as at the end of such Fiscal Quarter, and the related (i) consolidated statements of income or operations for such fiscal quarter and for the portion of the Fiscal Year then ended and (ii) consolidated statements of cash flows for the portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures for the corresponding Fiscal Quarter of the previous Fiscal Year, all in reasonable detail and certified by a Responsible Officer of Parent as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash

flows of Parent, Holdings, Company and their Subsidiaries in accordance with GAAP, subject only to audit and normal year-end adjustments and the absence of footnotes;

(c)    as soon as available, and in any event no later than 60 days after the end of each Fiscal Year, a detailed consolidated budget for the following Fiscal Year (including a projected consolidated balance sheet of Parent, Holdings, Company and their Subsidiaries as of the end of the following Fiscal Year, the related consolidated statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto), and, as soon as available, significant revisions, if any, of such budget and projections with respect to such Fiscal Year (collectively, the "**Projections**"), which Projections shall in each case be accompanied by a certificate of a Responsible Officer of Company stating that such Projections are based on reasonable estimates, information and assumptions and that such Responsible Officer has no reason to believe that such Projections are incorrect or misleading in any material respect; and

(d)        no later than 20 Business Days after furnishing the annual and quarterly reports required under Sections 5.1(a) and (b), hold a conference call to discuss the results of operations for the relevant reporting period and to answer questions posed by any Lender with regard to those results, with dates and dial-in information announced in accordance with Section 5.2.

Notwithstanding the foregoing, if Parent becomes obligated to file reports under Section 13 or 15(d) of the Exchange Act, the obligations in Sections 5.1(a) and (b) may be satisfied by furnishing Parent's Form 10-K or 10-Q, as applicable, filed with the SEC; provided that, to the extent such information is in lieu of information required to be provided under Section 5.1(a), such materials are accompanied by a report and opinion of Ernst & Young LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to a "going concern" emphasis paragraph or a qualification or disclaimer related to generally accepted accounting principles or generally accepted auditing standards or other material qualification or exception (provided that a paragraph in the audit report emphasizing a change in accounting as the result of new accounting rules promulgated by regulatory bodies such as the Financial Accounting Standards Board, the SEC or the American Institute of Certified Public Accountants shall be permitted).

**5.2.    Certificates; Other Information**.

Deliver to Administrative Agent for prompt further distribution to each Lender:

(a)    no later than five days after the delivery of the financial statements referred to in Sections 5.1(a) and (b), a duly completed Compliance Certificate signed by a Responsible Officer of Company;

(b)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which Parent, Holdings or Company files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration

statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to Administrative Agent pursuant hereto;

(c)    promptly after the furnishing thereof, copies of any material requests or material notices received by any of Parent, Holdings, Company or any of the Subsidiaries (other than in the ordinary course of business) or material statements or material reports furnished to any holder of debt securities of Parent, Holdings, Company or of any of the Subsidiaries pursuant to the terms of any Junior Financing Documentation in a principal amount greater than the Threshold Amount and not otherwise required to be furnished to Lenders pursuant to any other clause of this Section 5.2;

(d)    until Parent otherwise becomes obligated to file reports under Section 13 or Section 15(d) of the Exchange Act, Company shall furnish to Administrative Agent from time to time after the occurrence of an event required to be therein reported, such other reports containing substantially the same information required to be contained in, and within the timing required by, a Current Report on Form 8-K under the Exchange Act pursuant to Items 1.01 (Entry into a Material Definitive Agreement) (limited to agreements for business acquisitions or dispositions), 1.02 (Termination of a Material Definitive Agreement) (limited to agreements for business acquisitions or dispositions), 1.03 (Bankruptcy or Receivership), 2.01 (Completion of Acquisition or Disposition of Assets), 2.02 (Results of Operations and Financial Condition) (limited to earnings announcements regarding a completed fiscal year or quarter), 2.03 (Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant) (other than as contemplated in the Restructuring Support Agreement), 2.04 (Triggering Events that Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement), 2.05 (Costs Associated with Exit or Disposal Activities), 2.06 (Material Impairment), 3.03 (Material Modification to Rights of Security Holders), 4.01 (Changes in Registrant's Certifying Accountants), 4.02 (Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review), 5.01 (Changes in Control of Registrant), 5.02 (limited to Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers), 5.03 (Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year) and 8.01 (Other Events);

(e)    together with the delivery of each Compliance Certificate pursuant to Section 5.2(a), (i) a certificate of a Responsible Officer of Company either confirming that there has been no change in such information since the date of the Perfection Certificate delivered on the Closing Date or the date of the most recent certificate delivered pursuant to this Section and identifying such changes and (ii) a description of each event, condition or circumstance during the last Fiscal Quarter covered by such Compliance Certificate requiring a mandatory prepayment under Section 2.12;

(f)    promptly furnish to Collateral Agent written notice of any change (i) in any Credit Party's corporate name or (ii) in any Credit Party's jurisdiction of organization. Each Credit Party agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral as contemplated in the Collateral Documents; and

(g)    promptly, such additional information regarding the business, legal, financial or corporate affairs of any Credit Party or any of the Subsidiaries, or compliance with the terms of the Credit Documents, as Administrative Agent or any Lender through Administrative Agent may from time to time reasonably request;

Documents or announcements required to be delivered pursuant to Section 5.1(a), (b) or (d) or Section 5.2(c) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (A) on which Company posts such documents, or provides a link thereto on Company's website on the Internet at the website address listed on Appendix B, or (B) on which such documents are posted on Company's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender, each prospective Lender that is an Eligible Assignee and Administrative Agent have access (whether a commercial, third-party website or whether sponsored by Administrative Agent) (the "**Platform**"), which will require a confidentiality acknowledgement no broader than as set forth in this Agreement; provided  that  (1) upon written request by Administrative Agent, Company shall deliver paper copies of such documents to Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by Administrative Agent, (2) Company shall notify (which may be by facsimile or electronic mail) Administrative Agent of the posting of any such documents and provide to Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents and (3) upon the request by any prospective Lender that is an Eligible Assignee, Company shall provide access to the Platform to such Person.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from Administrative Agent and maintaining its copies of such documents.

**5.3.    Notices**.

Promptly after obtaining knowledge thereof, deliver to Administrative Agent written notice, for prompt further distribution to each Lender:

(a)    of the occurrence of any Default or Event of Default;

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including arising out of or resulting from (i) breach or non-performance of, or any default or event of default under, a Contractual Obligation of any Credit Party or any Subsidiary, (ii) any dispute, litigation, investigation, proceeding or suspension between any Credit Party or any Subsidiary and any Governmental Authority, (iii) the commencement of, or any material development in, any litigation or proceeding affecting any Credit Party or any Subsidiary, including pursuant to any applicable Environmental Laws or Education Laws or the assertion or occurrence of any noncompliance by any Credit Party or as any of its Subsidiaries with, or liability under, any Environmental Law or Environmental Permit or any Education Law, or (iv) the occurrence of any ERISA Event; and

(c)    each notice received from the United States Department of Education or any other educational regulatory agency, in each case, (i) that would reasonably be expected to have a Material Adverse Effect or (ii) relates to the accreditation or other regulatory approval of an educational institution.

Each notice pursuant to this Section shall be accompanied by a written statement of a Responsible Officer of Company (x) that such notice is being delivered pursuant to Section 5.3(a) or (b) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action Company has taken and proposes to take with respect thereto.

**5.4.    Payment of Obligations**.

Pay, discharge or otherwise satisfy as the same shall become due and payable, all its material obligations and liabilities in respect of taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property.

**5.5.    Preservation of Existence, Etc**.

(a)    Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 6.4 or 6.5 and (b) take all reasonable action to maintain all rights, privileges (including its good standing), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except (i) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect or (ii) pursuant to a transaction permitted by Section 6.4 or 6.5.

**5.6.    Maintenance of Properties**.

(a)    Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted, and (b) make in all material respects necessary renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof or thereto in accordance with prudent industry practice.

**5.7.    Maintenance of Insurance**.

(a)    Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as Parent and its Subsidiaries) as are customarily carried under similar circumstances by such other Persons, and (b) if requested by Administrative Agent (acting at the direction of the Requisite Lenders), deliver a certificate from Company's insurance broker(s) in form and substance reasonably satisfactory to Administrative Agent (in consultation with the Requisite Lenders) outlining all material insurance coverage maintained as of the date of such certificate by Parent, Holdings, Company and the Subsidiaries to the extent not unduly burdensome for Company. Each such policy of insurance shall (i) name Collateral Agent, on behalf of Secured Parties, as an additional insured thereunder as its interests may appear and (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, reasonably satisfactory in form and substance to Administrative Agent (in consultation with the Requisite Lenders), that names Collateral Agent, on behalf of Lenders as the loss payee thereunder.

**5.8.    Compliance with Laws**.

Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except if the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect. Without limiting the generality of the foregoing, Parent will, and will cause each Subsidiary to, comply with (a) all applicable Laws, the violation of which would terminate or materially impair the eligibility of Parent or any Subsidiary for participation, if applicable, in student financial assistance programs under Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C.A. § 1070 et seq., where such termination or material impairment could reasonably be expected to have a Material Adverse Effect, (b) the federal Truth-in-Lending Act, 15 U.S.C. § 1601 et seq., and all other consumer credit laws applicable to Parent or any Subsidiary in connection with the advancing of student loans, except for such laws and regulations the violation of which, in the aggregate, will not result in the assessment of penalties and damages claims against Parent or any Subsidiary where such penalties and damage claims could reasonably be expected to have a Material Adverse Effect, (iii) all statutory and regulatory requirements for authorization to provide post-secondary education in the jurisdictions in which its educational facilities are located, except for such requirements the violation of which could not reasonably be expected to have a Material Adverse Effect and (iv) if applicable, all requirements for continuing its accreditations, except for such requirements the violation of which could not reasonably be expected to have a Material Adverse Effect (including cases where the governing board of the institution in good faith elected to seek or permit the termination of such accreditation which could not reasonably be expected to have a Material Adverse Effect) (the laws, regulations and requirements referred to in this sentence prior to giving effect to any materiality carve-outs are collectively referred to as the "**Education Laws**").

### 5.9.  **Books and Records**.

Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP consistently applied shall be made of all material financial transactions and matters involving the assets and business of Parent, Holdings, Company or such Subsidiary, as the case may be.

### 5.10.  **Inspection Rights**.

Permit representatives and independent contractors of Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the reasonable expense of Company and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to Company; provided that, excluding any such visits and inspections during the continuation of an Event of Default, only Administrative Agent on behalf of Lenders may exercise rights of Administrative Agent and Lenders under this Section 5.10 and Administrative Agent shall not exercise such rights more often than two times during any calendar year absent the existence of an Event of Default and only one such time shall be at Company's expense; provided further that when an Event of Default exists, Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of Company at any time during normal business hours and upon reasonable advance notice.  Administrative Agent and

Lenders shall give Company the opportunity to participate in any discussions with Company's independent public accountants.

### 5.11. Compliance with Environmental Laws.

Except, in each case, to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) comply, and take all reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply with all applicable Environmental Laws and Environmental Permits, (b) obtain and renew all Environmental Permits necessary for its operations and properties (c) in each case to the extent required by Environmental Laws, conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all Environmental Laws.

### 5.12. Subsidiaries.

(a)     Subject to Section 3.3, in the event that any Person becomes an Included Domestic Subsidiary of Holdings, (i) promptly cause such Included Domestic Subsidiary to become a Guarantor hereunder and a Grantor under the Pledge and Security Agreement by executing and delivering to Administrative Agent and Collateral Agent a Counterpart Agreement and (ii) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as are similar to those described in Sections 3.1(b)(i) and 3.1(e)(i).

(b)     In the event that any Person becomes a Foreign Subsidiary of Holdings, and the ownership interests of such Foreign Subsidiary are owned by Holdings or by any Guarantor, Holdings or such Guarantor, as applicable, shall deliver all such documents and certificates as are similar to those described in Section 3.1(b), and shall take all of the actions referred to in Section 3.1(e)(i) necessary to grant and to perfect a First Priority Lien in favor of Collateral Agent, for the benefit of Secured Parties, under the Pledge and Security Agreement in 66% of such ownership interests.

### 5.13. Additional Material Real Estate Assets.

In the event that any Credit Party acquires a Material Real Estate Asset and such interest has not otherwise been made subject to the Lien of the Collateral Documents in favor of Collateral Agent, for the benefit of Secured Parties, then such Credit Party shall promptly take all such actions and execute and deliver, or cause to be executed and delivered, all such mortgages, documents, instruments, agreements, opinions, title insurance and certificates with respect to each such Material Real Estate Asset that Collateral Agent shall reasonably request to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid and, subject to any filing or recording referred to herein, perfected First Priority security interest in such Material Real Estate Assets.

### 5.14. Further Assurances.

At any time or from time to time upon the request of Administrative Agent, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as Administrative Agent or Collateral Agent may reasonably request in order to effect fully the purposes of the Credit Documents. In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as Administrative Agent or Collateral Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by all Guarantors and are secured by substantially all of the assets of the Credit Parties, including all of the outstanding Equity Interests in any Domestic Subsidiary directly owned by a Guarantor and 66% of the outstanding Equity Interests in any Foreign Subsidiary owned by a Guarantor.

## SECTION 6.  NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder which is accrued and payable shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding, Parent, Holdings and Company shall not, nor shall they permit any of the Subsidiaries to, directly or indirectly:

### 6.1.    Liens.

Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following (collectively, "**Permitted Liens**"):

(a)     Liens pursuant to any Credit Document;

(b)     Liens existing on the Closing Date and to the extent relating to assets of the Credit Parties, listed on Schedule 6.1(b) and any modifications, replacements, renewals or extensions thereof; provided that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under Section 6.3 and (B) proceeds and products thereof and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by Section 6.3;

(c)     Liens for taxes, assessments or governmental charges which are not overdue for a period of more than 30 days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)     statutory Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens arising in the ordinary course of business which secure amounts not overdue for a period of more than 30 days or if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Lien or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)     (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and

(ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to Parent, Holdings, Company or any of the Subsidiaries;

(f)    deposits to secure (i) the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) or (ii) obligations in respect of letters or credit, bank guarantees or similar instruments related thereto, in the case of both (i) and (ii) to the extent incurred in the ordinary course of business;

(g)    easements, rights-of-way, restrictions, encroachments, protrusions and other similar encumbrances and minor title defects affecting real property which, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of Company or any material Subsidiary;

(h)    Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.1(h);

(i)    Liens securing Indebtedness permitted under Section 6.3(e); provided that such Liens do not at any time extend to or cover any assets (except for accessions to such assets) other than the assets subject to such Capitalized Leases; and provided further that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(j)    leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of Company or any material Subsidiary or (ii) secure any Indebtedness;

(k)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(l)    Liens (i) of a collection bank arising under Section 4-210 of the UCC on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and (iii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(m)    Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Sections 6.2(i) and 6.2(s) to be applied against the purchase price for such Investment and (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 6.5, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(n)    Liens in favor of Parent, Holdings, Company or a Subsidiary securing Indebtedness permitted under Section 6.3(d);

(o)    Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Subsidiary, in each case after the Closing Date (other than Liens on the Equity Interests of any Person that becomes a Subsidiary); provided that (i) such Lien was not created in contemplation of such acquisition or such Person becoming a Subsidiary, (ii) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property subjected to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require, pursuant to their terms at such time, a pledge of after-acquired property, it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition) and (iii) the Indebtedness secured thereby is permitted under Section 6.3(e), (g) or (h);

(p)    any interest or title of a lessor under leases entered into by Company or any of the Subsidiaries in the ordinary course of business;

(q)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by Company or any of the Subsidiaries in the ordinary course of business permitted by this Agreement;

(r)    Liens deemed to exist in connection with Investments in repurchase agreements under Section 6.2;

(s)    Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(t)    Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of Parent, Holdings, Company or any of the Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Parent, Holdings, Company and any of the Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of Parent, Holdings, Company or any of the Subsidiaries in the ordinary course of business;

(u)    Liens solely on any cash earnest money deposits made by Parent, Holdings, Company or any of the Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(v)    (i) Liens placed upon the Equity Interests of any Subsidiary acquired pursuant to a Permitted Acquisition to secure Indebtedness incurred pursuant to Section 6.3(h) in connection with such Permitted Acquisition and (ii) Liens placed upon the assets of such Subsidiary and any of its Subsidiaries to secure a Guarantee by such Subsidiary and its Subsidiaries of any such Indebtedness incurred pursuant to Section 6.3(h);

90

(w)  ground leases in respect of real property on which facilities owned or leased by Company or any of the Subsidiaries are located;

(x)  Liens securing Indebtedness permitted by Section 6.3(q);

(y)  Liens securing the Bilateral LC Facilities existing as of the Closing Date or contemplated by the Bilateral LC Facilities as in effect on such date;

(z)  Liens arising out of sale-leaseback transactions permitted under Section 6.5(e), so long as such Liens attach only to the property sold and being leased in such transaction and any accessions thereto or proceeds thereof and related property; and

(aa)  other Liens securing Indebtedness of Parent, Holdings, Company or the Subsidiaries outstanding in an aggregate principal amount not to exceed $2,500,000 so long as such Liens rank junior in priority to the Liens securing the Obligations.

**6.2.  Investments**.

Make or hold any Investments, except:

(a)  Investments by Parent, Holdings, Company or the Subsidiaries in assets that were Cash Equivalents when such Investment was made;

(b)  loans or advances to officers, directors and employees of Parent, Holdings, Company and any of the Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests of Parent; provided that the amount of such loans and advances shall be contributed to Company in cash as common equity, and (iii) for purposes not described in the foregoing clauses (i) and (ii), in an aggregate principal amount outstanding not to exceed $5,000,000;

(c)  Investments (i) by Parent, Holdings, Company or any of the Subsidiaries in any Credit Party (excluding any new Subsidiary which becomes a Credit Party), (ii) by any Subsidiary that is not a Credit Party in any other such Subsidiary that is also not a Credit Party and (iii) by Company or any of its Subsidiaries in (A) any Wholly Owned Subsidiary that is not a Credit Party or (B) any Qualified Non-Wholly-Owned Subsidiary that is not a Credit Party;

(d)  Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)  Investments consisting of Liens, Indebtedness, fundamental changes, Dispositions and Restricted Payments permitted under Sections 6.1, 6.3, 6.4, 6.5 and 6.6, respectively;

(f)  Investments existing or contemplated on the Closing Date and set forth on Schedule 6.2(f) and any modification, replacement, renewal, reinvestment or extension thereof;

provided that the amount of the original Investment is not increased except by the terms of such Investment (to the extent such increase is noted on Schedule 6.2(f)) or as otherwise permitted by this Section 6.2;

(g)     Investments in Swap Agreements permitted under Section 6.3;

(h)     promissory notes and other noncash consideration received in connection with Dispositions permitted by Section 6.5;

(i)     any Permitted Acquisition so long as the Total Leverage Ratio of Parent, Holdings, Company and the Subsidiaries shall, on a pro forma basis after giving effect to such acquisition as of the last day of the Fiscal Quarter most recently ended, be no greater than 3.00:1:00;

(j)     the Transactions;

(k)     Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

(l)     Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(m)     Investments made by Parent, Holdings, Company or the Subsidiaries consisting of the purchase (other than from an Affiliate) of student loans; provided that the amount of aggregate Investments made under this clause (m) shall not exceed (i) $150,000,000 in any calendar year and (ii) $325,000,000 in the aggregate at any one time outstanding.

(n)     advances of payroll payments to employees in the ordinary course of business;

(o)     on and after the date of the initial Restructuring Change of Control, Investments to the extent that payment for such Investments is made solely with capital stock of Parent;

(p)     Investments of a Subsidiary acquired after the Closing Date or of a corporation merged into Company or merged or consolidated with a Subsidiary in accordance with Section 6.4 after the Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(q)     Guarantees by Parent, Holdings, Company or the Subsidiaries of leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(r)    Investments in assets useful to the business of Parent, Holdings, Company and the Subsidiaries made with any Asset Sale Reinvestment Deferred Amount or Insurance/Condemnation Reinvestment Deferred Amount; and

(s)    other Investments by Parent, Holdings, Company or the Subsidiaries in an aggregate outstanding amount (valued at the time of the making thereof, and without giving effect to any write downs or write offs thereof) under this clause (s) not to exceed the greater of (i) $5,000,000 and (ii) 1% of Consolidated Total Assets.

### 6.3.    Indebtedness.

Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    (i) Indebtedness of Parent, Holdings, Company and any of the Subsidiaries under the Credit Documents (including, without limitation, the payment of PIK Interest and New Term Loans and New Revolving Loans incurred in accordance with Section 2.22) and (ii) the Remaining Notes Indebtedness;

(b)    Indebtedness (including intercompany Indebtedness) outstanding on the Closing Date and listed on Schedule 6.3(b) and any Permitted Refinancing thereof;

(c)    Guarantees by Parent, Holdings, Company and the Subsidiaries in respect of Indebtedness of (i) Parent, Holdings, Company or the Subsidiaries and (ii) Education Management LLC and Education Management Finance Corp., as issuers under the 2013 Indenture in an aggregate principal amount not to exceed the then outstanding amount of Remaining Notes Indebtedness under the 2013 Indenture, in each case, as otherwise permitted hereunder; provided that (A) no Guarantee by any Credit Party of any Junior Financing shall be permitted unless such Credit Party shall have also provided a Guarantee of the Obligations substantially on the terms set forth in the Guaranty and (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(d)    Indebtedness of Parent, Holdings, Company or the Subsidiaries owing to Parent, Holdings, Company or any other Subsidiary to the extent constituting an Investment permitted by Section 6.2; provided that all such Indebtedness of any Credit Party owed to any Person that is not a Credit Party shall be subject to the subordination terms set forth in Section 4.4.3 of the Pledge and Security Agreement;

(e)    Indebtedness with respect to Capitalized Leases in an aggregate amount, together with the aggregate amount of Indebtedness incurred pursuant to Section 6.3(g), not to exceed at any time an amount equal to the greater of $50,000,000 and 2% of Consolidated Total Assets;

(f)    Indebtedness in respect of Swap Agreements designed to hedge against interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes;

#4822-5623-8110v18

(g)     purchase money Indebtedness in an aggregate amount, together with the aggregate amount of Indebtedness incurred pursuant to Section 6.3(e), not to exceed at any time an amount equal to the greater of $50,000,000 and 2% of Consolidated Total Assets; provided that any such Indebtedness (i) shall be secured only by the asset acquired in connection with the incurrence of such Indebtedness and (ii) shall constitute not less than 85% of the aggregate consideration paid with respect to such asset;

(h)     (i) the following Indebtedness assumed in connection with Permitted Acquisitions (provided that such Indebtedness is not incurred in contemplation of any such Permitted Acquisition):     (x) Indebtedness assumed by Parent, Holdings, Company or the Subsidiaries; provided that such Indebtedness is unsecured and is subordinated to the Obligations on terms reasonably satisfactory to the Requisite Lenders; and (y) other Indebtedness assumed by Parent, Holdings, Company or the Subsidiaries in an aggregate amount not to exceed $25,000,000 at any one time outstanding, (ii) Indebtedness incurred by Parent, Holdings, Company or the Subsidiaries to finance a Permitted Acquisition; provided that such Indebtedness is unsecured and is subordinated to the Obligations on terms reasonably satisfactory to the Requisite Lenders and (iii) any Permitted Refinancing of the foregoing; provided that with respect to any unsecured or subordinated Indebtedness, the Permitted Refinancing thereof shall be similarly unsecured or subordinated, as applicable; provided that, in each case of the foregoing clauses (i), (ii) and (iii), (A) both immediately prior and after giving effect thereto, no Default or Event of Default shall exist or result therefrom, (B) such Indebtedness and all Indebtedness resulting from any Permitted Refinancing thereof (I) matures after, and does not require any scheduled amortization (other than nominal amortization) or other scheduled payments of principal prior to, the date that is 91 days after the Term Loan Maturity Date (it being understood that such Indebtedness may have mandatory prepayment, repurchase or redemptions provisions satisfying the requirement of clause (B)(II) hereof) and (II) has terms and conditions (other than interest rate, redemption premiums and subordination terms), taken as a whole, that are not materially less favorable to Parent, Holdings, Company and the Subsidiaries as the terms and conditions of this Agreement as of the Closing Date; provided further that a certificate of a Responsible Officer delivered to Administrative Agent at least five Business Days prior to the assumption or incurrence of such Indebtedness permitted under this Section 6.3(h), together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that Company has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless Administrative Agent notifies Company within such five Business Day period that the Requisite Lenders disagree with such determination (including a reasonable description of the basis upon which they disagree);

(i)     Indebtedness representing deferred compensation to employees of Parent, Holdings, Company and the Subsidiaries incurred in the ordinary course of business;

(j)     Indebtedness incurred by Parent, Holdings, Company or the Subsidiaries in any Disposition constituting indemnification obligations or obligations in respect of purchase price or other similar adjustments;

94

(k)    Indebtedness consisting of obligations of Parent, Holdings, Company or the Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with the Transactions, Permitted Acquisitions or any other Investment expressly permitted hereunder;

(l)    Cash Management Obligations and other Indebtedness in respect of netting services, overdraft protections and similar arrangements in each case in connection with deposit accounts;

(m)    Indebtedness incurred by Parent, Holdings, Company or any of the Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims and including Indebtedness under the Bilateral LC Facilities; provided that any reimbursement obligations in respect thereof are reimbursed within 30 days following the incurrence thereof;

(n)    obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by Parent, Holdings, Company or any of the Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(o)    Indebtedness supported by a Letter of Credit, in a principal amount not to exceed the face amount of such Letter of Credit;

(p)    Indebtedness consisting of the financing of insurance premiums in the ordinary course of business;

(q)    Indebtedness of Parent, Holdings, Company or the Subsidiaries not otherwise permitted hereunder in an aggregate principal amount at any time outstanding not to exceed $25,000,000 (as reduced by the amount borrowed pursuant to Section 2.22) and any Permitted Refinancing thereof; provided that (i) such Indebtedness shall (A) rank junior or pari passu in priority to the Priority Obligations on a payment and lien basis and (B) shall be subject to an intercreditor agreement in form and substance reasonably satisfactory to Requisite Lenders, (ii) the terms of such Indebtedness shall not conflict with the terms of this Agreement in any respect, (iii) each of Revolving Lenders and Tranche A Term Lenders shall have a ratable right of first refusal (but with no obligation) with respect to providing such Indebtedness and (iv) the proceeds of such Indebtedness shall be used for general corporate or working capital purposes and not to repay or prepay the Tranche B Term Loans or any other Junior Financing;

(r)    other Indebtedness of Parent, Holdings, Company or the Subsidiaries in an aggregate amount not to exceed at any time $5,000,000;

(s)    obligations in respect of sale-leaseback transactions permitted under Section 6.5; and

95

(t)     all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (q) above.

### 6.4.     Fundamental Changes.

Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that:

(a)     any Subsidiary may merge with (i) Company (including a merger, the purpose of which is to reorganize Company in a new jurisdiction); provided that (x) Company shall be the continuing or surviving Person and (y) such merger does not result in Company ceasing to be incorporated under the Laws of the United States, any state thereof or the District of Columbia, (ii) Holdings (including a merger, the purpose of which is to reorganize Holdings in a new jurisdiction); provided that (x) Holdings shall be the continuing or surviving Person and (y) such merger does not result in Holdings ceasing to be incorporated under the Laws of the United States, any state thereof or the District of Columbia, (iii) Parent (including a merger, the purpose of which is to reorganize Parent in a new jurisdiction); provided that (x) Parent shall be the continuing or surviving Person and (y) such merger does not result in Parent ceasing to be incorporated under the Laws of the United States, any state thereof or the District of Columbia or (iv) any one or more other Subsidiaries; provided that when any Subsidiary that is a Credit Party is merging with another Subsidiary, a Credit Party shall be the continuing or surviving Person;

(b)     (i) any Subsidiary that is not a Credit Party may merge or consolidate with or into any other Subsidiary that is not a Credit Party and (ii) any Subsidiary (other than Company) may liquidate or dissolve or change its legal form if Parent determines in good faith that such action is in the best interests of Parent, Holdings, Company and the Subsidiaries and if not materially disadvantageous to Lenders;

(c)     any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to Parent, Holdings, Company or to another Subsidiary; provided that if the transferor in such a transaction is a Credit Party, then (i) the transferee must be a Credit Party or (ii) to the extent constituting an Investment, such Investment must be permitted under Sections 6.2 and 6.3;

(d)     so long as no Default or Event of Default exists or would result therefrom, any Subsidiary may merge with any other Person to effect an Investment permitted pursuant to Section 6.2; provided that the continuing or surviving Person shall be a Subsidiary, which together with each of its Subsidiaries, shall have complied with the requirements in Section 5.12; and

(e)     so long as no Default or Event of Default exists or would result therefrom, a Disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 6.5, shall be permitted.

### 6.5.     Dispositions.

Make any Disposition or enter into any agreement to make any Disposition, except:

(a)    Dispositions of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of Parent, Holdings, Company or the Subsidiaries;

(b)    Dispositions of assets that do not constitute Asset Sales, but excluding Dispositions that do not constitute Asset Sales solely by operation of clause (iii) of the definition thereof;

(c)    Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)    Dispositions of property to Parent, Holdings, Company or the Subsidiaries; provided that if the transferor of such property is a Credit Party, (i) the transferee thereof must either be a Credit Party or (ii) to the extent such transaction constitutes an Investment, such transaction is permitted under Section 6.2;

(e)    Dispositions permitted by Sections 6.4 and 6.6 and Liens permitted by Section 6.1;

(f)    Dispositions of property pursuant to sale-leaseback transactions; provided that the fair market value of all property so Disposed of (taken together with the aggregate book value of all property Disposed of pursuant to Section 6.5(k)) shall not exceed $50,000,000;

(g)    Dispositions of Cash Equivalents;

(h)    Dispositions of accounts receivable in connection with the collection or compromise thereof;

(i)    leases, subleases, licenses or sublicenses, in each case in the ordinary course of business and which do not materially interfere with the business of Parent, Holdings, Company and the Subsidiaries;

(j)    transfers of property subject to Casualty Events upon receipt of the Net Cash Proceeds of such Casualty Event;

(k)    Dispositions of property not otherwise permitted under this Section 6.5; provided that (i) at the time of such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Default or Event of Default exists), no Default or Event of Default shall exist or would result from such Disposition, (ii) the aggregate book value of all property Disposed of in reliance on this clause (k) (taken together with the aggregate fair market value of all property Disposed of pursuant to Section 6.5(f)) shall not exceed $50,000,000 and (iii) with respect to any Disposition pursuant to this clause (k) for a purchase price in excess of $2,500,000, Parent, Holdings, Company or a Subsidiary shall receive not less than 75% of such consideration in the form of cash or Cash Equivalents (in each case,

free and clear of all Liens at the time received, other than nonconsensual Liens permitted by Section 6.1 and Liens permitted by Section 6.1(s) and clauses (i) and (ii) of Section 6.1(t); provided that for the purposes of this clause (iii), (A) any liabilities (as shown on Parent's, Holdings', Company's or such Subsidiary's most recent balance sheet provided hereunder or in the footnotes thereto) of Parent, Holdings, Company or such Subsidiary, other than liabilities that are by their terms subordinated to the payment in cash of the Obligations, that are assumed by the transferee with respect to the applicable Disposition and for which Parent, Holdings, Company and all of the Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities received by Parent, Holdings, Company or such Subsidiary from such transferee that are converted by Parent, Holdings, Company or such Subsidiary into cash (to the extent of the cash received) within 180 days following the closing of the applicable Disposition and (C) any Designated Non-Cash Consideration received by Parent, Holdings, Company or such Subsidiary in respect of such Disposition having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (C) that is at that time outstanding, not in excess of 1.5% of Consolidated Total Assets at the time of the receipt of such Designated Non-Cash Consideration, with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value, shall be deemed to be cash;

(l)      Dispositions listed on Schedule 6.5(l); and

(m)      Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

provided that any Disposition of any property pursuant to this Section 6.5 (except pursuant to Sections 6.5(f) and except for Dispositions from a Credit Party to another Credit Party), shall be for no less than the fair market value of such property at the time of such Disposition.  To the extent any Collateral is Disposed of as expressly permitted by this Section 6.5 to any Person other than Parent, Holdings, Company or any of the Subsidiaries, such Collateral shall be sold free and clear of the Liens created by the Credit Documents, and Administrative Agent or Collateral Agent, as applicable, shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

**6.6.    Restricted Payments**.

Declare or make, directly or indirectly, any Restricted Payment, except:

(a)      each of Holdings, Company and the Subsidiaries may make Restricted Payments to Parent, Holdings, Company and the other Subsidiaries (and, in the case of a Restricted Payment by a non-Wholly Owned Subsidiary, to Parent, Holdings, Company and any other Subsidiary and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(b)      Parent, Holdings, Company and the Subsidiaries may declare and make dividend payments or other distributions payable solely in the Equity Interests (other than Disqualified Equity Interests not otherwise permitted by Section 6.3) of such Person;

98

(c)    Restricted Payments made on the Closing Date to consummate the Closing Date Transactions;

(d)    to the extent constituting Restricted Payments, Parent, Holdings, Company and the Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 6.4 or 6.8 other than Sections 6.8(e) and (k);

(e)    repurchases of Equity Interests in Parent, Holdings, Company or any of the Subsidiaries deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(f)    Parent may pay for the repurchase, retirement or other acquisition or retirement for value of Equity Interests of Parent by any future, present or former employee or director of Parent or any of its Subsidiaries in connection with the termination of employment, death or disability of such individual pursuant to any employee or director equity plan, employee or director stock option plan or any other employee or director benefit plan or any agreement (including any stock subscription or shareholder agreement) with any employee or director of Parent or any of its Subsidiaries;

(g)    other than at any time during the PIK Period when Company has elected to pay PIK Interest on the Tranche B Term Loans in accordance with Section 2.7(h), Parent may pay dividends to the holders of the Preferred A-1 Stock; and

(h)    other Restricted Payments in an aggregate amount, when taken together with all other Restricted Payments made pursuant to this clause (h) that are at that time outstanding, not to exceed (i) prior to the initial Restructuring Change of Control, $5,000,000 or (ii) after the initial Restructuring Change of Control, the greater of $5,000,000 and 1% of Consolidated Total Assets as of the date such Restricted Payment is made.

Notwithstanding anything to the contrary contained herein, no Restricted Payments shall be made upon the occurrence and during the continuation of (x) the Event of Default set forth in Section 8.1(a) or (y) any other Event Default whereby the Obligations are accelerated and become immediately due and payable.

### 6.7.    Change in Nature of Business.

Engage in any material line of business substantially different from those lines of business conducted by Parent, Holdings, Company and the Subsidiaries on the Closing Date or any business reasonably related or ancillary thereto.

### 6.8.    Transactions with Affiliates.

Enter into any transaction of any kind with any Affiliate of Company, whether or not in the ordinary course of business, other than:

(a)    transactions among Credit Parties or any Subsidiary or any entity that becomes a Subsidiary as a result of such transaction;

(b)     on terms substantially as favorable to Parent, Holdings, Company or such Subsidiary as would be obtainable by Parent, Holdings, Company or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(c)     the payment of fees and expenses related to the Transactions;

(d)     the issuance of Equity Interests to the management of Parent, Holdings, Company or any of the Subsidiaries pursuant to the Management Incentive Plan;

(e)     equity issuances, repurchases, retirements or other acquisitions or retirements of Equity Interests by Parent permitted under Section 6.6;

(f)     loans and other transactions by Parent, Holdings, Company and the Subsidiaries to the extent permitted under this Section 6;

(g)     employment and severance arrangements between Parent, Holdings, Company and the Subsidiaries and their respective officers and employees in the ordinary course of business;

(h)     payments by Parent, Holdings, Company and the Subsidiaries pursuant to the tax sharing agreements among Parent, Holdings, Company and the Subsidiaries on customary terms to the extent attributable to the ownership or operation of Holdings, Company and the Subsidiaries;

(i)     the payment of customary fees and reasonable out of pocket costs to, and indemnities provided on behalf of, directors, officers and employees of Parent, Holdings, Company and the Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of Parent, Holdings, Company and the Subsidiaries;

(j)     transactions pursuant to permitted agreements in existence on the Closing Date and set forth on Schedule 6.8 or any amendment thereto to the extent such amendment is not adverse to the Lenders in any material respect;

(k)     dividends, redemptions and repurchases permitted under Section 6.6; and

(l)     acquisition and investments permitted under Section 6.2.

**6.9.     Burdensome Agreements**.

Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Credit Document) that limits the ability of:

(a)     any Subsidiary of Holdings that is not a Guarantor to make Restricted Payments to any Credit Party; or

(b)     any Credit Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of Lenders with respect to the Obligations or under the Credit Documents;

<u>provided</u> that the foregoing clauses (a) and (b) shall not apply to Contractual Obligations which (i) (A) exist on the Closing Date and (to the extent not otherwise permitted by this Section 6.9) are listed on Schedule 6.9 hereto and (B) to the extent Contractual Obligations permitted by clause (A) are set forth in an agreement evidencing Indebtedness, are set forth in any agreement evidencing any permitted renewal, extension or refinancing of such Indebtedness so long as such renewal, extension or refinancing does not expand the scope of such Contractual Obligation, (ii) are binding on a Subsidiary of Parent at the time such Subsidiary first becomes a Subsidiary of Parent, so long as such Contractual Obligations were not entered into solely in contemplation of such Person becoming a Subsidiary of Parent, (iii) as determined by Company in good faith, will not adversely affect any Credit Party's ability to perform its obligations under this Agreement or any other Credit Document in any material respect, (iv) arise in connection with any Disposition permitted by Section 6.5 to the extent such Contractual Obligations are in effect prior to the consummation of such Disposition, (v) are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 6.2 and applicable solely to such joint venture entered into in the ordinary course of business, (vi) are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 6.3 but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness (and excluding in any event any Indebtedness constituting any Junior Financing), (vii) are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto, (viii) comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Section 6.3(e) or 6.3(g) to the extent that such restrictions apply only to the property or assets securing such Indebtedness or, in the case of Indebtedness incurred pursuant to Section 6.3(g) only, to the Subsidiaries incurring or guaranteeing such Indebtedness, (ix) are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of Parent, Holdings, Company or any Subsidiary, (x) are customary provisions restricting assignment of any agreement entered into in the ordinary course of business, (xi) are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business, (xii) are required by any applicable Education Laws or any other applicable laws or (xiii) comprise restrictions imposed by the Preferred Stock Documentation.

### 6.10.  Accounting Changes.

Make any change in fiscal year; <u>provided</u> that Company may, upon written notice to Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to Administrative Agent (in consultation with the Requisite Lenders), in which case, Company and Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

### 6.11.  Prepayments, Etc. of Indebtedness; Amendment of Agreements.

(a)  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness that is required to be subordinated in rights or payment to the Obligations pursuant to the terms of the Credit Documents (collectively, "**Junior Financing**") or make any payment in violation of any subordination terms of any Junior Financing Documentation, except (i) the refinancing thereof with the Net Cash Proceeds of any

Indebtedness (to the extent such Indebtedness constitutes a Permitted Refinancing and, if applicable, is permitted pursuant to Section 6.3(h)), to the extent not required to prepay any Loans pursuant to Section 2.12, or of any Indebtedness of Parent, (ii) the conversion of any Junior Financing to Equity Interests (other than Disqualified Equity Interests) of Parent, (iii) the prepayment of Indebtedness of Parent, Holdings, Company or any Subsidiary to Parent, Holdings, Company or any Subsidiary to the extent permitted by the Collateral Documents and (iv) prepayments, redemptions, purchases, defeasances and other payments in respect of Junior Financing prior to their scheduled maturity in an aggregate amount, together with the aggregate amount of Restricted Payments made pursuant to Section 6.6(h), not to exceed (i) prior to the initial Restructuring Change of Control, $5,000,000 or (ii) after the initial Restructuring Change of Control, the greater of $5,000,000 and 1% of Consolidated Total Assets as of the date such prepayment, redemption, purchase, defeasance or other payment in respect of Junior Financing is made.

(b)    Amend, modify or change in any manner adverse to the interests of the Lenders in any material respect any term or condition of any (i) Junior Financing Documentation, (ii) Organization Document (excluding for the avoidance of doubt any amendments, modifications or changes necessary to effectuate the Transactions) or (iii) Preferred Stock Documentation, in each case without the consent of the Requisite Lenders.

### 6.12.    Equity Interests of Company and Subsidiaries.

Permit any Domestic Subsidiary to be a non-Wholly Owned Subsidiary, except as a result of or in connection with a dissolution, merger, consolidation or Disposition of a Subsidiary permitted by Section 6.4 or 6.5 or an Investment in any Person permitted under Section 6.2.

### 6.13.    Holding Company.

In the case of each of Parent and Holdings, conduct, transact or otherwise engage in any business or operations other than those incidental to (i) its ownership of the Equity Interests of Holdings, Education Management Holdings LLC, a Delaware limited liability company, and Company, as the case may be, (ii) the maintenance of its legal existence, (iii) the performance of the Credit Documents to which it is a party, (iv) any public offering of its common stock or any other issuance of its Equity Interests not prohibited by this Section 6 and (v) any transaction that each of Parent and Holdings is not prohibited from entering into or consummating under this Section 6.

### 6.14.    Capital Expenditures.

(a)    Make any Capital Expenditure except for Capital Expenditures not exceeding, in the aggregate for Parent, Holdings, Company and the Subsidiaries during each fiscal year set forth below, the sum of (x) the amount set forth opposite such fiscal year and (y) the amount of Cumulative Excess Cash Flow that is Not Otherwise Applied:

| Fiscal Year | Amount |
| --- | --- |
| 2015 | $75,000,000 |

| 2016 | $75,000,000 |
|------|-------------|
| 2017 | $75,000,000 |
| 2018 | $100,000,000 |
| 2019 | $100,000,000 |
| 2020 | $100,000,000 |

(b)    Notwithstanding anything to the contrary contained in clause (a) above, to the extent that the aggregate amount of Capital Expenditures made by Parent, Holdings, Company and the Subsidiaries in any fiscal year pursuant to Section 6.14(a) is less than the maximum amount of Capital Expenditures permitted by Section 6.14(a) with respect to such fiscal year, the amount of such difference (the "**Rollover Amount**") may be carried forward and used to make Capital Expenditures in the two succeeding fiscal years; provided that Capital Expenditures in any fiscal year shall be counted against the base amount set forth in Section 6.14(a) with respect to such fiscal year prior to being counted against any Rollover Amount available with respect to such fiscal year.

## SECTION 7.  GUARANTY

### 7.1.    Guaranty of the Obligations.

Subject to the provisions of Section 7.2, Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Administrative Agent for the ratable benefit of the Beneficiaries the due and punctual payment in full of all Obligations of Company when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "**Guaranteed Obligations**").

### 7.2.    Contribution by Guarantors.

All Guarantors desire to allocate among themselves (collectively, the "**Contributing Guarantors**"), in a fair and equitable manner, their obligations arising under this Guaranty.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "**Funding Guarantor**") under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.  "**Fair Share**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the obligations Guaranteed.  "**Fair Share Contribution Amount**" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law;

provided that solely for purposes of calculating the "**Fair Share Contribution Amount**" with respect to any Contributing Guarantor for purposes of this Section 7.2, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.  "**Aggregate Payments**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (A) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including, without limitation, in respect of this Section 7.2), minus (B) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 7.2.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.  The allocation among Contributing Guarantors of their obligations as set forth in this Section 7.2 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder.  Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 7.2.

**7.3.    Payment by Guarantors**.

Subject to Section 7.2, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of Company to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), Guarantors will upon demand pay, or cause to be paid, in cash, to Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for Company's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against Company for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

**7.4.    Liability of Guarantors Absolute**.

Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)    this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)     Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between Company and any Beneficiary with respect to the existence of such Event of Default;

(c)     the obligations of each Guarantor hereunder are independent of the obligations of Company and the obligations of any other guarantor (including any other Guarantor) of the obligations of Company, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Company or any of such other guarantors and whether or not Company is joined in any such action or actions;

(d)     payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)     any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations, (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto or subordinate the payment of the same to the payment of any other obligations, (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations, (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations, (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith or the applicable Swap Agreement and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any Company or any security for the Guaranteed Obligations and (vi) exercise any other rights available to it under the Credit Documents or any Swap Agreements; and

(f)     this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or

termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them:  (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents or any Swap Agreements, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents, any of the Swap Agreements or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document, such Swap Agreement or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or any of the Swap Agreements or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of Parent or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which Company may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

### 7.5.    **Waivers by Guarantors**.

Each Guarantor hereby waives, for the benefit of Beneficiaries:  (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against Company, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Company, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of any Beneficiary in favor of Company or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Company or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Company or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a

surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, the Swap Agreements or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Company and notices of any of the matters referred to in Section 7.4 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

**7.6.    Guarantors' Rights of Subrogation, Contribution, etc**.

Until the Guaranteed Obligations shall have been indefeasibly paid in full and the Revolving Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against Company or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including, without limitation, (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against Company with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against Company, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary. In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full and the Revolving Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including, without limitation, any such right of contribution as contemplated by Section 7.2. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Company or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against Company, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not

have been finally and indefeasibly paid in full, such amount shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

### 7.7.    Subordination of Other Obligations.

Any Indebtedness of Company or any Guarantor now or hereafter held by any Guarantor (the "**Obligee Guarantor**") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

### 7.8.    Continuing Guaranty.

This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full in cash and the Revolving Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled.  Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

### 7.9.    Authority of Guarantors or Company.

It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Company or the officers, directors or any agents acting or purporting to act on behalf of any of them.

### 7.10.    Financial Condition of Company.

Any Credit Extension may be made to Company or continued from time to time, and any Swap Agreements may be entered into from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of Company at the time of any such grant or continuation or at the time such Swap Agreement is entered into, as the case may be.  No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Company. Each Guarantor has adequate means to obtain information from Company on a continuing basis concerning the financial condition of such Company and its ability to perform its obligations under the Credit Documents and the Swap Agreements, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Company and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of Company now known or hereafter known by any Beneficiary.

### 7.11.    Bankruptcy, etc.

#4822-5623-8110v18

(a)      So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of Administrative Agent acting pursuant to the instructions of Requisite Lenders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against Company or any other Guarantor.  The obligations of Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Company or any other Guarantor or by any defense which Company or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)      Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Beneficiaries that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve Company of any portion of such Guaranteed Obligations. Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar Person to pay Administrative Agent, or allow the claim of Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)      In the event that all or any portion of the Guaranteed Obligations are paid by Company, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

### 7.12.   Discharge of Guaranty Upon Sale of Guarantor.

If all of the Equity Interests of any Guarantor (other than Parent) or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions hereof, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such sale.

## SECTION 8.  EVENTS OF DEFAULT AND REMEDIES

### 8.1.   Events of Default.

Any of the following shall constitute an Event of Default:

(a)     *Non-Payment*.  Company or any other Credit Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within five Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Credit Document; or

(b)     *Specific Covenants*.  Company fails to perform or observe any term, covenant or agreement contained in any of Sections 2.5, 5.3(a) or 5.5(a) (solely with respect to Parent, Holdings and Company) or Section 6; or

(c)     *Other Defaults*.  Any Credit Party fails to perform or observe any other covenant or agreement (not specified in Section 8.1(a) or (b) above) contained in any Credit Document on its part to be performed or observed and such failure continues for 30 days after notice thereof by Administrative Agent to Company; or

(d)     *Representations and Warranties*.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of Company or any other Credit Party herein, in any other Credit Document, or in any document required to be delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)     *Cross-Default*.  Any Credit Party or any Subsidiary (i) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise), in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate principal amount of not less than the Threshold Amount, or (ii) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; provided that this clause (e)(ii) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; or

(f)     *Insolvency Proceedings*, *Etc*.  Any Material Company institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 60 calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for 60 calendar days, or an order for relief is entered in any such proceeding; or

(g) *Inability to Pay Debts; Attachment.* (i) Any Material Company becomes unable or admits in writing its inability or fails generally to pay its debts in excess of the Threshold Amount as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of the Material Companies, taken as a whole, and is not released, vacated or fully bonded within 60 days after its issue or levy; or

(h) *Judgments.* There is entered against any Material Company a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied coverage) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of 60 consecutive days; or

(i) *ERISA.* (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Credit Party under Title IV of ERISA in an aggregate amount which could reasonably be expected to have a Material Adverse Effect, or (ii) any Credit Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which could reasonably be expected to have a Material Adverse Effect; or

(j) *Invalidity of Credit Documents.* Any material provision of any Credit Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 6.4 or 6.5) or as a result of acts or omissions by Administrative Agent or any Lender or the satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Credit Party contests in writing the validity or enforceability of any provision of any Credit Document; or any Credit Party denies in writing that it has any or further liability or obligation under any Credit Document (other than as a result of repayment in full of the Obligations and termination of all Commitments), or purports in writing to revoke or rescind any Credit Document; or

(k) *Change of Control.* There occurs any Change of Control; or

(l) *Collateral Documents.* (i) Any Collateral Document after delivery thereof shall for any reason (other than pursuant to the terms thereof including as a result of a transaction permitted under Section 6.4 or 6.5) cease to create a valid and perfected lien, with the priority required by the Collateral Documents, (or other security purported to be created on the applicable Collateral) on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 6.1, except to the extent that any such loss of perfection or priority results from the failure of Administrative Agent or Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Documents or to file UCC continuation statements and except as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage, or (ii) any of the Equity Interests of Holdings, Company and the Subsidiaries ceasing to be pledged pursuant to the Pledge and

111

Security Agreement free of Liens other than Liens created by the Pledge and Security Agreement or any nonconsensual Liens arising solely by operation of Law; or

(m)    *Junior Financing Documentation*.  (i) Any of the Obligations of the Credit Parties under the Credit Documents for any reason shall cease to be "Senior Indebtedness" (or any comparable term) or "Senior Secured Financing" (or any comparable term) under, and as defined in any Junior Financing Documentation or (ii) the subordination provisions set forth in any Junior Financing Documentation shall, in whole or in part, cease to be effective or cease to be legally valid, binding and enforceable against the holders of any Junior Financing, if applicable; or

(n)    *Breach of RSA*.  Prior to the initial Restructuring Change of Control, Parent or any of its Subsidiaries party thereto shall have materially breached any of their respective obligations under the RSA.

## 8.2.    **Remedies Upon Event of Default**.

If any Event of Default occurs and is continuing, **THEN**, (x) upon the occurrence of any Event of Default described in Section 8.1(f), automatically, and (y) upon the occurrence of any other Event of Default, at the request of (or with the consent of) Requisite Lenders, upon notice to Company by Administrative Agent, (i) the Revolving Commitments, if any, of each Lender having such Revolving Commitments and the obligation of Issuing Bank to issue any Letter of Credit shall immediately terminate, (ii) each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Credit Party:  (A) the unpaid principal amount of and accrued interest on the Loans, (B) an amount equal to the maximum amount that may at any time be drawn under all Letters of Credit then outstanding (regardless of whether any beneficiary under any such Letter of Credit shall have presented, or shall be entitled at such time to present, the drafts or other documents or certificates required to draw under such Letters of Credit); and (C) all other Obligations; provided that the foregoing shall not affect in any way the obligations of Lenders under Section 2.3(e), (iii) Administrative Agent may cause Collateral Agent to enforce any and all Liens and security interests created pursuant to Collateral Documents; and (iv) Administrative Agent shall direct Company to pay (and Company hereby agrees upon receipt of such notice, or upon the occurrence of any Event of Default specified in Sections 8.1(f) and (g) to pay) to Administrative Agent such additional amounts of cash as reasonable requested by Issuing Bank, to be held as security for Company's reimbursement Obligations in respect of Letters of Credit then outstanding.  In addition to the foregoing, so long as the Requisite Lenders have not commenced the exercise of remedies with respect to the following Events of Default within the applicable time periods set forth below and until such time as such Event of Default is cured or the Requisite Lenders commence the exercise of remedies with respect thereto, the Majority Revolving Lenders may commence the exercise of the remedies set forth above: (1) upon the occurrence of an Event of Default described in Section 8.1(a) (other than a payment default upon the occurrence of the Revolving Commitment Termination Date) with respect to the Revolving Loans, 15 days after notice thereof by Administrative Agent (acting at the direction of the Majority Revolving Lenders) to Company; (2) upon the occurrence of an Event of Default described in Section 8.1(a) (solely with respect to a payment default upon the occurrence of the Revolving Commitment Termination Date) with

respect to the Revolving Loans, the Business Day after the Revolving Commitment Termination Date; (3) upon the occurrence of an Event of Default described in Section 8.1(e), 90 days after notice thereof by Administrative Agent to Company; and (4) upon the occurrence of an Event of Default described in Section 8.1(f), the Business Day thereafter.

## SECTION 9.  AGENTS

### 9.1.    **Appointment of Agents**.

U.S. Bank is hereby appointed Administrative Agent and Collateral Agent hereunder and under the other Credit Documents and each Lender and Issuing Bank hereby authorizes U.S. Bank to act as Administrative Agent and Collateral Agent in accordance with the terms hereof and the other Credit Documents.  Each Agent hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Credit Documents, as applicable.  The provisions of this Section 9 are solely for the benefit of the Agents and, except as set forth in Section 9.7, no Lender, Issuing Bank or Credit Party shall have any rights as a third party beneficiary of any of the provisions hereof.  In performing its functions and duties hereunder, each Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Parent or any of its Subsidiaries.  It is understood and agreed that the use of the term "agent" herein or in any other Credit Documents (or any other similar term) with reference to the Agents is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

### 9.2.    **Powers and Duties**.

Each Lender and Issuing Bank irrevocably authorizes each Agent to take such action on such Lender's or Issuing Bank's behalf and to exercise such powers, rights and remedies hereunder and under the other Credit Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto.  Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents.  Each Agent may exercise such powers, rights and remedies and perform such duties by or through its officers, directors, agents, sub-agents, employees or affiliates.  For the avoidance of doubt, in performing its functions and duties hereunder, no Agent assumes and nor shall any Agent be deemed to have assumed any obligation towards or relationship of agency or trust with or for Parent or any of its Subsidiaries.  Without limiting the generality of the foregoing, no Agent: (a) shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing; (b) shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Credit Documents that such Agent is required to exercise as directed in writing by the Requisite Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents); <u>provided</u> that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Credit Document or applicable law,

including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and (c) shall, except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Company or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

**9.3.    General Immunity**.

(a)    <u>No Responsibility for Certain Matters</u>.

(i)    No Agent nor any of its officers, partners, directors, employees, advisors, attorneys or agents shall be responsible to any Lender or Issuing Bank for (A) the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Credit Document, (B) any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to Lenders or by or on behalf of any Credit Party, any Lender or any person providing the Settlement Service to any Agent or any Lender in connection with the Credit Documents and the transactions contemplated hereby or thereby or (C) the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations.

(ii)    No Agent shall be required to ascertain or inquire as to (A) the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents, (B) the use of the proceeds of the Loans, (C) the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing, (D) the contents of any certificate, report or other document delivered hereunder or pursuant to any of the Credit Documents or in connection herewith or therewith or the adequacy, accuracy or completeness of the information contained therein or (E) the satisfaction of any condition set forth in Section 3 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

(iii)    No Agent nor any of its officers, partners, directors, employees, advisors, attorneys or agents shall be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to such Agent by Company or a Lender.    Anything contained herein to the contrary notwithstanding, the duties of Administrative Agent shall be administrative in nature and Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loans or the Letter of Credit Usage or the component amounts thereof.

(b)    <u>Exculpatory Provisions</u>.    No Agent nor any of its officers, partners, directors, employees, advisors, attorneys or agents shall be liable to any Lender or Issuing Bank for any action taken or omitted by any Agent under or in connection with any of the Credit Documents except to the extent caused by its or their gross negligence or willful misconduct (as

determined by a court of competent jurisdiction in a final and non-appealable decision). Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5) and, upon receipt of such instructions from Requisite Lenders (or such other Lenders, as the case may be), such Agent shall be entitled to act or refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions. Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, shall be fully protected and shall not incur any liability in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, including any settlement confirmation or other communication issues by any Settlement Service, and shall be entitled to rely, shall be protected and shall not incur any liability in relying on opinions and judgments of attorneys (who may be attorneys for Parent and its Subsidiaries), accountants, experts and other professional advisors selected by it, and (ii) no Lender or Issuing Bank shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5).

(c)    Delegation of Duties.  Administrative Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Credit Document by or through any one or more sub-agents appointed by Administrative Agent. Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective directors, officers, employees, agents or Affiliates. The exculpatory, indemnification and other provisions of this Section 9.3 and of Section 9.6 shall apply to any of the directors, officers, employees, agents, advisors, attorneys and Affiliates of Administrative Agent and shall apply to their respective activities as Administrative Agent. All of the rights, benefits, and privileges (including the exculpatory and indemnification provisions) of this Section 9.3 and of Section 9.6 shall apply to any such sub-agent and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Affiliates were named herein. Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by Administrative Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of the Credit Parties and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent and (iii) such sub-agent shall only have obligations to Administrative Agent and not to any Credit Party, Lender or any other Person and no Credit Party, Lender or any other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent. The exculpatory provisions of this Section 9 shall apply to any sub-agents appointed with due care.

**9.4.    Agents Entitled to Act as Lender**.

The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender hereunder.  With respect to its participation in the Loans and the Letters of Credit, each Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity.  Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with Parent or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from Company for services in connection herewith and otherwise without having to account for the same to Lenders.

**9.5.    Lenders' and Issuing Banks' Representations, Warranties and Acknowledgment**.

(a)    Each Lender and Issuing Bank represents and warrants that it has made its own independent investigation of the financial condition and affairs of Parent and its Subsidiaries in connection with Credit Extensions and conversions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Parent and its Subsidiaries.  No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or Issuing Banks or to provide any Lender or Issuing Bank with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or issuing a Letter of Credit or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders or Issuing Banks.

(b)    Each Lender and Issuing Bank, by delivering its signature page to this Agreement, an Assignment Agreement or a Joinder Agreement and its deemed funding of its Tranche A Term Loan, Tranche B Term Loan and Revolving Loans, as applicable, on the Closing Date, or by funding any New Term Loans or New Revolving Loans, as the case may be, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable on the Closing Date or as of the date of funding of such New Term Loans or New Revolving Loans, as the case may be.

(c)    Without limiting the foregoing, each Lender and Issuing Bank acknowledges and agrees that neither such Lender or Issuing Bank, nor any of its respective Affiliates, participants or assignees, may rely on Administrative Agent to carry out such Lender's, Issuing Bank's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the Patriot Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "**CIP Regulations**"), or any other Laws relating to terrorism or money laundering, including the Executive Order, the Patriot Act, the Bank Secrecy Act, the Money Laundering Control Act of 1986 (i.e., 18 USC. §§ 1956 and 1957), the Laws administered by OFAC, and all Laws comprising or implementing these Laws, including any programs involving any of the

following items relating to or in connection with any of the Credit Parties, their Affiliates or their agents, the Credit Documents or the transactions hereunder or contemplated hereby: (i) any identity verification procedures; (ii) any recordkeeping; (iii) comparisons with government lists; (iv) customer notices or (v) other procedures required under the CIP Regulations or such other Laws.

### 9.6. Right to Indemnity.

Each Lender, in proportion to its Pro Rata Share (determined as of the time such indemnity is sought, it being understood and agreed that if any Revolving Commitment Termination Date shall have occurred, with respect to the affected Class of Revolving Loans or Revolving Commitments, such determination shall be made immediately prior to giving effect thereto), severally agrees to indemnify each Agent (and any affiliate thereof), to the extent that such Agent (or such affiliate) shall not have been reimbursed by any Credit Party or any "Credit Party" (as defined in the Existing Credit Agreement), for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including reasonable counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Agent (or any affiliate thereof) in exercising its powers, rights and remedies or performing its duties hereunder, under the other Credit Documents, under the Existing Credit Agreement, under the other "Credit Documents" (as defined in the Existing Credit Agreement) or otherwise in its capacity as such Agent in any way relating to or arising out of this Agreement, the other Credit Documents, the Existing Credit Agreement or the other "Credit Documents" (as defined in the Existing Credit Agreement); provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision); provided, each Lender waives any defense based on or arising out of (a) the Mutual Release or (b) the lack of validity or the unenforceability of this Agreement, the RSA, the Intercompany Sale, the Debt Discharge or any agreement or instrument relating thereto or by reason of the cessation of the liability of any Credit Party or any "Credit Party" (as defined in the Existing Credit Agreement) hereunder, under the other Credit Documents, under the Existing Credit Agreement or under the other "Credit Documents" (as defined in the Existing Credit Agreement). If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided that in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof (determined as of the time such indemnity is sought, it being understood and agreed that if any Revolving Commitment Termination Date shall have occurred, with respect to the effected Class of Revolving Loans or Revolving Commitments, such determination shall be made immediately prior to giving effect thereto); provided further, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence. Notwithstanding anything to the contrary in the Mutual Release or in any of the Credit Documents (as defined in the Existing Credit Agreement), each Lender's obligation to indemnify the Agents pursuant to Section 9.6 of the

Existing Credit Agreement for any amounts incurred thereunder and not paid thereunder shall be subsumed by the indemnity set forth in this Section 9.6.

### 9.7.    Successor Administrative Agent and Collateral Agent.

Administrative Agent may resign at any time by giving 30 days' prior written notice thereof to Lenders and Company, and Administrative Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to Company and Administrative Agent and signed by Requisite Lenders.  Upon any such notice of resignation or any such removal, Requisite Lenders shall have the right, upon five Business Days' notice to Company, to appoint a successor Administrative Agent.  Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, that successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent and the retiring or removed Administrative Agent shall promptly (a) transfer to such successor Administrative Agent all sums, Securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent under the Credit Documents, and (b) execute and deliver to such successor Administrative Agent such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Administrative Agent of the security interests created under the Collateral Documents (in the case of clauses (a) and (b), at the sole cost and expense of Company), whereupon such retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder.  After any retiring or removed Administrative Agent's resignation or removal hereunder as Administrative Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent hereunder.  Any resignation or removal of Administrative Agent pursuant to this Section shall also constitute the resignation or removal of Administrative Agent as Collateral Agent, and any successor Administrative Agent appointed pursuant to this Section shall, upon its acceptance of such appointment, become the successor Collateral Agent for all purposes hereunder.  If no successor Administrative Agent has been appointed pursuant to the preceding sentences by the 45th day after the date of such retiring Administrative Agent's notice of resignation, Administrative Agent's resignation shall become effective and the Requisite Lenders shall thereafter perform all the duties of Administrative Agent hereunder or under any other Credit Document until such time, if any, as either (i) the Requisite Lenders appoint a successor Administrative Agent (which appointment shall be subject to the prior written approval of Company (such approval not to be unreasonably withheld, delayed or conditioned) unless an Event of Default has occurred and is continuing) or (ii) Company appoints a successor Administrative Agent so long (x) as the Lenders receive at least 10 Business Days' notice of such appointment (which notice may be given at any time following the 30th day after the retiring Administrative Agent's notice of resignation) and (y) Company has not received a written notice from the Requisite Lenders stating that the Requisite Lenders object to such appointment.

### 9.8.    Collateral Documents and Guaranty.

(a)    <u>Agents under Collateral Documents and Guaranty</u>.  Each Lender and each other Secured Party (by its acceptance of the benefits of the Guaranty, the Collateral and the Collateral Documents) hereby further authorizes Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of Secured Parties with respect to the Guaranty, the Collateral and the Collateral Documents.  Subject to Section 10.5, without further written consent or authorization from Lenders or any other Secured Party, Administrative Agent or Collateral Agent, as applicable, may execute any documents or instruments necessary to (i) in connection with a sale or disposition of assets permitted by this Agreement, release any Lien encumbering any item of Collateral that is the subject of such sale or other disposition of assets or to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented or (ii) release any Guarantor from the Guaranty pursuant to Section 7.12 or with respect to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented.  Upon the request by Collateral Agent at any time, the Requisite Lenders will confirm in writing Collateral Agent's authority to release its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.8(a).

(b)    <u>Right to Realize on Collateral and Enforce Guaranty</u>.  Anything contained in any of the Credit Documents to the contrary notwithstanding, Company, Administrative Agent, Collateral Agent, each Lender and each other Secured Party (by its acceptance of the benefits of the Guaranty, the Collateral and the Collateral Documents) hereby:

(i)    agree that (A) no Lender shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by Administrative Agent, on behalf of Lenders in accordance with the terms hereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by Collateral Agent; and

(ii)    irrevocably authorize Administrative Agent, at the direction of the Requisite Lenders, to credit bid all or any portion of the Obligations (including in combination with cash or other consideration, including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (A) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which a Loan Party is subject, or (B) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent

interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid, (1) Administrative Agent shall be authorized (I) to form one or more acquisition vehicles to make a bid, (II) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Requisite Lenders, irrespective of the termination of this Agreement, (2) the relevant Obligations shall automatically be assigned to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Lender or acquisition vehicle to take any further action, and (3) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Lender or any acquisition vehicle to take any further action.

(c)    <u>No Responsibility for Collateral</u>**.**    Neither Administrative Agent nor Collateral Agent shall be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of Collateral Agent's Lien thereon, or any certificate prepared by any Credit Party in connection therewith, and neither Administrative Agent nor Collateral Agent shall be responsible or liable to Secured Parties for any failure to monitor or maintain any portion of the Collateral or for the preparation, filing, form, content or continuation of any UCC financing statements, mortgages or similar instruments. For the avoidance of doubt, the Credit Parties shall make all filings (including filings of continuation statements and amendments to UCC financing statements that may be necessary to continue the effectiveness of such UCC financing statements) necessary to maintain (at the sole cost and expense of the Credit Parties) the security interest created by the Collateral Documents in the Collateral as a First Priority perfected security interest (subject to Permitted Liens) to the extent perfection is required by the Collateral Documents.

**9.9.    Credit Agreement Controls.** In the event of a conflict between the terms of this Agreement and any other Credit Document, the terms of this Agreement shall govern and control.

## SECTION 10.        MISCELLANEOUS

**10.1.    Notices**.

(a)     <u>Notices Generally</u>.  Any notice or other communication herein required or permitted to be given to a Credit Party Collateral Agent, Administrative Agent or Issuing Bank, shall be sent to such Person's address as set forth on Appendix B or in the other relevant Credit Document, and in the case of any Lender, the address as indicated on Appendix B or otherwise indicated to Administrative Agent in writing.  Except as otherwise set forth in paragraph (b) below, each notice hereunder shall be in writing and may be personally served, telexed or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile or telex, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed; <u>provided</u> that no notice to any Agent shall be effective until received by such Agent; <u>provided</u> <u>further</u>, any such notice or other communication shall at the request of Administrative Agent be provided to any sub-agent appointed pursuant to Section 9.3(c) hereto as designated by Administrative Agent from time to time.

(b)     <u>Electronic Communications</u>.  Notices and other communications to the Lenders and the Issuing Bank hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by Administrative Agent, <u>provided</u> that the foregoing shall not apply to notices to any Lender or the Issuing Bank pursuant to Section 2 if such Lender or the Issuing Bank, as applicable, has notified Administrative Agent that it is incapable of receiving notices under such Section by electronic communication.  Administrative Agent or Company may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; <u>provided</u> that approval of such procedures may be limited to particular notices or communications.  Unless Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); <u>provided</u> that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

**10.2.    Expenses**.

Whether or not the transactions contemplated hereby shall be consummated, Company shall promptly pay (a) all the actual and reasonable costs and expenses of preparation of the Credit Documents and any consents, amendments, waivers or other modifications thereto, (b) all the costs of furnishing all opinions by counsel for Company and the other Credit Parties, (c) the reasonable fees, expenses and disbursements of counsel to each of Agents, the ad hoc group of term loan lenders and the ad hoc group of revolving lenders (in each case including allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Company, (d) all the actual costs and reasonable expenses of creating and perfecting Liens in favor of Collateral Agent, for the benefit of Secured Parties pursuant hereto, including filing and recording fees,

expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to each Agent and of counsel providing any opinions that any Agent or Requisite Lenders may request in respect of the Collateral or the Liens created pursuant to the Collateral Documents, (e) all the actual costs and reasonable fees, expenses and disbursements of any auditors, accountants, consultants or appraisers, (f) all the actual costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by Collateral Agent and its counsel) in connection with the custody or preservation of any of the Collateral, (g) all other actual and reasonable costs and expenses incurred by each Agent in connection with the syndication of the Loans and Commitments and the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby, and (h) after the occurrence of a Default or an Event of Default, all costs and expenses, including reasonable attorneys' fees (including allocated costs of internal counsel) and costs of settlement, incurred by any Agent and Lenders in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings.

### 10.3.    Indemnity.

(a)     In addition to the payment of expenses pursuant to Section 10.2, whether or not the transactions contemplated hereby shall be consummated, each Credit Party agrees to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless, each Agent and Lender and the officers, partners, members, directors, trustees, advisors, employees, agents, sub-agents, attorneys and Affiliates of each Agent and each Lender (each, an "**Indemnitee**"), from and against any and all Indemnified Liabilities; provided that no Credit Party shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from the gross negligence or willful misconduct of that Indemnitee or a material breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document (in each case, as determined by a court of competent jurisdiction in a final and non-appealable decision).    To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.3 may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

(b)     To the extent permitted by applicable law, no Credit Party shall assert, and each Credit Party hereby waives, any claim against each Lender, each Agent and their respective Affiliates, directors, employees, attorneys, agents or sub-agents, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, arising out of, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated

hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Credit Party hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.  No Credit Party shall have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Credit Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date).  If any amounts due under this Section 10.3 shall be have been paid after demand therefor, the applicable Indemnitee shall promptly refund such amount to the extent that there is a final and non-appealable judicial or arbitral determination that such Indemnitee was not entitled to indemnification or contribution rights with respect to such payment pursuant to the express terms of this Section 10.3.

**10.4.   Set-Off**.

In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence of any Event of Default, each Lender is hereby authorized by each Credit Party at any time or from time to time subject to the consent of Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed), without notice to any Credit Party or to any other Person (other than Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by such Lender to or for the credit or the account of any Credit Party against and on account of the obligations and liabilities of any Credit Party to such Lender hereunder, the Letters of Credit and participations therein and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto, the Letters of Credit and participations therein or with any other Credit Document, irrespective of whether or not (a) such Lender shall have made any demand hereunder or (b) the principal of or the interest on the Loans or any amounts in respect of the Letters of Credit or any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although such obligations and liabilities, or any of them, may be contingent or unmatured.

**10.5.   Amendments and Waivers**.

(a)     Requisite Lenders' Consent.  Subject to the additional requirements of Sections 10.5(b) through (f), no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of the Requisite Lenders.

(b)     Affected Lenders' Consent.  Without the written consent of each Lender (other than a Defaulting Lender) that would be affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)     extend the scheduled final maturity of any Loan or Note;

(ii)    waive, reduce or postpone any scheduled repayment (but not prepayment);

(iii)    extend the stated expiration date of any Letter of Credit beyond the Revolving Commitment Termination Date;

(iv)    reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.10) or any fee or any premium payable hereunder;

(v)    extend the time for payment of any such interest or fee;

(vi)    reduce the principal amount of any Loan or any reimbursement obligation in respect of any Letter of Credit;

(vii)    amend, modify, terminate or waive any provision of this Section 10.5(b), Section 10.5(c), Section 10.5(d), Section 10.5(e), Section 10.5(f) or any other provision of this Agreement that expressly provides that the consent of all Lenders is required; or

(viii)    release all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guaranty except as expressly provided in the Credit Documents.

(c)    _Supermajority Lenders' Consent_.    No amendment, modification, termination or waiver of, or consent to any departure by any Credit Party from, any of the following provisions of the Credit Documents shall be effective without the written concurrence of the Supermajority Lenders:

(i)    amend, modify, terminate or waive Section 2.12(e), 2.13(a), 2.13(b), 2.14(g), 2.15 or any other provision or definition related to payment priority;

(ii)    amend, modify, terminate or waive Section 6.2, 6.3 (other than to increase Indebtedness permitted to be incurred pursuant to Section 6.3(q) by $25,000,000, which increase shall only require the consent of the Requisite Lenders), 6.6, 6.8 or 8.1(k);

(iii)    amend, modify, terminate or waive Section 7.2 of the Pledge and Security Agreement; or

(iv)    amend the definition of "**Non-Priority Obligations**," "**Priority Obligations**" or "**Pro Rata Share**".

(d)    _Majority Revolving Lenders_**.**    No amendment, modification, termination or waiver of any condition precedent set forth in Section 3 with respect to Credit Extensions of Revolving Loans or Letters of Credit shall be effective without the written concurrence of the Majority Revolving Lenders.

(e)    Other Consents.  No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall:

(i)    increase any Revolving Commitment of any Lender over the amount thereof then in effect without the consent of such Lender; provided, no amendment, modification or waiver of any condition precedent, covenant, Default or Event of Default shall constitute an increase in any Revolving Commitment of any Lender;

(ii)    amend, modify, terminate or waive any obligation of Lenders relating to the purchase of participations in Letters of Credit as provided in Section 2.3(e), any other provision contained in Section 2.3 or any other provision hereof as the same applies to the rights or obligations of any Issuing Bank, in each case without the written consent of Administrative Agent and of Issuing Bank;

(iii)    amend, modify, terminate or waive any provision of Section 9 as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the consent of such Agent; or

(iv)    amend the definition of "**Majority Revolving Lenders**," "**Requisite Lenders**" or "**Supermajority Lenders**" without the consent of each Lender; provided that notwithstanding the foregoing, New Term Loan Commitments, New Term Loans, New Revolving Loan Commitments and New Revolving Loans, as applicable, shall be included in the determination of "**Majority Revolving Lenders**," "**Requisite Lenders**" or "**Supermajority Lenders**" on substantially the same basis as the Term Loan Commitments, the Term Loans, the Revolving Commitments and the Revolving Loans, as applicable, are included on the Closing Date.

(f)    Correction of Ambiguities, Omissions, etc.  Administrative Agent and Company may, but shall have no obligation to, with the written consent of the other, amend, modify or supplement this Agreement or any of the other Credit Documents to cure any ambiguity, omission, typographical error, mistake, defect or inconsistency if such amendment, modification or supplement does not adversely affect the rights of any Lender or Issuing Bank.

(g)    Execution of Amendments, etc.  Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.5 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Credit Party, on such Credit Party.

**10.6.    Successors and Assigns; Participations**.

(a)    Generally.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and

125

their respective successors and assigns.  Notwithstanding the foregoing, no Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior written consent of all Lenders.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Register</u>.  Company, Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment or Loan shall be effective, in each case, unless and until recorded in the Register following receipt of an Assignment Agreement effecting the assignment or transfer thereof as provided in Section 10.6(d).  Administrative Agent shall record each assignment in the Register on the "Effective Date" specified in the applicable Assignment Agreement, provide prompt notice to Company thereof and maintain a copy of such Assignment Agreement.  The date of such recordation of a transfer shall be referred to herein as the "**Assignment Effective Date**."  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans.

(c)    <u>Right to Assign</u>.  Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including, without limitation, all or a portion of its Commitments or Loans owing to it or other Obligations; <u>provided</u> that each such assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any Loan and any related Commitments:

(i)    to any Person meeting the criteria of clause (i) of the definition of the term of "Eligible Assignee" upon the giving of notice to Company and Administrative Agent; <u>provided</u> that in the case of any assignment of Revolving Loans or Revolving Commitments to such Person (unless such Person is already a Lender with a Revolving Commitment), such assignment shall require the consent of the Issuing Bank, such consent not to be unreasonably withheld, conditioned or delayed, and

(ii)    to any Person meeting the criteria of clause (ii) of the definition of the term of "Eligible Assignee" upon giving of notice to Company and Administrative Agent and, in the case of assignments of Revolving Loans, Revolving Commitments or Term Loans to any such Person, consented to by each of Company, Administrative Agent and, other than in respect of Term Loans, each Issuing Bank (each such consent not to be (x) unreasonably withheld, conditioned or delayed or (y) in the case of Company, (I) required at any time an Event of Default under Section 8.1(a) or (f) shall have occurred and then be continuing and (II) failure to so consent within ten Business Days of receiving such request for consent shall be deemed to be a consent by Company); <u>provided further</u>, each such assignment pursuant to this Section 10.6(c)(ii) shall be in an aggregate amount of not less than (A) $5,000,000 (or such lesser amount as may be agreed to by Company and Administrative Agent or as shall constitute the aggregate

amount of the Revolving Commitments and Revolving Loans of the assigning Lender) with respect to the assignment of the Revolving Commitments and Revolving Loans and (B) $1,000,000 (or such lesser amount as may be agreed to by Company and Administrative Agent or as shall constitute the aggregate amount of the applicable Class of Loans of the assigning Lender) with respect to the assignment of Term Loans.

(d)    No Assignment to Natural Persons.  Notwithstanding anything to the contrary contained herein, no assignment or sale of participations shall be made to a natural Person.

(e)    Mechanics.  Assignments of Term Loans, Revolving Loans and Revolving Commitments by Lenders may be made via an electronic settlement system acceptable to Administrative Agent as designated in writing from time to time to the Lenders by Administrative Agent (the "**Settlement Service**").  Each such assignment shall be effected by the assigning Lender and proposed assignee pursuant to the procedures then in effect under the Settlement Service, which procedures shall be consistent with the other provisions of this Section 10.6.  Each assignor Lender and proposed assignee shall comply with the requirements of the Settlement Service in connection with effecting any transfer of Loans pursuant to the Settlement Service.  Assignments and assumptions of Term Loans, Revolving Loans and Revolving Commitments (regardless of whether the Settlement Service is utilized) shall require the execution and delivery to Administrative Agent of an Assignment Agreement.  Assignments made pursuant to the foregoing provision shall be effective as of the Assignment Effective Date. In connection with all assignments there shall be delivered to Administrative Agent such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver pursuant to Sections 2.18(f) and (g).  A processing fee of $3,500 will be required to be paid to Administrative Agent in connection with any assignments (other than contemporaneous assignments by or to two or more Related Funds).

(f)    Representations and Warranties of Assignee.  Each Lender, upon execution and delivery hereof or upon succeeding to an interest in the Commitments and Loans, as the case may be, represents and warrants as of the Closing Date or as of the Assignment Effective Date, as applicable, that (i) it is an Eligible Assignee, (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be and (iii) it will make or invest in, as the case may be, its Commitments or Loans for its own account in the ordinary course and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.6, the disposition of such Commitments or Loans or any interests therein shall at all times remain within its exclusive control).

(g)    Effect of Assignment.  Subject to the terms and conditions of this Section 10.6, as of the Assignment Effective Date, (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent of its interest in the Loans and Commitments as reflected in the Register and shall thereafter be a party hereto and a "Lender" for all purposes hereof, (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned to the assignee, relinquish its rights (other than any

rights which survive the termination hereof under Section 10.8) and be released from its obligations hereunder (and, in the case of an assignment covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto on the Assignment Effective Date; provided that anything contained in any of the Credit Documents to the contrary notwithstanding, (x) Issuing Bank shall continue to have all rights and obligations thereof with respect to such Letters of Credit until the cancellation or expiration of such Letters of Credit and the reimbursement of any amounts drawn thereunder and (y) such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder), (iii) the Commitments shall be modified to reflect any Commitment of such assignee and any Revolving Commitment of such assigning Lender, if any, and (iv) if any such assignment occurs after the issuance of any Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to Administrative Agent for cancellation, and thereupon Company shall issue and deliver new Notes, if so requested by the assignee or assigning Lender, to such assignee or to such assigning Lender, with appropriate insertions, to reflect the new Revolving Commitments or outstanding Loans of the assignee or the assigning Lender.

(h)     Participations.  Each Lender shall have the right at any time to sell one or more participations to any Person (other than Parent, any of its Subsidiaries or any of its Affiliates) in all or any part of its Commitments, Loans or in any other Obligation.  The holder of any such participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to (i) require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would extend the final scheduled maturity of any Loan, Note or Letter of Credit (unless such Letter of Credit is not extended beyond the applicable Revolving Commitment Termination Date) in which such participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement or (iii) release all or substantially all of the Collateral under the Collateral Documents (except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such participant is participating.   Company agrees that each participant shall be entitled to the benefits of Sections 2.16(c), 2.17 and 2.18 (subject to the requirements and limitations therein, including the requirements under Section 2.18(f) and (g) (it being understood that the documentation required under Sections 2.18(f) and (g) shall be delivered to the participant)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.6(c); provided that (x) a participant shall not be entitled to receive any greater payment under Section 2.17 or 2.18 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant, unless the sale of the participation to such participant is made with Company's prior written consent and (y) a participant that would be a Non-US Lender if it were a Lender shall not be entitled to the benefits of Section 2.18 unless Company is notified of the participation sold to

such participant and such participant agrees to comply with Section 2.18 as though it were a Lender. To the extent permitted by the applicable law, each participant also shall be entitled to the benefits of Section 10.4 as though it were a Lender; provided further such participant agrees to be subject to Section 2.15 as though it were a Lender.

(i)    Participant Register. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of Company, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Credit Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or a portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any Commitments, Loans, Letters of Credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participations for all purposes of this Credit Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register and shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

(j)    Certain Other Assignments. In addition to any other assignment permitted pursuant to this Section 10.6, any Lender may assign or pledge all or any portion of its Loans, the other Obligations owed by or to such Lender, and its Notes, if any, to secure obligations of such Lender including, without limitation, any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors and any operating circular issued by such Federal Reserve Bank; provided that no Lender, as between Company and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment or pledge, and provided further, in no event shall the applicable Federal Reserve Bank, pledgee or trustee be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

## 10.7.    Independence of Covenants.

All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

## 10.8.    Survival of Representations, Warranties and Agreements.

All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension. Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth

in Sections 2.16(c), 2.17, 2.18, 10.2, 10.3 and 10.4 and the agreements of Lenders set forth in Sections 2.15, 9.3(b) and 9.6 shall survive the payment of the Loans, the cancellation or expiration of the Letters of Credit and the reimbursement of any amounts drawn thereunder, and the termination hereof.

### 10.9.    No Waiver; Remedies Cumulative.

No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents or any of the Swap Agreements.  Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

### 10.10.  Marshalling; Payments Set Aside.

Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations.   To the extent that any Credit Party makes a payment or payments to Administrative Agent or Lenders (or to Administrative Agent on behalf of Lenders), or any Agent enforces any security interests or any Agent or Lender exercises its right of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

### 10.11.  Severability.

In case any provision in or obligation hereunder or under any other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

### 10.12.  Obligations Several; Independent Nature of Lenders' Rights.

The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder.   Nothing contained herein or in any other Credit Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity.  The amounts payable at any time hereunder to each Lender

shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

### 10.13.  Headings.

Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

### 10.14.  APPLICABLE LAW.

**THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.**

### 10.15.  CONSENT TO JURISDICTION.

**ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY CREDIT PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER CREDIT DOCUMENT, OR ANY OF THE OBLIGATIONS, MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK.  BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH CREDIT PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (a) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS, (b) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, (c) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE CREDIT PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 10.1, (d) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (c) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE CREDIT PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (e) AGREES THAT AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY CREDIT PARTY IN THE COURTS OF ANY OTHER JURISDICTION.**

### 10.16.  WAIVER OF JURY TRIAL.

**EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/COMPANY RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT**

MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 10.16 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

### 10.17. Confidentiality.

Each Lender shall hold all non-public information regarding Parent and its Subsidiaries and their businesses identified as such by Company and obtained by such Lender pursuant to the requirements hereof in accordance with such Lender's customary procedures for handling confidential information of such nature, it being understood and agreed by Company that, in any event, a Lender may make (a) disclosures of such information to Affiliates of such Lender and to their agents and advisors (and to other persons authorized by a Lender or Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 10.17) on a confidential basis, (b) disclosures of such information reasonably required by any pledgee referred to in Section 10.6 or any bona fide or potential assignee, transferee or participant in connection with the contemplated assignment, transfer or participation by such Lender of any Loans or any participations therein or by any direct or indirect contractual counterparties (or the professional advisors thereto) in Swap Agreements; provided that such counterparties and advisors are advised of and agree to be bound by the provisions of this Section 10.17), (c) disclosure to any rating agency when required by it; provided that, prior to any disclosure, such rating agency shall undertake in writing to preserve the confidentiality of any confidential information relating to the Credit Parties received by it from any Agent or any Lender, (d) disclosures required or requested by any governmental agency or representative thereof or by the NAIC or pursuant to legal or judicial process; provided that unless specifically prohibited by applicable law or court order, each Lender shall make reasonable efforts to notify Company of any request by any governmental agency or representative thereof (other than any such request in connection with any examination of the financial condition or other routine examination of such Lender by such governmental agency) for disclosure of any such non-public information prior to disclosure of such information and (e)

disclosures in connection with the exercise of remedies hereunder or under any other Credit Document.

**10.18. Usury Savings Clause**.

Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Company shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lenders and Company to conform strictly to any applicable usury laws. Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to Company.

**10.19. Counterparts**.

This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Delivery of an executed counterpart of this Agreement by telefacsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability and binding effect of this Agreement. The foregoing shall apply to each other Credit Document *mutatis mutandis*.

**10.20. Effectiveness**.

This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by Company and Administrative Agent of written or telephonic notification of such execution and authorization of delivery thereof.

**10.21. Patriot Act**.

Each Lender and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Company that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies Company, which information

includes the name and address of Company and other information that will allow such Lender or Administrative Agent, as applicable, to identify Company in accordance with the Patriot Act. Each Credit Party shall take such action and execute, acknowledge and deliver at its sole cost and expense, such instruments and document as any Agent or Lender may reasonably require form time to time in order to enable such Agent or Lender, as applicable, to comply with the Patriot Act.

### 10.22. Electronic Execution of Assignments.

The words "execution," "signed," "signature," and words of like import in any Assignment Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

### 10.23. Public-Side Lenders.

Company and each Lender acknowledge that certain of the Lenders may be "public-side" Lenders (Lenders that do not wish to receive material non-public information with respect to Parent, its Subsidiaries or their securities) and, if documents or notices required to be delivered pursuant to Section 5.1 or Section 5.2 or otherwise are being distributed through the Platform, any document or notice that Company has indicated contains Nonpublic Information shall not be posted on that portion of the Platform designated for such public-side Lenders. If Company has not indicated whether a document or notice delivered pursuant to Section 5.1 or Section 5.2 contains Nonpublic Information, Administrative Agent shall post such document or notice solely on that portion of the Platform designated for Lenders who wish to receive material nonpublic information with respect to Parent, its Subsidiaries and their securities.

### 10.24. No Fiduciary Duty.

Each Agent, each Lender and their Affiliates (collectively, solely for purposes of this Section 10.24, the "**Lenders**"), may have economic interests that conflict with those of Credit Parties, their stockholders or their affiliates. Company agrees that nothing in the Credit Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Credit Party, its stockholders or its affiliates, on the other. Credit Parties acknowledge and agree that (a) the transactions contemplated by the Credit Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between Lenders, on the one hand, and Credit Parties, on the other, and (b) in connection therewith and with the process leading thereto, (i) no Lender has assumed an advisory or fiduciary responsibility in favor of any Credit Party, its stockholders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Credit Party, its stockholders or its Affiliates on other matters) or any other obligation

134

to any Credit Party except the obligations expressly set forth in the Credit Documents and (ii) each Lender is acting solely as principal and not as the agent or fiduciary of any Credit Party, its management, stockholders, creditors or any other Person. Company acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Company agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to Company, in connection with such transaction or the process leading thereto.

[Remainder of page intentionally left blank]

#4822-5623-8110v18

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first set forth above.

**EDUCATION MANAGEMENT CORPORATION**

By: _____
Name: Mick J. Beekhuizen
Title: Executive Vice President and Chief
     Financial Officer


**EDUCATION MANAGEMENT HOLDINGS II LLC**

By: _____
Name: Mick J. Beekhuizen
Title: Executive Vice President and Chief
     Financial Officer


**EDUCATION MANAGEMENT II LLC**

By: _____
Name: Mick J. Beekhuizen
Title: Executive Vice President and Chief
     Financial Officer

**HIGHER EDUCATION SERVICES II LLC**

**THE CONNECTING LINK II LLC**

**BROWN MACKIE EDUCATION II LLC**

**EDUCATION FINANCE III LLC**

**SOUTH UNIVERSITY RESEARCH II LLC**

**THE ART INSTITUTES INTERNATIONAL II LLC**

By: _____
    Name: James A. Terrell
    Title: Treasurer

**BMC REAL PROPERTY HOLDINGS LLC**

By:

Name: James A. Terrell
Title: Treasurer

**U.S. BANK NATIONAL ASSOCIATION,**
as Administrative Agent and as Collateral Agent

By:
Name:          James A. Hanley
Title:          Vice President

Name of Institution: 1776 CLO I, Ltd

By: _____

Name: Ron Polye

Title: Authorized Officer

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: **ABBEY FUNDING ULC**


By: _____

Name:

Title:
    Mobasharul Islam
    Authorized Signatory

For parties requiring a second signature line:


By: _____

Name:

Title:


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

**ACA CLO 2006-2, LTD**

By: Its Investment Advisor CVC Credit Partners,
LLC

By: _____

Name: Jennifer Patrickakos

Title: Vice President
       Head of Operations

For parties requiring a second signature line:

By: _____ N.A. _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices
A-1 and A-2.

**ACA CLO 2007-1, LTD**

By: Its Investment Advisor CVC Credit Partners, LLC

By:
Name: Jennifer Patrickakus
Title: Vice President
       Head of Operations

For parties requiring a second signature line:

By: N.A
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**Ace Tempest Reinsurance Ltd.**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _____
Name:  Regan Scott
Title:  Managing Director

For parties requiring a second signature line:

By: _____
Name:  Desmund Shirazi
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
**ACSC Pension Plan**

By: Oaktree Capital Management, L.P.
Its: Investment Manager


By: _____
Name: Alan Adler
Title: Managing Director

For parties requiring a second signature line:


By: _____
Name: David Rosenberg
Title: Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

**AGF Floating Rate Income Fund**
By: Eaton Vance Management
as Investment Advisor

Name of Institution:

By: _Michael B. Botthof_____
Name: Michael B. Botthof
Title: Vice President

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
AllianceBernstein Global High Income Fund Inc

By: _____
Name:
Title:        Cosmo J Valente
              Custody Manager

For parties requiring a second signature line:

By: _____N/A_____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
AllianceBernstein High Income Fund Inc.


By: _____

Name:

Title:


For parties requiring a second signature line:


By: _____N/A_____

Name:

Title:


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
AllianceBernstein Institutional Investments – High Yield Loan Portfolio

By: _____

Name:   Cosmo Valente

Title:    Custody Manager

For parties requiring a second signature line:

By: _____N/A_____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

**Anchorage Capital Master Offshore, Ltd.**

By: Anchorage Capital Group, LLC, its Investment Manager

By: _____

Name:

Title:     **Melissa Griffiths**
    **Authorized Signatory**

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

**APIDOS CDO III**

By: Its Investment Advisor CVC Credit Partners,
LLC

By: _____
Name: Jennifer Patrick aRos
Title: Vice President
       Head of Operations

For parties requiring a second signature line:

By: _____N. A._____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices
A-1 and A-2.

**APIDOS CDO IV**

By: Its Investment Advisor CVC Credit Partners,
LLC

By: _____

Name: Jennifer Patrickakes

Title: Vice President
       Head of Operations

For parties requiring a second signature line:

By: _____ N.A _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

**APIDOS CDO V**

By: Its Investment Advisor CVC Credit Partners,
LLC

By: _____
Name: Jennifer Patrickakos
Title: Vice President
Head of Operations

For parties requiring a second signature line:

By: _N. A._____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices
A-1 and A-2.

**APIDOS CINCO CDO**

By: Its Investment Advisor CVC Credit Partners,
LLC

By: _____

Name: Jennifer Patrickakos

Title: Vice President
Head of Operations

For parties requiring a second signature line:

By: _____ N. A _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

**APIDOS QUATTRO CDO**

By: Its Investment Advisor CVC Credit Partners,
LLC

By:
Name: Jennifer Patrickakos
Title: Vice President
       Head of Operations

For parties requiring a second signature line:

By: N. A.
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices
A-1 and A-2.

Name of Institution:
**Arch Investment Holdings IV Ltd.**

By: Oaktree Capital Management, L.P.
Its: Investment Manager


By: _____
Name:  Regan Scott
Title:  Managing Director


For parties requiring a second signature line:


By: _____
Name:  Desmund Shirazi
Title:  Managing Director


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
**Arch Reinsurance Ltd**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _Alan Adler_
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:

By: _David Rosenberg_
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution: Bank of America, N.A.

By: _____
Name: Jonathan M. Barnes
Title: Vice President

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

BARCLAYS BANK PLC

By: _____
Name: Alicia Borys
Title: Vice President

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:

BCBSM, Inc.

By: _Nicole Mac_____

Name: Nicole Macarchuk
Title:   Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

*[Signature Page to Credit and Guaranty Agreement]*

Name of Institution:
BlackRock Funds II, BlackRock Floating Rate Income Portfolio
By: BlackRock Financial Management, Inc., its Sub-Advisor

By: _C A Marshall_____

Name: C. Adrian Marshall
Title: Authorized Signatory


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
BlackRock Senior Income Series IV
By: BlackRock Financial Management, Inc., its Collateral Manager

By: _C A Marshall_____
Name: C. Adrian Marshall C. Adrian Marshall
Title: Authorized Signatory


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
BlackRock Senior Income Series V Limited
By: BlackRock Financial Management, Inc., its Collateral Manager

By: _C. A. Marshall_

Name: C. Adrian Marshall
Title: Authorized Signatory


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices
A-1 and A-2.

Name of Institution: **BLT 15  LLC**

By: _____

Name:

Title:

Robert Healey

Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
BLUE FALCON LIMITED, as Lender
By: Regiment Capital Management LLC,
In its Capacity as Investment Advisor

By: _____

Name:        Mark A. Brostowski
Title:        Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
BlueMountain CLO II

By: _____

Name:          **Ellen Brooks**
Title:         **Operations Analyst**

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
BlueMountain CLO III

By: _____

Name:

Title:

            **Ellen Brooks**

            **Operations Analyst**

For parties requiring a second signature line:


By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
BlueMountain CLO

By: _____

Name:

Title: **Ellen Brooks**
         **Operations Analyst**

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
BMI CLO I
By: BlackRock Financial Management, Inc., its Investment Manager

By: _____
Name: C. Adrian Marshall
Title: Authorized Signatory


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution: **BNP PARIBAS**

By: _____

Name: Brock Harris
Title: Managing Director

By: _____

Name: Matthew Mulligan
Title: Vice President

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

Bond Portfolio
By: Boston Management and Research
As Investment Advisor

By: _michael B. Botthof_____

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:

Brookside Mill CLO Ltd.

By: SHENKMAN CAPITAL MANAGEMENT, INC.,
    as Collateral Manager

By: _____
    Name: Justin Slatky
    Title: Senior Vice President

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices
A-1 and A-2.

Name of Institution:
CAVALRY CLO III, LTD., as Lender
By: Regiment Capital Management LLC,
In its Capacity as Investment Advisor

By: _____

Name:        Mark A. Brostowski
Title:        Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices
A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
CCP Credit Acquisition Holdings, L.L.C. and Centerbridge Special Credit Partners II, L.P.,
severally and not jointly each in their individual capacity as lenders


By: _____
Name: Susanne V. Clark
Title: Authorized Signatory

For parties requiring a second signature line:


By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices
A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution: Cedarview Opportunities Master Fund, LP

By: _Burton Weinstein_____

Name: Burton Weinstein
Title: Managing Partner

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
CCP Credit Acquisition Holdings, L.L.C. and Centerbridge Special Credit Partners II, L.P.,
severally and not jointly each in their individual capacity as lenders


By: _____
Name: Susanne V. Clark
Title: Authorized Signatory

For parties requiring a second signature line:


By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices
A-1 and A-2.

Name of Institution:
**Central States, Southeast and Southwest Areas Pension Fund**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _Alan Adler_
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:

By: _David Rosenberg_
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
**Chrysler Group  LLC Master Retirement Trust**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _Alan Adler_
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:

By: _David Rosenberg_
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Citibank, N.A.

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Citigroup Financial Products Inc

By: _____
Name:
Title:    Brian S. Broyles
          Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

**Columbia Funds Variable Series Trust II-
Variable Portfolio-Eaton Vance
Floating Rate Income Fund
By: Eaton Vance Management
as Investment Sub-Advisor**

By: _~michael B Botthof_

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

CREDIT SUISSE AG, CAYMAN ISLAND BRANCH

By: _____
Name:
Title:     Megan Kane
           Authorized Signatory

By: _____
Name: Laura Katherine Schembri
Title: Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

**Credit Suisse International**

By:

Name:                                    Shul Wong
                                         Authorized Signatory
Title:

**For parties requiring a second signature line:**

By:

Name:                                    Sandra Pederzini
Title:                                   Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: **CREDIT SUISSE LOAN FUNDING LLC**

By: _____

Name:

Title:

Robert Healey

Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**CSAA Insurance Exchange**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _____
Name:  Regan Scott
Title:  Managing Director

For parties requiring a second signature line:

By: _____
Name:  Desmund Shirazi
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:


**Del Mar CLO I, LTD.**


By:  Allianz Global Investors U.S.
LLC-CS Credit Group

By:

Name:  **James Dudnick**
Title:  **Vice President**

For parties requiring a second signature line:


By:



Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices
A-1 and A-2.

Name of Institution:

DEUTSCHE BANK AG NEW YORK BRANCH
By: DB Services New Jersey, Inc.

By: _____
Name:       **Tavinton Miles**
Title:      **Assistant Vice President**

For parties requiring a second signature line:

By: _____
Name:       **Deirdre Cesario**
Title:      **Assistant Vice President**

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:

**DWS Floating Rate Fund**
**By:  Deutsche Investment Management Americas Inc.**
**Investment Advisor**

By:  _____

Name:  **Eric Meyer**
Title:    **Managing Director**

For parties requiring a second signature line:

By:  _____

Name:  **Joseph Tavolieri**
Title:    **Vice President**

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:          Eaton Vance CDO X PLC
                              By: Eaton Vance Management
                              As Investment Advisor


By: _____

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:


By: _____

Name:

Title:


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

Eaton Vance CDO IX Ltd.
By: Eaton Vance Management
as Investment Advisor

By: _Michael B. Botthof_

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Eaton Vance CDO VII PLC
By: Eaton Vance Management
as Interim Investment Advisor

Name of Institution:

By: _Michael B. Botthof_

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:    Eaton Vance CDO VIII, Ltd.
                        By: Eaton Vance Management
                        As Investment Advisor


By: _____

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:


By: _____

Name:

Title:


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:

Eaton Vance Corp
By: Eaton Vance Management
As Investment Advisor

By: _____

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

**Eaton Vance Floating-Rate Income Plus Fund**
By: Eaton Vance Management as Investment Advisor

By: ___Michael B. Botthof___

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:

Eaton Vance Floating-Rate Income Trust
By: Eaton Vance Management
as Investment Advisor

By: _____

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:    Eaton Vance Institutional Senior Loan Fund
By: Eaton Vance Management
as Investment Advisor

By: _____

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:                    **Eaton Vance International (Cayman Islands)**
                                        **Floating-Rate Income Portfolio**
                                        By: Eaton Vance Management
                                        as Investment Advisor

By: _~michael B Botthof~_____

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Eaton Vance Limited Duration Income Fund
By: Eaton Vance Management
as Investment Advisor

Name of Institution:

By: ~michael B Botthof~

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

**Eaton Vance Senior Floating-Rate Trust**
**By: Eaton Vance Management**
**as Investment Advisor**

By: _michael B Botthof_

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: **Eaton Vance Senior Income Trust**
By: Eaton Vance Management
as Investment Advisor

By: _Michael B. Botthof_

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:                    **Eaton Vance Short Duration**
                                        **Diversified Income Fund**
                                        By: Eaton Vance Management
                                        as Investment Advisor


By: _Michael B. Botthof_____
Name:
Title: Michael B. Botthof
       Vice President

For parties requiring a second signature line:


By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:

**Eaton Vance VT Floating-Rate Income Fund**
By: Eaton Vance Management
as Investment Advisor

By: _~michael B. Botthot_

Name: Michael B. Botthot

Title: Vice President

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

EF Corporate Holdings LLC
By: Ellington Financial Management LLC as it Manager:


By: _____
Name: Laurence E. Penn
Title: Authorized Signatory

For parties requiring a second signature line:


By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**Employees' Retirement Fund of the City of Dallas**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _Alan Adler_
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:

By: _David Rosenberg_
Name:  David Rosenberg
Title: Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
Fifth Third Bank


By: _____
Name: Scott E. Brod
Title: Vice President

For parties requiring a second signature line:


By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

**Flagship CLO V**
**By: Deutsche Investment Management Americas Inc.**
**(as successor in interest to Deutsche Asset Management, Inc.),**
**As Collateral Manager**

By: _____
Name: **Eric Meyer**
Title: **Managing Director**

For parties requiring a second signature line:

By: _____
Name: Joseph Tavolieri
Title: Vice President

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:

**Flagship CLO VI**
**By:  Deutsche Investment Management Americas Inc.**
**As Collateral Manager**

By: _____
Name:  Eric Meyer
Title:    **Managing Director**

For parties requiring a second signature line:

By: _____
Name:  Joseph Tavolieri
Title:   Vice President

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

**Stichting Bedrijfstakpensioenfonds voor het Beroepsvervoer over do Weg (Vervoer)**

By:  Oaktree Capital Management, L.P.
Its:  Investment Manager

By: _(signature)_
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:

By: _(signature)_
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: Future Fund Board of Guardians

By: _____

Name: Gregory S. Rubin

Title: Authorized Signatory

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution: Goldman Sachs Bank USA

By: _____ /AV

Name: PATRICIA RODNEY

Title: AUTHORIZED PERSON

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution: GOLDMAN SACHS LENDING PARTNERS LLC

By: _____

Name: Michael H. szafranski

Title: M. D.

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

**Grayson & Co**
By: Boston Management and Research
as Investment Advisor

Name of Institution:

By: _____

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

**GSC Group CDO Fund VIII, Limited**
By:    GSC Acquisition Holdings, L.L.C.,
       as its Collateral Manager
By:    GSC MANAGER, LLC, in its capacity as
       Manager
By:    BLACK DIAMOND CAPITAL
       MANAGEMENT, L.L.C., in its capacity as
       Member

By: _____
       Name: Stephen H. Deckoff
       Title: Managing Principal

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:

**GSC Partners CDO Fund VII, Limited**
By:    GSC Acquisition Holdings, L.L.C.,
        as its Collateral Manager
By:    GSC MANAGER, LLC, in its capacity as
        Manager
By:    BLACK DIAMOND CAPITAL
        MANAGEMENT, L.L.C., in its capacity as
        Member


By:    _____
        Name: Stephen H. Deckoff
        Title: Managing Principal


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices
A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

HG Vora Special Opportunities Master Fund, Ltd.
By:  HG Vora Capital Management LLC
Name of Institution:


By: _____
Name:
Title:

Michael Y. Lee
Chief Financial Officer
HG Vora Capital Management, LLC,
investment advisor to
HG Vora Special Opportunities

For parties requiring a second signature line:


By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
HillMark Funding, Ltd.
By: HillMark Capital Management, L.P.,
as Collateral Manager , as Lender

By: _____
Name: Mark Gold
Title:  CEO

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
**IBM Personal Pension Plan Trust - HY Separate Acct**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: 
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:

By:
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
**International Paper Company Commingled Investment Group Trust**

By: Oaktree Capital Management, L.P.
Its: Investment Manager


By: _(signature)_____
Name:  Alan Adler
Title:  Managing Director


For parties requiring a second signature line:



By: _(signature)_____
Name:  David Rosenberg
Title:  Managing Director


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**Iowa Public Employees Retirement System**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _Alan Adler_____
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:

By: _David Rosenberg_____
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:

JERSEY STREET CLO, LTD.,
By its Collateral Manager, Massachusetts
Financial Services Company

By: _____
Name: David J. Cobey
Title: Its authorized representative and not individually


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: JLP Credit Opportunity Master Fund Ltd

By: _____

Name: Jeffrey Peskind
Title: CEO, Phoenix Investment Adviser LLC,
Investment Manager to the Fund

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: JLP Stressed Credit Fund LP

By: _____
Name: Jeffrey Peskind
Title: CEO, Phoenix Investment Adviser LLC,
Investment Manager to the Fund

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
JPMORGAN CHASE BANK, N.A.


By: _____
Name:   Douglas A. Kravitz
Title:    Vice President

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**KATONAH 2007-I CLO LTD.**

By:
Name:                    DANIEL GILLIGAN
Title:                    Authorized Officer
                         Katonah Debt Advisors, L.L.C.
                         As Manager

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

**KATONAH IX CLO LTD.**

By:

Name:

Title:

DANIEL GILLIGAN
Authorized Officer
Katonah Debt Advisors, L.L.C.
As Manager

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**KATONAH X CLO LTD.**

By:
Name:
Title:

DANIEL GILLIGAN
Authorized Officer
Katonah Debt Advisors, L.L.C.
As Manager

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:

KKR-PBPR Capital Partners L.P.

By: _____
Name: Nicole Macarchuk
Title:   Authorized Signatory


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

KKR Corporate Credit Partners L.P.

By: _____
Name: Nicole Macarchuk
Title:   Authorized Signatory


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

KKR Credit Relative Value Master Fund L.P.

By: _____
Name: Nicole Macarchuk
Title:   Authorized Signatory


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

KKR Debt Investors II (2006) (Ireland) L.P.

By: _____
Name: Nicole Macarchuk
Title:   Authorized Signatory


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

KKR Financial CLO 2005-1, Ltd.

By: _____

Name: Nicole Macarchuk

Title:   Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

KKR Financial CLO 2005-2, Ltd.

By: _____

Name: Nicole Macarchuk

Title:   Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

KKR Financial CLO 2006-1, Ltd.

By: _____

Name: Nicole Macarchuk

Title:   Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

KKR Financial CLO 2007-1, Ltd.

By: _____

Name: Nicole Macarchuk

Title:   Authorized Signatory


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

KKR Financial CLO 2011-1, Ltd.

By: _____

Name: Nicole Macarchuk

Title:   Authorized Signatory


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

KKR Floating Rate Fund L.P.

By: _____
Name: Nicole Macarchuk
Title:   Authorized Signatory


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

KKR Lending Partners L.P.

By: _____
Name: Nicole Macarchuk
Title:   Authorized Signatory


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:     **KP Fixed Income Fund**
                         **By: Eaton Vance Management**
                         **As Investment Sub-Advisor**

By: _Michael B. Botthof_

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**Lucent Technology Inc. Master Pension Trust**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _____
Name: Alan Adler
Title: Managing Director

For parties requiring a second signature line:

By: _____
Name: David Rosenberg
Title: Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:

MARLBOROUGH STREET CLO, LTD.,
By its Collateral Manager, Massachusetts
Financial Services Company

By: _____
Name: David J. Cobey
Title: Its authorized representative and not individually


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:

Maryland State Retirement and Pension System

By: ⟨signature⟩
Name: Nicole Macarchuk
Title:   Authorized Signatory


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

MERRILL LYNCH CAPITAL CORPORATION

By: _____
Name:    Jay T. Wampler
Title:    Managing Director

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: **MET Investors Series Trust-
Met/Eaton Vance Floating Rate Portfolio
By: Eaton Vance Management
as Investment Sub-Advisor**

By: _michael B Botthof_

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**Microsoft Global Finance**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _Alan Adler_

Name: Alan Adler
Title: Managing Director

For parties requiring a second signature line:

By: _David M. Rosenberg_

Name: David Rosenberg
Title: Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**Missouri Education Pension Trust**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _____

Name:  Regan Scott
Title:  Managing Director

For parties requiring a second signature line:

By: _____

Name:  Desmund Shirazi
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution: Mizuho Bank, Ltd.


By: _____
Name: James R Fayen
Title:  Deputy General Manager

For parties requiring a second signature line:


By: _____
Name:
Title:


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: New Mountain Finance Corporation

By: _____
Name: Robert A. Hamwee
Title: CEO and President

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:  New Mountain Finance Holdings, L.L.C. (as successor-in-interest to New Mountain Finance SPV Funding, LLC)

By: _____
Name: John R. Kline
Title: EVP & COO

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**New York City Employees' Retirement System**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: *[signature]*
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:

By: *[signature]*
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**New York City Police Pension Fund**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _Alan Adler_
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:

By: _David Rosenberg_
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:

**Nob Hill CLO Limited**

By:

_____

Name:   **Kyle Jennings**
Title:   **Managing Director**

For parties requiring a second signature line:

By:

Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

Nuveen Floating Rate Income Fund
By: Symphony Asset Management LLC

By: _____
Name: James Kim
Title: Co-Head of Credit Research

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

Nuveen Floating Rate Income Opportunity Fund
By: Symphony Asset Management LLC

By: _____
Name: James Kim
Title: Co-Head of Credit Research

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

Nuveen Senior Income Fund
By: Symphony Asset Management LLC


By: _____
Name: James Kim
Title: Co-Head of Credit Research

For parties requiring a second signature line:


By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

Nuveen Symphony Credit Opportunities Fund
By: Symphony Asset Management LLC

By: _____
Name: James Kim
Title: Co-Head of Credit Research

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

Nuveen Symphony Floating Rate Income Fund
By: Symphony Asset Management LLC

By: _____
Name: James Kim
Title: Co-Head of Credit Research

For parties requiring a second signature line:


By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: Oak Hill Credit Alpha Master Fund, L.P.

By: _____
Name: Gregory S. Rubin
Title: Authorized Signatory

For parties requiring a second signature line:


By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: Oak Hill Credit Opportunities Master Fund, Ltd.

By: _____
Name: Gregory S. Rubin
Title: Authorized Signatory

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
**Oaktree Global High Yield Bond Fund, L.P.**

By: Oaktree Global High Yield Bond Fund GP, L.P.
Its: General Partner

By: Oaktree Fund GP IIA, LLC
Its: General Partner

By: Oaktree Fund GP II, L.P.
Its: Managing Member


By: _____
Name:  Alan Adler
Title:  Authorized Signatory

For parties requiring a second signature line:


By: _____
Name:  David Rosenberg
Title:  Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
**Oaktree High Yield Fund II**

By: Oaktree Fund GP II, L.P.
Its: General Partner


By: _Alan Adler_
Name:  Alan Adler
Title:  Authorized Signatory


For parties requiring a second signature line:



By: _David Rosenberg_
Name:  David Rosenberg
Title:  Authorized Signatory


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
**Oaktree High Yield Fund, L.P.**

By: Oaktree Fund GP II, L.P.
Its: General Partner


By: _Alan Adler_
Name:  Alan Adler
Title:  Authorized Signatory

For parties requiring a second signature line:



By: _David Rosenberg_
Name:  David Rosenberg
Title:  Authorized Signatory


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
**Oaktree Senior Loan Fund, L.P.**

By: Oaktree Senior Loan fund GP, L.P.
Its: General Partner

By: Oaktree Fund GP IIA, LLC
Its: General Partner

By: Oaktree Fund GP II, L.P.
Its: Managing Member

By: _____
Name:  Regan Scott
Title:  Authorized Signatory

For parties requiring a second signature line:

By: _____
Name:  Desmund Shirazi
Title:  Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
**OCM High Yield Trust**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _Alan Adler_
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:

By: _David Rosenberg_
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: OHA Asia Customized Credit Fund, L.P.

By: _____
Name: Gregory S. Rubin
Title: Authorized Signatory

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution: OHA Credit Partners IX, Ltd.

By: _____
Name: Gregory S. Rubin
Title: Authorized Signatory

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution: OHA Credit Partners VI, Ltd.

By: _____
Name: Gregory S. Rubin
Title: Authorized Signatory

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: OHA Credit Partners VII, Ltd.

By: _____
Name: Gregory S. Rubin
Title: Authorized Signatory

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution: OHA Credit Partners VIII, Ltd.


By: _____
Name: Gregory S. Rubin
Title: Authorized Signatory


For parties requiring a second signature line:


By: _____
Name:
Title:


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: OHA Custom Multi-Sector Credit Master Fund, L.P.


By: _____
Name: Gregory S. Rubin
Title: Authorized Signatory

For parties requiring a second signature line:


By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: OHA Diversified Credit Strategies Master Fund (Parallel), LP

By: _____
Name: Gregory S. Rubin
Title: Authorized Signatory

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: OHA Diversified Credit Strategies Fund Master, L.P.

By: _____
Name: Gregory S Rubin
Title: Authorized Signatory

For parties requiring a second signature line:


By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution: OHA Intrepid Leveraged Loan Fund, Ltd.

By: _____
Name: Gregory S. Rubin
Title: Authorized Signatory

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: OHA Loan Funding 2013-1, Ltd.

By: _____

Name: Gregory S. Rubin
Title: Authorized Signatory

For parties requiring a second signature line:

By: _____

Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: OHA Park Avenue CLOI, Ltd.

By: _____

Name: Gregory S. Rubin

Title: Authorized Signatory

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

**One Wall Street CLO II LTD**

**By: Alcentra NY, LLC, as investment advisor**

By:

_Thomas Frangione_

Name:    **Thomas Frangione**
Title:    **Senior Vice President**

For parties requiring a second signature line:

By:

Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:

Oregon Public Employees Retirement Fund

By: _____

Name: Nicole Macarchuk

Title:   Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

**Pacific Life Funds-
PL Floating Rate Loan Fund
By: Eaton Vance Management
as Investment Sub-Advisor**

By: _Michael B. Botthof_

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:

By: _Steven Leveille_

Name: Steven Leveille

Title: Assistant Vice President

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:     **Pacific Select Fund-
Floating Rate Loan Portfolio
By: Eaton Vance Management
as Investment Sub-Advisor**

By: _Michael B. Botthof_

Name: Michael B. Botthof

Title: Vice President

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

**Pacifica CDO VI LTD**

**By: Alcentra NY, LLC, as
investment advisor**

By:

*Thomas Frangione*

Name:    **Thomas Frangione**
Title:    **Senior Vice President**

For parties requiring a second signature line:

By:

Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
**Pacific Gas & Electric Retirement Plan Master Trust**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _____
Name: Alan Adler
Title: Managing Director

For parties requiring a second signature line:

By: _____
Name: David Rosenberg
Title: Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
**Pacific Gas & Electric Co. Post Retirement Medical**

By: Oaktree Capital Management, L.P.
Its: Investment Manager


By: _Alan Adler_____
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:



By: _David Rosenberg_____
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

ProAssurance Casualty Co.

By: _____

Name: _Loo Dickson_

Title: _SVP OIMO for PRA_

For parties requiring a second signature line:

By: _____

Name: 

Title: 

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

**Prospero CLO II B.V.**

**By: Alcentra NY, LLC, as investment advisor**

By:

_Thomas Frangione_

Name:  **Thomas Frangione**
Title:  **Senior Vice President**

For parties requiring a second signature line:

By:

Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

REEF ROAD CAPITAL, LLC on behalf of
REEF ROAD MASTER FUND, LTD

By:

Name:
Title:        Bernadette Conway
              Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
REGIMENT CAPITAL, LTD., as Lender
By: Regiment Capital Management LLC,
In its Capacity as Investment Advisor

By: _____
Name:        Mark A. Brostowski
Title:         Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**RIC Russell Global Opportunistic Credit Fund**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _____
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:

By: _____
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

**San Gabriel CLO I LTD**
By: Its Investment Advisor CVC Credit Partners,
LLC
On behalf of Resource Capital Asset Management (RCAM)


By:
Name: Jennifer Patrickakos
Title: Vice President
       Head of Operations

For parties requiring a second signature line:


By: W.A.
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices
A-1 and A-2.

Name of Institution:
Saratoga Investment Corp. 2013-1, Ltd.

By: _____
Name: Adam Kaiser
Title: Attorney-In-Fact

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**Sears Holdings Pension Trust**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _Alan Adler_
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:

By: _David Rosenberg_
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

**Senior Debt Portfolio**
By: Boston Management and Research
as Investment Advisor

Name of Institution:

By: _michael B Botthof_
Name: Michael B. Botthof
Title: Vice President

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

**Shasta CLO I Ltd.**
By: Its Investment Advisor CVC Credit Partners,
LLC
On behalf of Resource Capital Asset Management (RCAM)

By: _____
Name: Jennifer Patrickakos
Title: Vice President
       Head of Operations

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices
A-1 and A-2.

Name of Institution:

    Slater Mill Loan Fund, LP

By: SHENKMAN CAPITAL MANAGEMENT, INC.,
    as Collateral Manager

By: _____
    Name: Justin Slatky
    Title: Senior Vice President

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**State of Connecticut Retirement Plans and Trust Funds**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: *[signature]*
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:

By: *[signature]*
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
**State Teachers Retirement System of Ohio**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: *[signature]*
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:

By: *[signature]*
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
Stoney Lane Funding I, Ltd.
By: HillMark Capital Management, L.P.,
<u>as Collateral Manager , as Lender</u>


By: _____
Name: Mark Gold
Title:  CEO

For parties requiring a second signature line:


By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

SUNRISE PARTNERS LIMITED PARTNERSHIP

By: _____

Name: Douglas W. Ambrose

Title: Executive Vice President of
Paloma Partners Management Company,
general partner of
Sunrise Partners Limited Partnership

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

Symphony CLO III, LTD.
By: Symphony Asset Management LLC

By: _____
Name: James Kim
Title: Co-Head of Credit Research

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

Symphony CLO VII, LTD.
By: Symphony Asset Management LLC

By: _____
Name: James Kim
Title: Co-Head of Credit Research

For parties requiring a second signature line:

By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

Symphony CLO XII, LTD.
By: Symphony Asset Management LLC


By: _____
Name: James Kim
Title: Co-Head of Credit Research

For parties requiring a second signature line:


By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**Teachers' Retirement System of the City of New York**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _Alan Adler_
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:

By: _David Rosenberg_
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
Telos CLO 2006-1, LTD
Telos CLO 2007-2, LTD
Telos CLO 2013-3, LTD
Managed by:
Telos Asset Management LLC


By: _____
Name: Ro Toyoshima
Title: Managing Director

For parties requiring a second signature line:


By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
**Texas County & District Retirement System**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _____
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:

By: _____
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution: The Coca-Company Master Retirement Trust

By: _____

Name: Gregory S. Rubin

Title: Authorized Signatory

For parties requiring a second signature line:

By: _____

Name:

Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution: The Mangrove Partners Master Fund, Ltd.


By: _____

Name: Ward Dietrich

Title:   Authorized Person


For parties requiring a second signature line:


By: _____

Name:

Title:


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

THIRD AVENUE TRUST, ON BEHALF OF FOCUSED CREDIT FUND

By: Third Avenue Management LLC, its investment advisor

By: _____

Name: Vincent J. Dugan
Title:  Chief Financial Officer

For parties requiring a second signature line:


By: _____
Name:
Title:


Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**TMCT II, LLC**

By: Oaktree Capital Management, L.P.
Its: Investment Manager


By: _Alan Adler_____
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:



By: _David Rosenberg_____
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
**TMCT LLC**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _Alan Adler_

Name: Alan Adler
Title: Managing Director

For parties requiring a second signature line:

By: _David Rosenberg_

Name: David Rosenberg
Title: Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**UMC Benefit Board, Inc.**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _Alan Adler_ _____
Name:  Alan Adler
Title:  Managing Director

For parties requiring a second signature line:

By: _David M Rosenberg_ _____
Name:  David Rosenberg
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**UniSuper Limited, as Trustee for UniSuper**

By: Oaktree Capital Management, L.P.
Its: Investment Manager

By: _____

Name:  Regan Scott
Title:  Managing Director

For parties requiring a second signature line:

By: _____

Name:  Desmund Shirazi
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:

US Income Strategy Fund

By: _____

Name: Nicole Macarchuk
Title:   Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

**Venture IX CDO, Limited**

**By: its investment advisor,**
**MJX Asset Management LLC**

By:

Name:  **Martin E. Davey**
Title:  **Managing Director**

For parties requiring a second signature line:

By:

Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:

**Venture V CDO Limited**

**By: its investment advisor,
MJX Asset Management, LLC**

By:

Name: **Martin E. Davey**
Title: **Managing Director**

For parties requiring a second signature line:

By:

Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:


**Venture VII CDO Limited**


**By: its investment advisor,**
**MJX Asset Management, LLC**

By:

_(signature)_
_____

Name:   **Martin E. Davey**
Title:   **Managing Director**

For parties requiring a second signature line:


By:



Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:


**Venture VIII CDO, Limited**


**By: its investment advisor,**
**MJX Asset Management, LLC**

By:

_Martin E. Davey (signature)_

Name:    **Martin E. Davey**
Title:    **Managing Director**

For parties requiring a second signature line:


By:



Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:


**Venture X CLO, Limited**


**By: its investment advisor,**
**MJX Asset Management, LLC**

By:

Name:    **Martin E. Davey**
Title:    **Senior Portfolio Manager**

For parties requiring a second signature line:


By:


Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:

**Veritas CLO II, LTD**

**By: Alcentra NY, LLC, as investment advisor**

By:

*Thomas Frangione*

Name:    **Thomas Frangione**
Title:    **Senior Vice President**

For parties requiring a second signature line:

By:


Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:  WELLS FARGO BANK, NATIONAL ASSOCIATION


By: _____
Name:  Matthew Schnabel
Title:  Director

For parties requiring a second signature line:


By: _____
Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:

Westbrook CLO Ltd.

By: SHENKMAN CAPITAL MANAGEMENT, INC.,
as Investment Manager

By: _____
Name: Justin Slatky
Title: Senior Vice President

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:


 Westwood CDO I LTD


 By: Alcentra NY, LLC, as
 investment advisor

By:

*Thomas Frangione*

Name:   Thomas Frangione
Title:   Senior Vice President

For parties requiring a second signature line:


By:



Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices
A-1 and A-2.

Name of Institution:

**Westwood CDO II LTD**

**By: Alcentra NY, LLC, as investment advisor**

By:

_Thomas Frangione_

Name:    **Thomas Frangione**
Title:    **Senior Vice President**

For parties requiring a second signature line:

By:

Name:
Title:

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

Name of Institution:
**WM Pool - High Yield Fixed Interest Trust**

By: Oaktree Capital Management, L.P.
Its: Investment Manager



By: _____

Name:  Regan Scott
Title:  Managing Director

For parties requiring a second signature line:

By: _____

Name:  Desmund Shirazi
Title:  Managing Director

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices A-1 and A-2.

[Signature Page to Credit and Guaranty Agreement]

Name of Institution:
XL RE LTD., as Lender
By: Regiment Capital Management LLC,
In its Capacity as Investment Advisor

By: _____

Name:        Mark A. Brostowski
Title:         Authorized Signatory

Aggregate Principal Amounts Beneficially Owned or Managed shall be set forth on Appendices
A-1 and A-2.

AMENDMENT No. 1 dated as of November 13, 2015 (this "Amendment Agreement") to the Credit and Guaranty Agreement, dated as of January 5, 2015 (the "Existing Credit Agreement"), among Education Management II LLC ("Company"), Education Management Corporation ("Parent"), Education Management Holdings II LLC ("Holdings"), certain subsidiaries of Holdings, as Guarantors, the Lenders party thereto from time to time and U.S. Bank National Association, as administrative agent and collateral agent (in such capacity, the "Agent").  Unless otherwise defined herein, terms defined in the Amended Credit Agreement (as defined below) and used herein shall have the meanings given to them in the Amended Credit Agreement.

WHEREAS, Company has requested certain amendments to the Existing Credit Agreement; and

WHEREAS, in order to effect the foregoing, Company, Parent, Holdings and the other parties hereto desire to amend, as of the First Amendment Effective Date (as defined below), the Existing Credit Agreement, subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**Section 1**.  *Amendment of the Existing Credit Agreement.*  Effective as of the First Amendment Effective Date, the Existing Credit Agreement is hereby amended (the Existing Credit Agreement as amended hereby, the "Amended Credit Agreement") to:

(a)      add the following definition to Section 1.1. of the Existing Credit Agreement in correct alphabetical order:

"**First Amendment Agreement**" means that certain Amendment No. 1, dated as of November 13, 2015, among Company, the Guarantors, U.S. Bank National Association, in its capacity as Administrative Agent and Collateral Agent, and the Lenders listed on the signature pages thereto.

"**Settlement Agreement**" means that certain Settlement Agreement, dated November 16, 2015, entered into among the United States of America, acting through the United States Department of Justice and on behalf of the Department of Education; the States of California, Florida, Illinois, Indiana, and Minnesota; the Commonwealth of Massachusetts, the Commonwealth of Kentucky, the District of Columbia and the States of Montana, New Jersey, New Mexico, New York, and Tennessee; Parent and its subsidiaries and affiliates, including but not limited to Holdings, Company, Education Finance III LLC, the Argosy Education Group, Inc., Argosy University of California LLC, the Art Institutes International II LLC, Brown Mackie Education II LLC, the Institute of Post-Secondary Education, Inc., and South University LLC; and the relators as identified therein, each through their authorized representatives.

(b)      replace the definition of "Net Asset Sale Proceeds" in Section 1.1 of the Existing Credit Agreement as follows:

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to (a) cash payments (including any cash received by way of deferred payment pursuant to, or by monetization or otherwise, a note receivable or otherwise, but only as and when so received) received by Parent or any of its Subsidiaries from such Asset Sale, minus (b) any bona fide direct costs incurred in connection with such Asset Sale, including without limitation (i) Taxes payable by the seller (or a direct or indirect parent of such seller) as a result of

any gain recognized in connection with such Asset Sale, (ii) any additional Taxes paid, reasonably estimated by Parent in good faith to be payable (pending a final determination of the amount of such Taxes by a Governmental Authority), or reserved against as a result of the repatriation of such Net Asset Sale Proceeds to the United States, (iii) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale and (iv) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by Parent or any of its Subsidiaries in connection with such Asset Sale, minus (c) any and all amounts required to be paid pursuant to the Settlement Agreement in connection with such Asset Sale.

**Section 2.** *Representations and Warranties.* To induce the Agent and the Lenders to execute this Amendment Agreement, each Credit Party (solely as to itself and to the extent applicable) represents and warrants as of the Amendment Effective Date that:

(a) This Amendment Agreement has been duly authorized, executed and delivered by such Credit Party.

(b) This Amendment Agreement constitutes a legal, valid and binding obligation, enforceable against such Credit Party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(c) As of the First Amendment Effective Date, no Default or Event of Default has occurred and is continuing or would result from this Amendment Agreement or any transactions contemplated hereby.

(d) the representations and warranties of such Credit Party contained in Article IV of the Amended Credit Agreement are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified by materiality in the context thereof) on and as of the First Amendment Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties were true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified by materiality in the context thereof) on and as of such earlier date.

**Section 3.** *Effectiveness of this Amendment Agreement and the Amended Credit Agreement.* The effectiveness of this Amendment Agreement and the amendment of the Existing Credit Agreement set forth herein is subject to the satisfaction of the following conditions precedent (the date on which all of such conditions shall first be satisfied (or waived), which in the case of clause (b) may be substantially concurrent with the satisfaction of the other conditions specified below, the "First Amendment Effective Date"):

(a) The Agent's (or its counsel's) receipt of either (i) a counterpart of this Amendment Agreement signed on behalf of each Credit Party and the Requisite Lenders or (ii) customary written evidence reasonably satisfactory to the Agent (which may include telecopy or electronic transmission of a signed signature page of this Amendment Agreement) that such party has signed a counterpart of this Amendment Agreement; and

(b)      Company shall have paid all fees, costs and expenses due and payable to the Agent, for itself and on behalf of the Lenders, and its counsel on the First Amendment Effective Date for which Company has received an invoice (*provided* that such invoice may reflect an estimate and/or only costs processed to date and shall not thereafter preclude a final settling of accounts between Company and the Agent, including with respect to fees, costs or expenses incurred prior to the First Amendment Effective Date).

**Section 4**.  *Effect of Amendment.*  (a) Except as expressly set forth herein, this Amendment Agreement shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of the Lenders or the Agent under the Existing Credit Agreement or any other Credit Document and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Existing Credit Agreement or any other provision of the Existing Credit Agreement or of any other Credit Document, all of which, subject to the terms hereof, are ratified and affirmed in all respects and shall continue in full force and effect.  Nothing herein shall be deemed to entitle the Credit Parties to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Existing Credit Agreement, Amended Credit Agreement or any other Credit Document in similar or different circumstances.

(b)      It is the intention of each of the parties hereto that the Existing Credit Agreement be amended so as to preserve the perfection and priority of all security interests securing indebtedness and obligations under the Existing Credit and that this Amendment Agreement does not constitute a novation of the obligations and liabilities existing under the Existing Credit Agreement.

(c)      On and after the First Amendment Effective Date, each reference in the Existing Credit Agreement to "this Agreement", "hereunder", "hereof", "herein", or words of like import, and each reference to the "Credit Agreement" in any other Credit Document shall be deemed a reference to the Amended Credit Agreement.  This Amendment Agreement shall constitute a "Credit Document" for all purposes of the Amended Credit Agreement and the other Credit Documents.

**Section 5**.  *Counterparts*.  This Amendment Agreement may be executed in any number of counterparts (and by different parties hereto in separate counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Amendment Agreement by telecopy or electronic transmission shall be as effective as delivery of a manually executed counterpart hereof.

**Section 6**.  *Governing Law.*  THIS AMENDMENT AGREEMENT AND THE RIGHTS AND OBLIGATIONS OPF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVIN REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.

**Section 7**.  *Severability.*  If any provision contained in this Amendment Agreement shall be held to be invalid, illegal or unenforceable in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability, and the remaining provisions of this Amendment Agreement shall not in any way be affected or impaired.  The invalidity, illegality or unenforceability of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**Section 8**.  *Headings*.  Section headings herein are included for convenience of reference only and shall affect the interpretation of this Amendment Agreement.

*[Remainder of page intentionally blank; signature pages follow]*

-3-

IN WITNESS WHEREOF, the parties hereto have caused this Amendment Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first set forth above.

**EDUCATION MANAGEMENT
CORPORATION**

By: _____
Name: Mick J. Beckhuizen
Title: EVP & CFO

**EDUCATION MANAGEMENT HOLDINGS II LLC**

By: _____
Name: Mick J. Beckhuizen
Title: EVP & CFO

**EDUCATION MANAGEMENT II LLC**

By: _____
Name: Mick J. Beckhuizen
Title: EVP & CFO

*[Signature Page to Amendment No. 1]*

**HIGHER EDUCATION SERVICES II LLC**

**THE CONNECTING LINK II LLC**

**BROWN MACKIE EDUCATION II LLC**

**EDUCATION FINANCE III LLC**

**SOUTH UNIVERSITY RESEARCH II LLC**

**THE ART INSTITUTES INTERNATIONAL II LLC**

**BMC REAL PROPERTY HOLDINGS LLC**

By: _____

Name: James A. Terrell

Title: VP & Treasurer

*[Signature Page to Amendment No. 1]*

**U.S. Bank National Association,**
as Administrative Agent and Collateral Agent

By: _____

Name:
Title:    James A. Hanley
          Vice President

Credit Suisse AG,
Cayman Islands Branch,
as Lender

By: _____

Name:
Title:    **Megan Kane**
          **Authorized Signatory**

**Laura Katherine Schembri**
**Authorized Signatory**

*[Signature Page to Amendment No. 1]*

**CREDIT SUISSE LOAN FUNDING LLC,**
as Lender

By: _____

    Name:
    Title:

    Robert Healey
    Authorized Signatory

| | |
|---|---|
| Tranche A Term Loan | 8,706,048.95 |
| Tranche B Term Loan | 14,933,375.81 |
| Revolving Loan | 19,427,180.75 |

**CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,**
as Lender

By: _____

    Name:
    Title:

    Robert Healey
    Authorized Signatory

By: _____

    Name:
    Title:

    Michael Wotanowski
    Authorized Signatory

| | |
|---|---|
| Tranche A Term Loan | 410,427.95 |
| Tranche B Term Loan | 706,835.05 |
| Revolving Loan | 11,716,308.44 |

*[Signature Page to Amendment No. 1]*

**BNP PARIBAS,**
as Lender

By: _____
      Name:    Yung Wu
      Title:    Vice President

By: _____
      Name:    Charles Romano
      Title:    Director

*[Signature Page to Amendment No. 1]*

**ANCHORAGE CAPITAL MASTER OFFSHORE, Ltd.,**

**By: Anchorage Capital Group, L.L.C., its Investment Manager**
as Lender

By: _____

Name:

Title:
           Robert Dunleavy
   Managing Director of Middle Office
        & Operations

*[Signature Page to Amendment No. 1]*

Oaktree Capital Management, L.P.., as Agent and Investment Manager to the accounts listed on Schedule I

as Lender

By: _____
    Name:  Alan Adler
    Title: Managing Director

By: _____
    Name:  David Rosenberg
    Title:  Managing Director

*[Signature Page to Amendment No. 1]*

**Each of CCP Credit Acquisition Holdings, L.L.C.
and Centerbridge Special Credit Partners II, L.P.,
individually in their capacity** as Lenders

By: _____

Name: Jared S. Hendricks

Title: Authorized Signatory

**FUTURE FUND BOARD OF GUARDIANS
AS LENDER**

By: Oak Hill Advisors, L.P.
As its Investment Advisor

By:_____
Name: Robert Okun
Title: Authorized Signatory


**OHA DIVERSIFIED CREDIT STRATEGIES FUND MASTER, L.P.
AS LENDER**

By: OHA Diversified Credit Strategies GenPar, LLC,
its General Partner

By: OHA Global GenPar, LLC
its Managing Member

By: OHA Global MGP, LLC
its Managing Member

By: _____
Name: Robert Okun
Title: Authorized Signatory


**OHA DIVERSIFIED CREDIT STRATEGIES FUND (PARALLEL II), L.P.
AS LENDER**

By: OHA Diversified Credit Strategies GenPar, LLC,
its General Partner

By: OHA Global GenPar, LLC
its Managing Member

By: OHA Global MGP, LLC
its Managing Member

By: _____
Name: Robert Okun
Title: Authorized Signatory


*[Signature Page to Amendment No. 1]*

**OHA ASIA CUSTOMIZED CREDIT FUND, L.P.**
**AS LENDER**

By: OHA Asia Customized Credit GenPar, LLC,
its General Partner

By: _____
Name: Robert Okun
Title: Authorized Signatory


**OHA CUSTOM MULTI-SECTOR CREDIT MASTER FUND, L.P.**
**AS LENDER**

By: OHA Custom Multi-Sector Credit Fund GenPar, LLC,
its General Partner

By: OHA Global GenPar, LLC,
its Managing Member

By: OHA Global MGP, LLC,
its Managing Partner

By: _____
Name: Robert Okun
Title: Authorized Signatory


**OAK HILL CREDIT ALPHA MASTER FUND, L.P.**
**AS LENDER**

By: Oak Hill Credit Alpha Master Fund GenPar, Ltd.,
its General Partner

By: _____
Name: Robert Okun
Title: Authorized Signatory


**OAK HILL CREDIT OPPORTUNITIES MASTER FUND, LTD.**
**AS LENDER**

By: _____
Name: Robert Okun
Title: Authorized Signatory


*[Signature Page to Amendment No. 1]*

**THE COCA-COLA COMPANY MASTER RETIREMENT TRUST**
**AS LENDER**

By: Oak Hill Advisors, L.P.
As  Manager

By: _____
Name: Robert Okun
Title: Authorized Signatory


**OHA PARK AVENUE CLO I, LTD.**
**AS LENDER**

By: Oak Hill Advisors, L.P.
As Investment Manager

By: _____
Name: Alan Schrager
Title: Authorized Signatory


**OHA INTREPID LEVERAGED LOAN FUND, LTD**
**AS LENDER**

By: Oak Hill Advisors, L.P.
As Investment Manager

By: _____
Name: Alan Schrager
Title: Authorized Signatory


**OHA CREDIT PARTNERS VIII, LTD.**
**AS LENDER**

By: Oak Hill Advisors, L.P.
As Portfolio Manager

By: _____
Name: Alan Schrager
Title: Authorized Signatory


*[Signature Page to Amendment No. 1]*

**OHA CREDIT PARTNERS IX, LTD.**
**AS LENDER**

By: Oak Hill Advisors, L.P.
As Portfolio Manager

By: _____
Name: Alan Schrager
Title: Authorized Signatory


**OAK HILL CREDIT PARTNERS V, LIMITED**
**AS LENDER**

By: Oak Hill Advisors, L.P.
As Portfolio Manager

By: _____
Name: Alan Schrager
Title: Authorized Signatory


**OHA CREDIT PARTNERS VI, LTD.**
**AS LENDER**

By: Oak Hill Advisors, L.P.
As its Portfolio Manager

By: _____
Name: Alan Schrager
Title: Authorized Signatory


**OHA CREDIT PARTNERS VII, LTD.**
**AS LENDER**

By: Oak Hill Advisors, L.P.
As Portfolio Manager

By: _____
Name: Alan Schrager
Title: Authorized Signatory


*[Signature Page to Amendment No. 1]*

**OHA LOAN FUNDING 2013-1, LTD.**
**AS LENDER**

By: Oak Hill Advisors, L.P.
As Portfolio Manager

By: _____
Name: Alan Schrager
Title: Authorized Signatory

**Bank of America, N.A.,**
as Lender

By: _____
Name:  C. Mark Hedrick
Title:  Managing Director

Approval for the following exposures only:

Revolver:        $24,116,068.20

Term Loan A:      $844,797.20

Term Loan B:   $1,479,069.68

*[Signature Page to Amendment No. 1]*

**Merrill Lynch Capital Corporation,**
as Lender

By: _____
    Name:  Christopher DiBiase
    Title:   Director


Approval for the following exposures only:

Revolver:       $21,431,080.85

Term Loan A:     $750,740.83

Term Loan B:   $1,314,395.92

*[Signature Page to Amendment No. 1]*

**BCBSM, Inc.**
as Lender

By: _____
Name: Jeffrey M. Smith
Title: Authorized Signatory

*[Signature Page to Amendment No. 1]*

**KKR Corporate Credit Partners L.P.**
as Lender

By: _____
Name: Jeffrey M. Smith
Title: Authorized Signatory

**KKR Credit Relative Value Master Fund L.P.**
as Lender

By: _____

Name: Jeffrey M. Smith
Title: Authorized Signatory

**KKR Debt Investors II (2006) (Ireland) L.P.**
as Lender

By:  _____
     Name: Jeffrey M. Smith
     Title: Authorized Signatory

**KKR Financial CLO 2005-2, Ltd.**
as Lender

By:  _____
Name: Jeffrey M. Smith
Title: Authorized Signatory

**KKR Financial CLO 2006-1, Ltd.**
as Lender

By: _____
Name: Jeffrey M. Smith
Title: Authorized Signatory

**KKR Financial CLO 2007-1, Ltd.**
as Lender

By:

Name: Jeffrey M. Smith
Title: Authorized Signatory

**KKR Financial CLO 2011-1, Ltd.**
as Lender

By: _____
     Name: Jeffrey M. Smith
     Title: Authorized Signatory

**KKR Floating Rate Fund L.P.**
as Lender

By:

Name: Jeffrey M. Smith
Title: Authorized Signatory

**KKR-PBPR Capital Partners L.P.**
as Lender

By: _____
Name: Jeffrey M. Smith
Title: Authorized Signatory

**Maryland State Retirement and Pension System**
as Lender

By: _____
Name: Jeffrey M. Smith
Title: Authorized Signatory

**Oregon Public Employees Retirement Fund**
as Lender

By: _____
Name: Jeffrey M. Smith
Title: Authorized Signatory

**AGF Floating Rate Income Fund**
By: Eaton Vance Management
as Investment Advisor

as Lender

By: _____
Name:
Michael B. Botthof
Title:
Vice President

**Bond Portfolio**
By: Boston Management and Research
as Investment Advisor

as Lender

By: _____
Name: Michael B. Botthof
Title: Vice President

**Eaton Vance CDO VII PLC**
By: Eaton Vance Management as Investment Advisor

as Lender

By: _Michael B. Botthof_____

Name:
Title:
Michael B. Botthof
Vice President

**Eaton Vance CDO VIII, Ltd.**
By: Eaton Vance Management as Investment Advisor

as Lender

By: _____
Name: Michael B. Botthof
Title: Vice President

**Eaton Vance CDO IX Ltd.**
By: Eaton Vance Management as Investment Advisor

as Lender

By: _____
Name: Michael B. Botthof
Title: Vice President

**Eaton Vance CDO X PLC**
By: Eaton Vance Management as Investment Advisor

as Lender

By: _____

Name: Michael B. Botthof
Title: Vice President

**Eaton Vance Floating-Rate
Income Plus Fund**
By: Eaton Vance Management
as Investment Advisor

as Lender

By: _Michael B. Botthof_____

Name: Michael B. Botthof
Title: Vice President

**Eaton Vance Senior Floating-Rate Trust**
**By: Eaton Vance Management**
**as Investment Advisor**

as Lender

By: _Michael B. Botthof_

Name:
Title: Michael B. Botthof
Vice President

*[Signature Page to Amendment No. 1]*

**Eaton Vance Floating-Rate Income Trust**
By: Eaton Vance Management
as Investment Advisor

as Lender

By: _Michael B. Botthof_

Name: Michael B. Botthof
Title: Vice President

*[Signature Page to Amendment No. 1]*

**Eaton Vance International (Cayman Islands)**
**Floating-Rate Income Portfolio**
By: Eaton Vance Management
**as Investment Advisor**

as Lender

By: _Michael B. Botthof_____
Name:
Title: Michael B. Botthof
Vice President

**Eaton Vance Senior Income Trust**
By: Eaton Vance Management
as Investment Advisor

as Lender

By: _____
Name: Michael B. Botthof
Title: Vice President

**Eaton Vance Short Duration**
**Diversified Income Fund**
By: Eaton Vance Management
as Investment Advisor

as Lender

By: _____

Name:
Michael B. Botthof
Title:
Vice President

Eaton Vance Institutional Senior Loan Fund
By: Eaton Vance Management
as Investment Advisor

as Lender

By: _____

Name:
Title: Michael B. Botthof

Vice President

**Eaton Vance Limited Duration Income Fund**
By: Eaton Vance Management
as Investment Advisor

as Lender

By: _____
Name: Michael B. Botthof
Title: Vice President

**Eaton Vance Floating Rate Portfolio**
By: Boston Management and Research
as Investment Advisor

as Lender

By: _Michael B. Botthof_
       Name: Michael B. Botthof
       Title: Vice President

KP Fixed Income Fund
By: Eaton Vance Management
As Investment Sub-Advisor

as Lender

By: _____
Name: Michael B. Botthof
Title: Vice President

**MET Investors Series Trust-**
**Met/Eaton Vance Floating Rate Portfolio**
**By: Eaton Vance Management**
**as Investment Sub-Advisor**

as Lender

By: _Michael B. Botthof_____

Name:
Michael B. Botthof
Title:
Vice President

*[Signature Page to Amendment No. 1]*

**Pacific Select Fund-**
**Floating Rate Loan Portfolio**
**By: Eaton Vance Management**
**as Investment Sub-Advisor**

as Lender

By: _Michael B. Botthof_

Name:
Title:
Michael B. Botthof
Vice President

**Pacific Funds Series Trust- PF Floating Rate Loan Fund**
By: Eaton Vance Management as Investment Sub-Advisor

as Lender

By: _____

Name:
Michael B. Botthof
Title:
Vice President

Steven Leveille
Assistant Vice President

*[Signature Page to Amendment No. 1]*

**Columbia Funds Variable Series Trust II-
Variable Portfolio-Eaton Vance
Floating Rate Income Fund
By: Eaton Vance Management
as Investment Sub-Advisor**
as Lender

By: _____

Name: Michael B. Botthof

Title: Vice President

**Senior Debt Portfolio**
By: Boston Management and Research
as Investment Advisor

as Lender

By: _____
Name: Michael B. Botthof
Title: Vice President

Eaton Vance Corp
By: Eaton Vance Management
As Investment Advisor

as Lender

By: _____
      Name: Michael B. Botthof
      Title:
      Vice President

**Eaton Vance VT Floating-Rate Income Fund**
By: Eaton Vance Management
as Investment Advisor

as Lender

By: _____Michael B. Botthof_____
Name: Michael B. Botthof
Title: Vice President

NEW MOUNTAIN FINANCE CORPORATION,
as Lender

By: _____
Name: ROBERT A. HAMWEE
Title: CHIEF EXECUTIVE OFFICER & PRESIDENT

*[Signature Page to Amendment No. 1]*

New Mountain Finance Holdings, L.L.C.
as Lender

By:

Name: Robert A. Hamwee
Title: Chief Executive Officer & President

*[Signature Page to Amendment No. 1]*

AMENDMENT No. 2 dated as of April 18, 2017 (this "<u>Amendment Agreement</u>") to the Credit and Guaranty Agreement, dated as of January 5, 2015, as amended by that certain Amendment No. 1 dated as of November 13, 2015 (the "<u>Existing Credit Agreement</u>"), among Education Management II LLC ("<u>Company</u>"), Education Management Corporation ("<u>Parent</u>"), Education Management Holdings II LLC ("<u>Holdings</u>"), certain subsidiaries of Holdings, as Guarantors, the Lenders party thereto from time to time and U.S. Bank National Association, as administrative agent and collateral agent (in such capacity, the "<u>Agent</u>").  Unless otherwise defined herein, terms defined in the Amended Credit Agreement (as defined below) and used herein shall have the meanings given to them in the Amended Credit Agreement.

WHEREAS, Company and certain of its Subsidiaries have entered into that certain Amended and Restated Asset Purchase Agreement dated February 24, 2017 with the Dream Center Foundation and certain other entities (the "<u>Asset Purchase Agreement</u>");

WHEREAS, in connection with entry into the Asset Purchase Agreement and in furtherance of the transactions contemplated thereby Company has requested certain amendments to the Existing Credit Agreement; and

WHEREAS, in order to effect the foregoing, Company, Parent, Holdings and the Lenders party hereto (collectively, the "<u>Parties</u>")  desire to amend, as of the Second Amendment Effective Date (as defined below), the Existing Credit Agreement, subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

**Section 1.** *Acknowledgement of the Credit Parties.*

(a)      The principal amount of Revolving Loans outstanding as of the date hereof is $0.  The Letter of Credit Usage as of the date hereof is $105,223,161.00.  The principal amount of Tranche A Term Loans outstanding as of the date hereof is $149,999,999.12.  The principal amount of Tranche B Term Loans outstanding as of the date hereof is $285,168,559.84.  The foregoing amounts do not include interest, fees and expenses and other amounts that are chargeable or otherwise reimbursable under the Credit Documents.  The Company hereby reaffirms its obligations to pay interest, fees, expenses and other amounts under the Credit Documents, including without limitation each of the interest payments due and payable on each of the following Interest Payment Dates, (i) June  30, 2017, (ii) September 30, 2017, and (iii) December 31, 2017 (collectively, "<u>2017 Interest Payments</u>").  The Company currently expects to pay as and when due the 2017 Interest Payments.

(b)      The bank accounts listed on Schedule I hereto (the "<u>Existing Bank Accounts</u>") are the only bank accounts held or owned by the Credit Parties as of the date hereof.  Each Existing Bank Account is (i) subject to a control agreement in favor of the Collateral Agent for the benefit of the Secured Parties and Issuing Banks; (ii) a zero-balance disbursement or similar account; (iii) an account that sweeps daily to an account subject to a control agreement in favor of the Collateral Agent for the benefit of the Secured Parties and Issuing Banks; or (iv) an account containing cash collateral securing the Bilateral LC Facilities.

(c)      All of the assets pledged, assigned, conveyed, mortgaged, hypothecated or transferred to the Collateral Agent pursuant to the Collateral Documents are (and shall continue to be) subject to valid and enforceable Liens and security interests of the Collateral Agent, as collateral security for all of the Obligations, subject to no Liens except Permitted Liens, and such Liens and security interests are not subject to avoidance, disallowance or subordination pursuant to any requirement of law, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or

similar laws affecting the enforcement of creditors' rights generally or by general equitable principles (whether enforcement is sought by proceedings in equity or at law). Each Credit Party hereby reaffirms and ratifies its prior conveyance to the Collateral Agent of a continuing security interest in and lien on the Collateral.

(d)     The obligations of the Credit Parties under this Amendment Agreement of any nature whatsoever, whether now existing or hereafter arising, are hereby deemed to be "Obligations" for all purposes of the Credit Documents and the term "Obligations" when used in any Credit Document shall include all such obligations hereunder.

(e)     Each Credit Party hereby (i) ratifies and reaffirms all of its payment and performance obligations, contingent or otherwise, and each grant of security interests and Liens in favor of the Agent, the Issuing Banks or the Lenders, as the case may be, under each Credit Document to which it is a party, and (ii) agrees and acknowledges the Obligations constitute legal, valid and binding obligations of the Credit Parties, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law), and that as of the Second Amendment Effective Date, (a) no offsets, defenses or counterclaims to the Obligations or any other causes of action with respect to the Obligations or the Credit Documents exist and (b) no portion of the Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to any requirement of law, and it does not otherwise dispute in any respect the enforceability of the Obligations or the Credit Documents.

(f)     The entry by the Lenders party hereto into, and their covenants to perform in accordance with, this Amendment Agreement and such Lenders' consummation of the transactions contemplated hereby constitute "new value" and "reasonably equivalent value", as those terms are used in Section 547 and 548 of Title 11 of the United States Code, received by the Credit Parties as of the closing of this Amendment Agreement in contemporaneous exchange for the Credit Parties' entry into, and covenants to perform in accordance with, this Amendment Agreement and the Credit Parties' consummation of the transactions contemplated hereby.

**Section 2.** *Amendment of the Existing Credit Agreement.* Effective as of the Second Amendment Effective Date, the Existing Credit Agreement is hereby amended (the Existing Credit Agreement as amended hereby, the "Amended Credit Agreement") to:

(a)     add the following definitions to Section 1.1. of the Existing Credit Agreement in correct alphabetical order:

"**APA Closing Date**" means the "Closing Date" as defined in the Asset Purchase Agreement.

"**Asset Purchase Agreement**" means that certain Amended and Restated Asset Purchase Agreement dated February 24, 2017 among the Company, certain of its Subsidiaries, the Dream Center Foundation and certain other buyer entities, as in effect on the Second Amendment Effective Date and as may be amended in any manner not material and adverse to the interests of the Lenders or the Issuing Banks; it being understood that any amendment to the Asset Purchase Agreement that could reasonably be expected to result in a reduction in recoveries on the Obligations, including a reduction in purchase consideration or the cash component thereof, shall be deemed material and adverse to the interests of the Lenders and the Issuing Banks and require the consent of the Requisite Lenders.

"**Cash Collateral Proceeds**" means any and all cash payments and proceeds received by Parent, Holdings, Company or any of the Subsidiaries from the return of any cash collateral or release of any restricted cash, in each case, securing or otherwise attributable to any Existing Letter of Credit, any Letter of Credit, any letter of credit issued under any Bilateral LC Facility, any state surety bond or similar requirement of state regulatory authorities and any other cash collateral (including in respect of credit card or similar obligations) posted by Parent, Holdings, Company or any of the Subsidiaries.

"**DOE Existing Letter of Credit**" means that certain Existing Letter of Credit, Ref. No. 04141468 (formerly 91892434), issued for the account of the Company, by BNPP in favor of the U.S. Department of Education in the face amount of $102,168,215.

"**Second Amendment Agreement**" means that certain Amendment No. 2, dated as of April 18, 2017, among Company, the Guarantors, and the Lenders listed on the signature pages thereto."

"**Second Amendment Effective Date**" shall have the meaning ascribed to such term in the Second Amendment Agreement.

(b)     amend the definition of "Defaulting Lender" appearing in Section 1.1 of the Exiting Credit Agreement by inserting the text "or (f) has, or has a direct or indirect parent company that has, become the subject of a Bail-in Action  (as defined in the Second Amendment Agreement)" at the end thereof.

(c)     amend section 2.12(a) of the Existing Credit Agreement by deleting the proviso therein and adding a new proviso as follows:

"provided that Net Asset Sale Proceeds realized pursuant to the Asset Purchase Agreement in an amount not to exceed the difference between $50,000,000 and the amount paid pursuant to the Settlement Agreement upon consummation of the Asset Purchase Agreement may be retained by the Company for general corporate purposes."

(d)     amend section 2.12(b) of the Existing Credit Agreement by deleting the proviso therein.

(e)     amend section 2.12 of the Existing Credit Agreement to add at the end thereof new subsections (i) and (j) as follows:

"(i)     No later than July 5, 2017, the Revolving Commitments of each of the Revolving Lenders shall be automatically reduced ratably such that the aggregate Revolving Commitments shall be equal to the sum of (x) $66,000,000 plus (y) the aggregate Letter of Credit Usage on such date and, after giving effect to such reduction, the Company shall repay Revolving Loans in the amount necessary so that the Total Utilization of Revolving Commitments shall not exceed the Revolving Commitments then in effect.  Following the reduction of the aggregate Revolving Commitments pursuant to the immediately preceding sentence, the portion of the Revolving Commitments referred to in clause (y) of the immediately preceding sentence shall be available only in respect of Letters of Credit outstanding on the Second Amendment Effective Date (subject to extension, renewal or replacement in accordance with the terms of the Credit Documents) and any Letter of Credit Usage in respect thereof and, for the avoidance of doubt, the terms of Section 2.12(e) shall continue to apply to such Letters of Credit and the portion of the Revolving Commitment related thereto."

"(j)     Notwithstanding anything to the contrary contained herein or in any other Credit Document, (x) no later than three Business Days following receipt by Parent, Holdings, Company or any of the Subsidiaries of any Cash Collateral Proceeds and (y) within three Business Days following receipt by Parent, Holdings, Company or any of the Subsidiaries of any Deferred Payments (as defined in the Asset Purchase Agreement) Parent, Holdings, Company or such Subsidiary shall prepay the Loans and cash collateralize the Obligations as set forth in Section 2.13(e) in an aggregate amount equal to such amounts so received; provided that the Company (i) shall have the option to retain the first $48,900,000 of Cash Collateral Proceeds (in the aggregate) received after April 1, 2017 (whether before or after the Second Amendment Effective Date) for general corporate purposes and subject to Section 5.16, and (ii) may apply Cash Collateral Proceeds unrelated to the Bilateral LC Facilities to collateralize obligations incurred in replacement of the obligations previously secured by such Cash Collateral Proceeds (so long as such new obligations are of the same type and in no more than the same amount as the replaced obligations)."

(f)     amend section 2.13 of the Existing Credit Agreement to add at the end thereof a new subsection (e) as follows:

"(e)     Any amount required to be paid pursuant to Section 2.12(j) shall be applied as follows: (i) first, to repay Tranche A Term Loans and cash collateralize at 103% Letter of Credit Obligations in a manner reasonably satisfactory to the respective Issuing Bank (and to the extent the aggregate amount available to be drawn under all outstanding Letters of Credit is 103% cash collateralized, to repay outstanding Revolving Loans, with the Revolving Commitment permanently reduced by the amount of any such payments of Revolving Loans), in each case ratably in proportion to the ratio that each of (x) the aggregate Tranche A Term Loans then outstanding and (y) the aggregate Revolving Commitments (which includes (1) the aggregate amount of then outstanding Revolving Loans (the "Drawn RCF Loan Component") and (2) the aggregate amount of Letter of Credit Obligations in effect that have not as of the date of such calculation been cash collateralized) then outstanding or in effect (but in any case giving effect to the reduction in Revolving Commitments contemplated by Section 2.12(i)) bears to the aggregate of all amounts referred to in preceding clauses (x) and (y) (the "Ratable Proportion Calculation"), until cash collateralized and/or paid in full, as applicable; and (ii) second, subject to the immediately succeeding sentence, to the payment of all Non-Priority Obligations for the ratable benefit of the Non-Priority Lenders and Lender Counterparties.  If at any time and each time any Letter of Credit cash collateralized expires undrawn or is permanently reduced without a drawing (collectively "Undrawn LCs"), (x) the Ratable Proportion Calculation shall be recalculated by reducing the ratable proportion allocable to the Revolving Commitments pursuant to clause (i)(y)(2) of the preceding sentence as a result of the reduction in the aggregate Undrawn LCs ("Adjusted Ratable Proportion Calculation"), and the resulting amount of excess cash collateral attributable to such expired or reduced Letter of Credit (the "Excess LC Cash Collateral") (but not, for the avoidance of doubt, the cash collateral attributable to the Drawn RCF Component) shall be applied as follows: (i) first, to repay Tranche A Term Loans and cash collateralize Letter of Credit Obligations (and to the extent the aggregate amount available to be drawn under all outstanding Letters of Credit is 103% cash collateralized, to repay outstanding Revolving Loans, with the Revolving Commitment permanently reduced by the amount of any such payments of Revolving Loans ) in proportion to the Adjusted Ratable Proportion Calculation taking into account each amount previously repaid or cash collateralized, as applicable, (ii) second, to repay Tranche A Term Loans and Revolving Loans on a ratable basis in accordance with the

-4-

aggregate outstanding amounts thereof until paid in full and (iii) <u>third</u>, to the payment of all Non-Priority Obligations for the ratable benefit of the Non-Priority Lenders and Lender Counterparties and (y) the aggregate amount cash collateral that is attributable to the Drawn RCF Component (the "<u>Drawn RCF Component Cash Colateral</u>") shall continue to collateralize the Undrawn LCs until such time as the cash collateral for all Undrawn LCs exceeds the Undrawn LCs by more than 103%, at which time, any such excess that constitutes Drawn RCF Component Cash Collateral shall be applied solely and exclusively to repay Revolving Loans.  For avoidance of doubt, it is the intent of the Parties to provide a ratable recovery to (x) the Tranche A Term Loans, on the one hand and (y) the Revolving Loans and the aggregate amount of all unreimbursed drawings under all Letters of Credit, on the other hand, on amounts outstanding and owed to the applicable Lenders after giving effect to the termination of all Letters of Credit, whether such termination is due to the Letters of Credit being drawn (such that such amount is considered outstanding) or expiring or being terminated undrawn (such that such amount is not considered outstanding)."

(g)    amend section 5.1(a)(ii) of the Existing Credit Agreement by deleting therefrom the following language:

"and shall not be subject to a "going concern" emphasis paragraph or a qualification or disclaimer related to generally accepted accounting principles or generally accepted auditing standards or other material qualification or exception"

(h)    amend section 5.2 of the Existing Credit Agreement by deleting the word "and" at the end of subsection (f) thereof and replacing it with the ";", adding "and" prior to the semicolon at the end of subsection (g) thereof and adding the following new subsection (h):

"(h) from and after the Second Amendment Effective Date, on a bi-weekly basis (on the final Business Day of every other week) a cash flow forecast for the 13 week period subsequent to the date of delivery, such forecast to be in form and substance reasonably satisfactory to the Requisite Lenders; <u>provided</u> that a cash flow forecast in the form delivered by Company to the Department of Education for such 13 week period shall be a satisfactory form for purposes of this subsection 5.2(h);"

(i)    amend section 5.14 of the Existing Credit Agreement by adding at the end thereof the following new sentence:

"In furtherance and not in limitation of the foregoing, each Credit Party shall use commercially reasonable efforts to, and to cause its applicable banking counterparties to, enter into control agreements or other arrangements with the Collateral Agent sufficient to perfect liens for the benefit of the Secured Parties in all deposit accounts and securities accounts holding cash collateral securing the Bilateral LC Facilities, which liens can be on a junior priority basis and subject to subordination as required by the counterparties to the Bilateral LC Facilities.  For the avoidance of doubt, any such agreements or arrangements are subject to the approval of the applicable banking counterparty, and each such counterparty is entitled to approve or disapprove such agreements and arrangements in its sole discretion."

(j)    amend section 5 of the Existing Credit Agreement to add at the end thereof new sections 5.15 and 5.16 as follows:

"5.15 **Release of Letters of Credit and Cash Collateral**.

As soon as practical following the APA Closing Date, each Credit Party shall use its reasonable best efforts to obtain the full termination and release of (x) the DOE Existing Letter of Credit, (y) each letter of credit outstanding under each of the Bilateral LC Facilities and (z) any and all collateral (including cash collateral) securing each of the Bilateral LC Facilities and any letters of credit thereunder.  Following the APA Closing Date, the Credit Parties shall provide to (a) the Administrative Agent and the Lenders a report on the last day of each calendar month indicating in reasonable detail the status of efforts taken by the Company to obtain such terminations and releases, and (b) subject to confidentiality obligations, the legal advisors to the Lenders copies of any material, written notices or communications with, to or from the U.S. Department of Education or its representatives, in respect of, or relating to, such terminations and releases.  The Credit Parties shall cause all Cash Collateral Proceeds received by them or any of their respective subsidiaries to be deposited into a deposit or securities account subject to a control agreement in favor of the Collateral Agent."

"5.16 **Bank Accounts**.

Each Credit Party covenants to not, and not allow any of its subsidiaries to, establish or maintain any deposit or securities account in which a sum in excess of $10,000, individually, and $25,000, in the aggregate for all such accounts, will be held for a period exceeding 24 hours other than those set forth on Schedule I to the Second Amendment Agreement (the "Existing Bank Accounts"), unless such account becomes, prior to the deposit of any funds therein, subject to a control agreement in favor of the Collateral Agent.  Each Credit Party will cause all of its and its subsidiaries cash and cash equivalents not subject to Liens in favor of third parties to at all times be held in (including without limitation by causing all proceeds of Revolving Loans held by them to be funded into) a deposit or securities account subject to a control agreement in favor of the Collateral Agent, other than cash held in zero-balance disbursement or similar accounts pending disbursement and receipts held in accounts that sweep not less than daily to an account subject to a control agreement in favor of the Collateral Agent."

(k)     amend section 6.3 of the Existing Credit Agreement by deleting subsections (g), (h), (q), (r), and (s) and adding the following:

[Reserved.]

(l)     amend section 6.4 of the Existing Credit Agreement by deleting the word "and" at the end of subsection (d) thereof, adding "; and" prior to the period at the end of subsection (e) thereof and adding the following:

"(f)     the Company and its Subsidiaries may consummate the transactions contemplated by the Asset Purchase Agreement."

(m)     amend section 6.5 of the Existing Credit Agreement by deleting the word "and" at the end of subsection (l) thereof, adding "and" after the semi-colon at the end of subsection (m) thereof and adding the following:

"(n)     the Company and its Subsidiaries may consummate the transactions contemplated by the Asset Purchase Agreement;"

(n)     amend section 8.1(b) of the Existing Credit Agreement by inserting the text "Sections 2.12(i) and (j), 2.13(e), 5.15 and 5.16 or" immediately preceding the text "Section 6" appearing therein.

**Section 3.** *Implementation of Amendment.*  After giving effect to this Amendment Agreement, to the extent that the Amended Credit Agreement contains provisions that would be violated by the transactions contemplated by the Asset Purchase Agreement (as in effect on the date hereof) as described in this Amendment Agreement ("Sale Transaction"), such provisions are hereby modified to the extent necessary solely to permit such Sale Transaction.

**Section 4.** *Representations and Warranties.*  To induce the Agent and the Lenders to execute this Amendment Agreement, each Credit Party (solely as to itself and to the extent applicable) represents and warrants as of the Second Amendment Effective Date that:

(a)     This Amendment Agreement has been duly authorized, executed and delivered by such Credit Party.

(b)     This Amendment Agreement constitutes a legal, valid and binding obligation, enforceable against such Credit Party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(c)     As of the Second Amendment Effective Date, no Default or Event of Default has occurred and is continuing or would result from this Amendment Agreement or any transactions contemplated hereby.

(d)     The representations and warranties of such Credit Party contained in Article IV of the Amended Credit Agreement are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified by materiality in the context thereof) on and as of the Second Amendment Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties were true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified by materiality in the context thereof) on and as of such earlier date.

**Section 5.** *Effectiveness of this Amendment Agreement and the Amended Credit Agreement.*  The effectiveness of this Amendment Agreement and the amendment of the Existing Credit Agreement set forth herein is subject to the satisfaction of the following conditions precedent (the date on which all of such conditions shall first be satisfied (or waived), which in the case of clause (b) may be substantially concurrent with the satisfaction of the other conditions specified below, the "Second Amendment Effective Date"):

(a)     The Agent's (or its counsel's) receipt of either (i) a counterpart of this Amendment Agreement signed on behalf of each Credit Party and the Requisite Lenders or (ii) customary written evidence reasonably satisfactory to the Agent (which may include telecopy or electronic transmission of a signed signature page of this Amendment Agreement) that such party has signed a counterpart of this Amendment Agreement;

(b)     Company shall have provided to the Lenders, in a form reasonably satisfactory to the Requisite Lenders, a cash report and forecast setting forth in reasonable detail, on a month by month basis, for each month from June 2017 until (and including) the month ending December 31, 2017, (x) the

anticipated cash receipts and disbursements of the Company and the Subsidiaries for such month and (y) the anticipated unrestricted and restricted cash balances of the Company and the Subsidiaries as of the last day of such month; provided that each Revolving Lender, by delivering its signature page to this Amendment Agreement hereby acknowledges receipt of, and satisfaction with, such cash report; and

(c)     Company shall have paid all fees, costs and expenses due and payable to (x) the Agent, for itself and on behalf of the Lenders, and its counsel, (y) the ad hoc group of term loan lenders and its counsel, and (z) the ad hoc group of revolving lenders and its counsel, on the Second Amendment Effective Date, in each case for which Company has received an invoice (*provided* that such invoice may reflect an estimate and/or only costs processed to date and shall not thereafter preclude a final settling of accounts between Company and the Agent, including with respect to fees, costs or expenses incurred prior to the Second Amendment Effective Date).

**Section 6**. *Effect of Amendment.*

(a)     Except as expressly set forth herein, this Amendment Agreement shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of the Lenders or the Agent under the Existing Credit Agreement or any other Credit Document and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Existing Credit Agreement or any other provision of the Existing Credit Agreement or of any other Credit Document, all of which, subject to the terms hereof, are ratified and affirmed in all respects and shall continue in full force and effect.  Nothing herein shall be deemed to entitle the Credit Parties to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Existing Credit Agreement, Amended Credit Agreement or any other Credit Document in similar or different circumstances.

(b)     It is the intention of each of the Parties hereto that the Existing Credit Agreement be amended so as to preserve the perfection and priority of all security interests securing indebtedness and obligations under the Existing Credit and that this Amendment Agreement does not constitute a novation of the obligations and liabilities existing under the Existing Credit Agreement.

(c)     On and after the Second Amendment Effective Date, each reference in the Existing Credit Agreement to "this Agreement", "hereunder", "hereof", "herein", or words of like import, and each reference to the "Credit Agreement" in any other Credit Document shall be deemed a reference to the Amended Credit Agreement.  This Amendment Agreement shall constitute a "Credit Document" for all purposes of the Amended Credit Agreement and the other Credit Documents.

**Section 7**. *General Release.* To further induce the Lenders party hereto to enter into this Amendment Agreement and in consideration of, among other things, the amendments to the Existing Credit Agreement provided for herein, and other financial accommodations which the Lenders party hereto elect to extend to the Credit Parties, each Credit Party hereby absolutely and unconditionally waives and releases and forever discharges the Agent, the Issuing Banks and the Lenders, and any and all participants, parent corporations, subsidiary corporations, affiliated corporations, insurers, indemnitors, successors and assigns of the Agent, the Issuing Banks and the Lenders, together with all of the present and former directors, officers, agents, attorneys, and employees of any of the foregoing, from any and all claims (including, without limitation, cross-claims, counterclaims, rights of setoff and recoupment), damages (including costs and expenses), demands, suits, or causes of action of any kind, nature or description, whether arising in law or equity or upon contract or tort or under any provincial, state, local or federal law or otherwise, which each Credit Party has had, now has or has made claim to have against any such person for or by reason of any act, omission, matter, cause or thing whatsoever arising from the beginning

-8-

of time to and including the Second Amendment Effective Date out of or relating to the Existing Credit Agreement, this Amendment Agreement, the Amended Credit Agreement, the other Credit Documents and/or the transactions contemplated hereby or thereby, whether such claims, demands and causes of action are matured or unmatured or known or unknown (the "Release"). It is the intention of each Credit Party in executing the Release that the same shall be effective as a bar to each and every claim, demand and cause of action specified. Each Credit Party acknowledge that it may hereafter discover facts different from or in addition to those now known or believed to be true with respect to such claims, demands, or causes of action and agree that this instrument shall be and remain effective in all respects notwithstanding any such differences or additional facts. The Release shall survive the termination of the Amended Credit Agreement and payment in full of the Obligations.

Section 8. *Counterparts*. This Amendment Agreement may be executed in any number of counterparts (and by different Parties hereto in separate counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Amendment Agreement by telecopy or electronic transmission shall be as effective as delivery of a manually executed counterpart hereof.

Section 9. *Governing Law*. THIS AMENDMENT AGREEMENT AND THE RIGHTS AND OBLIGATIONS OPF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVIN REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.

Section 10. *Severability*. If any provision contained in this Amendment Agreement shall be held to be invalid, illegal or unenforceable in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity, *illegality* or unenforceability, and the remaining provisions of this Amendment Agreement shall not in any way be affected or impaired. The invalidity, illegality or unenforceability of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 11. *Headings*. Section headings herein are included for convenience of reference only and shall affect the interpretation of this Amendment Agreement.

Section 12. Acknowledgement *and Consent to Bail-In of EEA Financial Institutions.*

Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each Party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)      the effects of any Bail-in Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that

-9-

may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

      (iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

The following terms used herein or in any other Credit Document shall have the following meanings:

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

*[Remainder of page intentionally blank; signature pages follow]*

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first set forth above.

**EDUCATION MANAGEMENT CORPORATION**

By: _____

Name: FRANK JALINSKA
Title: SVP, CFO

**EDUCATION MANAGEMENT HOLDINGS II LLC**

By: _____

Name: FRANK JALINSKA
Title: SVP, CFO

**EDUCATION MANAGEMENT II LLC**

By: _____

Name: FRANK JALINSKA
Title: SVP, CFO

*[Signature Page to Amendment No. 2]*

#4851-5826-6949v2
#4851-5826-6949v9

**HIGHER EDUCATION SERVICES II LLC**

**THE CONNECTING LINK II LLC**

**BROWN MACKIE EDUCATION II LLC**

**EDUCATION FINANCE III LLC**

**SOUTH UNIVERSITY RESEARCH II LLC**

**THE ART INSTITUTES INTERNATIONAL II LLC**

**BMC REAL PROPERTY HOLDINGS LLC**

By: _____

Name: FRANK JALUNSKA
Title: SVP CFO

*[Signature Page to Amendment No. 2]*

**Candlewood Special Situations Master Fund, LTD.,**
as Lender

By: _____

Name: PHIL DESAUTIS

Title: AUTHORIZED SIGNATORY

*[Signature Page to Amendment No. 2]*

**CWD OC 522 Master Fund Ltd.,**
as Lender

By: _____
    Name:   PHIL DESANTIS
    Title:    AUTHORIZED SIGNATORY

*[Signature Page to Amendment No. 2]*

#4851-5826-6949v2
#4851-5826-6949v9

**Flagler Master Fund SPC Ltd. – Class A Portfolio,**
as Lender

By:

Name:     PHIL DESANTIS
Title:     AUTHORIZED SIGNATORY

#4851-5826-6949v2
#4851-5826-6949v9

**Flagler Master Fund SPC Ltd. – Class B Portfolio,**
as Lender

By: _____

Name:   PHIL DESANTIS

Title:   AUTHORIZED SIGNATORY

#4851-5826-6949v2
#4851-5826-6949v9

**Multisector Income Portfolio**
By: Boston Management and Research
as Investment Advisor

as Lender

By: _____

Name:

Title: Michael B. Botthof

Vice President

#4851-5826-6949v2
#4851-5826-6949v9

**Eaton Vance Floating-Rate**
**Income Plus Fund**
By: Eaton Vance Management
as Investment Advisor

as Lender

By: _____

Name:
Title: Michael B. Botthof
Vice President

EATON VANCE SENIOR
FLOATING-RATE TRUST
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR
as Lender

By: _____
Name:
Title: Michael B. Botthof
       Vice President

#4851-5826-6949v2
#4851-5826-6949v9

EATON VANCE FLOATING-RATE
INCOME TRUST
BY: EATON VANCE MANAGEMENT
as Its INVESTMENT ADVISOR

By:  _____
Name:
Title: Michael B. Botthof
        Vice President

*[Signature Page to Amendment No. 2]*

#4851-5826-6949x2
#4851-5826-6949x9

Eaton Vance International
(Cayman Islands) Floating-Rate
Income Portfolio
By: Eaton Vance Management as
Investment Advisor

as Lender

By: _____

Name:
Title: Michael B. Botthof
        Vice President

EATON VANCE SENIOR INCOME TRUST
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

as Lender

By:   michael B Botthof

Name:
Title: Michael B. Botthof
   Vice President

*[Signature Page to Amendment No. 2]*

#4851-5826-6949v2
#4851-5826-6949v9

EATON VANCE SHORT DURATION
DIVERSIFIED INCOME FUND
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

as Lender

By: _____

Name:
Title: Michael B. Botthof
Vice President

#4851-5826-6949v2
#4851-5826-6949v9

EATON VANCE INSTITUTIONAL SENIOR LOAN FUND
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

,

as Lender

By: _____

Name:

Title: Michael B. Botthof

Vice President

#4851-5826-6949v2
#4851-5826-6949v9

EATON VANCE
LIMITED DURATION INCOME FUND
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

as Lender

By:

Name: Michael B. Botthof
Title: Vice President

*[Signature Page to Amendment No. 2]*

#4851-5826-6949v2
#4851-5826-6949v9

**Eaton Vance Floating Rate Portfolio**
By: Boston Management and Research
as Investment Advisor

as Lender

By:

Name:
Title: Michael B. Botthof
Vice President

*[Signature Page to Amendment No. 2]*

#4851-5826-6949v2
#4851-5826-6949v3

**Senior Debt Portfolio**
By: Boston Management and Research
as Investment Advisor

as Lender

By: _____

Name:
Title: Michael B. Botthof
        Vice President

#4851-5826-6949v2
#4851-5826-6949v9

EATON VANCE
VT FLOATING-RATE INCOME FUND
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

as Lender

By: _____

Name:

Title: Michael B. Botthof

Vice President

#4851-5826-6949v2
#4851-5826-6949v9

**Credit Suisse AG, Cayman Islands Branch,**
as Lender

By: _____
Name:  Robert Healey
Title:  Authorized Signatory

By: _____
Name:
Title:  Michael Wotanowski
        Authorized Signatory

**Credit Suisse Loan Funding LLC,**
as Lender

By: _____

Name:
Title:

Robert Healey
Authorized Signatory

#4851 5826 6949v2
#4851-5826 6949v9

**Bell Atlantic Master Trust,**
as Lender

By: _____
Name: Grant Pothast
Title: Portfolio Manager

#4851-5826-6949v2
#4851-5826-6949v9

**Credit Value Master Fund III, LP,**
as Lender

By: _____
Name: Grant Pothast
Title: Portfolio Manager

**Credit Value Partners Distressed Duration Master Fund, LP,**
as Lender

By: _____
Name: Grant Pothast
Title: Portfolio Manager

#4851-5826-6949v2
#4851-5826-6949v9

**BANK OF AMERICA, N.A.,**
as Lender

By: _____
Name: Stefanie Tanwar
Title: Vice President

**BARCLAYS BANK PLC,**
as Lender

By: _____

Name: Vanessa Kurbatskiy
Title: Vice President

**BNP PARIBAS**,
as Lender

By:

    Name:
    Title:

By:

    Name:  **Charles Romano**
    Title:     **Director**

**CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,**
as Lender

By: _____

Name:
Title:     **Laura Katherine Schembri**
          **Authorized Signatory**

By: _____

Name:
Title:     Bryan J. Matthews
           Authorized Signatory

*[Signature Page to Amendment No. 2]*

**FIFTH THIRD BANK**
as Lender

By: _____
Name:   Terick R Hinze
Title:   Vice President

**JPMORGAN CHASE BANK, N.A.,**
as Lender

By: _____

Name: Douglas A. Kravitz
Title: Executive Director

**MERRILL LYNCH CAPITAL CORPORATION**,
as Lender

By: _____

Name:

Title: **Jay T. Wampler**
**Managing Director**

**BCBSM, Inc.,**
as Lender

By: _____
Name:   Nicole J. Macarchuk
Title:   Authorized Signatory

*[Signature Page to Amendment No. 2]*

**KKR Corporate Credit Partners L.P. - Leveraged Loan,**
as Lender

By: _____
Name: Nicole J. Macarchuk
Title: Authorized Signatory

**KKR Credit Relative Value Master Fund L.P.,**
as Lender

By:

Name: Nicole J. Macarchuk

Title: Authorized Signatory

**KKR Debt Investors II (2006) (Ireland) L.P. –**
**Concentrated Credit,**
as Lender

By: _____

Name:  Nicole J. Macarchuk
Title:  Authorized Signatory

*[Signature Page to Amendment No. 2]*

**KKR Debt Investors II (2006) (Ireland) L.P. – Special Situations,**
as Lender

By: _____
      Name:  Nicole J. Macarchuk
      Title:  Authorized Signatory

#4851-5826-6949v9

**KKR Financial CLO 2005-1, Ltd.,**
as Lender

By: _____
Name:  Nicole J. Macarchuk
Title:  Authorized Signatory

*[Signature Page to Amendment No. 2]*

**KKR Financial CLO 2005-2, Ltd.,**
as Lender

By: _____
    Name:
    Title:

*[Signature Page to Amendment No. 2]*

**KKR Financial CLO 2006-1, Ltd.,**
as Lender

By: _____
Name:  Nicole J. Macarchuk
Title: Authorized Signatory

*[Signature Page to Amendment No. 2]*

#4851-5826-6949v9

KKR Financial CLO 2007-1, Ltd.,
as Lender

By:

Name:  Nicole J. Macarchuk
Title:  Authorized Signatory

KKR Financial CLO 2011-1, Ltd.,
as Lender

By:

Name:   Nicole J. Macarchuk
Title:   Authorized Signatory

#4851-5826-6949v9

**KKR Floating Rate Fund L.P.,**
as Lender

By:                                            
Name:  Nicole J. Macarchuk
Title:  Authorized Signatory

#4851-5826-6949v9

**KKR Lending Partners L.P.,**
as Lender

By:

Name:  Nicole J. Macarchuk
Title:  Authorized Signatory

*[Signature Page to Amendment No. 2]*

**KKR-PBPR Capital Partners L.P. - Concentrated Credit,**
as Lender

By:  _____

Name:   Nicole J. Macarchuk
Title:  Authorized Signatory

*[Signature Page to Amendment No. 2]*

**Oregon Public Employees Retirement Fund – Leveraged Loan,**
as Lender

By: _____
    Name:  Nicole J. Macarchuk
    Title:  Authorized Signatory

*[Signature Page to Amendment No. 2]*

AMENDMENT No. 3 dated as of October 13, 2017 (this "Amendment Agreement") to the Credit and Guaranty Agreement, dated as of January 5, 2015, as amended by that certain Amendment No. 1 dated as of November 13, 2015, and as further amended by that certain Amendment No. 2 dated as of April 18, 2017 (the "Existing Credit Agreement"), among Education Management II LLC ("Company"), Education Management Corporation ("Parent"), Education Management Holdings II LLC ("Holdings"), certain subsidiaries of Holdings, as Guarantors, the Lenders party thereto from time to time and U.S. Bank National Association, as administrative agent and collateral agent (in such capacity, the "Agent"). Unless otherwise defined herein, terms defined in the Amended Credit Agreement (as defined below) and used herein shall have the meanings given to them in the Amended Credit Agreement.

WHEREAS, Company and certain of its Subsidiaries have entered into that certain First Amendment to Amended and Restated Asset Purchase Agreement dated July 20, 2017 with the Dream Center Foundation and certain other entities, amending the Asset Purchase Agreement (the "First APA Amendment" and, the Asset Purchase Agreement as amended thereby the "First Amended APA");

WHEREAS, Company and certain of its Subsidiaries have entered into that certain Second Amendment to Amended and Restated Asset Purchase Agreement dated on or about the date hereof with the Dream Center Foundation and certain other entities, amending the First Amended APA (the "Second APA Amendment" and, together with the First APA Amendment, the "APA Amendments" and the First Amended APA as amended thereby, the "Amended APA");

WHEREAS, in connection with entry into the Amended APA and in furtherance of the transactions and financings contemplated thereby, certain subsidiaries of the Dream Center Foundation have entered into (x) the Second Lien Guaranty (as defined below) in favor of the Collateral Agent (for the benefit of the Secured Parties) to guarantee certain Letter of Credit Obligations, (y) the Second Lien Pledge and Security Agreement (as defined below) in favor of the Collateral Agent (for the benefit of the Secured Parties) to provide a second priority security interest in respect of such Obligations and (z) the Intercreditor Agreement (as defined below) to provide for the relative rights and priorities with respect to the Collateral (as defined in the Second Lien Pledge and Security Agreement) as between the Collateral Agent (for the benefit of the Secured Parties) and the collateral agent for the lenders to such subsidiaries of the Dream Center Foundation ; and

WHEREAS, in connection with entry into the Amended APA and in furtherance of the transactions and financings contemplated thereby, and pursuant to Section 10.5(c) of the Existing Credit Agreement, the parties hereto desire to enter into certain amendments to the Existing Credit Agreement; and

WHEREAS, in order to effect the foregoing, Company, Parent, Holdings and the Lenders party hereto constituting not less than the Supermajority Lenders and not less than the Requisite Lenders (collectively, the "Parties") desire to amend, as of the Third Amendment Effective Date (as defined below), the Existing Credit Agreement, subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

**Section 1**. *Acknowledgement of the Credit Parties.*

(a)    The principal amount of Revolving Loans outstanding as of the date hereof is $65,999,999.00.  The Revolving Commitments, and the Letter of Credit Usage in respect thereof, as of

the date hereof is $105,223,161.00.  The principal amount of Tranche A Term Loans outstanding as of the date hereof is $149,999,999.12.  The principal amount of Tranche B Term Loans outstanding as of the date hereof is $285,168,559.84.  The foregoing amounts do not include interest, fees and expenses and other amounts that are chargeable or otherwise reimbursable under the Credit Documents.  The Company hereby reaffirms its obligations to pay interest, fees, expenses and other amounts under the Credit Documents, including without limitation each of the interest payments due and payable on or about the following Interest Payment Date (including, with respect to Eurodollar Rate Loans, on the calendar date occurring on or about such dates and constituting an Interest Payment Date in accordance with clause (ii) of the definition thereof): December 31, 2017 (such Interest Payment Date, the, "<u>Reaffirmed Interest Payment</u>").  The Company currently expects to pay as and when due the Reaffirmed Interest Payment.

(b)    The bank accounts listed on Schedule III hereto (the "<u>Existing Bank Accounts</u>") are the only bank accounts held or owned by the Credit Parties as of the date hereof.  Each Existing Bank Account is (i) subject to a control agreement in favor of the Collateral Agent for the benefit of the Secured Parties and Issuing Banks; (ii) a zero-balance disbursement or similar account; (iii) an account that sweeps daily to an account subject to a control agreement in favor of the Collateral Agent for the benefit of the Secured Parties and Issuing Banks; or (iv) an account containing cash collateral securing the Bilateral LC Facilities.

(c)    All of the assets pledged, assigned, conveyed, mortgaged, hypothecated or transferred to the Collateral Agent pursuant to the Collateral Documents are (and shall continue to be) subject to valid and enforceable Liens and security interests of the Collateral Agent, as collateral security for all of the Obligations, subject to no Liens except Permitted Liens, and such Liens and security interests are not subject to avoidance, disallowance or subordination pursuant to any requirement of law, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally or by general equitable principles (whether enforcement is sought by proceedings in equity or at law).  Each Credit Party hereby reaffirms and ratifies its prior conveyance to the Collateral Agent of a continuing security interest in and lien on the Collateral.

(d)    The obligations of the Credit Parties under this Amendment Agreement of any nature whatsoever, whether now existing or hereafter arising, are hereby deemed to be "Obligations" for all purposes of the Credit Documents and the term "Obligations" when used in any Credit Document shall include all such obligations hereunder.

(e)    Each Credit Party hereby (i) ratifies and reaffirms all of its payment and performance obligations, contingent or otherwise, and each grant of security interests and Liens in favor of the Agent, the Issuing Banks or the Lenders, as the case may be, under each Credit Document to which it is a party, and (ii) agrees and acknowledges the Obligations constitute legal, valid and binding obligations of the Credit Parties, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law), and that as of the Third Amendment Effective Date, (a) no offsets, defenses or counterclaims to the Obligations or any other causes of action with respect to the Obligations or the Credit Documents exist and (b) no portion of the Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to any requirement of law, and it does not otherwise dispute in any respect the enforceability of the Obligations or the Credit Documents.

(f)    The entry by the Lenders party hereto into, and their covenants to perform in accordance with, this Amendment Agreement and such Lenders' consummation of the transactions contemplated hereby constitute "new value" and "reasonably equivalent value", as those terms are used in Section 547

and 548 of Title 11 of the United States Code, received by the Credit Parties as of the closing of this Amendment Agreement in contemporaneous exchange for the Credit Parties' entry into, and covenants to perform in accordance with, this Amendment Agreement and the Credit Parties' consummation of the transactions contemplated hereby.

**Section 2.** *Amendment of the Existing Credit Agreement.* Effective as of the Third Amendment Effective Date, the Existing Credit Agreement is hereby amended (the Existing Credit Agreement as amended hereby, the "Amended Credit Agreement") to:

(a)    add the following definitions to Section 1.1 of the Existing Credit Agreement in correct alphabetical order:

"**DCEH Credit Agreement**" means that certain Senior Secured Credit and Guaranty Agreement, dated on or about the date hereof, by and among, inter alia, Dream Center Education Holdings, LLC, certain of its subsidiaries party thereto, certain banks and financial institutions, as lenders thereunder and U.S. Bank National Association, as administrative agent and collateral agent thereunder.

"**DOE Recovery Amounts**" means any cash proceeds returned by, or on behalf of, the U.S. Department of Education to the Administrative Agent, Collateral Agent, relevant Issuing Bank, Company (or any of its Subsidiaries) or the Dream Center Foundation (or any of its Subsidiaries) in respect of any amount drawn under the DOE Existing Letter of Credit (or any replacement of the DOE Existing Letter of Credit with another Letter of Credit issued hereunder), from and after May 1, 2018 and on or before September 15, 2018 following a replacement of such Existing Letter of Credit via a Replacement DOE LC Facility (under and as defined in the DCEH Credit Agreement), a replacement, modification or extension of the DOE Existing Letter of Credit with another Letter of Credit issued hereunder, or a technical correction or other adjustment in any letter of credit requirements imposed by the U.S. Department of Education.

"**Second Lien Recovery Proceeds**" means any proceeds (cash or otherwise) paid to or otherwise received by the Administrative Agent or the Collateral Agent under, in respect of, or pursuant to the Second Lien Guaranty or the Second Lien Pledge and Security Agreement; *provided* that all DOE Recovery Amounts shall be deemed to not constitute Second Lien Recovery Proceeds.

"**Reallocated Recovery Amount**" means an amount equal to 20.0% of the portion of the aggregate Recovery Amount that would otherwise be payable to or in respect of the Drawn RCF Component (including amounts payable towards Drawn RCF Component Cash Collateral) in accordance with Sections 2.12(j) and the first three sentences of Section 2.13(e).

"**Reallocated Recovery Amount Contributing Lender**" means each Revolving Lender listed on Schedule II to the Third Amendment Agreement and such Revolving Lender's successors and assigns to the extent that such Revolving Lender's rights and obligations with respect to the Reallocated Recovery Amount are transferred to such successor or assign in accordance with Section 2.13(e).

"**Reallocated Recovery Amount Recipient**" means each Lender listed on Schedule I to the Third Amendment Agreement to the extent that such Revolving Lender's rights and

obligations with respect to the Reallocated Recovery Amount are transferred to such successor or assign in accordance with Section 2.13(e).

"**Recovery Amount**" has the meaning given to such term in Section 2.12(j).

"**Third Amendment Agreement**" means that certain Amendment No. 3, dated as of October 13, 2017, among Company, the Guarantors, and the Lenders listed on the signature pages thereto."

"**Third Amendment Effective Date**" shall have the meaning ascribed to such term in the Third Amendment Agreement.

(b)    amend the definition of "Asset Purchase Agreement" in Section 1.1 of the Existing Credit Agreement by deleting it in its entirety and replacing it with the following:

"**Asset Purchase Agreement**" means that certain Amended and Restated Asset Purchase Agreement dated February 24, 2017, as amended by that certain First Amendment to Amended and Restated Asset Purchase Agreement dated July 20, 2017 and that certain Second Amendment to Amended and Restated Asset Purchase Agreement dated on or about the date hereof,  as the same is in effect on the Third Amendment Effective Date, among the Company, certain of its Subsidiaries, the Dream Center Foundation and certain other buyer entities, and as may be further amended in any manner not material and adverse to the interests of the Lenders or the Issuing Banks; it being understood that any amendment to the Asset Purchase Agreement that could reasonably be expected to result in a reduction in recoveries on the Obligations, including a reduction in purchase consideration or the cash component thereof, shall be deemed material and adverse to the interests of the Lenders and the Issuing Banks and require the consent of the Requisite Lenders.

(c)    amend the definition of "Cash Collateral Proceeds" in Section 1.1 of the Existing Credit Agreement by deleting it in its entirety and replacing it with the following:

"**Cash Collateral Proceeds**" means any and all cash collateral or restricted cash, in each case, securing or otherwise attributable to any Existing Letter of Credit, any Letter of Credit, any letter of credit issued under any Bilateral LC Facility, any state surety bond or similar requirement of state regulatory authorities and any other cash collateral (including in respect of credit card or similar obligations) posted by Parent, Holdings, Company or any of the Subsidiaries that is released from such arrangements at any time following the Third Amendment Effective Date, and any and all cash payments and proceeds thereof received by Parent, Holdings, Company or any of the Subsidiaries from the return of any such amounts.

(d)    amend Section 2.3(l) by removing "and" prior to "(ii)" therein and replacing it with ";" and inserting the following at the conclusion of such section:

"and (iii) to the extent that any honored draws are reimbursed or otherwise satisfied with any DOE  Recovery Amounts, no conversion of Tranche B Term Loans to Tranche A Term Loans shall  occur with respect to such honored draws and any prior conversion of Tranche B Term Loans to Tranche A Term Loans with respect to such honored draws shall be automatically reversed and deemed never to have occurred."

(e)    amend section 2.12(a) by deleting the proviso therein in its entirety.

(f)    amend section 2.12(j) of the Existing Credit Agreement by deleting it in its entirety and replacing it with the following:

-4-

"(j)    Notwithstanding anything to the contrary contained herein or in any other Credit Document, (I) immediately upon the release of any Cash Collateral Proceeds from the relevant bank, financial institution or other Person holding such amount, all such Cash Collateral Proceeds shall be deposited directly into a deposit account established in the name of the Collateral Agent (for the benefit of the Lenders) to prepay the Loans and cash collateralize the Obligations in the manner set forth in Section 2.13(e) and (II) (x) in the event such amounts are not directly deposited into a deposit account established in the name of the Collateral Agent (for the benefit of the Lenders), as promptly as practicable and in any event no later than one Business Day following receipt by Parent, Holdings, Company or any of the Subsidiaries of any Cash Collateral Proceeds and (y) as promptly as practicable and in any event no later than one Business Day following receipt by Parent, Holdings, Company or any of the Subsidiaries of any Closing Cash Purchase Price (as defined in the Asset Purchase Agreement), any Estimated Subsequent Closing Net Working Capital Adjustment (as defined in the Asset Purchase Agreement), any HLC Target Net Working Capital (as defined in the Asset Purchase Agreement), any MSCHE Target Net Working Capital  (as defined in the Asset Purchase Agreement), any Final New Working Capital Adjustment (as defined in the Asset Purchase Agreement) and any Deferred Payments (as defined in the Asset Purchase Agreement), Parent, Holdings, Company or such Subsidiary shall prepay the Loans and cash collateralize the Obligations as set forth in Section 2.13(e) in an aggregate amount equal to the greater of $50,000,000 and the actual amounts so received; *provided* that a portion of such amounts under preceding clauses (I) and (II)(x) may be used by the Company to make required payments under the Settlement Agreement, but in any event the Company shall be required to make the prepayments referred to in this Section 2.12(j) in an amount equal to no less than $50,000,000 within the periods required hereby. The amounts to be directly deposited, or to be paid by Parent, Holdings, Company and the Subsidiaries, to prepay the Loans and cash collateralize the Obligations pursuant to this Section 2.12(j), together with any Second Lien Recovery Proceeds, shall be herein referred to as the "Recovery Amount.".

(g)    amend section 2.13(e) of the Existing Credit Agreement by deleting it in its entirety and replacing it with the following:

Any amount required to be paid pursuant to Section 2.12(j) and all Second Lien Recovery Proceeds shall be applied as follows: (i) first, to repay Tranche A Term Loans and cash collateralize at 103% Letter of Credit Obligations in a manner reasonably satisfactory to the respective Issuing Bank (and to the extent the aggregate amount available to be drawn under all outstanding Letters of Credit is 103% cash collateralized, to repay outstanding Revolving Loans, with the Revolving Commitment permanently reduced by the amount of any such payments of Revolving Loans), in each case ratably in proportion to the ratio that each of (x) the aggregate Tranche A Term Loans then outstanding and (y) the aggregate Revolving Commitments (which includes (1) the aggregate amount of then outstanding Revolving Loans (the "Drawn RCF Component") and (2) the aggregate amount of Letter of Credit Obligations in effect that have not as of the date of such calculation been cash collateralized) then outstanding or in effect (but in any case giving effect to the reduction in Revolving Commitments contemplated by Section 2.12(i)) bears to the aggregate of all amounts referred to in preceding clauses (x) and (y) (the "Ratable Proportion Calculation"), until cash collateralized and/or paid in full, as applicable; and (ii) second, subject to the immediately succeeding sentence, to the payment of all Non-Priority Obligations for the ratable benefit of the Non-Priority Lenders and Lender Counterparties. If at any time and each time any Letter of Credit cash collateralized expires undrawn or is permanently reduced without a drawing (collectively "Undrawn LCs"), (x) the Ratable Proportion Calculation shall be recalculated by reducing the ratable proportion allocable to the Revolving Commitments pursuant to clause (i)(y)(2) of the preceding sentence as a result of the reduction in the aggregate Undrawn LCs ("Adjusted Ratable Proportion Calculation"), and the resulting amount of excess cash collateral attributable to such expired or reduced Letter of Credit (the "Excess LC Cash Collateral") (but not, for the avoidance of doubt, the cash collateral attributable to the

Drawn RCF Component) shall be applied as follows: (i) first, to repay Tranche A Term Loans and cash collateralize Letter of Credit Obligations (and to the extent the aggregate amount available to be drawn under all outstanding Letters of Credit is 103% cash collateralized, to repay outstanding Revolving Loans, with the Revolving Commitment permanently reduced by the amount of any such payments of Revolving Loans ) in proportion to the Adjusted Ratable Proportion Calculation taking into account each amount previously repaid or cash collateralized, as applicable, (ii) second, to repay Tranche A Term Loans and Revolving Loans on a ratable basis in accordance with the aggregate outstanding amounts thereof until paid in full and (iii) third, to the payment of all Non-Priority Obligations for the ratable benefit of the Non-Priority Lenders and Lender Counterparties and (y) the aggregate amount cash collateral that is attributable to the Drawn RCF Component (the "Drawn RCF Component Cash Collateral") shall continue to collateralize the Undrawn LCs until such time as the cash collateral for all Undrawn LCs exceeds the Undrawn LCs by more than 103%, at which time, any such excess that constitutes Drawn RCF Component Cash Collateral shall be applied solely and exclusively to repay Revolving Loans. For avoidance of doubt, it is the intent of the Parties to provide a ratable recovery to (x) the Tranche A Term Loans (including any Tranche A Terms Loans resulting from a conversion of Tranche B Term Loans in accordance with Section 2.3(l) hereof (if any)), on the one hand and (y) the Revolving Loans and the aggregate amount of all unreimbursed drawings under all Letters of Credit, on the other hand, on amounts outstanding and owed to the applicable Lenders after giving effect to the termination of all Letters of Credit, whether such termination is due to the Letters of Credit being drawn (such that such amount is considered outstanding) or expiring or being terminated undrawn (such that such amount is not considered outstanding).

The Company and each Lender hereby agree that the amounts allocable to the Tranche A Term Lenders holding the Tranche A Term Loans, on the one hand, and the Revolving Lenders holding the Revolving Commitments, on the other hand, pursuant to the terms of this Section 2.13(e) as set forth above (including following any recalculation using the Adjusted Ratable Proportion Calculation) shall be subject to further adjustment as follows: the portion of the Reallocated Recovery Amount otherwise allocable to each Reallocated Recovery Amount Contributing Lender (as represented by the percentage set forth opposite such Reallocated Recovery Amount Contributing Lender's name on Schedule II to the Third Amendment Agreement) shall be distributed and paid to each Lender constituting a Reallocated Recovery Amount Recipient in accordance with such Reallocated Recovery Amount Recipient's ratable percentage of the Reallocated Recovery Amount as set forth on Schedule I to the Third Amendment Agreement (it being understood that for purposes of calculating any subsequent recoveries pursuant to the terms of this Section 2.13(e), the ratable portion of any Reallocated Recovery Amount attributable to the Revolving Loans comprising the portion of the Drawn RCF Component attributable to each Reallocated Recovery Amount Contributing Lender shall be deemed to reduce to the Drawn RCF Component attributable to such Reallocated Recovery Amount Contributing Lender and shall not operate to reduce the Obligations owing to any Reallocated Recovery Amount Recipient, and such Reallocated Recovery Amount may be retained by each Reallocated Recovery Amount Recipient and applied in any manner determined by such Reallocated Recovery Amount Recipient). For the avoidance of doubt, the preceding sentence shall operate to provide each Reallocated Recovery Amount Recipient a recovery that is in excess of the ratable recovery otherwise allocable to such Lender in accordance with the other terms of this Section 2.13(e) (but in no event more than 100% of the Obligations owing to such Lender), by allocating the Reallocated Recovery Amount to the Obligations owing to such Reallocated Recovery Amount Recipient and reducing the portion of the Recovery Amount otherwise allocable to each Reallocated Recovery Amount Contributing Lender (but, for the avoidance of doubt, without reducing any portion of the Recovery Amount payable to any Lender other than a Reallocated Recovery Amount Contributing Lender). The rights and obligations with respect to the Reallocated Recovery Amount of each Reallocated Recovery Amount Contributing Lender and each Reallocated Recovery Amount Recipient may be transferred and assigned in accordance with Section 10.6, and upon such a transfer and assignment, such rights and obligations shall (i) in the case of a Reallocated Recovery Amount

Contributing Lender, be automatically, ratably transferred and assigned and (ii) in the case of a Reallocated Recovery Amount Recipient, be transferred and assigned in a manner to be determined by such Reallocated Recovery Amount Recipient and such assignee.

It is understood and agreed that (x) following any conversion of Tranche B Term Loans to Tranche A Term Loans in accordance with the provisions of Section 2.3(l) hereof, the terms of this Section 2.13(e) shall apply to such converted Tranche A Term Loans in the same manner as all other Tranche A Term Loans, such that ratable allocations of any amounts received following such conversion will be calculated to give effect to the increase to the aggregate amount of Tranche A Term Loans following such conversion in a manner that will provide for ratable recovery to all Tranche A Term Loans after taking into account the ratable recoveries distributed prior to such conversion, (y) all amounts required to be applied in accordance with this Section 2.13(e) that are received from and after May 1, 2018 and on or before September 15, 2018 by the Administrative Agent, the Collateral Agent, any Lender or any Issuing Bank shall be turned over to and held on deposit with the Administrative Agent to be applied in accordance with this Section 2.13(e) following the expiration of such period after taking into account any conversion of Tranche B Term Loans to Tranche A Term Loans (if any) in accordance with Section 2.3(l) or any reversal of such conversion (if any) and (z) the terms of this Section 2.13(e) shall not apply to any DOE Recovery Amounts which may be retained and applied to, or for the benefit of, the Obligations owing to the relevant Issuing Bank and Revolving Lenders with respect to the DOE Existing Letter of Credit, without any application to any other Obligations pursuant to this Section 2.13(e).".

(h)      amend section 5.15 of the Existing Credit Agreement by deleting the last sentence thereof in its entirety and replacing it with the following two sentences :

"The Credit Parties shall cause all Cash Collateral Proceeds (other than the Cash Collateral Proceeds relating to the Bilateral LC Facilities) to be deposited by each bank, financial institution or other Person holding such amounts, directly into a deposit account established in the name of the Collateral Agent (for the benefit of the Lenders) upon the release thereof. The Credit Parties shall cause all DOE Recovery Proceeds received by any of them to be deposited by each bank, financial institution or other Person holding such amounts, directly into a deposit account established in the name of the Collateral Agent (for the benefit of the relevant Issuing Bank and Revolving Lenders, as applicable) upon the release thereof. No later than the first Business Day following the Closing Date (under and as defined in the Asset Purchase Agreement), the Credit Parties shall cause (x) each letter of credit outstanding under each of the Bilateral LC Facilities to be returned, undrawn, by the U.S. Department of Education to the issuer thereof (other than a portion of the letter of credit issued under the Bilateral LC Facility of Bank of America in an amount not to exceed $5,340,918) and (y) all Cash Collateral Proceeds relating to such Bilateral LC Facilities (other than a portion of the Cash Collateral Proceeds relating to the Bilateral LC Facility of Bank of America in an amount not to exceed $5,875,009.80) to be deposited into a deposit account established in the name of the Collateral Agent (for the benefit of the Lenders); *provided* that a portion of such Cash Collateral Proceeds may be used by the Company to make required payments under the Settlement Agreement.".

***Section 3. Representations and Warranties.*** To induce the Agent and the Lenders to execute this Amendment Agreement, each Credit Party (solely as to itself and to the extent applicable) represents and warrants as of the Third Amendment Effective Date that:

(a)      This Amendment Agreement has been duly authorized, executed and delivered by such Credit Party.

(b)      This Amendment Agreement constitutes a legal, valid and binding obligation, enforceable against such Credit Party in accordance with its terms, subject to applicable bankruptcy, insolvency,

reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(c)    As of the Third Amendment Effective Date, no Default or Event of Default has occurred and is continuing or would result from this Amendment Agreement or any transactions contemplated hereby.

(d)    The representations and warranties of such Credit Party contained in Article IV of the Amended Credit Agreement are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified by materiality in the context thereof) on and as of the Third Amendment Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties were true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified by materiality in the context thereof) on and as of such earlier date.

***Section 4**.  Effectiveness of this Amendment Agreement and the Amended Credit Agreement.*  The effectiveness of this Amendment Agreement and the amendment of the Existing Credit Agreement set forth herein is subject to the satisfaction of the following conditions precedent (the date on which all of such conditions shall first be satisfied (or waived), which in the case of clause (b) may be substantially concurrent with the satisfaction of the other conditions specified below, the "Third Amendment Effective Date"):

(a)    The Agent's (or its counsel's) receipt of (x) either (i) a counterpart of this Amendment Agreement signed on behalf of each Credit Party, the Requisite Lenders and the Supermajority Lenders or (ii) customary written evidence reasonably satisfactory to the Agent (which may include telecopy or electronic transmission of a signed signature page of this Amendment Agreement) that such Party has signed a counterpart of this Amendment Agreement and (y) copies of the Second Lien Pledge and Security Agreement, the Second Lien Guaranty and the Intercreditor Agreement fully executed by each of the parties thereto; and

(b)    Company shall have paid all fees, costs and expenses due and payable to (x) the Agent, for itself and on behalf of the Lenders, and its counsel, (y) the ad hoc group of term loan lenders and its counsel, and (z) the ad hoc group of revolving lenders and its counsel, on the Third Amendment Effective Date, in each case, for which Company has received an invoice (*provided* that such invoice may reflect an estimate and/or only costs processed to date and shall not thereafter preclude a final settling of accounts between Company and such parties, including with respect to fees, costs or expenses incurred prior to the Third Amendment Effective Date).

***Section 5**.  Effect of Amendment.*

(a)    Except as expressly set forth herein, this Amendment Agreement shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of the Lenders or the Agent under the Existing Credit Agreement or any other Credit Document and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Existing Credit Agreement or any other provision of the Existing Credit Agreement or of any other Credit Document, all of which, subject to the terms hereof, are ratified and affirmed in all respects and shall continue in full force and effect.  Nothing herein shall be deemed to entitle the Credit Parties to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Existing Credit Agreement, Amended Credit Agreement or any other Credit Document in similar or different circumstances.

(b)    It is the intention of each of the Parties hereto that the Existing Credit Agreement be amended so as to preserve the perfection and priority of all security interests securing indebtedness and obligations under the Existing Credit and that this Amendment Agreement does not constitute a novation of the obligations and liabilities existing under the Existing Credit Agreement.

(c)    On and after the Third Amendment Effective Date, each reference in the Existing Credit Agreement to "this Agreement", "hereunder", "hereof", "herein", or words of like import, and each reference to the "Credit Agreement" in any other Credit Document shall be deemed a reference to the Amended Credit Agreement.  Each of this Amendment Agreement, the Second Lien Pledge and Security Agreement, the Second Lien Guaranty and the Intercreditor Agreement shall constitute a "Credit Document" for all purposes of the Amended Credit Agreement and the other Credit Documents. As used herein, (x) "Second Lien Pledge and Security Agreement" means that certain Second Lien Pledge and Security Agreement, dated on or about the date hereof, by and among the Collateral Agent and certain subsidiaries of the Dream Center Foundation, as it may be amended, restated, amended and restated, supplemented or otherwise modified in accordance with the terms the Credit Documents and thereof, (y) "Second Lien Guaranty" means that certain Second Lien Guaranty, dated on or about the date hereof, by and among the Collateral Agent and certain subsidiaries of the Dream Center Foundation, as it may be amended, restated, amended and restated, supplemented or otherwise modified in accordance with the terms of the Credit Documents and thereof and (z) "Intercreditor Agreement" means that certain Intercreditor Agreement, dated on or about the date hereof, by and among the Collateral Agent, certain subsidiaries of the Dream Center Foundation and the collateral agent for the lenders to such subsidiaries of the Dream Center Foundation, as it may be amended, restated, amended and restated, supplemented or otherwise modified in accordance with the terms the Credit Documents and thereof.

**Section 6.**  *General Release.* To further induce the Lenders party hereto to enter into this Amendment Agreement and in consideration of, among other things, the amendments to the Existing Credit Agreement provided for herein, and other financial accommodations which the Lenders party hereto elect to extend to the Credit Parties, each Credit Party hereby absolutely and unconditionally waives and releases and forever discharges the Agent, the Issuing Banks and the Lenders, and any and all participants, parent corporations, subsidiary corporations, affiliated corporations, insurers, indemnitors, successors and assigns of the Agent, the Issuing Banks and the Lenders, together with all of the present and former directors, officers, agents, attorneys, and employees of any of the foregoing, from any and all claims (including, without limitation, cross-claims, counterclaims, rights of setoff and recoupment), damages (including costs and expenses), demands, suits, or causes of action of any kind, nature or description, whether arising in law or equity or upon contract or tort or under any provincial, state, local or federal law or otherwise, which each Credit Party has had, now has or has made claim to have against any such person for or by reason of any act, omission, matter, cause or thing whatsoever arising from the beginning of time to and including the Third Amendment Effective Date out of or relating to the Existing Credit Agreement, this Amendment Agreement, the Amended Credit Agreement, the other Credit Documents and/or the transactions contemplated hereby or thereby, whether such claims, demands and causes of action are matured or unmatured or known or unknown (the "Release").  It is the intention of each Credit Party in executing the Release that the same shall be effective as a bar to each and every claim, demand and cause of action specified.  Each Credit Party acknowledge that it may hereafter discover facts different from or in addition to those now known or believed to be true with respect to such claims, demands, or causes of action and agree that this instrument shall be and remain effective in all respects notwithstanding any such differences or additional facts.  The Release shall survive the termination of the Amended Credit Agreement and payment in full of the Obligations.

**Section 7.**  *Counterparts.*  This Amendment Agreement may be executed in any number of counterparts (and by different Parties hereto in separate counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed

counterpart of a signature page of this Amendment Agreement by .pdf or electronic transmission shall be as effective as delivery of a manually executed counterpart hereof.

**Section 8**.  *Governing Law.*  THIS AMENDMENT AGREEMENT AND THE RIGHTS AND OBLIGATIONS OPF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.

**Section 9**.  *Severability.*  If any provision contained in this Amendment Agreement shall be held to be invalid, illegal or unenforceable in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability, and the remaining provisions of this Amendment Agreement shall not in any way be affected or impaired.  The invalidity, illegality or unenforceability of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**Section 10**.  *Headings*.  Section headings herein are included for convenience of reference only and shall affect the interpretation of this Amendment Agreement.

**Section 11**.  *Implementation of Amendment*.  After giving effect to this Amendment Agreement, to the extent that the Amended Credit Agreement contains provisions that would be violated by the transactions contemplated by the Amended APA as described in this Amendment Agreement ("Sale Transaction"), such provisions are hereby modified to the extent necessary solely to permit such Sale Transaction.

**Section 12** *Acknowledgement and Consent to Bail-In of EEA Financial Institutions.*

Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each Party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

The following terms used herein or in any other Credit Document shall have the following meanings:

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

     **Section 13**. *Lender Consent and Instruction*. Each of the Lenders party hereto hereby consents, and instructs the Agent, to enter into this Amendment Agreement and the parties hereto agree that in entering into this Amendment Agreement the Agent shall be protected by and shall enjoy all of the rights, immunities, protections and indemnities granted to it under the Existing Credit Agreement and the other Credit Documents, including without limitation Section 9.8(c) of the Existing Credit Agreement. The Agent shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Amendment Agreement or the recitals contained herein.

*[Remainder of page intentionally blank; signature pages follow]*

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first set forth above.

**EDUCATION MANAGEMENT CORPORATION**

By: _____

Name: Frank Jalufka

Title: SVP, CFO

**EDUCATION MANAGEMENT HOLDINGS II LLC**

By: _____

Name: Frank Jalufka

Title: SVP, CFO

**EDUCATION MANAGEMENT II LLC**

By: _____

Name: Frank Jalufka

Title: SVP, CFO

*[Signature Page to Amendment No. 3]*

**HIGHER EDUCATION SERVICES II LLC**

**THE CONNECTING LINK II LLC**

**BROWN MACKIE EDUCATION II LLC**

**EDUCATION FINANCE III LLC**

**SOUTH UNIVERSITY RESEARCH II LLC**

**THE ART INSTITUTES INTERNATIONAL II LLC**

**BMC REAL PROPERTY HOLDINGS LLC**

By: _____

Name: FRANK JALUFKA

Title: SVP, CFO

*[Signature Page to Amendment No. 3]*

**U.S. BANK NATIONAL ASSOCIATION,**
as Administrative Agent and Collateral Agent

By: _____
      Name:
      Title:

James A. Hanley
Vice President

ABRY Advanced Securities Fund II, L.P.

By: ABRY ASF Investors II, L.P., its General Partner

By: ABRY Advanced Securities Holding II, LLC, As Sole General Partner

[                    ],
as Lender

By: _____

Name: Matthew Lapides

Title: Authorized Signatory

*[Signature Page to Amendment No. 3]*

**Anchorage Capital Master Offshore, Ltd.**
By: Anchorage Capital Group, L.L.C., its Investment Manager

as Lender

By: _____

Name: _____

Title: Melissa Griffiths
Authorized Signatory

*[Signature Page to Amendment No. 3]*

**Banc of America Credit Products** as Lender

By: _Jennifer Koszta_____
      Name: Jennifer Koszta
      Title: Assistant Vice President

**BANK OF AMERICA, N.A.,**
as Lender

By: _____
Name:  C. Mark Hedrick
Title:   Managing Director

**BARCLAYS BANK PLC,**
as Lender

By: _____

Name: Robert Silverman
Title: Director

Barclays Bank PLC,
as Lender

By: _____

Name: **Name: Salvatore Russo**

Title: **Title: Authorized Signatory**

Digitally signed by
Salvatore Russo
DN: cn=Salvatore
Russo, o, ou,
email=Salvatore.Russo
@Barclays.com, c=US
Date: 2017.10.17
14:35:47 -04'00'

*[Signature Page to Amendment No. 3]*

**BCBSM, Inc.,**
as Lender

By: _____

Name: Jeffrey M. Smith
Title: Authorized Signatory

*[Signature Page to Amendment No. 3]*

Beadsea Opportunity LLC

[            ],
as Lender    By: Freestone ~~Capital~~ Investments LLC,
its manager

By: _____
Name: Jason Mann
Title: Managing Director

*[Signature Page to Amendment No. 3]*

**BELL ATLANTIC MASTER TRUST,** as Lender
By: Credit Value Partners, LLC as Investment Manager

By: _____

Name:   Donald Pollard
Title:   Managing Partner

Candlewood Special Situations Master Fund, Ltd.

[                    ],
as Lender

By: _____

Name:
Title:    Michael Lau
          Authorized Signatory

Candlewood Special Situations Master Fund II LP

I, as Lender I,

By: _____

Name:
Title:    Michael Lau
          Authorized Signatory

*[Signature Page to Amendment No. 3]*

**CCP Credit Acquisition Holdings, L.L.C.,**

as Lender

By:

Name: Jared S. Hendricks
Title:  Authorized Signatory

**Centerbridge Special Credit Partners II, L.P.,**

as Lender

By: _____

Name: Jared S. Hendricks
Title: Authorized Signatory

**CITIBANK, N.A.,**
as Lender

By: _____

Name:

Title:    Brian S. Broyles - Attorney-In-Fact

*[Signature Page to Amendment No. 3]*

**Citigroup Financial Products, Inc.**
as Lender

By: _____

Name:

Title:    Brian S. Broyles - Authorized Signatory

[                    ],
as Lender
Credit Suisse AG, Cayman Islands Branch

By:
    Name: _____
    Title:

Robert Healey
Authorized Signatory

Leigh Dworkin
**Authorized Signatory**

*[Signature Page to Amendment No. 3]*

[              ],
as Lender    CREDIT SUISSE LOAN FUNDING LLC

By: _____

Name:
Title:    Robert Healey
          Authorized Signatory

**CREDIT VALUE DISTRESSED DURATION
MASTER FUND, LP,** as Lender
By: Credit Value Partners, LLC as Investment Manager

By: _____

Name:   Donald Pollard
Title:    Managing Partner

**CREDIT VALUE MASTER FUND III, LP**, as Lender
By: Credit Value Partners, LLC as Investment Manager

By: _____
Name:  Donald Pollard
Title:  Managing Partner

*[Signature Page to Amendment No. 3]*

PLAGLER MASTER FUND SPC Ltd acting for and on behalf of the
Class A segregated Portfol

[                    ],
as Lender

By:    _____

Name:
Title:    Michael Lau
Authorized Signatory

*[Signature Page to Amendment No. 3]*

FLABLER MASTER FUND SPC Ltd acting for and behalf of the Class B segregated portfolio

[                    ],
as Lender

By:     _____

Name:
Title:

Michael Lau
Authorized Signatory

*[Signature Page to Amendment No. 3]*

**Future Fund Board of Guardians**

By: Oak Hill Advisors, L.P.,
    as its Investment Advisor,

as Lender

By:                      
        Name:  Gregory S. Rubin
        Title:    Authorized Signatory

*[Signature Page to Amendment No. 3]*

as Lender

**HillMark Funding, Ltd.**

By: HillMark Capital Management, L.P.,
    <u>as Collateral Manager , as a Lender</u>

By: _____
Name: Mark Gold
Title:   CEO

**GOLDMAN SACHS LENDING PARTNERS LLC,**
as Lender

By: _____

Name: Chris Lam
Title:  Authorized Signatory

**GOLDMAN SACHS BANK USA,**
as Lender

By: _____

Name: Chris Lam
Title:   Authorized Signatory

**JPMORGAN CHASE BANK, N.A.,**
as Lender

By: _____

Name:  Douglas A. Kravitz
Title:   Executive Director

Katonah 2007-I CLO Ltd. ,
as a Lender


By:

    Name: Daniel Gilligan
    Title: Authorized Signatory

**KKR Corporate Credit Partners L.P.,**
as Lender

By: _____

Name: Jeffrey M. Smith
Title: Authorized Signatory

**KKR Corporate Credit Partners L.P.,**
as Lender

By: _____

Name: Jeffrey M. Smith
Title: Authorized Signatory

**KKR Credit Relative Value Master Fund L.P.,**
as Lender

By: _____

Name: Jeffrey M. Smith
Title: Authorized Signatory

**KKR Debt Investors II (2006) (Ireland) L.P.,**
as Lender

By: _____

Name: Jeffrey M. Smith
Title: Authorized Signatory

**KKR Financial CLO 2005-1, Ltd.,**
as Lender

By: _____

Name: Jeffrey M. Smith
Title: Authorized Signatory

**KKR Financial CLO 2005-2, Ltd.,**
as Lender

By: _____

Name: Jeffrey M. Smith
Title: Authorized Signatory

**KKR Financial CLO 2006-1, Ltd.,**
as Lender

By: _____

Name: Jeffrey M. Smith
Title: Authorized Signatory

**KKR Financial CLO 2007-1, Ltd.,**
as Lender

By: _____

Name: Jeffrey M. Smith
Title: Authorized Signatory

**KKR Financial CLO 2011-1, Ltd.,**
as Lender

By: _____

Name: Jeffrey M. Smith
Title: Authorized Signatory

*[Signature Page to Amendment No. 3]*

**KKR Floating Rate Fund L.P.,**
as Lender

By: _____

Name: Jeffrey M. Smith
Title: Authorized Signatory

**KKR Lending Partners L.P.,**
as Lender

By: _____

Name: Jeffrey M. Smith
Title: Authorized Signatory

*[Signature Page to Amendment No. 3]*

**KKR-PBPR Capital Partners L.P.,**
as Lender

By: _____

Name: Jeffrey M. Smith
Title: Authorized Signatory

MAGNOLIA ROAD GLOBAL CREDIT MASTER FUND LP

[                  ],
as Lender

By: _____

Name:   ANTHONY PASQUA
Title:   AUTHORIZED
         SIGNATORY

*[Signature Page to Amendment No. 3]*

**Maryland State Retirement and Pension System,**
as Lender

By: _____

Name: Jeffrey M. Smith
Title: Authorized Signatory

MERRILL LYNCH CAPITAL CORPORATION,
as Lender

By: _____

Name:
Title:          Jay T. Wampler
                Managing Director

New Mountain Finance Corporation ,
as a Lender

By: _____

    Name: Robert A. Hamwee
    Title: Authorized Signatory

New Mountain Finance Holdings, L.L.C. ,
as a Lender

By: _____
    Name: Robert A. Hamwee
    Title: Authorized Signatory

**Oregon Public Employees Retirement Fund,**
as Lender

By: _____

Name: Jeffrey M. Smith
Title: Authorized Signatory

**OHA ASIA CUSTOMIZED CREDIT FUND, L.P.**

By: OHA Asia Customized Credit GenPar, LLC,
    its general partner

By: OHA Asia Customized Credit MGP, LLC,
    its managing member,

as Lender

By: _____
    Name:  Gregory S. Rubin
    Title:    Authorized Signatory

*[Signature Page to Amendment No. 3]*

as Lender

**Stoney Lane Funding I, Ltd.,**
By: HillMark Capital Management, L.P.,
<u>as Collateral Manager , as a Lender</u>

By: _____
Name: Mark Gold
Title:  CEO

Schedule I

**Reallocated Recovery Amount Recipient**

| Lender | Ratable Percentage of Reallocated Recovery Amount |
|---|---|
| Banc of America Credit Products, Inc. | 17.09% |
| Bank of America, N.A. | 0.00% |
| Barclays Bank PLC | 0.00% |
| BNP Paribas RCC, Inc. | 0.00% |
| CANDLEWOOD SPECIAL SITUATIONS MASTER FUND II, L.P. | 52.39% |
| FLAGLER MASTER FUND SPC LTD ACTING FOR AND ON BEHALF OF THE CLASS A | 0.00% |
| FLAGLER MASTER FUND SPC LTD ACTING FOR AND ON BEHALF OF THE CLASS B | 8.00% |
| Credit Suisse Loan Funding LLC | 0.05% |
| Eaton Vance | 0.00% |
| JPMorgan Chase Bank, N.A. | 22.47% |
| Oak Hill Advisors | 0.00% |
| Fifth Third Bank | 0.00% |
| **Total** | **100%** |

Schedule II

**Reallocated Recovery Amount Contributing Lenders**

| Revolving Lender | Reallocated Recovery Amount Percentage |
|---|---|
| BNP Paribas RCC, Inc. | 10.00% |
| Fifth Third Bank | 5.56% |
| Eaton Vance | 4.44% |
| **Total** | **20.0%** |

Schedule III

Bank Accounts

| Ed System | School Code | School | Legal Entity Name | Tax ID | Type of Account | Bank | Account Number | Open/ Closed | Restricted |
|---|---|---|---|---|---|---|---|---|---|
| EDMC | EDMC | Education Management | Education Management | | Investment | PNC | 435002556 | open | No |
| EDMC | EDMC | Education Management | Education Management | | Investment | PNC | 435003525 | open | No |
| EDMC | EDMC | Education Management | Education Management | | Investment | Bank of America | 386631 | open | Yes |
| EDMC | EDMC | Education Management | Education Management | | Investment | Bank of America | 410188 | open | Yes |
| EDMC | EDMC | Education Management | Education Management | | Investment | Bank of America | 406506 | open | Yes |
| EDMC | EDMC | Education Management | Education Management | | Investment | Bank of America | 406508 | open | Yes |
| EDMC | EDMC | Education Management | Education Management | | Investment | UBS Bank | CP 46882 G2 | open | No |
| EDMC | EDMC | Education Management Corp | Education Management Corp | 25-1119571 | Concentration Account | PNC | 1033474581 | open | No |
| EDMC | EDMC | Education Management Corp | Education Management Corp | 25-1119571 | RLI Collateral Account | Wells Fargo | 84287700 | open | Yes |
| EDMC | EDMC | Education Management Corp | Education Management Corp | 25-1119571 | Philadelphia Indemnity Ins. Co. | Wells Fargo | 84486600 | open | Yes |
| EDMC | EDMC | Education Management Corp | Education Management Corp | 25-1119571 | ARGO Collateral Account | UBS Bank | SU 13027 74 | open | Yes |
| EDMC | EDMC | Education Management Corp | Education Management Corp | 25-1119571 | Pledge Collateral Account | Merrill Lynch | 7EV-02000 | open | Yes |
| EDMC | EDMC | Education Management Corp | Education Management Corp | 25-1119571 | Pledge Collateral Account | Merrill Lynch | 7EV-02000 | open | Yes |
| EDMC | EDMC | Education Management Corp | Education Management Corp | 25-1119571 | EDMC Berkley Surety Group | BNY Mellon | 557745 | open | Yes |
| EDMC | EDMC | Education Management Corp | Education Management Corp | 25-1119571 | American Express CD | American Express | 001-012000-4 | open | Yes |
| EDMC | EDMC | Education Management Holding II LLC | Education Management Holding II LLC | 47-2042529 | Concentration Account | PNC | 1033474653 | open | No |
| EDMC | EDMC | Education Management II LLC | Education Management II LLC | 47-2042661 | Concentration Account | Bank of America | 8666108936 | open | No |
| EDMC | EDMC | Education Management II LLC | Education Management II LLC | 47-2042661 | Concentration Account | Wells Fargo | 4121565089 | open | No |
| EDMC | EDMC | Education Management II LLC | Education Management II LLC | 47-2042661 | Concentration Account | PNC | 1028876594 | open | No |
| EDMC | EDMC | Education Management II LLC | Education Management II LLC | 47-2042661 | ADP | PNC | 1033474717 | open | No |
| EDMC | EDMC | Education Management II LLC | Education Management II LLC | 47-2042661 | Controlled Disbursement | PNC | 1033475787 | open | No |
| EDMC | EDMC | Education Management II LLC | Education Management II LLC | 47-2042661 | Controlled Disbursement | PNC | 1033475832 | open | No |
| EDMC | EDMC | Education Management II LLC | Education Management II LLC | 47-2042661 | LOC Cash Collateral | Bank of America | 8666085374 | open | Yes |

| Ed System | School Code | School | Legal Entity Name | Tax ID | Type of Account | Bank | Account Number | Open/ Closed | Restricted |
|---|---|---|---|---|---|---|---|---|---|
| EDMC | EDMC | Education Management II LLC | Education Management II LLC | 47-2042661 | Education Management LLC Aetna | PNC | 1029097162 | open | No |
| EDMC | EDMC | Education Management II LLC | Education Management II LLC | 47-2042661 | OHE CollectionsLocal Operating | Bank of America | 8666187882 | open | No |
| EDMC | EDMC | Education Management II LLC | Education Management II LLC | 47-2042661 | LOC Cash Collateral | BNP Paribas | 00200-623066-001-USA-18 | open | Yes |
| EDMC | EDMC | Education Management II LLC | Education Management II LLC | | Investment | Bank of America | 425934 | open | Yes |
| EDMC | EDMC | Education Management II LLC | Education Management II LLC | 47-2042661 | P-card Program Collateral | Bank of America | 8666888821 | open | Yes |
| EDMC | EDMC | Education Management II LLC | Education Management II LLC | 47-2042661 | PayCard Funding Account | Bancorp Bank | 7551001130 | open | Yes |
| BMC | BMC Corp | Brown Mackie Education II LLC | Brown Mackie Education II LLC | 47-2169099 | Local Operating | PNC | 1028876623 | open | No |
| BMC | BMC Corp | Brown Mackie Education II LLC | Brown Mackie Education II LLC | 47-2169099 | Controlled Disbursement | PNC | 1033475728 | open | No |
| BMC | BMC Corp | Brown Mackie Education II LLC | Brown Mackie Education II LLC | 47-2169099 | VA Depository | Bank of America | 8666887195 | open | No |
| BMC | BMC | Brown Mackie Education II LLC | Brown Mackie Education II LLC | 47-2169099 | BMC Tuition Options Receipts | Bank of America | 8670706203 | open | No |
| EDMC | EDMC | Education Finance III LLC | Education Finance III LLC | 47-2192533 | EFL Loans | Bank of America | 8666485551 | open | No |
| EDMC | EDMC | Education Finance III LLC | Education Finance III LLC | 47-2192533 | EFL Collections | Bank of America | 8666485556 | open | No |
| EDMC | EDMC | Education Finance III LLC | Education Finance III LLC | 47-2192533 | Tuition Options | BNY Mellon | 1096690 | open | No |
| AI | Ai Corp | The Art Institutes International II LLC | The Art Institutes International II LLC | 47-2179270 | VA Depository | Bank of America | 8666887152 | open | No |
| AI | Ai Corp | The Art Institutes International II LLC | The Art Institutes International II LLC | 47-2179270 | Non Credit Course Receipts | Bank of America | 8666887138 | open | No |
| AI | Ai Corp | The Art Institutes International II LLC | The Art Institutes International II LLC | 47-2179270 | Controlled Disbursement | PNC | 1033476026 | open | No |
| AI | AI | Art Institutes International II LLC | Art Institutes International II LLC | 47-2179270 | AI Tuition Options Receipts | Bank of America | 8670706161 | open | No |

*EXECUTION VERSION*

AMENDMENT No. 4 dated as of May 16, 2018 (this "Amendment Agreement") to the Credit and Guaranty Agreement, dated as of January 5, 2015, as amended by that certain Amendment No. 1 dated as of November 13, 2015, as further amended by that certain Amendment No. 2 dated as of April 18, 2017, and as further amended by that certain Amendment No. 3 dated as of October 13, 2017 (the "Existing Credit Agreement"), among Education Management II LLC ("Company"), Education Management Corporation, Education Management Holdings II LLC ("Holdings"), certain subsidiaries of Holdings, as Guarantors, the Lenders party thereto from time to time and U.S. Bank National Association, as administrative agent and collateral agent (in such capacity, the "Agent"). Unless otherwise defined herein, terms defined in the Amended Credit Agreement (as defined below) and used herein shall have the meanings given to them in the Amended Credit Agreement.

WHEREAS, Company wishes to condition the payment or reimbursement of professional fees incurred by Lenders in accordance with Sections 10.2 of the Existing Credit Agreement upon the approval of the Requisite Lenders; and

WHEREAS, in order to effect the foregoing, each of the Credit Parties and the Lenders party hereto constituting not less than the Requisite Lenders (collectively, the "Parties") desire to amend, as of the Fourth Amendment Effective Date (as defined below), the Existing Credit Agreement, subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

**Section 1**. *Acknowledgement of the Credit Parties.*

(a)     Each of the bank accounts held by the Credit Parties and their respective subsidiaries is either (i) listed on Schedule I hereto (the "Postpetition Bank Accounts") or (ii) in the process of being closed (the "Closed Bank Accounts"). Each Postpetition Bank Account is (i) subject to a control agreement in favor of the Collateral Agent for the benefit of the Secured Parties and Issuing Banks; (ii) a zero-balance disbursement or similar account; (iii) an account that sweeps daily to an account subject to a control agreement in favor of the Collateral Agent for the benefit of the Secured Parties and Issuing Banks; (iv) an account containing cash collateral securing the Bilateral LC Facilities; (v) a restricted account to which access by the Credit Parties and their respective affiliates is blocked; or (vi) solely in the case of a PNC Bank account in the name of Education Management II LLC (account number ending 5787), a controlled disbursement account to which transfers are made only in order to fund the payment of duly issued invoices by check. The Closed Bank Accounts hold, in the aggregate, less than $100,000.

(b)     All of the assets pledged, assigned, conveyed, mortgaged, hypothecated, or transferred to the Collateral Agent pursuant to the Collateral Documents are (and shall continue to be) subject to valid and enforceable Liens and security interests of the Collateral Agent, as collateral security for all of the Obligations, subject to no Liens except Permitted Liens, and such Liens and security interests are not subject to avoidance, disallowance, or subordination pursuant to any requirement of law, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally or by general equitable principles (whether enforcement is sought by proceedings in equity or at law). Each Credit Party hereby reaffirms and ratifies its prior conveyance to the Collateral Agent of a continuing security interest in and lien on the Collateral.

(c)     Each Credit Party hereby (i) ratifies and reaffirms all of its payment and performance

obligations, contingent or otherwise, and each grant of security interests and Liens in favor of the Agent, the Issuing Banks or the Lenders, as the case may be, under each Credit Document to which it is a party, and (ii) agrees and acknowledges the Obligations constitute legal, valid, and binding obligations of the Credit Parties, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law), and that as of the Fourth Amendment Effective Date, (a) no offsets, defenses, or counterclaims to the Obligations or any other causes of action with respect to the Obligations or the Credit Documents exist and (b) no portion of the Obligations is subject to avoidance, disallowance, reduction, or subordination pursuant to any requirement of law, and it does not otherwise dispute in any respect the enforceability of the Obligations or the Credit Documents.

**Section 2.** *Amendment of the Existing Credit Agreement.* Effective as of the Fourth Amendment Effective Date, the Existing Credit Agreement is hereby amended (the Existing Credit Agreement as amended hereby, the "Amended Credit Agreement") to:

(a)     amend Section 10.2 of the Existing Credit Agreement by inserting the following prior to the period at the end thereof:

"provided that no Credit Party shall be obligated to pay or reimburse pursuant to this Section 10.2, and no Credit Party shall pay or reimburse, any fees, expenses, or disbursements of any professional (including counsel) retained by any Lender or any group of Lenders (including any ad hoc group) unless and until the payment of such professional's fees, expenses, and disbursements has been approved in writing by the affirmative written consent of the Requisite Lenders (which may be by email), each acting in its respective sole discretion; provided further, that following approval of the payment of any professional's fees, expenses, and disbursements in accordance with the immediately preceding proviso, the Credit Parties shall be obligated to pay or reimburse, and shall pay or reimburse, the fees, expenses, and disbursements of such professional in accordance with this Section 10.2 until such time as the Requisite Lenders advise the Credit Parties in writing (which may be by email) that payment of such professional's fees, expenses, and disbursements is no longer authorized."

**Section 3.** *Effectiveness of this Amendment Agreement and the Amended Credit Agreement.* The effectiveness of this Amendment Agreement and the amendment of the Existing Credit Agreement set forth herein is subject to the satisfaction of the following conditions precedent (the date on which all of such conditions shall first be satisfied (or waived), the "Fourth Amendment Effective Date"):

(a)     The Agent's (or its counsel's) receipt of either (i) a counterpart of this Amendment Agreement signed on behalf of each Credit Party and the Requisite Lenders or (ii) customary written evidence reasonably satisfactory to the Agent (which may include telecopy or electronic transmission of a signed signature page of this Amendment Agreement) that such Party has signed a counterpart of this Amendment Agreement.

**Section 4.** *Effect of Amendment.*

(a)     Except as expressly set forth herein, this Amendment Agreement shall not by implication or otherwise limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of the Lenders or the Agent under the Existing Credit Agreement or any other Credit Document and shall not alter, modify, amend, or in any way affect any of the terms, conditions, obligations, covenants, or

2

agreements contained in the Existing Credit Agreement or any other provision of the Existing Credit Agreement or of any other Credit Document, all of which, subject to the terms hereof, are ratified and affirmed in all respects and shall continue in full force and effect. Nothing herein shall be deemed to entitle the Credit Parties to a consent to, or a waiver, amendment, modification, or other change of, any of the terms, conditions, obligations, covenants, or agreements contained in the Existing Credit Agreement, Amended Credit Agreement, or any other Credit Document in similar or different circumstances.

(b)     It is the intention of each of the Parties hereto that the Existing Credit Agreement be amended so as to preserve the perfection and priority of all security interests securing indebtedness and obligations under the Existing Credit and that this Amendment Agreement does not constitute a novation of the obligations and liabilities existing under the Existing Credit Agreement.

**Section 5**. *General Release.* To further induce the Lenders party hereto to enter into this Amendment Agreement and in consideration of, among other things, the amendments to the Existing Credit Agreement provided for herein, and other financial accommodations which the Lenders party hereto elect to extend to the Credit Parties, each Credit Party hereby absolutely and unconditionally waives and releases and forever discharges the Agent and the Lenders party hereto, and any and all participants, parent corporations, subsidiary corporations, affiliated corporations, insurers, indemnitors, successors, and assigns of the Agent and the Lenders party hereto, together with all of the present and former directors, officers, agents, attorneys, and employees of any of the foregoing, from any and all claims (including, without limitation, cross-claims, counterclaims, rights of setoff, and recoupment), damages (including costs and expenses), demands, suits, or causes of action of any kind, nature, or description, whether arising in law or equity or upon contract or tort or under any provincial, state, local, or federal law or otherwise, which each Credit Party has had, now has, or has made claim to have against any such person for or by reason of any act, omission, matter, cause, or thing whatsoever arising from the beginning of time to and including the Fourth Amendment Effective Date out of or relating to the Existing Credit Agreement, this Amendment Agreement, the Amended Credit Agreement, the other Credit Documents, and/or the transactions contemplated hereby or thereby, whether such claims, demands and causes of action are matured or unmatured or known or unknown (the "Release"). It is the intention of each Credit Party in executing this Amendment Agreement that the Release shall be effective as a bar to each and every claim, demand, and cause of action specified. Each Credit Party acknowledges that it may hereafter discover facts different from or in addition to those now known or believed to be true with respect to such claims, demands, or causes of action and agrees that this instrument shall be and remain effective in all respects notwithstanding any such differences or additional facts. The Release shall survive the termination of the Amended Credit Agreement and payment in full of the Obligations.

**Section 6**. *Counterparts*. This Amendment Agreement may be executed in any number of counterparts (and by different Parties hereto in separate counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Amendment Agreement by .pdf or electronic transmission shall be as effective as delivery of a manually executed counterpart hereof.

**Section 7**. *Governing Law.* THIS AMENDMENT AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.

**Section 8**. *Severability.* If any provision contained in this Amendment Agreement shall be held to be invalid, illegal, or unenforceable in any jurisdiction, such provision shall, as to such jurisdiction, be

3

ineffective to the extent of such invalidity, illegality, or unenforceability, and the remaining provisions of this Amendment Agreement shall not in any way be affected or impaired. The invalidity, illegality, or unenforceability of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**Section 9**. *Headings*. Section headings herein are included for convenience of reference only and shall not affect the interpretation of this Amendment Agreement.

*[Remainder of page intentionally blank; signature pages follow]*

4

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first set forth above.

**EDUCATION MANAGEMENT CORPORATION**

By: _____

Name: Frank Jankowski
Title: SVP, CFO

**EDUCATION MANAGEMENT HOLDINGS II LLC**

By: _____

Name: Frank Jankowski
Title: SVP, CFO

**EDUCATION MANAGEMENT II LLC**

By: _____

Name: Frank Jankowski
Title: SVP, CFO

**HIGHER EDUCATION SERVICES II LLC**

**BROWN MACKIE EDUCATION II LLC**

**EDUCATION FINANCE III LLC**

**SOUTH UNIVERSITY RESEARCH II LLC**

**THE ART INSTITUTES INTERNATIONAL II LLC**

**BMC REAL PROPERTY HOLDINGS LLC**

By: _____

Name: FRANK JALUVKA

Title: SVP, CRO

*[Signature Page to Amendment No. 4]*

**CANDLEWOOD SPECIAL SITUATIONS MASTER FUND II, L.P.**

as Lender

By: _____
Name: Michael Lau
Title: Authorized Signatory

*[Signature Page to Amendment No. 4]*

**CANDLEWOOD SPECIAL SITUATIONS
MASTER FUND, LTD.**

as Lender

By: _____

Name: Michael Lau

Title: Authorized Signatory

*[Signature Page to Amendment No. 4]*

**FLAGLER MASTER FUND SPC LTD, acting for and on behalf of the class B segregated portfolio**

as Lender

By: _____

Name: Michael Lin

Title: Authorized Signatory

**FLAGLER MASTER FUND SPC LTD, acting for
and on behalf of the class A segregated portfolio**

as Lender

By: _____
Name: Michael Lau
Title: Authorised Signatory

*[Signature Page to Amendment No. 4]*

**BANC OF AMERICA CREDIT PRODUCTS, INC.**

as Lender

By:

Name:
Title: SETH DENSON
DIRECTOR

*[Signature Page to Amendment No. 4]*

**ANCHORAGE CAPITAL MASTER
 OFFSHORE, LTD.**

**By: Anchorage Capital Group, LLC, Its
Investment Manager**

as Lender

By:

Name:        Melissa K. Griffiths
Title:        Authorized Signatory

*[Signature Page to Amendment No. 4]*

**CITIBANK, N.A.**

as Lender

By: _____

Name:

Title:
    Brian S. Broyles - Attorney-In-Fact

*[Signature Page to Amendment No. 4]*

**CITIGROUP FINANCIAL PRODUCTS INC.**

as Lender

By: _____

Name:

Title:    Brian S. Broyles – Authorized Signatory

*[Signature Page to Amendment No. 4]*

**Bell Atlantic Master Trust**
By: Credit Value Partners LP, as Authorized
Signatory

as Lender

By: _____
Name:  Don Pollard
Title:   Managing Partner

*[Signature Page to Amendment No. 4]*

**Credit Value Fund III, LP**

as Lender

By: _____
    Name:  Don Pollard
    Title:   Managing Partner

*[Signature Page to Amendment No. 4]*

**CVP DD Liquidating Trust A**

as Lender

By: _____
Name:  Don Pollard
Title:   Managing Partner

ny-1324976

*[Signature Page to Amendment No. 4]*

**Schedule I**

**Bank Accounts**

| Accountholder | Bank | Account Number (Last Four Digits) |
|---|---|---|
| Education Finance III LLC | Bank of America | 5556 |
| Education Finance III LLC | Bank of America | 5551 |
| Education Management II LLC | Bank of America | 8936 |
| Education Management II LLC | PNC Bank | 6594 |
| Education Management II LLC | PNC Bank | 5787 |
| South University LLC | Bank of America | 8507 |
| Education Management II LLC | BNY Mellon | 7745 |
| Education Management II LLC | Wells Fargo Bank | 6600 |
| Education Management II LLC | Merrill Lynch | 2000 |
| Education Management II LLC | Merrill Lynch | 2000 |
| Education Management II LLC | Bank of America | 8821 |
| Education Management II LLC | Amex Bank | 0004 |