# EXHIBIT 9



**U.S. Department of Education**
**Office of Inspector General**

# Inspection of the Department's Activities Surrounding the Sale of Postsecondary Schools to Dream Center Education Holdings

June 29, 2021
ED-OIG/I05T0010

*INSPECTION REPORT*

## NOTICE

Statements that managerial practices need improvements, as well as other conclusions and recommendations in this report, represent the opinions of the Office of Inspector General. The appropriate Department of Education officials will determine what corrective actions should be taken.

In accordance with Freedom of Information Act (Title 5, United States Code, Section 552), reports that the Office of Inspector General issues are available to members of the press and general public to the extent information they contain is not subject to exemptions in the Act.



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE OF INSPECTOR GENERAL

Audit Services

June 29, 2021

TO:          Miguel A. Cardona
             Secretary

             Richard Cordray
             Chief Operating Officer
             Federal Student Aid

FROM:        Bryon S. Gordon /s/
             Assistant Inspector General for Audit

SUBJECT:     Final Inspection Report, "Inspection of the Department's Activities Surrounding the Sale of Postsecondary Schools to Dream Center Education Holdings," Control Number ED-OIG/I05T0010

Attached is the subject final report presenting the results of our inspection of the U.S. Department of Education's activities surrounding the sale of postsecondary schools to Dream Center Education Holdings. We received the Department's comments on the draft of this report and considered them as we prepared this final report.

U.S. Department of Education policy requires that you develop a final corrective action plan within 30 days of the issuance of this report. The corrective action plan should set forth the specific action items and targeted completion dates necessary to implement final corrective actions on the findings and recommendations contained in this final inspection report. Corrective actions that your office proposes and implements will be monitored and tracked through the Department's Audit Accountability and Resolution Tracking System.

In accordance with the Inspector General Act of 1978, as amended, the Office of Inspector General is required to report to Congress twice a year on inspections that remain unresolved after 6 months from the date of issuance.

We appreciate the Department's and Federal Student Aid's cooperation during this inspection. If you have any questions, please contact me at (202) 245-6051 or Bryon.Gordon@ed.gov or Gary D. Whitman, Regional Inspector General for Audit, at (312) 730-1658 or Gary.Whitman@ed.gov.

# Table of Contents

Results in Brief ................................................................................................................ 1

Introduction ................................................................................................................ 11

Finding 1. The Department's Involvement in Dream Center's Purchase of Postsecondary Schools from Education Management Corporation ........................................................ 16

Finding 2. The Department's Involvement in Dream Center's Sale of Postsecondary Schools to Education Principle Foundation ...................................................................... 34

Finding 3. The Department's Drawdown and Application of Surety Funds from the Education Management Corporation Letters of Credit and How the Department Ensured the Surety Funds Were Used in Accordance with Requirements ................................... 46

Finding 4. The Department's Actions to Ensure That Dream Center Complied with Requirements for Drawing Down and Disbursing Title IV Funds ..................................... 55

Appendix A. Scope and Methodology ............................................................................ 60

Appendix B. Timeline Relevant to Dream Center's Purchase of 13 For-Profit Postsecondary Schools from Education Management Corporation .................................. 67

Appendix C. Timeline of Activities Relevant to Transactions Among Dream Center, Education Principle Foundation, and Studio Enterprise Manager ................................. 81

Appendix D. Timeline of the Department's Handling of Surety Funds ........................... 85

Appendix E. Acronyms and Abbreviations ..................................................................... 90

Department Comments ................................................................................................ 91

# Results in Brief

## What We Did

The objectives of our inspection were to describe

1.  the involvement of the U.S. Department of Education (Department) in transactions among Education Management Corporation, Dream Center Education Holdings, LLC (Dream Center), Education Principle Foundation, and Studio Enterprise Manager, LLC, and the steps the Department took to protect students and taxpayers;

2.  how the Department drew down and applied surety funds from letters of credit for Education Management Corporation and Dream Center and how the Department ensured that the surety funds were used in accordance with the terms of the provisional program participation agreements and any other requirements;[1] and

3.  how the Department ensured that Dream Center complied with requirements for drawing down and disbursing Title IV of the Higher Education Act of 1965, as amended (Title IV), program funds.

In January 2017, Dream Center, a nonprofit company solely owned by the Dream Center Foundation,[2] agreed to purchase 13 for-profit postsecondary schools from Education Management Corporation—Argosy University, South University, and 11 Art Institute schools.[3] As of June 2018, these 13 schools operated 76 locations serving about 34,000 students with more than $925 million in student loans. At the end of December 2018, Dream Center closed 5 of these schools and the branch campuses of

---

[1] Throughout this report, we use "surety funds" to refer to the funds the Department held in its accounts after drawing on letters of credit posted by Education Management Corporation.

[2] The Dream Center Foundation is a nonprofit organization based in Los Angeles, California; according to its website, the Dream Center Foundation's primary mission is to fund programs providing human services that address immediate and long-term needs in the areas of homelessness, hunger, poverty, addiction, domestic violence, human trafficking, and educational opportunity.

[3] The Art Institutes that Dream Center acquired were the Art Institute of Atlanta, the Art Institute of Colorado, the Art Institute of Fort Lauderdale, the Art Institute of Houston, the Art Institute of Philadelphia, the Art Institute of Phoenix, the Art Institute of Pittsburgh, the Art Institute of Portland, the Art Institute of Seattle, the Illinois Institute of Art, and the Miami International University of Art & Design.

4 other schools (a total of 27 locations). These 27 locations were serving more than 9,000 students. In January 2019, Dream Center sold South University and three Art Institute schools (a total of 19 locations) to Education Principle Foundation, a nonprofit foundation created by Colbeck Capital Management.[4] Education Principle Foundation entered into a managed services agreement with Studio Enterprise Manager, in which Colbeck Capital Management is an investor. Dream Center entered into a transition services agreement with Studio Enterprise Manager. Our inspection covered the Department's involvement in the transactions among these entities, its actions relevant to drawing on and using surety funds, and its actions for monitoring Dream Center's compliance with Title IV drawdown and disbursement requirements from January 1, 2017, through December 31, 2019.

To accomplish our objectives, we analyzed records of the Department's reviews, approvals, and other decisions; reviewed correspondence among the relevant entities; reviewed agreements between the Department and Dream Center and records supporting payments of surety funds to Dream Center; analyzed draw down transactions and Dream Center's accounting and credit balance payment records; and read email communications of Department and Dream Center officials and employees. We also interviewed Department officials and employees who were involved in reviewing and making decisions about the transactions,[5] including the approving and releasing of surety funds to pay the operating expenses of the school locations that Dream Center closed at the end of December 2018, and employees of an audit firm hired by Dream Center to review the operating expenses Dream Center was submitting to the Department for reimbursement.

## What We Found

During and after Federal Student Aid's (FSA) preacquisition review,[6] the Department identified significant financial risks associated with Dream Center's purchase of 13 postsecondary schools, including Dream Center's loss of the financial backing of an investor who was to provide at least 50 percent of the capital for the purchase, Dream Center's lack of experience investing in or operating schools participating in the Title IV

---

[4] Education Principle Foundation was formerly known as the Colbeck Foundation. Colbeck Capital Management is an investment firm.

[5] Throughout this report, when we refer to a person by title, we are referring to the person who held the position at the time unless otherwise indicated.

[6] Following its standard procedures, from February 2017 through September 2017, FSA conducted a preacquisition review in advance of Dream Center finalizing the purchase of the 13 schools.

programs, potential cash flow issues, and more than a decade of failing financial health scores for all 13 schools. Since October 2006, the Department had required Education Management Corporation to post a letter of credit to mitigate the financial risks posed by its schools' continued noncompliance with financial responsibility regulations. As of September 2017, the Department was requiring Education Management Corporation to post letters of credit totaling about $194 million, 15 percent of the Title IV funds that its schools received during the prior fiscal year. Despite the risks identified during and after FSA's preacquisition review, the Department deviated from FSA's financial analysis procedures, reduced the letter of credit amount to about $108 million, and issued temporary provisional program participation agreements to all 13 schools.

Also, on May 3, 2018, the Department took the unprecedented action of approving temporary nonprofit status for two schools, retroactive to the date of the change in ownership. The Department took the action despite not having a final decision about whether the two schools satisfied all aspects of the regulatory definition of a nonprofit school (Title 34 Code of Federal Regulations (C.F.R.) § 600.2).[7] From the change in ownership on January 21, 2018, through May 2, 2018, the two schools received about $12 million in Title IV funds, even though both schools were not eligible to continue participation in the Title IV programs as for-profit schools and had not yet been approved to participate as nonprofit schools (Finding 1).

In December 2018, the Department convened a meeting between Dream Center, its lenders, and any parties interested in acquiring the 13 schools that Dream Center purchased from Education Management Corporation. Those discussions culminated in a January 7, 2019, purchase agreement for Education Principle Foundation to acquire 4 of the 13 schools (South University and three Art Institute schools). Because of the speed with which the transaction took place and the threat of the four schools' immediate closures, the Department made decisions before completing its due diligence. Similar to its handling of Dream Center's purchase of the 13 schools from Education Management Corporation, the Department's handling of the proposed sale of these four schools to Education Principle Foundation deviated from FSA's financial analysis procedures. In this case, the Department extended the four schools' temporary provisional program participation agreements that were expiring on February 28, 2019, based on oral and email assurances from accrediting agencies and State agencies that they would approve the sale of the schools rather than waiting for official approval. The Department also agreed to limit the letter of credit requirement for Education Principle Foundation to the minimum 10 percent of the Title IV funds that the four schools received in the prior fiscal year. However, the Department had not received financial statements for the

---

[7] Unless otherwise noted, all references to the C.F.R. are to the July 1, 2017, version.

previous 2 years from the highest level of ownership (Education Principle Foundation). According to 34 C.F.R. § 600.20(g) and section 13.3.2 of FSA's "Financial Analysis Procedures," absent financial statements for the previous 2 years from the highest level of ownership, the required letter of credit amount should be 25 percent of the Title IV funds the schools received in the prior fiscal year.

Because the Department extended their temporary provisional program participation agreements even though they should have been deemed ineligible when their agreements expired on February 28, 2019, the four schools received more than $207 million in Title IV funds from March 1, 2019, through December 31, 2019. Because the Department lowered the required letter of credit amount, it had about $42 million less to protect the interests of students and taxpayers. According to the Principal Deputy Under Secretary Delegated the Duties of the Under Secretary (Principal Deputy Under Secretary) and FSA,[8] receivership or immediate closure of the four schools could have disrupted about 12,000 students' education and could have resulted in potential closed-school loan discharges from $300 to $420 million([Finding 2]).[9]

After Dream Center failed to post its own letter(s) of credit, the Department drew down the entire amount of the letters of credit (almost $108 million) that it had required Education Management Corporation to post for the 13 schools it sold to Dream Center. In June 2018, Dream Center notified the Department that it planned to close 5 of the 13 schools and the branch campuses of 5 other schools by December 31, 2018. At Dream Center's request—but contrary to the terms of the Education Management Corporation letters of credit—the Department agreed to release as much as $50 million in surety funds to pay the operating expenses of the school locations that Dream Center was closing.[10] Typically, surety funds held by the Department are designated to cover potential refunds to students, the additional costs that other postsecondary schools incur to teach out students who are transferring from the closing schools, loan

---

[8] The Principal Deputy Under Secretary joined the Department in early 2018 and was not involved in the Department's activities relevant to FSA's preacquisition review, Dream Center's purchase of 13 for-profit proprietary schools from Education Management Corporation, or the Department's decision to approve temporary interim nonprofit status for the Art Institute of Colorado and the Illinois Institute of Art.

[9] Receivership is a situation in which a company is held by a receiver—a person placed in the custodial responsibility for the property of others, including tangible and intangible assets and rights. Receivership is usually for cases where a company cannot meet its financial obligations and is said to be insolvent.

[10] The Education Management Corporation letters of credit stated that funds could be used "TO PROVIDE FOR THE "TEACHOUT" OF STUDENTS ENROLLED AT THE TIME OF THE CLOSURE OF THE INSTITUTION(S)."

discharges, and liabilities that the closing schools might owe to the Department. Before Dream Center, the Department had never allowed an entity to use surety funds to cover the operating expenses that schools incurred to continue teaching students at the closing schools. The unprecedented decision resulted in Dream Center receiving more funds than its schools normally would have received had they not been closing ($57 million instead of $17 million). According to the Principal Deputy Under Secretary and data from the National Student Loan Data System provided by FSA, allowing Dream Center to use surety funds to cover the operating expenses of the 27 closing school locations through the end of December 2018 ensured that more than half of the approximately 9,300 students attending the schools could complete their education at the closing school locations or transfer to other postsecondary schools. As of November 2020, the potential closed school loan discharges for students who attended those schools totaled about $97 million for about 3,300 students.

Also, according to the Principal Deputy Under Secretary, the General Counsel for the Department determined that there was no legal prohibition on using surety funds to pay the operational expenses of schools that were closing but had not yet closed and the Secretary approved the decision.[11] The Principal Deputy Under Secretary signed the agreements allowing Dream Center to use surety funds to pay the operational expenses of schools that it was closing. The Principal Deputy Under Secretary also signed Department documents authorizing the releases of surety funds. However, both those actions are operational activities delegated to and the responsibility of the Chief Operating Officer for FSA, not the Office of the Under Secretary (Section 141 of the Higher Education Act of 1965, as amended (HEA) and a 2008 Delegation of Authority from the Secretary). (Finding 3.)

Finally, the Department's oversight was not rigorous enough to ensure that Dream Center complied with requirements for drawing down and disbursing Title IV funds. Rather than applying more rigorous cash monitoring, the Department used the same cash monitoring procedures it was using before Dream Center purchased the 13 for-profit postsecondary schools. Under those procedures, a school must first credit a student's account for the Title IV funds that the student is eligible to receive and pay any credit balance due to the student before drawing any Title IV funds.[12] However, the school is not required to provide evidence that it adhered to this requirement. We found that from July 1, 2018, through March 31, 2019, Dream Center drew down at

---

[11] The Department did not provide us records documenting the legal opinion or the Secretary's approval.

[12] A student is owed a credit balance when the amount of Title IV funds credited to a student's account for a payment period exceeds the allowable charges on the student's account for that payment period.

least $80 million in Title IV funds before its service provider paid Title IV credit balances to students (Finding 4).

## What We Recommend

We recommend that the Chief Operating Officer for FSA ensure that records of decisions regarding changes in ownership, changes in accreditation status, percentage of required letters of credit, or Title IV cash monitoring that deviate from the regulations or FSA policy are created and retained (Recommendation 1.1); design and implement policies and procedures for reviewing and approving schools' applications for conversions from for-profit to nonprofit status (Recommendation 1.2); and ensure that FSA creates and retains records explaining its decisions to deviate from prescribed policy for letter of credit requirements and temporary provisional program participation agreement extensions during a change in ownership and explaining how the interests of students and taxpayers are adequately protected (Recommendation 2.2).

We also recommend that the Secretary of Education clarify the functional statements for the Office of the Under Secretary and FSA to clearly state whether and in what circumstances the Under Secretary may, consistent with the provisions of the HEA governing FSA as a performance-based organization, exercise the Secretary's authority to direct the operations of FSA (Recommendations 2.1 and 3.1).

## Department Comments

We provided a draft of this report to Department officials for comment on January 15, 2021.[13] We received the last of the Department's comments on the draft of this report on March 12, 2021,[14] and include the full text of those comments at the end of this report (see Department Comments).

Overall, the Department stated that the draft report ignored significant relevant information that it provided; that evidence would have provided context for the decisions made regarding the Dream Center situation. The Department stated that, instead of including and discussing all available evidence, the draft report focused on certain evidence and ignored other evidence, data, and contextual explanations for the events that were the subject of the investigation. The Department further stated that when it confronts unusual, complex, or exigent circumstances, it must be able to

---

[13] The former Deputy Secretary (who was acting as Secretary at the time) and the former Chief Operating Officer for FSA.

[14] Throughout this report, we use Department to mean any component of the Department, including FSA, unless otherwise noted.

exercise flexibility and make a risk-based decision, even when that decision deviates from internal procedures. Such flexibility was required and exercised in dealing with the Dream Center situation. Decisions to deviate from standard procedures were made with input from representatives from FSA, the Office of the General Counsel, and the Office of the Under Secretary. At each decision point, the Department considered both the potential harm to students as well as to taxpayers when assessing the limited options available. As a result of the way it managed the sale and closure of the Dream Center schools, the Department helped many students complete their programs without interruption and reduced or avoided closed-school loan discharges that could have occurred if the schools had precipitously closed.

The Department disagreed with Findings 1, 2, and 3 but generally agreed with Finding 4. The Department disagreed with Recommendations 1.1 and 2.2 and neither agreed nor disagreed with Recommendations 2.1 and 3.1. It agreed with Recommendation 1.2, stating that its existing procedures should be updated to reflect its current review processes. Although the Department disagreed with Recommendations 1.1 and 2.2, it stated that FSA will prepare materials for escalation and approval by documenting deviations from standard procedures or established practices.

The Department disagreed with the conclusion in Finding 1 that responses to identified risks did not sufficiently protect students and taxpayers and that nonprofit status was retroactively approved for two schools without ensuring the schools met the Title IV definition of nonprofit. The Department stated that it complied with regulatory requirements, imposed conditions on Dream Center because of its review of the transactions, and sought to facilitate the sale of the schools to protect students and taxpayers from the effects of the potential precipitous closure of the schools.

The Department disagreed with Recommendation 1.1, stating that not all decisions are formally documented in a memorandum, but it sends emails and letters communicating and explaining its decisions to schools or other bodies. The Department agreed with Recommendation 1.2.

The Department disagreed with our conclusion in Finding 2 that it did not follow FSA's financial analysis procedures during Dream Center's sale of postsecondary schools to Education Principle Foundation and that it did not follow policy for extending temporary provisional program participation agreements. The Department stated that FSA's standard procedures are not regulatory or binding guidance and therefore allow for some flexibility. The Department stated that it made the decision to be flexible rather than applying standard procedures to transition Dream Center schools to a new owner as quickly as possible, given Dream Center's financial issues and plans to place its schools under receivership or precipitously close them.

The Department neither agreed nor disagreed with Recommendation 2.1, stating that similar situations involving closures of large multi-location schools were coordinated by the Office of the Under Secretary in conjunction with FSA. The Department disagreed with Recommendation 2.2, again stating that it sends emails and letters communicating and explaining its decisions to schools or other bodies.

The Department disagreed with our conclusion in Finding 3 that the Principal Deputy Under Secretary exceeded the authority of the position by making decisions relevant to Title IV program administration. The Department stated that the Principal Deputy Secretary's actions relevant to Dream Center were done in conjunction with FSA and the Office of the General Counsel. The Department added that the Office of the Under Secretary is tasked with assisting the Secretary in discharging the Secretary's duties and coordinating policies and activities related to FSA. The Department also stated that a precedent was set by a previous Under Secretary who was closely involved in activities surrounding other large multi-school closures.

The Department neither agreed nor disagreed with Recommendation 3.1; however, it again stated that similar situations involving closures of large multi-location schools were coordinated by the Office of the Under Secretary in conjunction with FSA.

The Department agreed with our description in Finding 4 of the processes used for monitoring payment requests for Title IV funds and generally agreed that those processes did not prevent Dream Center from violating Title IV drawdown and disbursement requirements.

## OIG Response

We did not change our findings and conclusions based on the Department's comments. However, we clarified multiple sections of the report, and we emphasized that the Department told us that it took the actions it did because it wanted to avoid the immediate closure of the Dream Center schools and the resulting negative impact on students. We also revised the report to include new information provided by the Department about the number of students affected by the Dream Center transactions and the potential closed school loan discharge liabilities. Additionally, we revised Recommendations 2.1 and 3.1 to focus them on actions that the Secretary can take to ensure that delegations of authority to the Under Secretary and FSA are clear and consistent with the requirements of section 141 of the HEA. Finally, we condensed the Results in Brief to focus on the main points of each finding.

Regarding the Department's comment that the draft report ignored significant relevant information that the Department provided, we conducted this inspection in accordance with the "Council of the Inspectors General on Integrity and Efficiency Quality Standards for Inspection and Evaluation." Those standards require that we plan and perform the

inspection to obtain sufficient and appropriate evidence to provide a reasonable basis for our findings and conclusions based on our objectives. As part of this inspection, we reviewed and considered all information and all records that the Department provided. We conducted more than 30 interviews, reviewed hundreds of records, and analyzed thousands of emails (see Scope and Methodology). We believe that evidence provides a reasonable basis for our findings and conclusions, and the presentation of the report accurately reflects and is a fair and balanced description of the Department's actions relevant to the transactions described in this report.

Regarding the Department's comments about deviating from FSA's standard procedures, throughout our report we explain that the Department's primary justifications were to avoid the immediate closure of the 13 schools that Dream Center purchased from Education Management Corporation in October 2017 and January 2018 and to avoid the resulting negative impact on students. The actions that the Department took that deviated from FSA's standard procedures included reducing the required letter of credit to facilitate Dream Center's purchase of the 13 schools, retroactively approving the nonprofit status of 2 schools to avoid terminating their eligibility to participate in the Title IV programs, and not placing any of the Dream Center-acquired schools under more stringent cash monitoring (Finding 1); extending temporary provisional program participation agreements for 4 schools despite not having needed information about approval from accreditors and State agencies and approving the nonprofit status of 2 schools without having all needed information and before making final decisions (Finding 2); and waiving the requirement for a school owner to submit 2-years of required financial statements, waiving associated letter of credit requirements, allowing letter of credit funds to be used to pay the operating expenses of closing schools, and allowing the Office of the Under Secretary to make operational decisions otherwise delegated to the Chief Operating Officer for FSA (Finding 3).

While the Department emphasized in its comments that it was justified in bypassing long-established internal control to prevent immediate closure of the schools that Dream Center purchased, the multiple deviations were not consistent with a strong system of internal control. A strong system of internal control includes but is not limited to delegations of authority, analysis of risks, and control activities, such as policies and procedures, designed to respond to identified risks. Additionally, management should have clear policy stating who can bypass certain aspects of its system of internal control. When management overrides any aspect of the system of internal control, it should ensure that such deviations, the reasons for the deviations, and the specific alternative actions taken to mitigate the risks are fully documented. The Department did not adequately document its justifications for its multiple deviations from its system of internal control. Not creating such records increases the risk that senior officials might override controls without accountability. To better emphasize the importance of

following a strong system of internal control, we added information relevant to Federal internal control requirements to Findings 1, 2, and 3. But we did not change our conclusions or our recommendations for the Secretary and Chief Operating Officer for FSA to ensure that they have clear policy governing when internal control can be bypassed and by whom.

# Introduction

## Purpose

On February 15, 2019, Senator Richard J. Durbin and Congresswoman Rosa DeLauro sent a letter requesting that the Acting Inspector General examine, among other things, the U.S. Department of Education's (Department) review and approval of Dream Center Education Holdings, LLC's (Dream Center) purchase of for-profit postsecondary schools from Education Management Corporation; its role in transactions involving Dream Center's sale of schools to Education Principle Foundation and agreements involving Studio Enterprise Manager, LLC; and its management of Title IV of the Higher Education Act of 1965, as amended (Title IV), and surety funds received by Dream Center, Education Principle Foundation, Studio Enterprise Manager, or any other service provider. We conducted this inspection in response to that request.

## Background

### Transactions Among Education Management Corporation, Dream Center, Education Principle Foundation, and Studio Enterprise Manager

In January 2017, the Department received a request from Education Management Corporation for a preacquisition review of its planned sale of 13 for-profit postsecondary schools to the nonprofit Dream Center Foundation.[15] At the request of the parties involved in an acquisition of a school, Federal Student Aid (FSA) will perform a preacquisition review and preliminarily advise the parties whether it has identified problems with the proposed transaction and any conditions that might be imposed after the change in ownership. FSA conducted the requested preacquisition review from February 2017 through September 2017.

In October 2017 and January 2018, Dream Center finalized its purchase of Argosy University, South University, and 11 Art Institutes from Education Management Corporation. These 13 schools operated 76 locations. Dream Center organized these schools under 3 main limited liability companies: Dream Center Argosy University of California, LLC; The Art Institutes International, LLC; and Dream Center South University, LLC.

In June 2018, Dream Center notified the Department that it would close as many as 39 Argosy University, Art Institute, and South University locations by the end of

---

[15] Dream Center Foundation was the sole owner of Dream Center.

December 2018. In December 2018, Dream Center closed 27 Argosy University and Art Institute locations.

On January 7, 2019, Dream Center sold 4 schools (19 locations) that it did not close (South University, the Art Institute of Atlanta, the Art Institute of Houston, and the Miami International University of Art & Design) to Education Principle Foundation. Education Principle Foundation entered into a managed services agreement with Studio Enterprise Manager to provide services such as information technology services, finance, marketing, enrollment management, and student support services. Dream Center entered into a transition services agreement with Studio Enterprise Manager. Under this agreement, Dream Center would provide finance and accounting, human resources, marketing, compliance services, academic support, information technology services, and any other managed services that Studio Enterprise Manager requested. Dream Center would provide those services until Studio Enterprise Manager could separate the Education Principle Foundation schools' information technology platforms from Dream Center's information technology platforms.

On January 18, 2019, one of Dream Center's creditors asked the United States District Court for the Northern District of Ohio to appoint a receiver over Dream Center and its subsidiaries.[16] The reason for the request was Dream Center's poor financial condition, which led to Dream Center's failure to pay for services that the creditor provided and an expectation that Dream Center would also fail to pay other creditors. Dream Center consented, and the court appointed a receiver.

On February 27, 2019, the Department denied Dream Center's October 2017 change in ownership application for Argosy University because the school failed to meet the standards for financial responsibility and administrative capability after entering receivership. The action ended Argosy University's Title IV eligibility. In March 2019, Dream Center closed all but one Argosy University location. It kept Western College School of Law open to allow graduating students to finish the semester and become eligible to sit for the bar exam. Also in March 2019, Dream Center closed all but one Art Institute location.

---

[16] A court appoints a receiver to protect property controlled by an entity sued in a court case. A receiver is a neutral third-party custodian for the property who is granted certain powers by the court. A receiver's powers generally include taking legal control of and protecting assets; filing claims on behalf of an entity placed into receivership; and, ultimately, distributing assets to investors, claimants, or creditors through a court-approved plan.

## Letters of Credit

If a school is not in compliance with the Title IV financial responsibility regulations, the Department can require it to post a letter of credit. A letter of credit is a financial instrument issued by a financial institution, such as a bank, on behalf of a school and is generally secured by collateral, such as cash reserves. The letter of credit allows the school to continue participating in the Title IV programs while mitigating the monetary risk to students, taxpayers, and the Department that might result from the school's continued noncompliance.

If the Department learns that a school has or will soon close, the school's financial situation poses a high risk to Title IV funds, or a letter of credit is expiring, the Department might collect the letter of credit funds from the financial institution that issued the letter of credit. When the Department initiates collection of these funds, the financial institution that issued the letter of credit provides the funds to the Department; the Department then places the funds in accounts that it controls. The Department may use the funds to cover costs as prescribed by the letter of credit.

Before Dream Center purchased 13 for-profit postsecondary schools from Education Management Corporation, Education Management Corporation had letters of credit totaling about $194 million to mitigate the financial risk that the schools posed to students and taxpayers. To facilitate Dream Center's purchase of the schools, the Department lowered the required letters of credit amount to about $108 million. The Education Management Corporation letters of credit allowed the funds to be used to (1) pay refunds of institutional or noninstitutional charges owed to or on behalf of current or former students, (2) provide for the teach-out of students enrolled at the time of the schools' closures, or (3) pay liabilities owed to the Department by the schools. In an October 17, 2017, letter to the Department, Education Management Corporation agreed to allow funds from its letters of credit to be used to cover the liabilities for all 13 schools regardless of ownership. The Department still told Dream Center to post its own $107,509,133 letter of credit to replace the Education Management Corporation letters of credit. However, Dream Center failed to post its own letters of credit; therefore, in May 2018, the Department drew down the entire $107,509,133 in Education Management Corporation letters of credit and placed the funds in accounts controlled by the Department's Office of Finance and Operations.

## Drawing Down and Disbursing Title IV Funds, Heightened Cash Monitoring, and Route Pay

Absent any special conditions, a school may draw down Title IV funds from the Department by submitting a request for the funds it needs to disburse to students. After drawing down the funds, the school must disburse the funds to students within 3 days and must pay applicable credit balances to students within 14 days.

When a school demonstrates a lack of financial responsibility, has significant program review or audit findings, fails to comply with reporting requirements, or receives an adverse action from its accrediting agency or State authorizing agency, the Department may place the school on heightened cash monitoring to closely monitor the schools' management of Title IV funds. Schools placed on heightened cash monitoring must make disbursements to eligible students and pay credit balances to students using non-Title IV sources of funds before drawing down funds from the Department. The Department established two levels (1 and 2) of heightened cash monitoring. A school on heightened cash monitoring level 1 may draw down funds after making disbursements to students and paying credit balances without FSA reviewing any supporting records. A school on heightened cash monitoring level 2 must provide FSA with a reimbursement request and records showing that it has already made disbursements and paid credit balances to students. FSA reviews the submissions before allowing the school to draw down the requested funds. All 13 schools purchased by Dream Center had been on heightened cash monitoring level 1 since 2007.

The Department also established "route pay." Route pay is not tied to heightened cash monitoring level 1 or 2; however, it allows FSA to scrutinize the Title IV funding provided to the school. Under route pay, FSA approves a school's request to draw down Title IV funds only after it determines that the conditions necessary for making those payments have been satisfied. The Department places a temporary hold on Title IV funds requested by a school through the Department's grants management system (G5) until an FSA school participation division director determines that the funds can be released.

## Creation of FSA and Delegation of Authority for the Administration of the Title IV Programs

Section 141 of the Higher Education Act of 1965, as amended (HEA), established in the Department a performance-based organization responsible for the delivery of Federal student financial assistance. The law states that the Secretary maintains responsibility for developing policy and regulations relevant to the Title IV programs, but the performance-based organization is granted responsibility for the administration of all Title IV programs. Specifically, the law states that the performance-based organization "shall be subject to the direction of the Secretary" but it "shall exercise independent control of its budget allocations and expenditures, personnel decisions and processes, procurements, and other administrative and management functions." The performance-based organization is to operate as a "discrete management unit responsible for managing the administrative and oversight functions supporting the programs authorized under Title IV."

In a May 2008 memorandum (Control Number EA/EN/59), the Secretary directly delegated management of and programmatic authority over the Title IV programs to the

Chief Operating Officer for FSA. This delegation did not pass through either the Deputy Secretary or the Under Secretary.

## Finding 1. The Department's Involvement in Dream Center's Purchase of Postsecondary Schools from Education Management Corporation

In January 2017, Education Management Corporation and Dream Center entered into an agreement for Dream Center to purchase Argosy University, South University, and 11 Art Institutes and convert the 13 schools from for-profit to nonprofit statuses under Department regulations. In early February 2017, Education Management Corporation asked the Department to conduct a preacquisition review (see Appendix B). FSA conducted the requested preacquisition review from February 2017 through September 2017. During and after this review, the Department identified financial risks associated with the 13 schools and Dream Center, including Dream Center's loss of the financial backing of an investor who would provide at least 50 percent of the capital for the purchase. Despite the identified risks, the Department reduced the letter of credit amount to the minimum required under the regulations and Department policy and issued temporary provisional program participation agreements to nine schools on November 30, 2017, and four schools on February 20, 2018.

On January 20, 2018, the Higher Learning Commission placed 2 of the 13 schools that Dream Center purchased (the Art Institute of Colorado and the Illinois Institute of Art) in change of control candidacy status, a preaccredited status. Because the Department recognized both as for-profit schools for Title IV purposes, the preaccredited status left both schools ineligible to participate in the Title IV programs as for-profit postsecondary schools. On May 3, 2018, to ensure the two schools did not lose their eligibility to participate in the Title IV programs, the Department approved temporary interim nonprofit statuses for both schools, retroactive to January 20, 2018. The Department took this unprecedented action without following its own procedures for ensuring that schools meet the regulatory definition of a nonprofit school.[17] From January 21, 2018, through May 2, 2018, the two schools received almost $12 million in Title IV funds.

---

[17] The Principal Deputy Under Secretary joined the Department in early 2018 and was not involved in the Department's activities relevant to FSA's preacquisition review, Dream Center's purchase of 13 for-profit proprietary schools from Education Management Corporation, or the Department's decision to approve temporary interim nonprofit status for the Art Institute of Colorado and the Illinois Institute of Art.

## Responses to Identified Risks Did Not Sufficiently Protect Students and Taxpayers

Since October 2006, the Department had required Education Management Corporation to post a letter of credit to mitigate the financial risks posed by its schools' continued noncompliance with financial responsibility regulations. When Education Management Corporation sold the 13 schools to Dream Center, the letter of credit amount was about $194 million, 15 percent of the Title IV funds that Education Management Corporation schools received in the prior award year. After identifying significant financial responsibility and administrative capability risks posed by Dream Center and the 13 schools, the Department did not take actions sufficient to mitigate the identified risks. The Department did not impose more rigorous cash monitoring restrictions or take any other administrative action against Dream Center. Instead, it reduced the amount of the letter of credit required for the schools and took unprecedented actions to ensure the schools continued eligibility to participate in the Title IV programs.

## Significant Risks Identified During FSA's Preacquisition Review

FSA identified significant financial responsibility and administrative capability risks before Dream Center finalized its purchase of 13 schools from Education Management Corporation. During its preacquisition review, FSA identified the following risks that raised questions about Dream Center's ability to satisfy Title IV financial responsibility requirements.

- Purchase of the schools would be financed with $25 million provided by an investor and $10 million in deferred payments from Dream Center to Education Management Corporation. The deferred payments ($5 million 6 months after the transaction and another $5 million 12 months after the transaction) would have to be generated from the schools' operations during the first year after acquisition, which was concerning because of the schools' history of poor financial health and declining enrollment.

- Cash flow issues would make Dream Center heavily reliant on a line of credit from a third-party lender to generate working capital.

- Dream Center might not have the operational funding or financial background necessary to operate a system of multiple schools and locations.

These risks were presented to FSA's Peer Review Board.[18] In August 2017, the eligibility analyst who presented the case to the board told other employees involved in the preacquisition review that the Peer Review Board favored requiring Dream Center to post a 25-percent letter of credit instead of the minimum 10-percent letter of credit. The recommendation to post a higher letter of credit was based on Dream Center's lack of Title IV experience and concerns about the financing arrangements for the purchase of the schools.

On September 12, 2017, FSA sent a letter to Dream Center describing the following additional risks identified during its preacquisition review.

- Dream Center Foundation and Dream Center had no experience investing in or operating postsecondary schools.

- Claims and investigations suggested historical administrative capability weaknesses at the schools, which increased the risk of the schools' losing accreditation, State licenses, and Title IV funding.

- All 13 schools had failed to meet a composite score of 1.5, the score required for a school to be considered financially responsible, every year since 2006, and scores were getting worse every year.[19]

- Declining enrollment at some of the schools could affect their financial viability.

The letter also described the following conditions that the Department was imposing on Dream Center and the 13 schools.

- **Letter of Credit:** No later than 10 business days following the change in ownership, Dream Center must post a letter of credit equal to 10 percent of the Title IV funds the schools received in the prior fiscal year.

- **Financial Reporting:** Every 2 weeks, each school must submit a 13-week projected cash flow statement to FSA.

---

[18] The Peer Review Board is a group of FSA employees who provide predecisional internal recommendations on cases brought before them.

[19] The composite score combines different measures of financial health, such as liquidity, capital resources, ability to borrow, and profitability, to yield an overall measure of a school's overall financial health.

- **Enrollment Monitoring:** Monthly, each school must submit a student roster that includes enrollment information for students taking both on-campus and online classes.

- **Notification of Changes to Servicing Agreements:** Schools must notify the Department of any changes to the existing service agreements between them and Dream Center. Additionally, the schools must notify the Department if a new or amended agreement was signed or another entity assumed any responsibility associated with the schools' operations.

On September 14, 2017, Dream Center and Education Management Corporation officials met with Department officials to discuss the letter of credit requirement. Dream Center objected to posting its own letter of credit and threatened to pull out of the deal. Pulling out of the deal would result in all 13 schools closing. According to an email from the director of FSA's Multiregional and Foreign Schools Participation Division to other FSA employees, the Acting Under Secretary and the Chief Operating Officer for FSA held firm to a 10-percent letter of credit requirement but indicated that they might be flexible in how Dream Center could fulfill the requirement.[20]

At the time of Dream Center's initial acquisition in October 2017, the Department reduced the letter of credit requirement from about $194 million to about $108 million—10 percent of the Title IV funds that the 13 schools Dream Center was acquiring received in fiscal year 2016–2017. The Department also kept all 13 schools on heightened cash monitoring level 1.

The Department did not take any additional actions to mitigate the risks identified during the preacquisition review. Instead, the Department increased the risk to students and taxpayers by reducing the required letter of credit and not placing all the Dream Center schools on heightened cash monitoring level 2.

## Significant Risks Identified After FSA's Preacquisition Review

After FSA's preacquisition review, the Department identified additional risks posed by Dream Center's purchase of the 13 schools. Shortly before the initial purchase in October 2017, an investor providing at least 50 percent of the capital for the purchase withdrew its financial support. In emails, FSA employees and the Office of the General Counsel (OGC) attorneys involved in the ongoing review expressed concerns among themselves about the purchase agreement changing at the last minute. They also

---

[20] Throughout this report, when we refer to a person by title, we are referring to the person who held the position at the time, unless otherwise indicated.

expressed concerns about the two parties rewriting the terms of the agreement without informing the Department.

Despite the Department identifying concerns during and after the preacquisition review, a compliance manager and the director of FSA's Multiregional and Foreign Schools Participation Division issued for the Secretary temporary provisional program participation agreements on November 30, 2017, and February 20, 2018, allowing all 13 schools to continue participating in the Title IV programs while the Department continued to review the acquisitions.

In a February 28, 2018, letter, the Department reiterated its requirement that Dream Center post its own letter of credit by May 1, 2018. The Department informed Dream Center that if it did not provide its own letter of credit by May 1, 2018, the Department would draw down the entire $107,509,133 letter of credit posted by Education Management Corporation. The Department also told Dream Center that it might consider terminating the 13 schools' eligibility to participate in the Title IV programs or taking other administrative action, which could include a fine or action to limit or suspend the schools' participation in the Title IV programs. On April 20, 2018, Dream Center asked the Department to extend the deadline for providing its own letter of credit to May 17, 2018. The Department granted the extension. On May 1, 2018, Dream Center asked the Department to reduce or eliminate the letter of credit requirement. The Department denied the request on May 14, 2018.

Emails between FSA employees stated that Dream Center was having difficulty getting financial institutions to support its letter of credit. These emails also revealed that Dream Center planned to close schools but did not have the funds needed to operate them through the planned closure date. On May 18, 2018, after Dream Center failed to post its own letter of credit by the deadline, the Department drew down the entire $107,509,133 in Education Management Corporation letters of credit and placed those surety funds in accounts controlled by the Department's Office of Finance and Operations. The Department did not terminate the eligibility of the 13 schools to participate in the Title IV programs or take any other administrative actions against Dream Center.

During a June 2018 meeting, Dream Center notified the Principal Deputy Under Secretary Delegated the Duties of the Under Secretary (Principal Deputy Under Secretary), FSA, and OGC that it was having financial difficulties. Dream Center alleged that the financial difficulties were caused by misrepresentations made by Education Management Corporation about the schools' financial situations and the schools' projected enrollments. Dream Center told Department officials that it would need to close as many as 39 school locations and asked for $75 million in surety funds to finance the closures. The Department agreed to release up to $50 million of the surety funds.

From August 2018 through December 2018, Dream Center continued to urge the Department to provide even more surety funds because of its dire financial situation.

According to FSA's closed school list, Dream Center closed 27 of its school locations on December 14, 2018. On January 7, 2019, Dream Center sold 4 schools (South University, the Art Institute of Atlanta, the Art Institute of Houston, and the Miami International University of Art & Design) consisting of 19 school locations to Education Principle Foundation. The Department kept the four schools sold to Education Principle Foundation on heightened cash monitoring level 1. Only after the remaining Dream Center schools were placed under receivership did the Department move them to heightened cash monitoring level 2, effective January 25, 2019.

## Regulations Provide Minimum Requirements and Considerations for Letters of Credit and Heightened Cash Monitoring

According to "Standards for Internal Control in the Federal Government,"[21] Federal agency management should identify, analyze, and respond to risks. Management can respond to risks by implementing the control activities it has designed to address those specific risks.

To mitigate financial responsibility and administrative capability risks, the Department established regulations in Title 34 Code of Federal Regulations (C.F.R.) §§ 668.15 and 668.16, respectively.[22] According to 34 C.F.R. § 668.15, to continue participating in any Title IV program, a school must demonstrate that it is financially responsible. Among other things, a school is considered financially responsible only if it provides the administrative resources necessary to comply with requirements, meets all its financial obligations, and is current in its debt payments. According to 34 C.F.R. § 668.16, among other things, a school is considered administratively capable only if it shows that it can competently administer the Title IV programs and does not have significant problems that affect its ability to administer the Title IV programs.

The Secretary may allow a school that is not financially responsible to participate in the Title IV programs under a provisional certification, provided the school posts a letter of credit in an amount determined by the Secretary but no less than 10 percent of the Title IV funds that the school received in the most recently completed fiscal year (34 C.F.R. § 668.175(f)). If the Department determines that a school is not financially responsible, it may take administrative action against the school (34 C.F.R.

---

[21] Issued by the Government Accountability Office in September 2014.

[22] Unless otherwise noted, all references to the C.F.R. are to the July 1, 2017, version.

§ 668.171(e)). Administrative actions may include a fine; limitation, suspension, or termination of the school's participation in the Title IV programs; or, for a school participating under a provisional certification, revocation of that provisional certification.

The Department has the discretion to determine the method (advance, reimbursement, or heightened cash monitoring) under which it provides Title IV funds to schools (34 C.F.R. § 668.162). FSA's "Method of Payment" procedures provide for two levels of heightened cash monitoring. Schools under heightened cash monitoring level 2 are subject to more scrutiny of their management of Title IV funds. FSA's "Method of Payment" procedures also allow FSA to place a school on "route pay." When a school is placed on route pay, FSA places a temporary hold on the Title IV funds requested by the school. FSA manually approves drawdown requests only after an FSA school participation division director determines that the conditions necessary for making those payments have been satisfied.

FSA's "Method of Payment" procedures are part of the Department's system of internal control. According to "Standards for Internal Control in the Federal Government," as part of the control environment, management defines responsibilities, assigns them to key roles, and delegates authority to achieve the entity's objectives (Principle 3.06). To achieve the entity's objectives and respond to risks, Federal agency management designs control activities. Control activities include the proper execution of transactions and appropriate documentation of transactions and internal control. Specifically, transactions are authorized and executed only by persons acting within the scope of their authority, and management clearly documents internal control and all transactions and other significant events in a manner that allows the documentation to be readily available for examination (Principle 10). According to the Government Accountability Office's "Internal Control Management and Evaluation Tool," when addressing intervention or overriding of internal control, Federal agency management should consider whether guidance exists concerning the circumstances and frequency with which intervention may be needed, consider the management levels that may take such action, and ensure that any intervention or overriding of internal control is fully documented as to reasons and specific actions taken.

## Why the Department Did Not Require More Than the Minimum Letter of Credit and Implement More Rigorous Cash Monitoring Restrictions to Protect the Interests of Students and Taxpayers

August 2017 versions of its preacquisition review letter indicated that the Department considered requiring Dream Center to post either a 25-percent or a 15-percent letter of credit to mitigate the significant financial responsibility and administrative capability risks posed by Dream Center and the 13 schools it was purchasing from Education

Management Corporation. However, after discussions among the Chief Compliance Officer for FSA, the Chief Operating Officer for FSA, and the Acting General Counsel, the Department reduced the required letter of credit to the regulatory minimum 10 percent of the Title IV funds received by the schools during the previous fiscal year.

When Dream Center purchased them from Education Management Corporation, the Department was requiring a 15-percent letter of credit from Education Management Corporation for the 13 schools. Although the Department did not retain any record of the decision to lower the requirement, according to emails, the 15-percent letter of credit imposed on Education Management Corporation was because of Education Management Corporation's poor financial condition and legal issues. According to the Chief Compliance Officer for FSA, one third of the letter of credit was attributed to Education Management Corporation's legal issues, which would not transfer to Dream Center. Additionally, according to the former Chief Operating Officer for FSA, the Chief Compliance Officer for FSA, and the Multiregional and Foreign Schools Participation Division Director for FSA, lowering the letter of credit requirement to the minimum 10 percent would facilitate the purchase by Dream Center and avoid the immediate closure of the 13 schools. Immediate closure of all 13 schools could have resulted in about 34,000 students being unable to complete their education at these schools and the Department potentially discharging as much as $925 million in student loans. Therefore, the Department decided that requiring only a 10 percent letter of credit was in the best interests of students and taxpayers. According to the September 12, 2017, preacquisition review letter and a May 14, 2018, letter from the Department to Dream Center, the Department might reconsider the required letter of credit amount after reviewing same-day balance sheets and financial statements covering an entire year of the 13 schools being operated by Dream Center.

The Department could have implemented more rigorous financial oversight procedures but instead kept all 13 schools that Dream Center acquired on heightened cash monitoring level 1.[23] Department officials did not implement more rigorous financial oversight procedures because they considered the $107,509,133 in surety funds secured by Education Management Corporation and the temporary nature of the Department's approval of the schools to participate in Title IV programs sufficient to protect the interests of students and taxpayers. In June 2018, after hearing that Dream Center planned to close as many as 39 of its school locations by the end of December 2018 because of financial difficulties, the Department still did not implement more rigorous financial oversight procedures, such as heightened cash monitoring level 2. Department

---

[23] See Drawing Down and Disbursing Title IV Funds, Heightened Cash Monitoring, and Route Pay for a description of heightened cash monitoring level 1 and level 2.

officials told us that they did not want to create further financial stress on the 13 schools, which could have caused them to immediately close.

## Lowering the Required Letter of Credit Increased Risk to Students and Taxpayers

Because the Department lowered the amount of the required letter of credit, it increased the risk that sufficient funds would not be available to cover potential liabilities resulting from the closure of Dream Center schools. When Dream Center purchased the 13 Education Management Corporation schools, the Department reduced the amount of the required letter of credit from about $194 million to about $108 million. FSA told us that $49 million of the $86 million reduction could be attributable to a decline in the Title IV funds received by the 13 schools in the previous fiscal year from $1.25 billion to $926 million. Regardless, reducing the percentage of the required letter of credit amount left the Department about $37 million less to cover (1) refunds of charges owed to or on behalf of current or former students, (2) the costs of teaching out students enrolled at the time of the schools closing, and (3) liabilities owed to the Department by the closed schools.

## Nonprofit Status Retroactively Approved without Making a Final Decision on Whether the Schools Met the Title IV Definition of Nonprofit

The Department temporarily approved the conversion of the Art Institute of Colorado and the Illinois Institute of Art from for-profit status to nonprofit status without completing its review and making a final decision on whether the two schools satisfied all aspects of the regulatory definition of nonprofit schools for Title IV purposes. Although the Department had evidence that the U.S. Internal Revenue Service recognized the two schools as organizations to which contributions were tax-deductible, it approved the conversion without determining whether the schools' net earnings would benefit any private shareholder or individual. The Department also had not yet obtained evidence that the schools were legally authorized to operate as nonprofit organizations in Colorado and Illinois, respectively.

## Higher Learning Commission Notifications

On November 16, 2017, the Higher Learning Commission provided FSA and the Office of Postsecondary Education a copy of its letter notifying Dream Center that the commission had concerns about the Art Institute of Colorado's and the Illinois Institute of Art's abilities to meet all the Higher Learning Commission's accreditation requirements following the change in ownership. The Higher Learning Commission, therefore, was requiring the two schools to accept placement in change of control candidacy status, a preaccredited status, as a condition of accrediting agency approval of the change in ownership. On January 4, 2018, Dream Center and the two schools

accepted in writing the change of control candidacy status designation. On January 19, 2018, Dream Center finalized the purchase of the two schools from Education Management Corporation.

On January 20, 2018, the Higher Learning Commission officially placed the Art Institute of Colorado and the Illinois Institute of Art in change of control candidacy status and posted a public disclosure notice on its website. The public disclosure notice stated that change of control candidacy status is not an accredited status, and students at the two schools should be aware that credits and degrees earned from the two schools would be unaccredited.[24]

The Higher Learning Commission also updated the two schools' accreditation statuses in the Department's "Database of Accredited Postsecondary Institutions and Programs." The database entries for both schools stated: "[Higher Learning Commission] approved the Change of Control, Structure or Organization, wherein assets of Education Management Corporation … are acquired by Dream Center Education Holdings. This approval subjects the [school] to transition status from accredited to a candidate for accreditation." The Art Institute of Colorado and the Illinois Institute of Art remained in a candidate for accreditation status until their closures in December 2018.

According to Higher Learning Commission officials, this was the first time the commission had used the change of control candidacy status designation, but Higher Learning Commission policy has allowed for such a designation since 2009.

> ### *Subsequent Event: The Department's and the National Advisory Committee on Institutional Quality and Integrity's Review of the Higher Learning Commission's Actions Involving the Art Institute of Colorado and the Illinois Institute of Art*
> In October 2020, after a review conducted by the Department and the National Advisory Committee on Institutional Quality and Integrity, the Deputy Secretary, acting as the designated senior department official under the Department's accrediting agency recognition regulations, determined that the Higher Learning Commission's action to move the Art Institute of Colorado and the Illinois Institute of Art to preaccredited status was not compliant with Department regulations. The Deputy Secretary required the Higher Learning Commission to submit periodic reports about its board's actions to the Department but did not limit the Higher Learning Commission's scope of recognition. This review

---

[24] The other 11 schools that Dream Center purchased were accredited by accrediting agencies other than the Higher Learning Commission. All 11 of those schools remained in accredited statuses after their change in ownership from Education Management Corporation to Dream Center.

process occurred after the period covered by our inspection; therefore, we did not inspect it.

## Retroactive Approval of Conversion from For-Profit to Nonprofit

Before and after January 20, 2018, the Department recognized the Art Institute of Colorado and the Illinois Institute of Art as for-profit schools for Title IV purposes; it had not approved the two schools' conversion to nonprofit status. Despite the Department's knowing that the schools were in candidate for accreditation status and had yet to be approved as nonprofit schools, on February 20, 2018, the director of FSA's Multiregional and Foreign Schools Participation Division signed for the Secretary temporary provisional program participation agreements for the Art Institute of Colorado and the Illinois Institute of Art. The agreements extended both schools' eligibility to participate in the Title IV programs through February 28, 2018.

The temporary provisional program participation agreements did not state whether the Department was temporarily recognizing them as nonprofit schools. On February 26 and 27, 2018, internal email discussions showed that FSA employees and OGC attorneys involved with the ongoing review concluded that the Art Institute of Colorado and the Illinois Institute of Art were ineligible to participate in the Title IV programs as of January 20, 2018, because of their existing recognition as for-profit schools and the Higher Learning Commission's placing the schools in change of control candidacy status. In the emails, these FSA employees and OGC attorneys discussed drafting a loss of eligibility letter stating that the schools were ineligible as of January 20, 2018. However, they eventually concluded that, had they received all the records needed to complete their review, it would be permissible to issue interim approvals of the two schools' conversions from for-profit to nonprofit status. The interim approval would allow the two schools to continue participating in the Title IV programs while the Department completed its review.

On March 9, 2018, the director of FSA's Multiregional and Foreign Schools Participation Division, an FSA employee involved in the ongoing review, and the Acting General Counsel discussed the change of control candidacy status with the Higher Learning Commission. According to the FSA employee, they ended the call with an understanding that the Higher Learning Commission's change of control candidacy status was a preaccredited status.

On May 3, 2018, the Department sent letters, signed by the director of FSA's Multiregional and Foreign Schools Participation Division, to the Art Institute of Colorado and the Illinois Institute of Art granting the two schools' temporary interim nonprofit status retroactive to January 20, 2018. According to the director of FSA's Multiregional and Foreign Schools Participation Division and an OGC attorney involved in the review of

the Dream Center transactions, the Department had never before granted a school temporary interim nonprofit status.

Before the Department approved the two schools' nonprofit statuses, FSA had received evidence that the schools were considered nonprofit entities by the U.S. Internal Revenue Service. However, FSA had not yet obtained evidence that the schools were authorized to operate as nonprofit organizations in all States in which they were located and had not made a final decision on whether the schools' net earnings would benefit any private individual.

## Department Regulations Require For-Profit Schools to Be Accredited and Define Nonprofit Schools for Title IV Purposes

To participate in the Title IV programs, for-profit schools must be accredited (34 C.F.R. § 600.5(a)(6)). A for-profit school in a preaccredited status is not in an accredited status.[25] Only public and private nonprofit schools are eligible to participate in the Title IV programs while in a preaccredited status (34 C.F.R. § 600.4(a)(5)).

A school that undergoes a change in ownership automatically loses eligibility to participate in the Title IV programs unless it timely submits a materially complete application to the Department for approval of the change in ownership. If the Department receives a materially complete application, it may issue a provisional program participation agreement to the school going through the change in ownership (34 C.F.R. § 600.31). The provisional program participation agreement generally extends the terms and conditions for Title IV participation that were in place before the change in ownership (34 C.F.R. § 600.20(h)).

A school seeking Title IV eligibility as a nonprofit school must meet the Department's definition of a nonprofit school. According to 34 C.F.R. § 600.2, a nonprofit school is defined as a school that (1) is owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which benefits any private

---

[25] Before November 1, 2019, the Department defined preaccredited as "a status that a nationally recognized accrediting agency, recognized by the Secretary to grant that status, has accorded an unaccredited public or private nonprofit institution that is progressing toward accreditation within a reasonable period of time" (34 C.F.R. § 600.2). On November 1, 2019, the Department removed that definition and added a definition of preaccreditation: "The status of accreditation and public recognition that a nationally recognized accrediting agency grants to an institution or program for a limited period of time that signifies the agency has determined that the institution or program is progressing toward full accreditation and is likely to attain full accreditation before the expiration of that limited period of time (sometimes referred to as 'candidacy')."

shareholder or individual; (2) is legally authorized to operate as a nonprofit organization by each State in which it is physically located; and (3) is determined by the U.S. Internal Revenue Service to be an organization to which contributions are tax-deductible in accordance with the Internal Revenue Code (26 United States Code 501(c)(3)).

Neither Department regulations nor FSA policies and procedures provide detailed instructions for reviewing an application for conversion to nonprofit status or mention temporary interim approval of nonprofit status.

## Why the Department Granted Retroactive Nonprofit Status

According to the May 3, 2018, letter granting the Art Institute of Colorado and the Illinois Institute of Art temporary interim nonprofit status, the Department decided to retroactively grant the schools temporary nonprofit status to avoid a lapse in their eligibility to participate in the Title IV programs. According to FSA, the Higher Learning Commission's unprecedented action of moving the two schools to change of control candidacy status caused the Department to expedite a decision even though FSA had not reviewed all the records it had requested from Dream Center. However, FSA employees were confident, based on the results of the part of the review that they had already completed, that the key considerations for nonprofit status would be met and temporary interim nonprofit status would be appropriate.

Even though the two schools neither had the accreditation status needed to continue participating in the Title IV programs as for-profit schools nor alternatively had approval to participate as nonprofit schools, the Department provided the Art Institute of Colorado with about $2.6 million in Title IV funds, and it provided the Illinois Institute of Art about $9.4 million in Title IV funds from January 21, 2018, through May 2, 2018. When they closed in December 2018, the two schools had not regained accreditation status with the Higher Learning Commission or received final approval from the Department to participate in the Title IV programs as nonprofit schools.

## Recommendations

We recommend that the Chief Operating Officer for FSA—

1.1 Ensure that records explaining decisions regarding changes in ownership, changes in accreditation status, percentage of required letters of credit, or heightened cash monitoring placement that deviate from the regulations or Department policy are created and retained.

1.2 Design and implement policies and procedures for reviewing and approving schools' applications for conversions from for-profit to nonprofit status.

## Department Comments

The Department disagreed with the conclusion in this finding that its responses to identified risks did not sufficiently protect students and taxpayers and that it retroactively approved nonprofit status for two schools without ensuring the schools met the Title IV definition of nonprofit. The Department also disagreed with Recommendation 1.1 and agreed with Recommendation 1.2.

### Department's Responses to Risks

The Department stated that FSA's decisions in a preacquisition review letter are preliminary and subject to a final determination when FSA completes its review of the change in ownership. The Department added that, even though it considered letter of credit amounts greater than 10 percent, it complied with regulations when it required only a 10-percent letter of credit.

Regarding the financing change described in the report, the Department stated that there is no regulatory basis for it to deny Title IV program participation following a change in ownership simply because of changes in financing arrangements. The Department stated that the impact of the change would be reviewed as part of FSA's review of the schools' same-day balance sheet. Based on that review, the Department could impose conditions on the schools' participation. The Department also stated that it already imposed additional conditions by requiring additional enrollment and financial reporting and requiring a 10 percent letter of credit.

The Department stated that Dream Center submitted the documents required for the Department to issue temporary provisional program participation agreements allowing the schools to continue participating in the Title IV programs on a month-to-month basis while FSA continued its review of the change in ownership.

As for not taking additional action against the schools, like moving them to heightened cash monitoring level 2, the Department stated that it considered the potential harm to students and taxpayers and sought to avoid creating further financial stress on the schools. According to the Department, imposing heightened cash monitoring level 2 would have likely triggered an immediate closure for all locations—as it did in early 2019 when the Department moved the schools to heightened cash monitoring level 2 after the receivership action was filed.

### Temporary Approval of Conversion from For-profit to Nonprofit Status

The Department stated that it became aware in early February 2018 that the Higher Learning Commission had removed accreditation from the Art Institute of Colorado and the Illinois Institute of Art. It also stated that the two schools were fully accredited prior to the transaction. Additionally, the Department stated that, even though it received a copy of the Higher Learning Commission's November 2017 letter to the schools

explaining that they would transition to change of control candidacy status, the letter did not fully explain what the status was, what it would mean for the schools and students, or that the schools would no longer be accredited.

Left with the choice of either refusing to issue the temporary provisional program participation agreements or issuing them and allowing the schools to continue participating on a month-to-month basis, the Department decided to issue the agreements to give it more time to evaluate the situation. After discussing the situation with the Higher Learning Commission and internally, the Department decided the best course of action was to grant temporary interim nonprofit status for the two schools. The Department stated that, even though this had not been done before, regulations did not preclude it from approving an interim change in status. The Department added that the decision to grant interim nonprofit status would best serve the students by allowing them to continue receiving Title IV funds.

The Department also disagreed with the conclusion that it provided the Art Institute of Colorado and the Illinois Institute of Art a combined $12 million in Title IV program funds from January 21, 2018, through May 2, 2018, even though neither had the accreditation status needed to participate in the Title IV programs as a for-profit school nor approval to participate as a nonprofit school. The Department stated that the letter it issued on May 3, 2018, granted the two schools' temporary interim nonprofit status effective January 20, 2018, and served as evidence of the Department's approval. The Department also stated that, even if it had not granted temporary interim nonprofit status, the schools continued to provide instruction from January 21, 2018, through May 2, 2018; therefore, most of the Title IV funds disbursed would have been permitted under 34 C.F.R. § 668.26(d).

### Recommendations

The Department disagreed with Recommendation 1.1. It stated that although the Department does not formally memorialize every decision in a memorandum, all decisions are communicated and explained in emails and letters that it sends to schools or other bodies. The Department also stated that FSA will prepare materials for escalation and approval by documenting deviations from procedures or established practices.

The Department agreed with Recommendation 1.2, stating that its existing procedures should be updated to reflect its current review processes. The Department added that FSA, in consultation with OGC, has been enhancing its procedures since 2016, taking into consideration that each change in ownership transaction is unique and needs to be reviewed on a case-by-case basis. The Department also agreed that the procedures should be expanded to cover circumstances in which a grant of temporary interim nonprofit status may be appropriate.

## OIG Response

We did not change the finding, conclusions, or recommendations based on the Department's comments.

### Department's Responses to Risks

This finding provides information about the risks that the Department identified during and after its preacquisition review and the actions it took in response. The finding states that the Department's approval for the schools to participate in the Title IV programs was preliminary. The finding also explains that 10 percent is the regulatory minimum required letter of credit, and the Department considered higher amounts before settling on the minimum 10 percent. The finding does not state that the Department's actions and decisions were not compliant with the regulations.

This finding does not state that the Department should have denied continued participation only because Dream Center's financing arrangements changed. Rather, the finding highlights the financial responsibility concerns that Department employees identified during and after their preacquisition review, the actions that the Department typically would take when it identifies such concerns, and the actions that the Department took in the case of the Dream Center situation.

### Temporary Approval of Conversion to Nonprofit Status

Although this was the first time that the Higher Learning Commission used the change of control candidacy status, the Department, Dream Center, and its schools should have understood the implication of the candidacy status that Dream Center and the schools accepted in writing. Although the November 2017 letter from the Higher Learning Commission to Dream Center did not explicitly state that the schools would no longer be accredited, it did state that Dream Center's and the schools' acceptance of the board's action would result in the Higher Learning Commission moving the schools to candidacy status. The letter also stated: "If at the time of the second focused evaluation, the institutions are able to demonstrate to the satisfaction of the Board that they meet the Eligibility Requirements, Criteria for Accreditation and Assumed Practices without concerns, the Board shall **reinstate accreditation** and place the institutions on the Standard Pathway …" [emphasis added]. Such a statement indicated that the Higher Learning Commission removed the schools' accreditation status when Dream Center and the schools accepted, in writing, the change of control candidacy status designation. If the Department, Dream Center, or school officials were confused about the designation, they could have discussed it with the Higher Learning Commission. However, after issuance of the November 2017 letter and until issuance of a public disclosure notice on January 20, 2018, none of the records that we were provided showed that the Department, Dream Center, or either school discussed the designation

with the Higher Learning Commission to learn the meaning and ramifications of a move to change of control candidacy status.

Regarding the Department's decision to approve a temporary interim nonprofit status for the schools, the finding does not state that the regulations do not allow the Department to make such a decision; it states that FSA procedures do not mention temporary interim nonprofit status. The finding also states that the Department had received information about the schools' tax-exempt status under § 501(c)(3) of the Internal Revenue Code, but it had not reached a final decision on whether the schools' net earnings would benefit any private individual, which is a regulatory requirement. Additionally, the finding explains that Department officials were confident, based on the review employees had conducted to that point, that the schools would meet the key considerations for nonprofit status. However, stating that the Department had not made a final determination is accurate. At the time of the May 3, 2018, issuance of the letter granting temporary interim nonprofit status retroactive to January 20, 2018, the Department had not received all information relevant to Dream Center's financing of the transactions. In a May 17, 2018, letter, the Department told Dream Center to provide additional documentation relevant to agreements between the schools and any of the buyers, sellers, or related parties; loan agreements; and compensation information. Dream Center provided the additional documentation on June 1, 2018. The Department typically obtains and reviews all this information before making a final decision on a school's conversion from for-profit to nonprofit status.

We do not dispute that the Department's approval made the Art Institute of Colorado and the Illinois Institute of Art retroactively eligible to participate in the Title IV programs as nonprofit schools. However, the Department did not provide us with any records that would allow us to assess the validity of its statement that, even if it had not granted temporary interim nonprofit status, most of the Title IV funds disbursed from January 21, 2018, through May 2, 2018, would have been permitted under 34 C.F.R. § 668.26(d). According to the regulation, a school may use Title IV funds it has received only if the (1) school's participation in the Title IV programs ended during a payment period (or period of enrollment for the Direct Loan Program); (2) school continued to provide educational programs to the end of the payment period or period of enrollment; (3) commitment of the funds was made before the end of the school's participation in the Title IV programs; (4) commitment of the funds was made for attendance during that payment period, period of enrollment, or a prior payment period; and (5) the first disbursement of a loan was credited to the student's account before the end of the school's participation in the Title IV programs. Based on the Higher Learning Commission's decision to place the two schools in change of control candidacy status and the Department not yet having approved the schools' conversion from for-profit to nonprofit status, the Art Institute of Colorado's and the Illinois

Institute of Art's eligibility to participate ended when they lost accreditation as for-profit schools on January 20, 2018.

*Recommendations*

We did not revise Recommendation 1.1 based on the Department's comments. We understand that in unique situations like the Dream Center transactions the Department might need to deviate from standard procedures. However, although its final decisions are reflected in communications sent to schools or other bodies, the Department's rationale for the decisions or deviations from existing policy are not necessarily included in those communications. For example, after the Department decided to reduce the required letter of credit from 15 percent to 10 percent, the Department communicated the 10-percent letter-of-credit requirement to the schools in a September 12, 2017, letter to Dream Center; however, Department records do not include any information explaining why the Department decided that the reduced letter of credit amount was still sufficient to protect taxpayers.

## Finding 2. The Department's Involvement in Dream Center's Sale of Postsecondary Schools to Education Principle Foundation

When addressing the sale of four Dream Center schools to Education Principle Foundation, the Department did not follow FSA's financial analysis procedures. On January 7, 2019, Education Principle Foundation agreed to purchase South University, the Art Institute of Atlanta, the Art Institute of Houston, and the Miami International University of Art & Design from Dream Center (see Appendix C). To facilitate the purchase, the Department agreed to limit the letter of credit requirement for Education Principle Foundation to the minimum 10 percent ($28.5 million) of the Title IV funds the four schools received in the prior fiscal year. However, the Department did not receive financial statements for the previous 2 years from the highest level of ownership (Education Principle Foundation). Therefore, according to FSA policy, the required letter of credit amount should have been 25 percent ($70.8 million) of the Title IV funds the schools received in the prior fiscal year.

Additionally, the Department did not follow FSA policy when it extended the temporary provisional program participation agreements for the four schools. On February 28, 2019, the Department issued temporary provisional program participation agreements to South University, the Art Institute of Atlanta, the Art Institute of Houston, and the Miami International University of Art & Design, that expired on February 28, 2019. When these temporary agreements expired, the Department extended them monthly without receiving evidence that the accrediting agencies and all State authorizing agencies had approved the changes in ownership.

Despite not having evidence that the accrediting agencies and all State authorizing agencies had approved the changes in ownership, the Department disbursed more than $207 million in Title IV funds to the four schools from March 1, 2019, through December 31, 2019.

### Financial Analysis Procedures Relevant to Sales of Postsecondary Schools Not Followed

On January 7, 2019, Education Principle Foundation purchased South University, the Art Institute of Atlanta, the Art Institute of Houston, and the Miami International University of Art & Design from Dream Center.[26] The Department did not obtain audited financial statements and same day balance sheets from the highest level of ownership—

---

[26] Before December 31, 2018, Education Principle Foundation was known as the Colbeck Foundation. The Colbeck Foundation was formed on December 9, 2013.

Education Principle Foundation. The Department also did not require Education Principle Foundation to provide a letter of credit in the amount of 25 percent ($70.8 million) of the Title IV funds received by the four schools during their most recently completed fiscal year. Instead, the Department required Education Principle Foundation to provide only a $28.5 million letter of credit.

## Art Institutes International Schools

Art Institutes International is the parent company of the Art Institute of Atlanta, the Art Institute of Houston, and the Miami International University of Art & Design. Education Principle Foundation is the parent company (with sole membership interest) of Art Institutes International. On January 7, 2019, the Department sent a letter signed by the Principal Deputy Under Secretary to the law firm representing Studio Enterprises, LLC, and Candlewood Special Situations Master Fund II, L.P., the two entities facilitating Dream Center's sale of the Art Institutes International schools to Education Principle Foundation. The letter stated that the Art Institutes International had to post a $6.5 million letter of credit. However, it also stated that the Department would allocate $6.5 million in surety funds that it held from the letters of credit originally posted by Education Management Corporation to satisfy the letter of credit requirement. The surety funds were to cover potential liabilities resulting from conduct that might have happened before the sale of the schools to Education Principle Foundation.

The January 7, 2019, letter further stated that the Department agreed to accept and review financial statements of the Art Institutes International instead of Education Principle Foundation to satisfy the requirement in 34 C.F.R. § 600.20(g) that a new owner provide 2 years of financial statements. In a January 15, 2019, letter, FSA noted that Education Principle Foundation had replaced Dream Center as the new nonprofit member at the highest level of the ownership.

On February 28, 2019, Art Institutes International submitted a balance sheet as of January 7, 2019, and audited financial statements for the fiscal years that ended December 31, 2017, and 2018. The balance sheet and audited financial statements were submitted at the Art Institutes International and individual school levels, rather than the highest level of ownership for the schools, Education Principle Foundation, as required by FSA's financial analysis procedures. Because the Department did not obtain 2 years of financial statements from the highest level of ownership (Education Principle Foundation) to evaluate financial responsibility, according to FSA's financial analysis procedures, the required letter of credit should have been about $16.1 million (25 percent of $64.4 million).

In a November 27, 2019, letter signed by the director of FSA's Multiregional and Foreign Schools Participation Division, the Department notified Art Institutes International that its acid test ratio (0.66:1) at the time of the change in ownership failed to meet the

1:1 acid test ratio requirement set forth in 34 C.F.R. § 668.15.[27] Therefore, it was still requiring Art Institutes International to provide a 10-percent letter of credit. However, because the $6.5 million of surety funds that the Department allocated from the funds it held represented more than 10 percent of the $64.4 million in Title IV funds that Art Institutes International received for the fiscal year that ended June 30, 2019, the Department would not require Education Principle Foundation to provide a $6.5 million letter of credit.

## Dream Center South University Schools

Dream Center South University, LLC is the parent company (with sole membership interest) of South University Savannah, LLC. South University Savannah is the parent company of the South University schools. Education Principle Foundation is the parent company (with sole membership interest) of Dream Center South University. On January 7, 2019, the Department sent a letter signed by the Principal Deputy Under Secretary to the law firm representing Studio Enterprises, LLC and Candlewood Special Situations Master Fund II, L.P., the two entities facilitating Dream Center's sale of Dream Center South University. The letter stated that, in lieu of requiring Education Principle Foundation to post a letter of credit for the South University schools, the Department would allocate $22 million of surety funds it held from the letter of credit originally posted by Education Management Corporation, provided Dream Center South University otherwise met financial responsibility requirements. In a January 15, 2019, letter signed by the director of FSA's Multiregional and Foreign Schools Participation Division, the Department noted that Education Principle Foundation had replaced Dream Center as the new nonprofit member at the highest level of ownership.

On February 28, 2019, Dream Center South University submitted a balance sheet as of January 7, 2019, and audited financial statements for the fiscal years ended December 31, 2017, and 2018. The balance sheet and audited financial statements were submitted at the Dream Center South University and individual school levels, rather than the highest level of ownership for the entity, Education Principle Foundation, as required by FSA's financial analysis procedures. Because the Department did not obtain 2 years of financial statements from the highest level of ownership (Education Principle Foundation) to evaluate financial responsibility, according to FSA's financial analysis procedures, the required letter of credit amount should have been about $54.7 million (25 percent of $219 million).

---

[27] The acid test ratio measures an organization's ability to meet short-term financial obligations. According to 34 C.F.R. § 668.15, it is calculated by adding cash and cash equivalents to current accounts receivable and dividing the sum by total current liabilities.

In a November 27, 2019, letter signed by the director of FSA's Multiregional and Foreign Schools Participation Division, the Department notified Dream Center South University that its acid test ratio (0.74:1) at the time of the change in ownership failed to meet the 1:1 acid test ratio requirement set forth in 34 C.F.R. § 668.15. Therefore, the Department was requiring Dream Center South University to post a 10-percent ($23.2 million) letter of credit. However, because it was already holding $22 million of surety funds, the Department's letter notified Dream Center South University that it was required to post only an additional $1.2 million letter of credit by December 31, 2019. On December 23, 2019, Dream Center South University asked the Department to base the letter of credit amount on the fiscal year ended December 31, 2019, which was its first year under Education Principle Foundation ownership. Without obtaining audited financial statements for fiscal year 2019, the Department agreed and determined that the Title IV funding for the fiscal year would be about $219 million. Therefore, it would not require Dream Center South University to provide an additional letter of credit—the $22 million of surety funds that the Department held exceeded 10 percent of the Title IV funding Dream Center South University schools received during the fiscal year ended December 31, 2019.

## Regulations and FSA's Financial Analysis Procedures Require a 25-Percent Letter of Credit When an Entity Does Not Provide 2 Years of Financial Statements for the Highest Level of Ownership

According to §498(i)(1) and (2) of the HEA, an otherwise eligible school that has had a change in ownership resulting in a change of control shall not qualify to participate in Title IV programs after the change in control unless it establishes that it meets certain requirements, including financial responsibility, after such change in control. Among other types of transactions, an action resulting in a change of control is the sale of the school or most of its assets.

According to 34 C.F.R. § 600.20(g), if a school undergoes a change in ownership, the Department may continue the school's participation in the Title IV programs on a provisional basis if the school submits certain records, including the new owner's audited financial statements for the two most recently completed fiscal years or equivalent information for the new owner that is acceptable to the Secretary. According to 34 C.F.R. § 668.15(a), to participate in any Title IV program, a school must demonstrate to the Secretary that the school is financially responsible. To be considered financially responsible, the school must post a 25-percent letter of credit unless it can meet certain conditions described in 34 C.F.R. § 668.15(d). These conditions include the school showing that it has met all the Department's financial responsibility standards for each of the 2 most recently completed fiscal years.

Section 13.3.2 of FSA's "Financial Analysis Procedures" states that a new owner's financial statements should be for the highest level of ownership of the school listed on the preacquisition application.

> [If] the new owner does not have two years of financials … it will be required to post an irrevocable standby [letter of credit] in the amount of 25 percent of the [Title IV] funds used by the institution during its most recently completed fiscal year prior to the Department providing the institution with a temporary provisional program participation agreement.

It further states: "the submission of equivalent information does not obviate the need for the [letter of credit] described in the preceding subsections. The equivalent information is used in the evaluation of the financial condition of the new owner prior to the acquisition of the institution."

## The Department Allowed the Office of the Under Secretary to Override Decisions Made by FSA

The Department required a 10-percent letter of credit instead of a 25-percent letter of credit because the Principal Deputy Under Secretary overruled FSA's determination that Art Institutes International and Dream Center South University should post 25-percent letters of credit. In emails, two OGC attorneys informed the Principal Deputy Under Secretary, the Chief Compliance Officer for FSA, the director of FSA's School Eligibility Services Group, and the director of FSA's Multiregional and Foreign Schools Participation Division that a 25-percent letter of credit should be required because Education Principle Foundation did not have financial statements showing at least 2 years of Title IV experience. In response to the attorneys' emails, the Principal Deputy Under Secretary stated that the regulations do not require a new owner's financial statements to show 2 years of Title IV experience. The Principal Deputy Under Secretary stated that the General Counsel, Deputy General Counsel, and the Secretary agreed with this interpretation. According to emails between the Chief Compliance Officer for FSA and the directors of FSA's School Eligibility Services Group and Multiregional and Foreign Schools Participation Division, the practice of requiring a 25-percent letter of credit in such a situation was well established and had protected students and taxpayers for years. However, FSA officials deferred to the Principal Deputy Under Secretary's decision, allowing the Principal Deputy Under Secretary to make an operational decision delegated to the Chief Operating Officer for FSA by law and a Secretarial delegation of authority.

The Principal Deputy Under Secretary signed the January 7, 2019, letter to the law firm representing the entities negotiating the sale. In the letter, the Principal Deputy Under Secretary agreed to the conditions that would allow the schools' continued participation in the Title IV programs. Authority for determining a school's eligibility for Title IV

participation and determining the conditions for that participation was delegated to FSA, not the Office of the Under Secretary.

Not requiring a larger letter of credit left the Department with less surety funds to cover the financial risks to students and taxpayers posed by the possible closure of the four schools now owned by Education Principle Foundation. Additionally, the Department set a precedent that could allow other school owners to claim financial distress and request the minimum (10-percent) letter of credit requirement. Continued approvals of letter of credit amounts lower than called for under FSA's financial analysis procedures could leave the Department with insufficient funds to (1) pay refunds of institutional or noninstitutional charges owed to or on behalf of current or former students, (2) provide for the teach-out of students if the schools close, or (3) pay liabilities owed to the Department by the schools.

## Policy for Extending Temporary Provisional Program Participation Agreements Not Followed

On February 28, 2019, the Department extended the temporary provisional program participation agreements for South University, the Art Institute of Atlanta, the Art Institute of Houston, and the Miami International University of Art & Design without receiving the records FSA policy requires for extending the agreements on a month-to-month basis. Specifically, the Department did not receive evidence that the Southern Association of Colleges and Schools Commission on Colleges, the accrediting agency for all four schools, had approved the change in ownership as of February 28, 2019. The Department also did not receive evidence that Texas and Virginia, two of the States in which the schools were authorized to operate, had approved the change in ownership as of February 28, 2019.[28] As of December 31, 2019, the Department still had not completed its review of the change-in-ownership application for the four schools.

### Accrediting Agency Approval

Southern Association of Colleges and Schools Commission on Colleges' policy states that schools are responsible for receiving prior approval for a change in ownership. The commission's January 11, 2019, letter to Dream Center stated that South University, the Art Institute of Atlanta, the Art Institute of Houston, and the Miami International University of Art & Design underwent a change in ownership on January 7, 2019, without accrediting agency approval. Because the January 7, 2019, changes in ownership occurred without prior approval, the schools and their respective branch

---

[28] Georgia and Florida, the two other States in which the schools operated, did not require for-profit postsecondary schools to obtain authorizations to operate or obtain State approval for changes in ownership.

campuses were not in compliance with the accrediting agency's policy. Although Southern Association of Colleges and Schools Commission on Colleges did not take adverse action against the four schools, it required them to submit substantive change prospectuses that its board of trustees would consider at its June 2019 meeting. All four schools' substantive change prospectuses were accepted by the accrediting agency on June 13, 2019.

## State Approval

Texas and Virginia did not approve the changes in ownership for Education Principle Foundation schools and campuses located in each State before FSA extended the schools' temporary provisional program participation agreements. A February 25, 2019, email from the Texas Higher Education Coordinating Board to the Art Institutes International stated that it was reviewing the change of ownership request for the Art Institute of Houston and branch campuses in Austin and San Antonio, the Art Institute of Dallas (a branch campus of the Miami International University of Art & Design), and South University of Austin (a branch campus of South University). The email further stated that the Texas Higher Education Coordinating Board would provide a letter regarding the change in ownership within 1 week. However, because it had not received all requested records from the schools, the Texas Higher Education Coordinating Board did not approve the change in ownership by February 28, 2019. As of December 31, 2019, the Texas Higher Education Coordinating Board still had not approved the change in ownership.

On January 16, 2019, the State Council of Higher Education for Virginia sent a letter directing Dream Center to apply for a new certificate to operate the Art Institute of Virginia Beach, a branch campus of the Art Institute of Atlanta, because of the January 7, 2019, change in ownership. The letter indicated that the school's prior authorization remained in place during the application review process but did not state that the change in ownership was approved. Dream Center subsequently submitted applications for the Art Institute of Virginia Beach on March 14, 2019, and South University campuses in Richmond and Virginia Beach on March 18, 2019. On May 20, 2019, the State Council of Higher Education for Virginia approved the change in ownership for all three school locations.

## Regulations Require Accrediting Agency and State Approval of Changes in Ownership Before Extension of Temporary Provisional Program Participation Agreements

Section 498(i)(4) of the HEA allows the Department to provisionally certify a school seeking approval of a change in ownership based on the preliminary review of a materially complete application, defined in 34 C.F.R. § 600.20(g), that is received by the Department within 10 business days of the transaction for which the approval is sought.

Additionally, a provisional certification shall expire not later than the end of the month following the month in which the transaction occurred. If the Department has not issued a decision on the application for the change in ownership within that period, the regulations state that the Department may continue such provisional certification on a month-to-month basis until such a decision has been issued.

According to 34 C.F.R. § 600.20(h)(3), the Department may extend a temporary provisional program participation agreement on a month-to-month basis only if the school submits certain records, including records showing accrediting agency and State approval of the change in ownership, by the expiration date of the agreement. Section 3.3.6 of FSA's "Eligibility Procedures" states that if the Department does not receive the records by the expiration date of a temporary provisional program participation agreement, the school loses Title IV eligibility until FSA completes its review of the application for the change in ownership.

Each of the four temporary provisional program participation agreements that the director of FSA's Multiregional and Foreign Schools Participation Group signed for the Department stated that the agreements would be extended monthly after February 28, 2019, if, before expiration, the schools provided (1) a same-day balance sheet, (2) records of approval of the change in ownership by the applicable accrediting agency, and (3) records of approval by the States in which the school operates. Otherwise, the agreement would expire, and the school would lose Title IV eligibility.

## The Department Sought to Prevent Schools from Losing Title IV Eligibility

The speed with which the transaction took place and the threat of the schools' immediate closures resulted in the Department making decisions before completing its due diligence. According to the Principal Deputy Under Secretary and FSA, the accrediting agency and all relevant State agencies were supportive of the sale of South University, the Art Institute of Atlanta, the Art Institute of Houston, and the Miami International University of Art & Design to Education Principle Foundation. According to the Principal Deputy Under Secretary and FSA, the accrediting agency and all relevant States assured the Department through phone calls and emails that accreditation and State authorization would continue during their formal reviews of the change in ownership. Department officials accepted these assurances and extended the temporary provisional program participation agreements. According to FSA, the Department accepted the assurances from the relevant entities because the sale of the schools appeared to be the only available option for saving them from receivership or immediate closure; receivership or immediate closure could have resulted in disruption of about 12,000 students' education and from $300 million to $420 million in potential closed-school loan discharges.

As of December 31, 2019, the Department still had not completed its review of the change in ownership. FSA's procedures state that if a temporary provisional program participation agreement expires, the school loses eligibility until the Department completes its review of the change in ownership. Therefore, the four schools should have been deemed ineligible to participate in the Title IV program after February 28, 2019. Yet, from March 1, 2019, through December 31, 2019, the Department disbursed more than $207 million in Title IV funds to the four schools purchased by Education Principle Foundation. The four schools that Education Principle Foundation purchased—South University, the Art Institute of Atlanta, the Art Institute of Houston, and Miami International University of Art & Design—were still open as of March 1, 2021.

## Recommendations

We recommend that the Secretary of Education—

2.1 Clarify the functional statements for the Office of the Under Secretary and FSA to clearly state whether and in what circumstances the Under Secretary may, consistent with the provisions of the HEA governing FSA as a performance-based organization, exercise the Secretary's authority to direct the operations of FSA. Authority areas that should be clarified include but are not limited to determinations regarding changes in school ownership.

We also recommend that the Chief Operating Officer for FSA—

2.2 Ensure that FSA creates and retains records explaining decisions to deviate from prescribed policy for letter of credit requirements and temporary provisional program participation agreement extensions during a change in ownership and documenting how the interests of students and taxpayers are adequately protected.

## Department Comments

The Department disagreed with the conclusion in this finding that it did not follow FSA's financial analysis procedures when addressing the sale of postsecondary schools and extending temporary provisional program participation agreements. The Department stated that FSA's policies and procedures are not regulatory or binding guidance and, therefore, allow for some flexibility. The Department made the decision to be flexible in applying the procedures to transition Dream Center schools to a new owner as quickly as possible, given Dream Center's financial issues and plan to place all its schools into receivership or precipitously close them. The Department expressed confidence in its decisions, stating that it made risk-based decisions to facilitate the sale of schools from Dream Center to Education Principle Foundation to allow thousands of students to complete their programs without interruption. The Department further stated that, if

the four schools had been placed under receivership and closed, about 12,000 students would have been affected and potential closed school loan discharges could have totaled from $300 million to $420 million.

Regarding the Education Principle Foundation purchase, the Department provided additional context about the financial issues facing Dream Center and its schools. The issues included Dream Center's inability to pay its employees and contractors. The Department stated that Studio Enterprise Manager, the service provider for Education Principle Foundation schools, had to pay contractors for both Education Principle Foundation and Dream Center schools until the schools that Education Principle Foundation purchased could be removed from the existing contracts. Studio Enterprise Manager also had to pay the salaries of the data management employees working for Dream Center because all the schools' student records were in a centralized data management system.

### Following FSA's Financial Analysis Procedures

The Department disagreed that it did not follow FSA's financial analysis procedures when it did not require 2 years of financial statements for the highest level of ownership. The Department explained that FSA's financial analysis procedures are not regulatory requirements or binding guidance. The Department explained that the abbreviated timeframe between the December 2018 meetings that it convened and the sale of the schools to Education Principle Foundation forced the Department to make quick decisions to allow flexibilities that would facilitate the sale of the schools and avoid their closures. Those decisions included accepting financial statements and same-day balance sheets from the top-level of the Art Institutes and South University entities instead of requiring them from the highest level of ownership, Education Principle Foundation. The Department stated that the information in the Art Institutes and South University financial statements provided a better assessment of the schools' financial situation than Education Principle Foundation's financial statements. It added that the Department's January 7, 2019, letter documented the management-approved exception to FSA's financial analysis procedures.

### Accreditor and State Approval

The Department disagreed that it extended the temporary provisional program participation agreements for the schools purchased by Education Principle Foundation even though the change in ownership had not been approved by the schools' accreditors and relevant State authorizing agencies. The Department stated that the Principal Deputy Under Secretary was in regular contact with accrediting agencies and State authorizing bodies and sought their verbal approval of the change in ownership before allowing the transaction to move forward. Likewise, the Department added that it received assurances that the relevant accreditors and State authorizing agencies

supported the transaction and would continue accreditation and authorization pending their final reviews of the transaction. The Department extended the temporary provisional program participation agreements based on those assurances because: "the timing and the emergency situation made it impossible for [Education Principle Foundation] to secure the final approval from [S]tate authorizing agencies and accreditors of the proposed change in ownership as required by 34 C.F.R. § 600.20(h)(3)(ii) and (iii)." Waiting for formal approvals that met the regulatory requirements would have delayed the transaction and left the schools subject to receivership or closure.

### *Recommendations*

The Department neither agreed nor disagreed with Recommendation 2.1. The Department stated that similar situations involving closures of large multi-location schools were coordinated by the Office of the Under Secretary in conjunction with FSA. Such coordination is authorized and prudent because of the potential significant impact of the closures and the number of policy decisions that need to be made.

The Department disagreed with Recommendation 2.2, stating that, although it does not formally memorialize every decision in a memorandum, communications and explanations of all decisions are reflected in emails and letters sent to schools or other bodies. The Department stated that FSA will continue to prepare materials for escalation and approval by documenting deviations from policy or established procedures.

## OIG Response

The finding already acknowledged that the speed with which the transactions occurred and the threat of school closures caused the Department to expedite its processes to facilitate the sale of the schools from Dream Center to Education Principle Foundation. We explained that the Department made its decisions relevant to the Education Principle Foundation purchase to avoid the schools entering receivership or immediately closing and the negative impact both would have had on students and taxpayers.

### *Following FSA's Financial Analysis Procedures*

The finding does not state that FSA's financial analysis procedures have the force of regulatory requirements or that they are binding guidance. However, FSA established those procedures as part of its system of internal control and based on its experiences in operating the Title IV programs since the creation of the Department. Additionally, the procedures reflect what the Department has codified in regulations. According to 34 C.F.R. § 600.20(g), a school **must submit the new owner's audited financial statements for the 2 most recently completed fiscal years or equivalent information for the new owner** [emphasis added]. In the case of the four schools that Dream Center

sold, the new owner was Education Principle Foundation, not the top-level Art Institutes and South University entities. Further, according to 34 C.F.R. § 668.15, a school must post a 25-percent letter of credit unless it can show that it has met the Department's financial responsibility standards in each of the 2 most recently completed fiscal years. In deviating from FSA's financial analysis procedures, the Department also deviated from its own regulations.

### Accreditor and State Approval

The finding explains that the Department relied on assurances from accrediting agencies and State authorizing agencies when making the decision to extend the four schools' temporary provisional program participation agreements. However, we reviewed emails from State agencies and found that, while those emails stated that the schools' authorizations would continue through the States' reviews of the change in ownership, the emails did not state that any of the State agencies had approved the change in ownership.

We did not change this finding or our conclusions relevant to the actions the Department took in addressing the sale of schools from Dream Center to Education Principle Foundation. We did revise the finding to include new information provided by the Department about the number of students potentially affected and the amount of potential closed school loan discharges that the Department sought to avoid.

### Recommendations

We revised Recommendation 2.1 based on the Department's comments. In the draft of this report, we had recommended that the Secretary direct the Office of the Under Secretary to abide by the delegations of authority that pass directly from the Secretary to the Chief Operating Officer for FSA. Because these delegations do not specifically address when the Under Secretary may direct FSA's operational decisions and actions, we revised the recommendation to clarify this point.

We did not change Recommendation 2.2 based on the Department's comments. Although we found that the Department's final decisions were reflected in communications sent to schools or other bodies, the rationale for the decisions and explanations for deviations from existing policy were not reflected in those communications. The Department's records should include such explanations to provide transparency and accountability.

## Finding 3. The Department's Drawdown and Application of Surety Funds from the Education Management Corporation Letters of Credit and How the Department Ensured the Surety Funds Were Used in Accordance with Requirements

After Dream Center failed to post its own letter of credit by May 18, 2018, the Department drew down the entire $107,509,133 in Education Management Corporation letters of credit and placed those surety funds in accounts controlled by the Department's Office of Finance and Operations (see Appendix D). The Department proceeded to allow Dream Center to use the funds to pay the operating expenses of schools Dream Center planned to close at the end of December 2018. Allowing surety funds to be used for such purposes was unprecedented, and neither the Department nor FSA had policies or procedures for such a situation. The unprecedented decision to allow such a use of surety funds left the Department less protected against liabilities resulting from Dream Center closing schools shortly after it purchased them from Education Management Corporation. The account that held the surety funds allocated for Dream Center schools started at $107,509,133. By the time the Department released funds to cover the operating expenses of the schools and returned $14.5 million to the collateral agent for Education Management Corporation's letters of credit, it had only about $53 million to pay refunds owed to or on behalf of current or former students and liabilities owed to the Department by the remaining Dream Center schools.

### Approval to Use Surety Funds to Pay the Operating Expenses of Schools That Dream Center Planned to Close

In June 2018, Dream Center notified the Department that by December 31, 2018, it would close 5 of the 13 schools and locations of 5 other schools (a total of 39 locations) it purchased from Education Management Corporation. Dream Center eventually closed 5 schools and the branch campuses of 4 other schools (a total of 27 locations).

Although it had already received Title IV funds for students attending during the period, Dream Center sought $75 million in surety funds from the Department to cover the 39 school locations' operating expenses from June 2018 through December 2018. The Education Management Corporation letters of credit that were the source of the surety funds stated that the funds could be used: "TO PROVIDE FOR THE "TEACH-OUT" OF STUDENTS ENROLLED AT THE TIME OF THE CLOSURE OF THE INSTITUTION(S)." Yet the Department authorized the use of these surety funds to pay the operating expenses of the school locations before their closure.

Before the Department released any surety funds to Dream Center, FSA employees and OGC attorneys considered the impact of allowing Dream Center to use surety funds to pay the operating expenses of school locations it was closing. According to their June 2018 calculations, the closure of all the schools that Dream Center purchased from Education Management Corporation could have exposed taxpayers to about $925 million in potential closed school loan discharges; allowing Dream Center to use surety funds to cover the operating expenses of the closing school locations could potentially reduce loan discharges to about $168 million. FSA employees and OGC attorneys also considered the potential legal questions about, as well as the precedent that might be set by, the Department allowing Dream Center to use surety funds to pay the operating expenses of closing schools. Eventually, the Department agreed to provide Dream Center with as much as $50 million of the $107,509,133 in surety funds being held to protect the interests of students and taxpayers. The Department also allowed Dream Center to use the surety funds to pay the operational expenses of the school locations it was closing.

According to the Principal Deputy Under Secretary, the General Counsel for the Department determined that using surety funds to pay the operational expenses of schools that were closing was not legally prohibited; also, the terms of the letter of credit allowed for surety funds to be used to cover the costs of providing teach-out services to students. The Principal Deputy Under Secretary also told us that the Secretary approved the decision to allow the use of surety funds to pay the operational expenses of the schools that Dream Center was closing. However, the Principal Deputy Under Secretary did not provide us with records documenting the legal opinion or documenting the Secretary's approval of the decision.

After the Department made the decision to allow the use of surety funds to pay the operating expenses of the schools that Dream Center was closing, FSA and OGC drafted addenda to the temporary provisional program participation agreements for each of the schools. The addenda set conditions on Dream Center's use of the surety funds. Specifically, the addenda stated that the Department would provide Dream Center up to $50 million in surety funds as reimbursement for operating expenses for the schools it was closing. The Department would provide Dream Center an initial reimbursement of no more than $10 million and a supplemental reimbursement of no more than $7.5 million, contingent on Dream Center submitting and the Department reviewing records showing that the expenses were allowable under the terms of the addenda. After that, Dream Center could submit requests for reimbursement of no more than $4 million every 14 days, for a total of no more than $50 million. On August 20, 2018, the Principal Deputy Under Secretary signed all nine addenda for the schools that Dream Center planned to close by the end of December 2018.

The addenda also placed requirements that Dream Center had to satisfy before the Department would reimburse it for the operating expenses of the closing schools. Specifically, the addenda required Dream Center to submit requests for surety funds and records supporting the operating expenses to an accounting firm hired by Dream Center. The addenda required the accounting firm to review the records and certify that the operating expenses for which Dream Center was seeking reimbursement were reimbursable under the terms of the addenda to the temporary provisional program participation agreements. From August 2018 through December 2018, Dream Center submitted eight reimbursement requests to the accounting firm. After its review, the accounting firm submitted to the Department an attestation report and a spreadsheet identifying the operating expenses that it determined were reimbursable under the terms of the addenda to the temporary provisional program participation agreements and those that it determined were not reimbursable. An FSA accountant or an FSA case manager would review each of the accounting firm's attestation reports and associated spreadsheets to identify any additional nonreimbursable expenses before the Department would release surety funds to Dream Center.

The Department released the initial $10 million reimbursement that Dream Center requested before the accounting firm reviewed and determined whether the submitted operating expenses were reimbursable under the terms of the addenda to the temporary provisional program participation agreements. However, the accounting firm reviewed the operating expenses associated with the initial reimbursement request when it reviewed Dream Center's submission for the supplemental $7.5 million reimbursement request. After the Department reviewed the accounting firm's report for both the initial request and supplemental request, the Department determined that Dream Center included about $3.1 million in operating expenses for schools that were not closing. Therefore, the Department reduced the reimbursement for the supplemental request to $4.4 million.

Each of Dream Center's subsequent reimbursement requests included at least $4 million in operating expenses even after removing operating expenses from previous submissions and costs questioned by the accounting firm and the Department. Therefore, the Department reimbursed Dream Center the maximum $4 million each time. For the December 7, 2018, reimbursement request, the Department agreed to waive the maximum $4 million allowed by the terms of the addenda to the temporary provisional program participation agreements. The addenda had limited reimbursements for rent to August, September, and October 2018. However, to ensure that the closing school locations could continue operating through December 31, 2018, the Department agreed to reimburse Dream Center for the closing schools' July, November, and December 2018 rent payments. For this one submission, the Department reimbursed Dream Center $9.2 million.

After FSA's review of each reimbursement submission, an OGC attorney sent an email to the Office of Finance and Operations with an attached letter signed by the Principal Deputy Under Secretary. The letter authorized the Department's Office of Finance and Operations to release surety funds to Dream Center. The Department and FSA did not have any procedures specific to this type of reimbursement process because surety funds had never before been used in this manner.

### The Department Allowed the Office of the Under Secretary to Make Operational Decisions Although Authority Had Been Delegated to FSA

The functional statement of the Office of the Under Secretary states that the Under Secretary "assists the Secretary in the discharge of Secretarial duties and responsibilities;" however, the HEA and the Secretary delegated operational management of the Title IV programs directly to the Chief Operating Officer for FSA. Despite these delegations of authority, the Department allowed the Principal Deputy Under Secretary to sign all the letters authorizing the release of nearly $39.6 million of surety funds to Dream Center from August 24, 2018, through December 27, 2018. Additionally, the Department allowed the Principal Deputy Under Secretary to sign a January 8, 2019, memorandum authorizing the release of $14.5 million of surety funds to the collateral agent for Education Management Corporation's letters of credit. In doing so, the Department allowed the Principal Deputy Under Secretary to take actions outside the delegated authority of the position. Both those activities are Title IV operational management activities delegated to and the responsibility of the Chief Operating Officer for FSA, not the Office of the Under Secretary.

### Operational Management of the Title IV Programs Delegated Directly to the Chief Operating Officer for FSA

According to Section 141 of the HEA, FSA is responsible for administering and overseeing the Title IV programs. This programmatic authority over Title IV programs was further delegated to FSA by a 2008 delegation of authority from the Secretary (Control Number EA/EN/59).

According to section 3.3 of FSA's "Eligibility Procedures," temporary provisional program participation agreements and related addenda are to be signed and issued by the appropriate director of FSA's School Participation Division or School Eligibility Service Group. Section 4 of FSA's "Financial Analysis Procedures" describes the management of letters of credit, including collecting on the letters of credit and releasing funds back to the schools, as an operational function of FSA's School Participation Division.

## Decision to Have the Principal Deputy Under Secretary Sign Documents Was a Group Decision

The Principal Deputy Under Secretary and the FSA employees and OGC attorneys involved in the ongoing review of the Dream Center transactions collectively decided that the Principal Deputy Under Secretary would sign the addenda to the temporary provisional program participation agreements and approve all releases of surety funds. They made the decision because the Chief Operating Officer for FSA at the time had not been directly involved in the transactions involving Dream Center or the Department's ongoing review of those transactions. The Principal Deputy Under Secretary, not the Chief Operating Office for FSA, worked directly with FSA's Multiregional and Foreign Schools Participation Division and OGC.

Allowing the Office of the Under Secretary to direct FSA's operations goes beyond the Office of the Under Secretary's designated function of developing policy and regulations relevant to the Title IV programs. It also circumvents the programmatic authority over the Title IV programs that the Secretary delegated to the Chief Operating Officer for FSA.

### *Using Surety Funds Diminished Financial Protections*

Typically, surety funds held by the Department are designated to cover potential refunds to students, the costs to teach-out students at other postsecondary schools, loan discharges, and liabilities that the closing schools might owe to the Department. Before Dream Center, the Department had never allowed surety funds to be used to pay the operating expenses of schools that an owner was closing. In this unprecedented case, the Department provided Dream Center with about $39.6 million more than the closing school locations normally would have received to continue teaching the students who were already enrolled. While Dream Center was closing the 27 school locations, it was drawing down Title IV funds for the students still attending those locations. From July 1, 2018, through their closures in December 2018, Dream Center drew down about $17 million in Title IV funds for these students. Despite having already received Title IV funds and tuition payments from non-Title IV sources to operate these 27 school locations, Dream Center received about $39.6 million in surety funds from the Department to pay the operating expenses of those schools for the same 6-month period.

The unprecedented decision to allow Dream Center to use surety funds to pay the operating expenses of school locations it was closing left the Department less protected against liabilities resulting from the closures. The account that held surety funds reserved for paying potential liabilities associated with the Dream Center schools started at about $93 million. Releasing about $39.6 million to cover the operating expenses of the 27 school locations that were closing left the account with only about

$53 million to pay refunds of charges owed to or on behalf of current or former students, teach-out costs for students transferring to other schools, or liabilities owed to the Department by the remaining Dream Center schools. According to the Principal Deputy Under Secretary, allowing Dream Center to use about $39.6 million in surety funds to cover the operating expenses of the 27 closing school locations through December 2018 ensured that more than half the 9,309 students attending the schools could complete their education at the closing schools or transfer to other schools. Additionally, as of November 2020, the potential closed school loan discharges for students who attended those schools was limited to about $97 million for 3,343 students.[29]

## Recommendation

We recommend that the Secretary of Education—

    3.1  Clarify the functional statements for the Office of the Under Secretary and FSA to clearly state whether and in what circumstances the Under Secretary may, consistent with the provisions of the HEA governing FSA as a performance-based organization, exercise the Secretary's authority to direct the operations of FSA. Authority areas that should be clarified include but are not limited to dealing with potential school closures and the Department's release of and approval for the use of surety funds.

## Department Comments

The Department disagreed with the conclusion in this finding that the Principal Deputy Under Secretary exceeded the authority of the Office of the Under Secretary by making operational decisions that had been delegated to the Chief Operating Officer for FSA. The Department explained that the Principal Deputy Under Secretary became involved in the Dream Center situation only after Dream Center notified the Department that it would be closing school locations and asked the Department to release surety funds to pay teach-out expenses. According to the Department, the Acting Chief Operating Officer for FSA identified the Principal Deputy Under Secretary as the person who should be responsible for making policy decisions relevant to the unique teach-out situation. In addition, the Secretary directed the Principal Deputy Under Secretary to oversee the teach-outs and the releases of surety funds.

The Department further stated that it was decided that the former Chief Operating Officer for FSA would not sign off on these decisions given that they were Title IV policy decisions. Additionally, the former Chief Operating Officer for FSA, who was originally

---

[29] FSA provided the information using data from the National Student Loan Data System.

chosen to review Dream Center's requests for reimbursement, could not review them because of a conflict of interest and suggesting to Dream Center that more than $50 million would be available to it.

Additionally, the Department stated that the decision to have the Principal Deputy Under Secretary sign the addenda to the temporary provisional program participation agreements was made in conjunction with FSA leadership. Because the Principal Deputy Under Secretary coordinated the teach-outs and the addenda included provisions related to the teach-outs, the Department decided that the Principal Deputy Under Secretary should sign the addenda and the subsequent releases of surety funds. According to the Department, the Principal Deputy Under Secretary's actions were consistent with precedent set by a former Under Secretary during the closures of two other large school systems. In those situations, a former Under Secretary negotiated the sale of the schools from one company to another, executed operating and other agreements, directed FSA's actions relevant to Title IV drawdowns for the closing schools, and managed enforcement actions against the closing school systems.

Finally, the Department explained that the Principal Deputy Under Secretary's actions were consistent with the functional statement of the Office of the Under Secretary and the law, stating that FSA was subject to the direction of the Secretary. The functional statement for the Office of the Under Secretary states that the Under Secretary "assists the Secretary in the discharge of Secretarial duties and responsibilities" and "coordinates policies, programs and activities related to" among other things, "college grant aid, and the Federal Student Aid." According to the Department, once the Secretary made the decision to release the letter of credit proceeds, the process of releasing those proceeds involved both policy decisions and operational matters. Additionally, the Principal Deputy Under Secretary's signing of the addenda to the schools' temporary provisional program participation agreements and the letters authorizing the releases of surety funds were taken to implement the Secretary's policy decision and made with input from FSA and OGC; therefore, the actions were consistent with the duties of the Office of the Under Secretary.

## OIG Response

We did not revise the finding based on the Department's comments. The finding does not state that the Principal Deputy Under Secretary's involvement in discussions about school closures or the relevant decision-making processes was inappropriate. However, the administrative actions of signing addenda to temporary provisional program participation agreements and releasing surety funds are Title IV management decisions

that the HEA and a Secretarial delegation of authority assign to the Chief Operating Officer for FSA.

The Department has not provided any records documenting that the former Chief Operating Officer for FSA or other FSA officials were involved in the decision to have the Principal Deputy Under Secretary sign the addenda to the temporary provisional program participation agreements. We found documentation that FSA and OGC employees did not have a clear understanding of which senior official would sign the addenda to the temporary provisional program participation agreements. Email communications on Friday, August 17, 2018, showed that FSA and OGC employees expected the former Chief Operating Officer for FSA to sign the addenda. However, on Monday, August 20, 2018, the Principal Deputy Under Secretary signed all the addenda to the temporary provisional program participation agreements. Department records do not explain the reason for the change in signatory, the conflict of interest that resulted in the former Chief Operating Officer for FSA being excluded from the process, or the Secretary's assignment of oversight of the processes to the Principal Deputy Under Secretary.

Regarding a former Under Secretary setting a precedent, this inspection only covered the Department's involvement in the transactions relevant to Dream Center's purchase and sale of postsecondary schools, the Department's handling of surety funds, and the Department's monitoring of the use of those surety funds. Analyzing the circumstances surrounding previous decisions and the corresponding departmental actions were not within the scope of this inspection.

Finally, we recognize that section 141(b)(1) of the HEA provides that, in carrying out its functions, FSA is subject to the direction of the Secretary. We also acknowledge that the functional statement of the Office of the Under Secretary states that the Under Secretary assists the Secretary in the discharge of Secretarial duties and coordinates policies; programs; and activities related to, among other things, college grant aid and Federal Student Aid. However, the functional statement for the Office of the Under Secretary does not state that the Under Secretary exercises the Secretary's authority to direct the decisions and operational actions of FSA. Additionally, the Department did not provide us with any records documenting that the Secretary directed the Principal Deputy Under Secretary to direct the process of releasing surety funds to pay the operating expenses of the closing school locations. Operational management of the Title IV programs is delegated to the Chief Operating Officer for FSA. Neither the 1998 amendments to the HEA nor the Secretarial delegation of authority for administering the Title IV programs state that authority from the Secretary passes through the Office of the Under Secretary. Absent a delegation of those responsibilities to the Office of the Under Secretary, such operational decisions remain delegated to the Chief Operating Officer for FSA. The Department's interpretation of the functional statement would set

a precedent and allow the Under Secretary to direct any operational action of and make any decision for FSA based on the Secretary providing oral approval to the Under Secretary without creating a record of the approval or delegation of authority.

We modified Recommendation 3.1 to recommend that the Secretary clarify the functional statements for the Office of the Under Secretary and FSA to clearly state whether and in what circumstances the Under Secretary may exercise the Secretary's authority to direct the operations of FSA, including dealing with possible school closures and the use and release of surety funds.

## Finding 4. The Department's Actions to Ensure That Dream Center Complied with Requirements for Drawing Down and Disbursing Title IV Funds

The Department applied FSA's standard procedures for overseeing Dream Center's drawdown and disbursement of the Title IV funds. However, these standard procedures were not rigorous enough to ensure that Dream Center complied with requirements for drawing down and disbursing Title IV funds, including the payment of credit balances. As a result, Dream Center was drawing down about $80 million in Title IV funds before its service provider made credit balance payments to Argosy University students. Additionally, the Department ended up cancelling or discharging more than $30 million in Federal student loans for students who attended Argosy University and three Art Institutes.

### Monitoring Requests for Title IV Funds

Typically, a school may draw down Title IV funds from the Department by submitting a request for the funds it needs to disburse to students within the next 3 business days. The school must pay any resulting credit balances to students within 14 days. The Department does not scrutinize the draw down request or require the school to prove it timely paid credit balances to students.

However, when a school demonstrates a lack of financial responsibility, repeatedly fails to comply with reporting requirements, or receives an adverse action from its accrediting or State authorizing agency, the Department may place the school on heightened cash monitoring to more closely monitor its management of Title IV funds. A school placed on heightened cash monitoring is supposed to first make disbursements and pay credit balances to eligible students using non-Title IV sources of funds before drawing down funds from the Department.

For a school on heightened cash monitoring level 1, the Department does not review any supporting records before allowing the school to draw down Title IV funds. A school on the more rigorous heightened cash monitoring level 2 must submit a reimbursement request along with records showing that it made disbursements to students and paid credit balances. An FSA payment analyst reviews a sample of the students for whom the school is seeking reimbursement. The Department will release the requested Title IV funds only if the FSA payment analyst's review does not identify any errors.

The Department also established "route pay." Route pay is not specifically tied to either heightened cash monitoring level 1 or 2; however, it allows FSA to scrutinize Title IV funding requests before the Department releases the Title IV funds requested. Under

route pay, the Department places a temporary hold on a school's drawdown requests until FSA determines that the conditions necessary for making those payments have been satisfied. According to the FSA payment analyst tasked with reviewing Dream Center's drawdown requests, the Department required Dream Center to submit rosters of students for whom it was requesting Title IV funds. The FSA payment analyst reviewed the rosters and verified that the total amount requested for the students matched the total amount shown in the submitted records.

## The Department's Standard Procedures Did Not Ensure That Dream Center Complied with Requirements for Drawing Down and Disbursing Title IV Funds

The Department placed all schools owned by Education Management Corporation on heightened cash monitoring level 1 in 2007. That status continued for all the schools after Dream Center purchased them. On December 21, 2018, the Department placed Dream Center-owned schools on route pay. On January 25, 2019, it placed Argosy University, the Art Institute of Pittsburgh, the Art Institute of Seattle, and the Art Institute of Las Vegas schools on heightened cash monitoring level 2, after the schools entered receivership.[30]

The Department followed its standard procedures for overseeing schools on heightened cash monitoring level 1 and route pay. However, these standard procedures did not ensure that Dream Center complied with the requirements for drawing down Title IV funds or paying credit balances. Following standard oversight procedures in an unprecedented situation in part resulted in the Department cancelling or discharging more than $30 million in Federal student loans for students who attended the Dream Center-owned Argosy University and three Art Institute schools.

## Noncompliance with Heightened Requirements for Drawing Down Title IV Funds and Paying Credit Balances

A school must hold Title IV funds in trust for the intended beneficiaries. As a trustee of those funds, a school may not use them for any other purpose or otherwise engage in any practice that risks the loss of those funds (34 C.F.R. § 668.161(b)). A school's request for reimbursement may not exceed the amount of the disbursements that the school has made to the students included in that request. Before a school under heightened cash monitoring may submit a request to draw down Title IV funds, it must first credit

---

[30] Dream Center sold South University and three Art Institutes schools (the Art Institute of Atlanta, the Art Institute of Houston, and the Miami International University of Art & Design) to Education Principle Foundation on January 7, 2019.

a student's account for the Title IV funds that the student is eligible to receive and pay any credit balance due to the student (34 C.F.R. § 668.162(d)).

We obtained records accounting for Dream Center's Title IV funds from July 1, 2018, through March 31, 2019, from Studio Enterprise Manager and the service provider through which credit balances were paid to students. The records included general ledgers, student-level ledgers, student account records, and credit balance payment records for Argosy University; Art Institutes International; and Dream Center South University. The records covering July 1, 2018, through December 31, 2018, showed more than $282 million of Title IV drawdowns. The total Title IV drawdowns matched, in all material respects, what was recorded in G5.[31]

We analyzed the general ledgers, student-level ledgers, student account records, and credit balance payment records for Argosy University and concluded that Dream Center did not comply with the requirements for drawing down Title IV funds and paying credit balances to students for schools subject to heightened cash monitoring level 1. We identified 20,654 student terms in which records showed more than $131 million in Title IV disbursements.[32] Dream Center drew down about $80 million in Title IV funds for 10,821 student terms before the service provider made credit balance payments to the students. Of about $52 million drawn down for 9,833 student terms, about $3 million in drawdowns for 638 student terms showed credit balance payments made on or before the dates of the drawdown. For about $49 million in drawdowns for the remaining 9,195 student terms, we could not compare the timing of G5 drawdowns with credit balance payments because we could not attribute the student terms to specific G5 drawdowns or the records did not show that the credit balance payments were paid (see Analysis of Dream Center Drawdowns and Credit Balance Payments).

### Unpaid Credit Balances

In late January and early February 2019, Argosy University students started alleging that they were not receiving their credit balance payments. When the Department learned that the students were not receiving their credit balance payments, the Department rejected all Dream Center schools' pending drawdown requests because neither it nor

---

[31] For 1 of the 6 months, the amount for Art Institutes International was off by $18,403.

[32] A student term is a unique academic term for which Dream Center records showed transactions in a student's account during our review period. A student was counted more than once if records showed transactions relevant to that student for more than one term. For example, if a student attended for three academic terms and had Title IV funds credited to their account for each term, we counted this as three student terms.

the schools could determine which students had or had not been paid the credit balances that they were owed. Reports in the media alleged that Dream Center had not paid $13 million in credit balances to Argosy University students.

In February 2019, the court-appointed receiver for the Dream Center schools submitted to the Department a disbursement request and a list showing about $16 million in unpaid credit balances. Based on our review of accounting records, neither Dream Center nor the schools ever drew down the Title IV funds for the students on the receiver's unpaid credit balances list, and the students never received the credit balance payments. The last drawdown of Title IV funds by Dream Center-owned schools during our review period occurred on January 29, 2019.

## Loan Cancellations and Discharges

The Department researched options to remedy the missing credit balance payments situation. The Principal Deputy Under Secretary and FSA employees and OGC attorneys involved with the Department's activities involving the Dream Center transactions concluded that the Department did not have the authority to pay credit balances directly to students. Therefore, on March 7, 2019, the Department cancelled or discharged all the more than $30 million in Federal student loans for 4,021 borrowers attributable to the Spring 2019 semester at Argosy University, the Art Institute of Pittsburgh, the Art Institute of Seattle, and the Art Institute of Las Vegas. The Department also reset the students' eligibility usage for the Federal Pell Grant program.

Under normal circumstances, a student must have been enrolled at a school within 120 days of its closure to be eligible for a closed school loan discharge. On October 30, 2019, the Secretary approved an extension of the timeframe for which students of Dream Center-owned schools would be eligible for closed school loan discharges. Given the circumstances surrounding and continued troubles of Dream Center schools, the Secretary agreed to extend eligibility to all students who were enrolled as of June 29, 2018, 168 days before the Dream Center-owned schools closed in December 2018. For students who attended the Art Institute of Colorado and the Illinois Institute of Art, the Secretary extended discharge eligibility to students enrolled as of January 20, 2018 (328 days before the schools closed), the date that the Higher Learning Commission placed the schools in change of control candidacy status.

As of February 20, 2020, the Department had cancelled or discharged more than $128 million in Federal loans for students who attended Dream Center schools. The Department has estimated that at least $500 million more in student loans could potentially be discharged because of Dream Center's closing 9 of the 13 schools about 1 year after purchasing them from Education Management Corporation.

## Recommendations

We do not have any recommendations relevant to this finding because the events that took place were caused by the now-closed Dream Center's noncompliance with Title IV requirements or in part by the actions described elsewhere in this report (see Finding 1).

## Department Comments

The Department agreed with the finding's description of its standard processes for monitoring payment requests for Title IV funds and agreed that the processes did not prevent Dream Center from violating Title IV drawdown and disbursement requirements.

# Appendix A. Scope and Methodology

Our inspection covered the transactions involving the (1) sale of 13 Education Management Corporation-owned schools to Dream Center, (2) sale of 4 Dream Center-owned schools to Education Principle Foundation, and (3) servicing agreements between Dream Center, Education Principle Foundation, and Studio Enterprise Manager. Our inspection also covered the Department's management and oversight of Title IV and surety funds provided to Dream Center. We only considered the actions the Department took from January 1, 2017, through December 31, 2019, that were relevant to these four areas. Our inspection did not include the Department's interactions with the Higher Learning Commission over the commission's action to place the Art Institute of Colorado and the Illinois Institute of Art in change of control candidacy status.

To achieve our objectives, we gained an understanding of the law (sections 141 and 498 of the HEA), regulations (34 C.F.R. §§ 600.20, 668.15, 668.16, 668.162, and 668.175), and FSA policies and procedures ("Eligibility Procedures," "Financial Analysis Procedures," and "Method of Payment Procedures") relevant to changes in ownership, financial responsibility, administrative capability, letters of credit, and Title IV cash management.

We also reviewed the following records:

- purchase agreements, managed services agreements, transition services agreements, credit agreements, audited financial statements, and supporting documents relevant to the transactions among Education Management Corporation, Dream Center, Education Principle Foundation, and Studio Enterprise Manager;

- accreditor and State agency approvals of the changes in ownership from Education Management Corporation to Dream Center and from Dream Center to Education Principle Foundation;

- correspondence between the Department and Education Management Corporation, Dream Center, Education Principle Foundation, Studio Enterprise Manager, or their representatives;

- analyses relevant to FSA's review of the transactions among Education Management Corporation, Dream Center, Education Principle Foundation, and Studio Enterprise Manager;

- temporary provisional program participation agreements for the schools acquired by Dream Center and the schools subsequently acquired by Education Principle Foundation;

- emails sent or received by the chief executive officer and other Dream Center officials;

- emails sent or received by Department employees who were involved in reviewing, analyzing, and making decisions relevant to the transactions;

- letters of credit posted by Education Management Corporation;

- August 20, 2018, addenda to the temporary provisional program participation agreements for the schools that the Department allowed surety funds to be used to pay for the operating expenses of 27 school locations from August 2018 through December 2018;

- eight attestation reports (dated September 5, September 24, October 9, October 23, November 21, December 7, December 13, and December 17, 2018) submitted by the accounting firm that Dream Center hired to review its requests for surety funds;

- correspondence from the Department authorizing seven releases of surety funds to Dream Center, dated August 24, September 18, October 2, October 18, November 21, December 11, and December 27, 2018;

- G5 transactions for all Dream Center-owned schools and locations from July 1, 2017, to December 31, 2019;

- general ledgers covering October 1, 2017, through May 31, 2019, for Dream Center, Argosy University, Art Institutes International, and Dream Center South University;

- student-level ledgers covering July 1, 2018, through March 31, 2019, for Argosy University;

- monthly bank statements for all accounts used by Dream Center schools to disburse Title IV funds and pay credit balances to students from August 2018 through April 2019;

- records of credit balance payments that Dream Center made through a service provider from July 1, 2018, through March 31, 2019;

- a roster of unpaid stipends and a drawdown request submitted by the court-appointed receiver for Dream Center in February 2019; and

- a draft deliberative document showing a brief monthly timeline of events and potential closed school loan discharges for students who attended Dream Center schools.

Finally, we interviewed the following:

- the Principal Deputy Under Secretary;

- Office of Postsecondary Education officials and employees: Deputy Assistant Secretary for Policy, Planning, and Innovation; Director of the Accreditation Group; and two Education Program Specialists in the Accreditation Group;

- FSA officials and employees: the Chief Operating Officer who subsequently served as Chief Strategy and Transformation Officer; a Deputy Chief Operating Officer who previously served as Chief Compliance Officer; the director of the School Eligibility Services Group; the director of the Multi-Regional and Foreign Schools Participation Division; three compliance managers in the Multi-Regional and Foreign Schools Participation Division; a case manager; a financial analyst; an accountant; a payment analyst; a program analyst; and the director of Program Management Services;

- three OGC attorneys who were responsible for reviewing the various transactions and providing legal guidance about decisions relevant to Dream Center;

- the accountant and program analyst from the Department's Office of Finance and Operations who managed the account holding surety funds from Education Management Corporation's letter of credit;

- the presidents of the 6 regional accrediting agencies that accredited the 13 for-profit postsecondary schools purchased by Dream Center and officials of those agencies who were assigned to oversee the schools;[33]

- the court-appointed receiver charged with managing the remaining Dream Center schools starting in January 2019; and

---

[33] Accrediting Council for Independent Colleges and Schools, Higher Learning Commission, Middle States Commission on Higher Education, Northwest Commission on Colleges and Universities, Southern Association of Colleges and Schools Commission on Colleges, and Western Association of Schools and Colleges Senior College and University Commission.

- two Studio Enterprise Manager employees who previously worked for Dream Center and had a general understanding of the Dream Center accounting records that we reviewed.

## Analysis of Drawdowns and Credit Balance Payments

As part of our work to describe how FSA ensured that Dream Center complied with requirements for drawing down and disbursing Title IV funds, we obtained the following records:

- all Argosy University award year 2017–2018 and award year 2018–2019 Title IV transactions as recorded in G5;

- Dream Center schools' general ledgers for October 1, 2017, through May 31, 2019;

- Argosy University student-level ledgers for July 1, 2018, through March 31, 2019;

- rosters of credit balance payments that the service provider for Dream Center made to students from July 2017 through February 2019; and

- the service provider's monthly bank statements showing deposits by Dream Center and credit balance payments to students for August 2018 through April 2019.

The Argosy University student-level ledgers showed 48,427 unique student terms in the student accounts receivable account. Each entry on the rosters of credit balance payments had a unique batch number. Each transaction shown on the service provider's monthly bank statements indicated the unique batch number to which it was assigned. We traced the total dollar amounts for all batch numbers on the rosters of credit balance payments to the service provider's bank statements. We then compared the date that Dream Center deposited funds for each batch into the bank account from which the service provider paid students and to the associated roster of credit balance payments to determine the date on which the service provider for Dream Center paid credit balances. We used the deposit date as the date that the credit balances were paid to the students.

Next, we assigned a drawdown date to each disbursement transaction recorded in G5, applying the assumption that the funds of the earliest drawdown for a Title IV award would be applied to the earliest disbursement transactions posted to the student-level ledger. For example, the date of the first $1 million drawdown for a Title IV award would be applied to the first $1 million in disbursements posted to the student-level ledger. We continued this process until all G5 drawdowns for an award were exhausted. We did

this for all Title IV programs for which the schools received funds for award years 2017–2018 and 2018–2019.

Of the 48,427 unique student terms in the Argosy University student accounts receivable account, 20,654 included a Title IV disbursement (see Table 1). We separated these 20,654 student terms into 6 groups: tuition charged and Title IV aid posted to the account (further grouped by a credit balance amount of zero, credit balance, or debit balance) and no tuition charged but Title IV aid was posted to the account (further grouped by a credit balance amount of zero, credit balance, or debit balance). We analyzed the timing of disbursements and credit balance payments for each of the six groups.

**Table 1. Breakdown of Student Terms Based on Final Balance and Tuition Charges**

| Student Account Balance Status | Tuition Charged and Title IV Aid Posted to the Account | No tuition Charged but Title IV Aid Posted to the Account | Total |
|---|---|---|---|
| Final balance was zero | 5,211 | 652 | 5,863 |
| Final balance was a credit balance | 5,116 | 4,540 | 9,656 |
| Final balance was a debit balance | 4,260 | 875 | 5,135 |
| Total Student Terms | 14,587 | 6,067 | 20,654 |

## Use of Computer-Processed Data

To describe how FSA ensured that Dream Center complied with requirements for drawing down and disbursing Title IV funds, we relied in part on computer-processed data provided by Studio Enterprise Manager on behalf of Dream Center and rosters of credit balance payments provided by the third-party service provider hired by Dream Center.

Studio Enterprise Manager provided us with a chart of accounts and general ledgers covering October 1, 2017, through May 31, 2019, for Argosy University, Art Institutes International, and Dream Center South University. Studio Enterprise Manager also provided us with Argosy University student-level ledgers covering July 1, 2018, through March 31, 2019. To assess the reliability of the general ledgers and student-level ledgers, we confirmed that the query Studio Enterprise Manager used to assemble the data included the correct period (July 1, 2018, through March 31, 2019) covered by our

request. We also confirmed that the general ledgers provided by Studio Enterprise Manager accurately reflected all Dream Center's Title IV drawdowns from July 1, 2018, through March 31, 2019, by comparing them to G5 and the bank statements for the accounts into which the schools deposited Federal funds. The ledgers provided by Studio Enterprise Manager for the four schools that Dream Center sold to Education Principle Foundation were only through January 7, 2019, the closing date of the sale. Therefore, we could not confirm that all entries in the general ledgers and student-level ledgers for the four schools were included in the records assembled by Studio Enterprise Manager.[34]

We also relied on rosters of credit balance payments made to students provided by the third-party service provider that Dream Center hired to pay credit balances to students. To assess the reliability of the rosters of credit balance payments, we compared the total credit balance payments for a group of students to the corresponding entry on the bank statements for the accounts from which Dream Center paid credit balances to students.[35] The bank statements showed that the amounts listed on the rosters of credit balance payments were paid.

Because we received Dream Center's accounting records only from July 1, 2018, through March 31, 2019, and the accounting records might not have been closed out completely after the schools closed, we could not determine whether the records that we were provided reflected all accounting transactions for all students attending the 13 schools Dream Center purchased from Education Management Corporation. Also, the accounting records that we were provided were not sufficiently reliable to confirm that all credit balances due to all students attending the 13 schools were paid in full.

## Compliance with Inspection Standards

We conducted this inspection in accordance with the "Council of the Inspectors General on Integrity and Efficiency Quality Standards for Inspection and Evaluation." Those standards require that we plan and perform the inspection to obtain sufficient and appropriate evidence to provide a reasonable basis for our findings and conclusions based on our objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our objectives.

---

[34] We did not obtain direct access to Dream Center's systems to verify the completeness or accuracy of the records.

[35] The third-party service provider grouped credit balance payments to students in batches. The assigned batch numbers were shown on the credit balance rosters and in the bank statements.

We conducted our inspection at the Department's offices in Washington, D.C. and Kansas City, Missouri; Dream Center's former office in Pittsburgh, Pennsylvania; the accounting firm's office in Naperville, Illinois; and our offices from May 2019 through July 2020. We discussed the results of our inspection with Department officials on December 18, 2020, and provided them a draft of this report on January 15, 2021.

# Appendix B. Timeline Relevant to Dream Center's Purchase of 13 For-Profit Postsecondary Schools from Education Management Corporation

**Early February 2017**

Education Management Corporation submitted a request to the Department for a preacquisition review of the planned sale of 13 for-profit postsecondary schools to the nonprofit Dream Center.

**February 17, 2017**

The FSA eligibility analyst assigned to conduct the preacquisition review sent an email to Education Management Corporation requesting records needed to start the preacquisition review. After reviewing the records, the FSA eligibility analyst identified financial responsibility and administrative capability concerns about Dream Center's purchase of schools from Education Management Corporation.

**May 15, 2017**

The president and chief executive officer of Education Management Corporation sent a letter to the Secretary defending Education Management Corporation and the planned sale of schools to Dream Center against criticisms included in a joint letter from organizations representing students, consumers, veterans, and servicemembers. The president and chief executive officer of Education Management Corporation asked the Department to review the transaction objectively.

**May 16, 2017**

The managing director of Dream Center Foundation sent a letter to the Secretary defending the transaction against criticisms included in a joint letter from organizations representing students, consumers, veterans, and servicemembers. The managing director requested a meeting with the Secretary to discuss the proposed transaction.[36]

**August 10, 2017**

After receiving advice from the director of FSA's School Eligibility Services Group, the FSA eligibility analyst assigned to conduct the preacquisition review presented the details about the acquisition and concerns about Dream Center to the Peer Review

---

[36] Department records do not indicate whether a meeting took place.

Board. According to the FSA eligibility analyst's emails, the Peer Review Board favored the Department requiring a letter of credit equal to 25 percent of the schools' prior-year Title IV funds because Dream Center lacked Title IV experience. The emails further explained that the board also had concerns about how Dream Center was financing the purchase. After discussions between the Chief Operating Officer for FSA, the Chief Compliance Officer for FSA, and the Acting General Counsel for the Department, the Department reduced the required letter of credit to 10 percent of the Title IV funds that the schools received in the prior year.

**September 12, 2017**

The Department sent a preacquisition review letter, signed by the director of FSA's Multiregional and Foreign Schools Participation Division, to Dream Center and Education Management Corporation. The letter stated that the Department did not see any impediment to Education Management Corporation's request for approval of the change in ownership or its request for approval of the 13 schools' conversion from for-profit to nonprofit status following the change in ownership. However, the letter described concerns identified during the preacquisition review. It also described conditions for preliminary approval that the Department would include in the schools' provisional program participation agreements. The letter described the following concerns.

- The schools faced claims and investigations that suggested historical administrative and operational weaknesses, which could lead to the risk of loss of accreditation, State licensing, and continued Title IV funding.

- Acquisition of the schools would be financed by $25 million provided by a private investor but $10 million in deferred payments over the first year would have to be generated from the 13 schools' operations.

- Two schools (the Art Institute of Fort Lauderdale and the Art Institute of Phoenix) accredited by the Accrediting Council for Independent Colleges and Schools, which lost recognition by the Department,[37] could lose Title IV eligibility if they did not obtain accreditation from a new federally recognized accrediting

---

[37] The Department terminated its recognition of the Accrediting Council for Independent Colleges and Schools on December 12, 2016. On April 3, 2018, the Department restored the recognition retroactive to December 12, 2016.

agency. The letter stated that the two schools would immediately lose Title IV eligibility if they were included in the planned October 2017 sale.[38]

**September 14, 2017**

Dream Center and Education Management Corporation officials met with Department officials to discuss the letter of credit requirement. Dream Center contested the letter of credit requirement and threatened that it would not complete the deal and the schools would close if the Department required Dream Center to post its own letter of credit.

**September 28, 2017**

Dream Center and Education Management Corporation officials met with the Acting Under Secretary, the Acting General Counsel, the Chief Operating Officer for FSA, Chief Compliance Officer for FSA, and director of FSA's Multiregional and Foreign Schools Participation Division to discuss the financial structuring of the letter of credit requirement and the possibility of the Department approving the sale of the Art Institute of Fort Lauderdale and the Art Institute of Phoenix as part of the planned October 2017 sale of schools. According to an email sent the same day from the director of FSA's Multiregional and Foreign Schools Participation Division to FSA employees and the OGC attorney reviewing the acquisition, the Department agreed to hold Education Management Corporation's letter of credit at a lower amount to cover schools sold to Dream Center and schools not sold to Dream Center. The email also noted that the Acting General Counsel, after consulting with counsel for Dream Center, advised the Chief Operating Officer for FSA that the Art Institute of Fort Lauderdale and the Art Institute of Phoenix could be included as part of the first planned sale of schools.

**September 29, 2017**

Counsel for Dream Center sent the director of FSA's Multiregional and Foreign Schools Participation Division and the Chief Compliance Officer for FSA suggestions for amendments to the preacquisition review letter. Counsel for Dream Center recommended that the Department change the section of the letter regarding two schools (the Art Institute of Fort Lauderdale and the Art Institute of Phoenix) accredited by the Accrediting Council for Independent Colleges and Schools. Counsel for Dream Center suggested that an updated preacquisition review letter should state that

---

[38] According to the preacquisition review letter, Education Management Corporation and Dream Center planned to finalize the sale of the 13 schools in 2 transactions. The first transaction would be finalized in September 2017. The second transaction would be finalized near the end of calendar year 2017, depending on which accrediting agencies had approved changes in ownership.

the Department would allow Dream Center's purchase of the Art Institute of Fort Lauderdale and the Art Institute of Phoenix in the first part of the transaction without loss of Title IV eligibility given the pending application with Middle States Commission on Higher Education requesting that the two schools be merged with the Art Institute of Pittsburgh.

**October 4, 2017**

The Department sent a letter to Dream Center that included the changes suggested by the counsel for Dream Center. The revised preacquisition review letter stated that the Department would allow the purchase of the Art Institute of Fort Lauderdale and the Art Institute of Phoenix in the first sale of schools with the understanding that the Art Institute of Pittsburgh would assume Title IV program liabilities and the cohort default rates after Middle States Commission on Higher Education approved the merger.

The Department also modified the letter of credit requirements. Following the first sale, the Department would reduce the letters of credit it held to about $104 million—about $98 million for schools owned by Dream Center and about $6 million for Education Management Corporation schools not being purchased by Dream Center. The funds for Education Management Corporation schools not sold to Dream Center would be held to cover potential closed school loan discharges. Following the sale, the Department would require Dream Center to modify the letters of credit or submit a new letter of credit by May 1, 2018.

Education Management Corporation and Dream Center immediately asked the Department to reconsider its calculation of the letter of credit amount. They stated that the Department should exclude Education Management Corporation locations that were sold to other parties and the locations not being sold to Dream Center in the calculation of Title IV funds received. The Department agreed to recalculate the letter of credit amount. However, it advised Education Management Corporation that the Department would still require a letter of credit sufficient to satisfy discharges resulting from the closure of the excluded schools.

**October 5, 2017**

The Department sent a letter to Dream Center with the amended letter of credit amounts. The recalculated amounts resulted in a decrease in the portion of the letter of credit intended to cover the Dream Center schools (to about $93 million) but an increase in the amount intended to cover the other Education Management Corporation schools (to about $15 million). The Department required Dream Center or Education Management Corporation to post a new $108 million letter of credit no later than May 1, 2018, or extend the Education Management Corporation letters of credit until May 31, 2019. If Dream Center or Education Management Corporation did not post or

extend the letters of credit by May 1, 2018, the Department would draw down the $107,509,133 from the existing Education Management Corporation letters of credit.[39]

**October 17, 2017**

Dream Center and Education Management Corporation sent the Department a letter confirming that the $107,509,133 in Education Management Corporation letters of credit would remain in place. The letter also stated that the entire amount of the letters of credit could be used to cover the liabilities of the schools, regardless of ownership.

Dream Center finalized its purchase of Argosy University, South University, the Miami International University of Art & Design, the Art Institute of Houston, the Art Institute of Atlanta, the Art Institute of Seattle, the Art Institute of Portland, the Art Institute of Fort Lauderdale, and the Art Institute of Phoenix from Education Management Corporation.

**November 16, 2017**

The Higher Learning Commission sent a letter to Dream Center, the Art Institute of Colorado, and the Illinois Institute of Art notifying them that its board of trustees voted to approve the two schools' applications for a change in ownership; however, the approval was subject to the requirement of change of control candidacy status, effective as of the date that Dream Center acquired the two schools. According to the letter, the board of trustees concluded that the two schools did not satisfy all five factors that the Higher Learning Commission uses when determining whether to approve a request for change of control, structure, or organization without issue. The board of trustees did conclude that the two schools demonstrated sufficient compliance with the Higher Learning Commission's eligibility requirement to be considered for pre-accreditation status (change of control candidacy status).

The Higher Learning Commission sent an email with a copy of the letter to the director of FSA's Multiregional and Foreign Schools Participation Division and the director of OPE's Accreditation Group. The director of FSA's Multiregional and Foreign Schools Participation Division forwarded the letter to the Chief Compliance Officer for FSA, the director of FSA's School Eligibility Service Group, FSA employees involved in the ongoing review of Dream Center's purchase of the schools, and two attorneys in OGC involved in the ongoing review of Dream Center's purchase of the two schools.

---

[39] The Department released about $86 million (the difference between the original amount of the letters of credit and the recalculated amount) back to the collateral agents from which Education Management Corporation obtained its letters of credit.

**November 30, 2017**

After receiving a materially complete application from Dream Center and the nine schools purchased on October 17, 2017, the Department issued all nine schools temporary provisional program participation agreements.

**December 1, 2017**

Middle States Commission on Higher Education notified an FSA compliance manager by email that the Art Institute of Pittsburgh withdrew its application to merge with the Art Institute of Fort Lauderdale and the Art Institute of Phoenix. The email indicated that the Art Institute of Pittsburgh intended to resubmit the application to include two additional locations, and the application would be considered by the Middle States Commission in March 2018.

FSA employees and OGC attorneys involved in the review of Dream Center's acquisition discussed whether the Art Institute of Fort Lauderdale and the Art Institute of Phoenix should lose Title IV eligibility. In its preacquisition review letter, the Department allowed the two schools to continue participation in the Title IV programs based on the merger application submitted to Middle States Commission on Higher Education. However, the deadline for the schools to become accredited by a new accrediting agency was June 12, 2018.

**January 4, 2018**

The Art Institute of Colorado, the Illinois Institute of Art, and Dream Center sent a letter to the Higher Learning Commission accepting the change of control candidacy status.

**January 12, 2018**

The Higher Learning Commission sent another letter to the Art Institute of Colorado, the Illinois Institute of Art, and Dream Center reaffirming the Higher Learning Commission's approval of the change in ownership. The letter restated that approval was conditional and based on the schools' accepting change of control candidacy status. The change of control candidacy status would become effective immediately following the sale of the schools.

**January 19, 2018**

Dream Center finalized its purchase of the Art Institute of Colorado, the Illinois Institute of Art, the Art Institute of Pittsburgh, and the Art Institute of Philadelphia.

**January 20, 2018**

The Higher Learning Commission posted a public disclosure announcing that the Art Institute of Colorado and the Illinois Institute of Art transitioned to change of control candidacy status after previously being accredited. The public disclosure stated that, during candidacy status, a school is not accredited but holds a recognized status with the Higher Learning Commission, indicating that the school meets the standards for candidacy. The public disclosure further stated that students taking classes or graduating during the candidacy period should know that their courses or degrees are not accredited by the Higher Learning Commission and might not be acceptable to transfer to other colleges and universities or recognized by prospective employers.

The Higher Learning Commission also updated the schools' accreditation statuses in the Department's "Database of Accredited Postsecondary Institutions and Programs." The database entries for the two schools stated that the Higher Learning Commission: "approved the Change of Control, Structure or Organization, wherein assets of Education Management Corporation … are acquired by Dream Center Education Holdings. This approval subjects the [school] to transition status from accredited to a candidate for accreditation."

**January 23, 2018**

The Higher Learning Commission sent the director of FSA's Multiregional and Foreign Schools Participation Division and the director of OPE's Accreditation Group an email with a copy of the January 12, 2018, letter sent to Dream Center and the Art Institute of Colorado and the Illinois Institute of Art. The director of FSA's Multiregional and Foreign Schools Participation Division forwarded the email with the attached letter to other Multiregional and Foreign Schools Participation Division employees who were involved in the ongoing review of Dream Center's purchase of schools.

**February 2, 2018**

Counsel for Dream Center sent a letter to the Higher Learning Commission stating that the language in the January 20, 2018, public disclosure notice for the Art Institute of Colorado and the Illinois Institute of Art was different than what the schools and Dream Center agreed to. The director of FSA's Multiregional and Foreign Schools Participation Division received a copy of the letter and forwarded it to the Chief Compliance Officer for FSA, the director of FSA's School Eligibility Service Group, employees in FSA involved in the ongoing review of Dream Center's purchase of schools, and two OGC attorneys involved in the ongoing review.

**February 7, 2018**

The Higher Learning Commission responded to the February 2, 2018, letter from counsel for Dream Center. In the letter, the Higher Learning Commission confirmed that the Art Institute of Colorado and the Illinois Institute of Art were in change of control candidacy status as agreed to by the schools and Dream Center on January 4, 2018. The letter also noted that the schools and Dream Center had ample opportunity between November 2017 and January 2018 to ask questions about the implications of accepting change of control candidacy status.

The Higher Learning Commission sent a copy of the letter to the director of FSA's Multiregional and Foreign Schools Participation Division, who forwarded the letter to the Chief Compliance Officer for FSA, the director of FSA's School Eligibility Service Group, FSA employees involved in the ongoing review of Dream Center's purchase of the schools, and two OGC attorneys involved in the ongoing review.

**February 12, 2018**

An OGC attorney involved in the ongoing review of Dream Center's acquisition of schools from Education Management Corporation sent an email to the Chief Compliance Officer for FSA, the director of FSA's School Eligibility Service Group, the director of FSA's Multiregional and Foreign Schools Participation Division, FSA employees involved in the ongoing review of the Dream Center acquisition of schools, and another OGC attorney involved in the ongoing review of the acquisition. The attorney acknowledged that the Higher Learning Commission's change of control candidacy status made the Art Institute of Colorado and the Illinois Institute of Art ineligible for Title IV purposes because the Department had not yet approved the schools' conversion from for-profit to nonprofit status.

**February 20, 2018**

The Department issued temporary provisional program participation agreements to the four schools (the Art Institute of Colorado, the Illinois Institute of Art, the Art Institute of Pittsburgh, and the Art Institute of Philadelphia) that Dream Center purchased on January 19, 2018.

The Department also became aware, through an automated accreditation activity email, that Middle States Commission on Higher Education had placed the Art Institute of Pittsburgh on probation.

**February 23, 2018**

Counsel for Dream Center responded to the Higher Learning Commission's February 7, 2018, letter. Counsel for Dream Center wanted the Higher Learning Commission to

confirm that the Art Institute of Colorado and the Illinois Institute of Art (1) remained eligible for Title IV funds because a preaccredited status is an eligible status for nonprofit schools, (2) remained accredited in change of control candidacy status, (3) would receive objective reviews for continued accreditation, and (4) would communicate to their students that they remained accredited in change of control candidacy status. The director of FSA's Multiregional and Foreign Schools Participation Division received a copy of the letter.

The director of FSA's Multiregional and Foreign Schools Participation Division sent an email to the Higher Learning Commission to set up a call to discuss the change of control candidacy status and the two schools' Title IV eligibility.

An FSA compliance manager and an FSA case manager set up a call with Middle States Commission on Higher Education to discuss the Art Institute of Pittsburgh's probation status. During the call, Middle States Commission on Higher Education stated that it placed the school on probation because it was seeking approval of a merger from two different accrediting agencies. The Art Institute of Pittsburgh was seeking to make the Art Institute of Fort Lauderdale and the Art Institute of Phoenix its branch campuses. While Middle States Commission on Higher Education was reviewing the merger, the Art Institute of Pittsburgh applied for the same approval from the Western Association of Schools and Colleges, Senior College and University Commission.

**February 26 and 27, 2018**

FSA employees and OGC attorneys discussed through email the eligibility issues that resulted from the Art Institute of Colorado's and the Illinois Institute of Art's change of control candidacy status. They concluded that both schools were ineligible to participate in the Title IV programs as of January 20, 2018, because they were for-profit schools in candidacy status. The FSA employees and OGC attorneys discussed through emails drafting a loss of eligibility letter that would state that the two schools were ineligible as of January 20, 2018. However, they determined that if they had received all the documentation needed to complete their review of the schools' conversions from for-profit to nonprofit status, then they would be able to issue an interim approval of the conversion. The interim approval would allow the two schools to continue participating in the Title IV programs while in candidacy status and while the Department completed its review of the acquisition and request for conversion from for-profit to nonprofit status.

**February 28, 2018**

The Department sent a letter to Dream Center reiterating its requirement that it post its own letter of credit. The letter reminded Dream Center that the Department would

draw down the entire amount of the Education Management Corporation letters of credit if Dream Center did not post its own letter of credit by May 1, 2018.

**March 9, 2018**

The director of FSA's Multiregional and Foreign Schools Participation Division, an FSA employee involved in the ongoing review of Dream Center's acquisition of schools, and the Acting General Counsel held a call with the Higher Learning Commission. During the call, the Higher Learning Commission confirmed that change of control candidacy status was a preaccredited status.

**April 6, 2018**

The Principal Deputy Under Secretary provided to the Acting General Counsel, Senior Counselor to the Secretary, and Senior Advisor to the Under Secretary a first draft of a memorandum regarding retroactive accreditation for schools. The memorandum would allow an accrediting agency to retroactively accredit schools back to the date on which the agency completed its initial review of the school and placed the school in candidacy, pre-accreditation, or a similar status.

**April 20, 2018**

The Chief Officer of Regulatory and Government Affairs for Dream Center sent an email to the director of FSA's Multiregional and Foreign Schools Participation Division asking the Department to extend the deadline for providing its own letter of credit to May 18, 2018.

**April 20 and 24, 2018**

The Chief Compliance Officer for FSA provided the Acting Under Secretary and Acting Chief Operating Officer for FSA with draft copies of letters granting interim approval of nonprofit status to the Art Institute of Colorado and the Illinois Institute of Art.

**April 25, 2018**

The Department sent a letter to Dream Center granting an extension until May 17, 2018, for it or Education Management Corporation to provide a new letter of credit. The letter stated that if Dream Center or Education Management Corporation did not provide a new letter of credit by that date, the Department would draw down the entire $107,509,133 of Education Management Corporation's letters of credit on May 18, 2018.

**May 1, 2018**

Dream Center sent a letter to the Acting Under Secretary asking the Department to eliminate or significantly reduce the letter of credit requirement.

**May 3, 2018**

The Department sent letters to the Art Institute of Colorado and the Illinois Institute of Art. The letters acknowledged that the schools' change of control candidacy status meant that, pursuant to 34 C.F.R. §§ 600.5(a)(6) and 600.4(a)(5)(i), the two schools were no longer eligible to participate in the Title IV programs as for-profit schools. However, given their pending applications for approval of change in ownership and conversion from for-profit to nonprofit status, the Department granted the two schools temporary nonprofit status retroactive to January 20, 2018. The letter stated that the temporary nonprofit status would not be reflected in the school's Eligibility and Certification Approval Report. Instead, the letter would serve as evidence of the Department's approval of the schools' temporary nonprofit status.

**May 14, 2018**

The Acting Under Secretary sent a letter to Dream Center denying its request to eliminate or reduce the amount of the required letter of credit.

**May 18, 2018**

Dream Center failed to post its own letter of credit by May 17, 2018. The Department drew down the $107,509,133 in Education Management Corporation letters of credit and placed the funds in accounts controlled by the Department's Office of Finance and Operations.

**June 27, 2018**

The Higher Learning Commission sent an email to the Principal Deputy Under Secretary requesting clarification on how the Department would view the Higher Learning Commission if it granted a school retroactive accreditation. The email was prompted by the Art Institute of Colorado's and the Illinois Institute of Art's request that the Higher Learning Commission retroactively accredit them to January 20, 2018.

**June 29, 2018**

Dream Center submitted to the Department a campus closure plan stating its intention to close 30 of its Argosy University, South University, and Art Institute school locations (see Appendix D).

**July 3, 2018**

The Higher Learning Commission sent an email to the Principal Deputy Under Secretary seeking written assurance that a decision to retroactively reinstate a school's accreditation would not jeopardize the Higher Learning Commission's recognition with the Department. The Higher Learning Commission stated that its policy did not allow for retroactive accreditation beyond 30 days, so a decision to retroactively reinstate accreditation status more than that would go against its policy. In an email response, the Principal Deputy Under Secretary agreed to provide a written letter providing the requested assurance.[40]

**July 10, 2018**

The Principal Deputy Under Secretary provided to a special counsel in OGC and the former Acting General Counsel a revised version of the April 6, 2018, retroactive accreditation memorandum, adding a statement that the policy would also apply in cases of a change in control or ownership.

**July 19, 2018**

The Principal Deputy Under Secretary sent an email to the Higher Learning Commission in response to a complaint about the Art Institute of Colorado and the Illinois Institute of Art misrepresenting their accreditation statuses. According to the email, the school presidents agreed to send written communication to all students, faculty, and staff notifying them that the schools were not accredited.

**July 25, 2018**

The Principal Deputy Under Secretary issued the retroactive accreditation memorandum to accrediting agency directors and presidents. The memorandum rescinded the Department's June 6, 2017, guidance that allowed for retroactive accreditation with respect to changes in ownership only to the extent allowed by 34 C.F.R. § 602.22(b), which was no more than 30 days before the change in ownership.

**July through early August 2018**

Through multiple discussions, the Principal Deputy Under Secretary coordinated with the accrediting agencies and States to agree on a single teach-out plan for all the school locations that Dream Center was closing. The Principal Deputy Under Secretary told FSA

---

[40] According to Higher Learning Commission officials, the Principal Deputy Under Secretary did not provide such a letter.

and OGC officials and employees that all Dream Center matters related to the school closures were to be coordinated by the Principal Deputy Under Secretary and the Chief Strategy and Transformation Officer for FSA.[41]

**January 7, 2019**

Dream Center sold South University, the Art Institute of Atlanta, the Art Institute of Houston, and the Miami International University of Art & Design to Education Principle Foundation (see Appendix C).

**January 18, 2019**

A Federal court in Ohio granted a request by one of Dream Centers' creditors for the appointment of a Federal receiver over Dream Center and its schools.[42] The court-appointed receiver would manage Argosy University, the Art Institute of Las Vegas, the Art Institute of Pittsburgh, and the Art Institute of Seattle, which remained under Dream Center ownership after the December 2018 closures and the January 2019 sale of four schools to Education Principle Foundation.

**February 27, 2019**

The Department sent a letter to the court-appointed receiver and the chairman of the board for Dream Center notifying them that the Department disapproved Argosy University's application for change in ownership and conversion from for-profit to nonprofit status. The letter stated that the Department's decision resulted in the termination of Argosy University's eligibility to participate in the Title IV programs as of the date of the letter.

**March 6, 2019**

The court-appointed receiver announced that Argosy University would cease operations by March 8, 2019, because the Department had placed the school on heightened cash monitoring level 2. Western College School of Law, a branch campus of Argosy University, would continue operations to allow for graduating students to complete the semester and become eligible to sit for the bar exam. The court-appointed receiver also

---

[41] According to the Principal Deputy Under Secretary, the purpose of centralizing matters was to ensure that the Department was providing consistent information to the accrediting agencies, States, and schools.

[42] Digital Media Solutions, LLC, v. South University of Ohio, LLC. United States District Court, Northern District of Ohio, Eastern Division.

indicated that the Art Institute of Seattle, the Art Institute of Pittsburgh, and the Art Institute of Las Vegas would close if a buyer could not be found.

The Department began its closed-school communication protocols to provide information to students at those schools about transferring to other schools, resources available to help the students decide next steps, and the Department's next steps if the schools closed.

**March 8, 2019**

Argosy University, the Art Institute of Pittsburgh, and the Art Institute of Seattle closed.

**March 7 and 8, 2019**

The Department issued a memorandum signed by the Principal Deputy Under Secretary. The memorandum stated that the Department would cancel the student loans disbursed to students who attended or were attending the Dream Center schools that were closing on March 8, thereby removing the students' obligations to repay their loans for the spring semester.

The Department posted a notice on FSA's website and emailed affected students to clarify the situation. The Department informed all Argosy University and Art Institute students who were disbursed a Federal student loan for the spring semester that the Department would cancel those disbursements. The Department also notified students of the next steps that the Department would take in the event the schools closed and provided the students with information about transfer resources.

# Appendix C. Timeline of Activities Relevant to Transactions Among Dream Center, Education Principle Foundation, and Studio Enterprise Manager

As early as May 2018, Dream Center officials were discussing with Colbeck Capital Management a potential sale or partnership involving some of the 13 for-profit postsecondary schools that Dream Center had purchased from Education Management Corporation.

**November 16, 2018**

The Principal Deputy Under Secretary, FSA officials and employees, and OGC attorneys met with Dream Center officials to discuss the potential sale of Dream Center schools to Eastern Gateway Community College.

**December 12, 2018**

The Principal Deputy Under Secretary, FSA officials and employees, and OGC attorneys again met with Dream Center officials and representatives of Eastern Gateway Community College. Eastern Gateway Community College provided a letter of intent to purchase Argosy University and South University "out of receivership" if the Dream Center schools were to enter receivership at some point. The OGC attorney who reviewed the letter of intent determined it was inadequate because such a transaction would require review by the State of Ohio Attorney General and the Ohio Department of Higher Education.

**December 19, 2018**

Because of concerns about the immediate closure of some schools and the threatened receivership for all remaining Dream Center schools, the Department convened a meeting at its offices in Washington, DC. The meeting included representatives from Dream Center, Dream Center's lenders and potential investors, and representatives from Eastern Gateway Community College, Helms College, Colbeck Capital Management, Studio Enterprise Manager, and a former owner of South University. Department officials attending the meeting were the Principal Deputy Under Secretary, a Deputy Chief Operating Officer for FSA, the director of FSA's Multiregional and Foreign Schools Participation Division, and two OGC attorneys. According to these Department officials, they acted as a mediator between the parties, meeting with each entity

individually. At the end of the meeting, the Department told the attendees to return if a purchase agreement was reached.

**December 20, 2018**

Representatives of Colbeck Capital Management and Studio Enterprise Manager returned to the Department with a plan. They proposed that Education Principle Foundation, a nonprofit company formerly known as The Colbeck Foundation, purchase South University and the Art Institutes, excluding the Art Institute of Phoenix, the Art Institute of Las Vegas, and the Art Institute of Seattle. Studio Enterprise Manager would move the Art Institutes from Dream Center's information technology systems to new systems.

**December 27, 2018**

According to emails among FSA employees, including South University in the Education Principle Foundation purchase would require the posting of a 25-percent letter of credit. The 25-percent letter of credit would be required because the new owners did not have 2 years of financial statements showing Title IV experience.

The Principal Deputy Under Secretary sent an email to FSA employees discussing the potential sale of Dream Center schools to Education Principle Foundation. The email provided an interpretation of existing policy that would allow the Department to require only a 10-percent letter of credit even though Education Principle Foundation did not have 2 years of financial statements showing Title IV experience.

**December 31, 2018**

Cooley LLP, on behalf of Studio Enterprises and Candlewood Special Situations Master Fund II, L.P, sent the Principal Deputy Under Secretary a letter regarding the planned purchase of five Dream Center schools. The letter contained a list of concessions with which the parties wanted the Department to agree. The requested concessions were as follows.

- The Department would accept financial statements of Art Institutes International and Dream Center South University (which were not formed until January 2017) to satisfy the requirement for a new owner to provide 2 years of financial statements as part of a materially complete application instead of 2 years of financial statements for Education Principle Foundation.

- The Department, in its evaluation of the same-day balance sheet, would consider supplementary information pertaining to events that occurred after the transaction date.

- The Department would release $15 million of the surety funds that it held from the Education Management Corporation letters of credit to help support the schools being purchased by Education Principle Foundation.

- The Department would allocate $22 million in existing surety funds to satisfy South University's letter of credit requirement and would limit the letter of credit amount required of the Art Institutes to $6.5 million.

**January 7, 2019**

The Department sent a letter signed by the Principal Deputy Under Secretary to Cooley LLP in response to its December 31, 2018, letter. The Department agreed to accept financial statements of Art Institutes International and Dream Center South University to satisfy the requirement for a new owner to provide 2 years of financial statements. The letter indicated that Dream Center notified the Principal Deputy Under Secretary that financial statements for the year ended December 31, 2018, could not be submitted as part of a materially complete application within 10 days of the change in ownership. The letter stated that the Department agreed to accept just the financial statements for the year ended December 31, 2017, as part of the materially complete application, if the financial statements for the year ended December 31, 2018, were provided to the Department by March 30, 2019. The Department also agreed to consider information pertaining to events that occurred after the purchase when evaluating the same-day balance sheet.

The letter further stated that the Department would not require the schools to submit gainful employment rates or 90/10 percentages.[43] The Department reasoned that the schools had passing 90/10 percentages in the most recent fiscal year, and this transaction was not being reviewed as a request for conversion from for-profit to nonprofit status because the conversion was requested in the original transaction in which Dream Center bought the schools.

The Department denied the request for the release of $15 million in surety funds. The Department agreed to allocate $22 million of the surety funds it was holding in lieu of requiring South University to post a letter of credit. For the Art Institutes, the Department agreed to limit the amount of the required letter of credit to $6.5 million and agreed to allocate an additional $6.5 million of the surety funds it held.

---

[43] See gainful employment regulations at 34 C.F.R. Part 668, Subpart Q, and 90/10 regulation at 34 C.F.R. § 668.28.

Dream Center completed the transfer of ownership of South University, the Art Institute of Atlanta, the Art Institute of Houston, and the Miami International University of Art & Design to Education Principle Foundation.

**January 8, 2019**

A representative of Cooley LLP sent an email to the director of FSA's Multiregional and Foreign Schools Participation Division. The letter notified the Department that the transaction occurred as described in the December 31, 2018, letter but one school, the Art Institute of Seattle, was excluded from the transaction.

**January 18, 2019**

Dream Center submitted to the Department applications for change in ownership for South University, the Art Institute of Atlanta, the Art Institute of Houston, and the Miami International University of Art & Design.

**February 28, 2019**

The Department issued temporary provisional program participation agreements to South University, the Art Institute of Atlanta, the Art Institute of Houston, and the Miami International University of Art & Design. The agreements expired on February 28, 2019.

## Appendix D. Timeline of the Department's Handling of Surety Funds

**October 5, 2017**

According to the amended preacquisition review letter, the Department would continue to hold about $93 million in surety funds from the Education Management Corporation letters of credit on behalf of the Dream Center-purchased schools and about $15 million on behalf of the schools that were not acquired by Dream Center. The surety funds for schools not acquired by Dream Center would pay for any amounts, including any closed school loan discharges, owed to the Department after those schools' closures. The letter indicated that the Department would continue to hold the $15 million until the schools had been closed for 2 years and the final audits for the schools were completed.

**April 17, 2018**

According to an email from the Chief Officer of Regulatory and Government Affairs for Dream Center to Dream Center colleagues, the Acting Under Secretary provided guidance on communicating with the Department about potential school closures and requests relevant to the letter of credit.

**May 1, 2018**

In a letter to the Acting Under Secretary, Dream Center asked the Department to reduce or eliminate the nearly $108 million letter of credit required by the Department following Dream Center's purchase of schools from Education Management Corporation.

**May 3, 2018**

In an email to FSA employees involved in the ongoing review of Dream Center's acquisition of schools, the director of FSA's Multiregional and Foreign Schools Participation Division indicated that Dream Center provided notification "a couple of weeks ago" that it planned to close schools and did not have the financial resources necessary to cover expenses that would be incurred to continue providing an education to the current students.

**May 14, 2018**

The Department sent a letter to Dream Center denying its request to reduce or eliminate the nearly $108 million letter of credit requirement. The letter explained that the Department had already reconsidered and negotiated the amount of the required letter of credit several times. The letter further stated that the Department would not consider any additional reduction or elimination of the required letter of credit until it

had received a full year of audited financial statements from Dream Center (for the year ended December 31, 2018).

**May 18, 2018**

Because Dream Center failed to post its own letter of credit by the required deadline, the Department drew down the remaining amount ($107,509,133) of the letters of credit posted by Education Management Corporation and placed the surety funds in accounts controlled by the Department's Office of Finance and Operations. The Department placed the surety funds in two accounts—one to cover Dream Center schools ($92,624,329) and one to cover potential liabilities resulting from the closure of Education Management Corporation schools that Dream Center did not purchase ($14,884,804).

**June 14, 2018**

The Principal Deputy Under Secretary, FSA officials and employees, and OGC attorneys met with Dream Center officials to discuss a Dream Center restructuring proposal that would facilitate the closure of up to 39 school locations and allow Dream Center to keep the remaining school locations open. According to these Department employees, Dream Center claimed that Education Management Corporation had inflated financial and enrollment projections and left Dream Center in an untenable situation; claimed that it needed financial support from the Department to avoid the immediate closure of the schools; and asked the Department to release $75 million of surety funds to pay the operating costs of the school locations it was closing.

**June 26, 2018**

FSA employees and OGC attorneys developed a list of pros and cons to help the Department decide whether to allow Dream Center to use surety funds to pay the operating costs of the school locations it was closing. According to their calculations, the immediate closure of all Dream Center schools could expose taxpayers to about $925 million in potential closed school loan discharges. Allowing Dream Center to use surety funds to pay the operating expenses of schools it was closing could potentially reduce closed school loan discharges to about $168 million, a difference of $757 million.

In the list of pros and cons, FSA employees and OGC attorneys acknowledged that the terms of Education Management Corporation's letters of credit required the proceeds to be used only to pay institutional charges owed to or on behalf of former students, to provide for the teach-out of students enrolled at the time of the schools' closures, or to pay any liabilities owed to the Federal government arising from schools' actions on or before the expiration of the letters of credit.

**August 20, 2018**

The Department issued an addendum to the temporary provisional program participation agreement for each school with locations that Dream Center was closing. According to each addendum, the Department agreed to provide Dream Center with as much as $50 million in surety funds to pay the operating expenses of the school locations that were closing. Each addendum laid out the conditions for the use of the surety funds and listed the operating expenses that were eligible for reimbursement and those that were not.

Each addendum also required Dream Center to hire a certified public accountant to review each reimbursement request and certify that the operating expenses included in each request were reimbursable under the terms of the addenda to the temporary provisional program participation agreements. The Department agreed to provide Dream Center an initial reimbursement of $10 million and a supplemental reimbursement up to $7.5 million, contingent on review of the expenses submitted by Dream Center. Dream Center could then request reimbursement for up to $4 million every 14 days, but the total reimbursement amount would be limited to $50 million.

**August 21 through 23, 2018**

Dream Center submitted records to the Department and claimed that the records supported the operating expenses to be reimbursed by the initial release of $10 million. Based on a preliminary review of the expenses, the Department was satisfied that the expenses met the requirements of the addenda to the temporary provisional program participation agreements.

The Department notified Dream Center that it retained the right to reduce future reimbursements if it later determined the initial release of $10 million was not fully reimbursable.

**August 28, 2018**

The Department released $10 million in surety funds to Dream Center. The accounting firm had not yet reviewed and certified as reimbursable any of the operating expenses.

**September 21, 2018**

The Department released about $4.4 million of the $7.5 million that Dream Center requested as a supplemental reimbursement of operating expenses incurred before the addenda to the temporary provisional program participation agreements. The Department reduced the supplemental reimbursement because Dream Center sought reimbursement for about $3.1 million in operating expenses of schools that it did not plan to close by the end of December 2018.

**August 28 through December 31, 2018**

The Department released $39,586,989 in surety funds to reimburse Dream Center for operating expenses of the schools it was closing (see Table 2).

**January 8, 2019**

The Principal Deputy Under Secretary signed a letter authorizing the Office of Finance and Operations to release to the collateral agent $14.5 million of the surety funds held on behalf of the Education Management Corporation schools that Dream Center did not purchase. Releasing the funds left about $384,800 to cover potential liabilities that these schools might owe the Department. Final FSA program reviews of the schools identified at least $168,000 in liabilities.

**February 11, 2019**

The Department moved $28.5 million from the account holding surety funds for Dream Center-owned schools to two new accounts it created to hold surety funds for schools purchased by Education Principle Foundation. The Department moved $6.5 million to one account it established to cover potential liabilities relevant to the Art Institutes and $22 million to cover potential liabilities relevant to South University.

**Table 2.** **Accounting for Surety Funds Allocated to Dream Center Schools**

| Description | Release Date | Amount Released | Remaining Balance |
|---|---|---|---|
| Beginning Balance of Available Surety Funds | - | - | $92,624,329 |
| First Advance to Dream Center | 8/28/2018 | $10,000,000 | $82,624,329 |
| Second Advance to Dream Center | 9/21/2018 | $4,361,704 | $78,262,625 |
| Reimbursement Paid to Dream Center | 10/12/2018 | $4,000,000 | $74,262,625 |
| Reimbursement Paid to Dream Center | 10/23/2018 | $4,000,000 | $70,262,625 |
| Reimbursement Paid to Dream Center | 11/28/2018 | $4,000,000 | $66,262,625 |
| Reimbursement Paid to Dream Center | 12/18/2018 | $9,225,285 | $57,037,340 |

| Description | Release Date | Amount Released | Remaining Balance |
|---|---|---|---|
| Reimbursement Paid to Dream Center | 12/31/2018 | $4,000,000 | $53,037,340 |
| Surety Funds Moved to Account for Art Institutes | 2/11/2019 | $6,500,000 | $46,537,340 |
| Surety Funds Moved to Account for South University | 2/11/2019 | $22,000,000 | $24,537,340 |

## Appendix E. Acronyms and Abbreviations

| | |
|---|---|
| C.F.R. | Code of Federal Regulations |
| Department | U.S. Department of Education |
| Dream Center | Dream Center Education Holdings, LLC |
| FSA | Federal Student Aid |
| G5 | Department's grants management system |
| HEA | Higher Education Act of 1965, as amended |
| OGC | Office of the General Counsel |
| Principal Deputy Under Secretary | Principal Deputy Under Secretary Delegated the Duties of Under Secretary |
| Title IV | Title IV of the Higher Education Act of 1965, as amended |

# Department Comments



THE SECRETARY OF EDUCATION

WASHINGTON, DC 20202

January 19, 2021

Gary Whitman, Regional Inspector General for Audit
U.S. Department of Education
Office of Inspector General
400 Maryland Avenue, S.W.
Washington, D.C. 20202-1510

Dear Mr. Whitman,

This response to the Draft Report of the Office of the Inspector General Inspection of the Department's Activities Surrounding the Sale of Postsecondary Schools to Dream Center Education ("Draft Report") is submitted in conjunction with the Principal Deputy Under Secretary Diane Jones.

Unfortunately, the Draft Report was submitted to the Department right before midnight on Friday, January 15, 2021 in advance of the Martin Luther King federal holiday, and only one business day prior to the change of administrations on January 20, 2021. Accordingly, this response to the Draft Report is focused only on information, omissions, and mischaracterizations contained in the Draft Report relating to the activities of the Principal Deputy Under Secretary.

This limited response is submitted with the understanding that both FSA and the Office of the General Counsel will have an opportunity to submit their own responses to the Draft Report in the time provided for comment.

Sincerely,

Mitchell M. Zais, Ph.D.

Enclosure

www.ed.gov

U.S. Department of Education
Office of Inspector General



UNITED STATES DEPARTMENT OF EDUCATION

**Response to the Draft Report of the OIG Inspection of the Department's Activities Surrounding the Sale of Postsecondary Schools to Dream Center Education (Submitted in Coordination with the Principal Deputy Under Secretary Diane Jones)**

Introduction:

This response to the Draft Report of the OIG Inspection of the Department's Activities Surrounding the Sale of Postsecondary Schools to Dream Center Education ("Draft Report") is submitted in conjunction with the Principal Deputy Under Secretary Diane Jones. Unfortunately, the Draft Report was submitted to the Department right before midnight on Friday, January 15, 2021 in advance of the Martin Luther King federal holiday, and only one business day prior to the change of administrations on January 20, 2021. Accordingly, this response to the Draft Report is focused only on information, omissions, and mischaracterizations contained in the Draft Report relating to the activities of the Principal Deputy Under Secretary.

Of particular concern to the Principal Deputy Under Secretary is the omission of certain evidence and data from the Draft Report that would have provided necessary context for the decisions made regarding the Dream Center situation. Instead of including and discussing all available evidence, the Draft Report selectively focuses on certain evidence and ignores other evidence. The Principal Deputy Under Secretary has repeatedly provided the OIG with evidence, data and contextual explanation for the events that are the subject of the Investigation. Given the limited time available prior to the change of administrations, this response does not endeavor to counter each omission or mischaracterization of evidence, but rather, it is intended to provide information and necessary context for the events in which the Principal Deputy Under Secretary was personally involved. This limited response is submitted with the understanding that both FSA and the Office of the General Counsel will have an opportunity to submit their own responses to the Draft Report in the time provided for comment.

<u>Response to the Surety Issue relating to the Education Principle Foundation and Various Omissions on the Part of the OIG:</u>

While the Department's policy leadership team agrees that the interests of taxpayers must be protected, which is the purpose of a required letter of credit ("LOC") or other surety, it must also be understood that large LOCs may harm students by limiting the amount of resources a school can devote to its educational mission. In the case of the Education Principal Foundation ("EPF") transaction, the Department was well aware that the Dream Center's financial condition had reduced investments in its continuing institutions, and that a new owner would be required to devote substantial resources to the institutions to ensure that students were provided with a high-

quality education and high-quality student support services. In addition, because of the shared services agreements that Education Management Corporation ("EDMC") had put in place to manage its schools prior to their acquisition by the Dream Center, it was impossible for EPF to pay its employees, accept in-coming phone calls, operate its websites and online learning platforms, provide student records or provide employee health insurance unless the contracts which covered all schools owned and operated by the Dream Center were also paying their employees and fulfilling the terms of all service contracts – which the Dream Center was unable to do due to its financial challenges.

As a result, Studio Enterprises (the service provider to EPF-owned schools) had to pay all the relevant contractors not just for the portion of the costs allocated to the schools it purchased, but for all of the schools owned and operated by the Dream Center until such time that the schools it purchased could be removed from existing contracts and procure their own contractual services, including payroll, telephone, information technology, and employee health insurance contracts. In addition, Studio Enterprises had to pay the salaries of Dream Center's centralized data management team since all student records were contained in a centralized data management system, the collapse of which would render all student records for Dream Center and former EDMC schools inaccessible.

Finally, although provided with the information required to provide a more complete and accurate description of the context in which the EPF pre-acquisition decisions were made, the OIG failed to include that information in its report. As we explained to the OIG previously, and substantiated with data provided by FSA, the schools EPF acquired served approximately 12,000 students at the time of the transaction. Had EPF not acquired those institutions, it was clear that Dream Center would have gone into receivership, essentially initiating a precipitous closure of all its schools. As the OIG was previously told, but failed to acknowledge in its report, the Department had convened a meeting in Washington, DC that consisted of Dream Center, its investors, and potential new owners because Dream Center had notified the Department that it intended to go into receivership immediately if the Department could not provide Dream Center with additional proceeds of the EDMC letter of credit. Therefore, the Department was literally racing against the clock to review the interests and financial capability of potential new owners to ensure that as many students as possible would have the opportunity to continue and complete their education, rather than showing up one day to find the doors of their school locked. Also, we previously made clear to the OIG, but absent from its report, was information about the timing of these intense discussions and decisions regarding EPF's acquisition, which took place primarily during the Christmas holiday. The OIG's report fails to accurately describe the actual situation that the Department faced, and the fact that we had only days to discuss and make decisions regarding the acquisition by EPF – as opposed to the OIG's after the fact review in hindsight, in which the OIG has the luxury of taking its time, sometimes years later to second guess our actions.

As we explained to the OIG, and as the subsequent receivership of the remaining Dream Center schools proved, had EPF not timely acquired the schools, they and the remaining Dream Center schools would have all gone into immediate receivership. Not only would this have harmed the

12,000 students who attended the schools ultimately acquired by EPF, it would have created an additional closed school loan discharge liability to taxpayers of approximately $420 million. Then, and now, the Department believes that it made the decision that was in the best interest of students and taxpayers, and in so doing, saved the taxpayer from a potential $420 million liability.

Perhaps most disturbing is the OIG's relative, apparent lack of concern regarding the welfare of students, or the need to take their interests into account when making decisions. At the direction of the Secretary, the Principal Deputy Under Secretary, FSA Staff and OGC staff first and foremost considered the impact of each potential decision on students, including how any given decision could impact the students' ability to continue and complete their education. By allowing the EPF transaction to move forward, the Department helped to avoid a situation in which 12,000 students would have found themselves unexpectedly locked out of their school, and potentially unable to continue or complete their education, since both the Art Institute schools and South University offered several programs that are not available at most other schools. This includes the nurse anesthetist program at South University, which is one of the few in its field. The Department had already learned from the orderly teach-out of a number of Art Institutes that it was difficult for students in certain art and design programs to identify an institution that offered similar programs in the student's geographic region and at a price point the same as or lower than the Art Institute. In addition, since many of the remaining art and design colleges are highly selective, not only is it likely that many students would not be served by these schools, those who were admitted would likely lose credits in a transfer, which is costly to students in terms of time and money.

As for the assertions made by the OIG that the Department allowed the EPF transaction to proceed without approval from accreditors, OIG again fails to include the information that the Department has provided to it during the course of its inspection. This information made clear that the Principal Deputy Under Secretary was in regular contact with accrediting agencies and state authorizing bodies and sought verbal approval from each before allowing the EPF acquisition to move forward. Given the real and present nature of the situation in place during this time-period, the Department did not have the luxury of waiting months to make sure that every document it would normally obtain during this sort of transaction was available, including written approvals of states and accrediting agencies. We knew that a receivership was imminent, and we were racing against the clock to make decisions in the best interest of both students and taxpayers. And, as mentioned above, the key decisions regarding a potential acquisition by EPF took place during the Christmas holiday. As a result, the Department realized that it would be impossible for accrediting agencies to convene their boards to make formal decisions regarding the approval of the EPF transaction. However, as the Department demonstrated to the OIG through emails it provided to the OIG, the Department was in regular contact with state authorizing agencies and relevant accrediting agencies throughout the transaction and provided both with as much information as possible as discussions were taking place.

Although the timing and the emergency situation made it impossible for EPF to secure the final approval from state authorizing agencies and accreditors of the proposed change in ownership as

required by 34 C.F.R. § 600.20(h)(3)(ii) and (iii), the Department had been in communication with both states and accrediting agencies about the proposed transaction. The Department understood those bodies to be in support of the transaction moving forward, and the schools acquired by EPF have maintained their accreditation and state authorization. Indeed, each accrediting agency confirmed that it would continue accrediting these institutions until such time that the new owners could submit complete applications which could be reviewed by the relevant decision-making bodies.

In addition, the Department required Dream Center to receive approval from each state authorizing body for the transaction to move forward, again with the understanding that after the holidays, a formal review would be required. In the case of two states, the Principal Deputy Under Secretary had direct conversations with state authorizers to ensure that the states would not remove state authorization despite the fact that the transaction would not follow the state's usual timetable. Both states (Florida and Texas) approved the transaction to move forward.

As a result, it is simply not true that the Department allowed these transactions to move forward without approval from the relevant accrediting and state authorizing agencies, albeit with the caveat that in each case, a formal application would be required after the holidays were over, and each agency would go through its normal review process before issuing a final decision.

In a perfect world the Department would have required these reviews to take place prior to allowing the transaction to move forward. However, had the Department made those demands in this case, there is no doubt that the schools would have been placed into receivership and would have closed precipitously along with the Dream Center schools that were eventually put into receivership, and the students and the taxpayers would have suffered. It is also worth noting that the Department was able to leverage its control over LOC proceeds and the reimbursement of Dream Center for allowable teach-out costs at its closing schools to delay the inevitable receivership for as long as possible. However, not only had Dream Center been clear in communicating its intent to file for receivership, in November, Dream Center and its would-be receiver met with the Department to explain their planned receivership.

As the Department advised counsel for EPF in January 2019, the schools EPF acquired would not be approved for continued participation under a Provisional Program Participation Agreement ("PPPA") until the required audited financial statements were reviewed and accepted, and until the required state and accreditor approvals were received. Until such approval, the schools would continue in a temporary month-to-month status. Under the month-to-month status, the TPPP could be terminated at any time.

The OIG's account of the Department's decisions regarding the EPF transaction omits important facts. The facts omitted from the Draft Report provide data and context that not only demonstrate that the Department engaged in responsible and reasonable decision-making, even though we had hours, days, and weeks to make these decisions, not months or years, and that our decisions enabled 12,000 students to continue their education and avoided a closed school loan discharge liability of $420 million. As we explained previously to the OIG, we are extremely proud of the collaboration between OUS, FSA and OGC that enabled us to have significant high-

quality discussions about options available to us, to consider the risks and benefits of each option, and to make decisions only after it was decided unanimously that we were making the best decision possible. Our decisions proved to be good and reasonable decisions given that the EPF schools continue to operate, and we have received no complaints about the conduct of these schools, or the educational services provided to students. And, as mentioned above, had EPF, Studio Enterprises and Colbeck not been engaged in the operation of the EPF schools, Dream Center would have failed to meet the terms of numerous contracts, leaving employees unpaid, health insurance policies expired, and student records lost to states that may not have been able to retrieve them from shut-off electronic records systems.

<u>Responses to Issues Regarding the Authority of the Principal Deputy Under Secretary and Other incomplete Information Provided in the Draft Report</u>:

The Draft Report asserts that it was beyond the authority of the Principal Deputy Under Secretary to authorize the addendum to the temporary provisional program participation agreements ("TPPA") that stated the terms of the orderly-teach out that the institutions would be required to meet, including meeting the requirements of all accrediting agencies, as well as the expenses that would be considered for reimbursement using LOC proceeds. The Department strongly disagrees. The Draft Report fails to note that the Principal Deputy Under Secretary had no involvement whatsoever in the decisions around Dream Center's acquisition of the former EDMC schools, the reduction in the LOC requirement to 10 percent, or the decision to grant TPPAs to the newly acquired Dream Center schools. The Principal Deputy Under Secretary did not work at the Department during this period.

In addition, the Principal Deputy Under Secretary had no knowledge of the March 2018 decision to grant the Art Institutes in Colorado or Chicago a TPPPA recognizing those institutions, temporarily, as non-profit institutions until the Department's review of the request for non-profit treatment under Title IV, HEA regulations was decided. The Principal Deputy Under Secretary appreciates that the OIG has provided in its report information about the Department's later determination that the Higher Learning Commission ("HLC") violated its written policies and the Department's policies and regulations in approving the transaction but applying a never-before-used category called change of control candidacy status. However, the Principal Deputy Under Secretary is disappointed that the OIG did not include in its report the all the information provided by the Department, including that because of the due-process requirements of the Department's accreditation regulations which recognize an institution as accredited until its due process rights are expended, the Art Institutes in Chicago and Colorado remained accredited by HLC until those schools closed in December 2018. The OIG was provided with a letter from the HLC in November 2018 in which the president of HLC told the Principal Deputy Under Secretary that the HLC board had decided to "extend" accreditation through December 2018. It would be hard to understand how an agency that removed accreditation could "extend" that accreditation. In addition, as pointed out in the materials provided to the OIG, there were other

reasons why it was clear that HLC had *not* removed accreditation from these institutions including:

- HLC's policies and the Department's regulations require that any institution that is subject to an adverse accreditation decision (termination, suspension or withdrawal of accreditation) is given the right to appeal that decision, during which time the institution remains accredited;
- HLC's policies and the Department's regulations require that an institution subject to an adverse action must complete a mandatory "wait out" period prior to applying for a new, initial award of accreditation, but the Art Institute's in Chicago and Colorado were not required to complete the mandatory wait-out period, which in the case of HLC's policies, is a 5-year period (the Department's regulations require a minimum of 2 years);
- HLC's policies and the Department's regulations require that an institution applying for an initial award of accreditation complete a full application and participate in a full site visit and review; however, HLC had stated in its correspondence to Dream Center that the agency would be performing only a focused review of several criteria at the time of its required (by the Department) 6-month post-acquisition review;
- HLC's policies require the institution to be financially viable following a change of control in order for the agency to approve the transaction, yet HLC admitted to performing its financial review of the Art Institutes in Chicago and Colorado under the assumption that title IV, HEA participation would continue (which means that HLC was either negligent when it performed its review to not consider the impact of the loss of Title IV participation on the financial viability of the institution, or it performed the review fully understanding that an approval of the transaction includes transfer of accreditation to the new owner except in the case that the new institution was a wholly new institution subsequent to the transaction); and
- Neither HLC's policies nor the Department's regulations include as a possible adverse action the "demotion" of an institution's accreditation status from accredited to pre-accredited without the institution first being subjected to an adverse action (loss, suspension, or termination of accreditation), exhausting its appeal rights, completing the required wait-out period, submitting a new application for initial accreditation, and completing the full accreditation review and approval process.

The Department also emphasizes that it would have had to be clairvoyant to know that while HLC approved the transaction, which by its published policies means that accreditation conveyed to the new owner, it planned to violate its own policies and apply conditions disallowed by its standards and the Department's regulations. It would have been a violation of the Department's regulations to remove title IV participation for the Art Institutes of Chicago and Colorado until such time that the institutions exhausted their appeal rights with the agency. Department staff made a responsible decision in the best interest of students to ensure that their education was not disrupted while the Department worked to sort out the very difficult situation that HLC had made by violating its policies and the Department's regulations.

The OIG asserts that the Principal Deputy Under Secretary exceeded her authority by signing the addendum to the TPPA or certain correspondence with the Dream Center or EPF. However, that is simply not true. The Department agrees that FSA functions autonomously in carrying-out the administrative duties of Title IV programs, which is why OUS was not involved in any conversations about the Dream Center transaction until June 2018. However, in June 2018 Federal Student Aid invited the Principal Deputy Under Secretary to join them in the meeting requested by Dream Center to discuss the orderly teach-out of more than 30 campuses. There was nothing surprising in this invitation to include the Principal Deputy Under Secretary in this meeting. FSA had previously worked closely with a previous Under Secretary in similar situations – where potential and actual closures of large, multi-campus institutions were coordinated by the Office of Under Secretary. Coordination by the Under Secretary is prudent because of the number of policy decisions that need to be made and the significant impact that potential closures would have on students.

In addition, for an orderly closure of these institutions to be accomplished, there would need to be close collaboration between the Department and the institutions' accrediting agencies, and that coordination would be the responsibility of the Department. In June 2018, the Principal Deputy Under Secretary was also serving as the acting assistant secretary for the office of postsecondary education, which oversees the work of the accreditation group. Given the disastrous results of the precipitous closure of ITT Tech, the Department had been called upon by a number of constituents, including members of Congress, to develop policies and processes that would end precipitous closures of schools. In response to those calls for increasing our responsibility to ensure that the interests of students and taxpayers are served by an orderly teach-out, rather than a precipitous closure, the Department sought to develop new policies and procedures for incentivizing and engaging in the oversight of orderly closures. Much of what the Department learned by engaging in the oversight of the teach-out of the Dream Center campuses informed subsequent negotiated rulemaking proposals and discussions and resulted in final accreditation regulations that included new and expanded incentives and oversight requirements related to orderly teach-outs. The Draft Report fails to acknowledge that the Principal Deputy Under Secretary's collaboration with accrediting agencies throughout the orderly teach-out of Dream Center campuses not only resulted in successful teach-outs, but it informed new regulations promulgated on July 1, 2020.

The Draft Report also fails to mention that the decision that the Principal Deputy Under Secretary would sign the Temporary Provisional Program Participation Agreement Addendum ("TPPPA Addendum") was made in conjunction with FSA leadership (including the Acting Chief Operating Officer). It was an integral part of the Principal Deputy Under Secretary's coordination of the plans for the teach-outs with the states and accreditors, and the TPPPA Addendum was integral to that effort.

The Draft Report incorrectly states the numbers of students served and potential closed school loan discharge liability in several places. First, the OIG stated that at the time of Dream Center's acquisition of the former EDMC schools involved 34,000 students with a closed school loan discharge liability of $925 million, but that is incorrect. It was in June 2018, at the time the

teach-out was announced that Dream Center schools collectively served 34,000 students who had an aggregated potential closed school loan discharge liability of $925 million.

The Draft Report goes on to incorrectly state that the number of students who were enrolled at the 30 teach-out campuses was 3,300 with almost $97 million in student loans.  That is not correct.  In reality, there were over 9309 students enrolled at the DCEH teach-out campuses at the time the teach-out was announced, and those students had hundreds of millions of dollars in student loan debt.  As a result of the orderly teach-outs, 2599 of those 9309 students completed their programs before the schools closed in December 2018, and 2293 students transferred to a new school.  Only 2821 students withdrew, making them eligible for closed school loan discharge.

However, since some of the teach-out students had transferred to other DCEH schools that ultimately became receivership schools, they regained eligibility for a closed school loan discharge bringing the total number of students from the teach-out campuses who were eligible for closed school loan discharges as of November 2020 was around 3300 students who held approximately $97 million in closed school loan discharge liabilities.  In other words, our good decisions and aggressive oversight resulted in 2/3 of the students originally enrolled at the teach-out schools being able to complete their program prior to their closure or transfer to another institution.  Of the original 9309 students enrolled, only around 3300 either elected to withdraw or enrolled in a school that became a receivership school and remained eligible for closed school loan discharge.  While we agree that FSA presented the data oddly in the data tables provided, had the OIG read the accompanying narrative, perhaps this error would not have been made.

OIG has completely missed the point of what the Department sought to achieve (and avoid) by improperly viewing the data of the teach out schools in isolation.  At the time it was considering whether to allow the surety funds to be released for the teach-outs, the Department was viewing the situation in a much wider lens than OIG describes.  In Summer 2018, Dream Center officials were threatening the precipitous closure of the entire chain.  An orderly teach-out of the nearly 30 campuses was the only available option for avoiding closure of the entire chain, and that teach-out could ensue only if DCEH could access a small portion of their LOC proceeds to cover the added costs of conducting an orderly teach-out.  Thus, the Department viewed the orderly teach-out not just as serving the interests of the 9309 students enrolled at the closing campuses, but also as serving the interests of all Dream Center students and taxpayers by avoiding the immediate shut down of all campuses.  And although the receiver ultimately closed all campuses that went into receivership, that happened more than 6 months later, and only after the teach-outs had successfully given 9309 students options about how to complete their education and preserved the opportunity for an additional 12,000 students who were enrolled at the schools acquired by EPF to complete their education. The reimbursement of certain teach-out costs provided Dream Center with the resources to bring many students to completion or transfer, without draining resources from the schools that ultimately that could continue serving students under new ownership.   As a result, the total liability at stake when the Department decided to

oversee the orderly teach-out of nearly 30 campuses was nearly $1B, not $97 million as the OIG incorrectly states in your draft report.

The Draft Report also fails to credit the Department for the unprecedented steps it took to engage in the approval of the Dream Center teach-out plans and oversight of the teach-outs. Although it is typically accrediting agencies, not the Department, that approves teach-out plans, Congress had asked the Department to become more engaged in the oversight of teach-outs and teach-out plans. Because of the complexity of this orderly teach-out, which involved 6 regional accrediting agencies and one national accrediting agency, the Department recognized the need to coordinate with accrediting agencies to ensure that the teach-out plans put in place were satisfactory to all of those agencies. Had the Dream Center been required to follow 6 different teach-out plans, the Department recognized success was highly unlikely given the very limited experience of Dream Center leaders in the conduct or teach-outs. Also, because of the multi-campus nature of the Dream Center institutions, it was often the case that a campus in a specific geography was accredited by the regional accrediting agency that does not typically accredit campuses in that region, and that teach-out agreements with other local schools would need to be reviewed and approved by both regional accreditors, including the regional accrediting agency of the Dream Center campus and the regional accrediting agency of the local receiving institution. In order to facilitate teach-out agreements that would serve the interests of students, both accrediting agencies would need to be in agreement about the terms of those agreements, which further necessitated the up-front review and agreement by all involved accrediting agencies of the requirements of the teach-out plans.

Because oversight of accreditation was the responsibility of the Principal Deputy Under Secretary, who was also acting assistant secretary for postsecondary education, and because of her experience working with accrediting agencies and overseeing large teach-outs, the Principal Deputy Under Secretary asked accrediting agencies if they would be willing to work together to approve a common teach-out plan that meets the requirements of each agency, and if they would engage in regular telephone meetings to share information about the status of the teach-out campuses, to share information about teach-out agreements that had been executed, and to report any concerns to the Department so that the Department could address them. Because the Principal Deputy Under Secretary was, at the same time, completing her review of the Part II Submission from the Accrediting Council for Independent Colleges and Schools, she felt it prudent to refrain from having any contact with that agency, and therefore did not include them in the conversations about the common teach-out agreement or the subsequent oversight conversations. However, ACICS is an agency that has considerable experience overseeing teach-outs, and it accredited only one Dream Center institution, which was located in the service area of the Northwest Commission on Colleges and Universities. As a result, the Principal Deputy Under Secretary engaged in conversations with the Northwest Commission and the Arizona state authorizing body to ensure that the teach-out of that single school was being conducted appropriately.

The Department provided ample evidence to the OIG to show that the Principal Deputy Under Secretary engaged routinely and regularly with accrediting agencies to get status reports, and

took quick action when agencies reported concerns about teach-out activities. The Principal Deputy Under Secretary provided the OIG with samples of correspondence from the involved accrediting agencies thanking her for taking an active role in overseeing the teach-outs and ensuring that the schools were taking corrective action swiftly when required by the accrediting agencies. This important and very significant context was omitted from the Draft Report.

The Draft Report also fails to explain that the TPPPA Addendum which was signed by the Principal Deputy Under Secretary included requirements that Dream Center schools make regular submissions to accrediting agencies and the Department, as a condition of receiving the e reimbursements for allowable teach-out expenses, as set forth in Appendix A to the Addendum. Because the oversight of the teach-outs was so heavily linked to the work of accrediting agencies, it was reasonable for the Principal Deputy Under Secretary, who was also the acting assistant secretary for the office of postsecondary education to sign the TPPPA Addendum.

While the Department agrees that under circumstances in which FSA can reasonably operate in accordance with existing policies and procedures, it would be the responsibility of the FSA COO to oversee those operations, nothing about the Dream Center situation was routine or anticipated under FSA's existing policies and procedures, and the teach-out of such a large number of campuses by an otherwise on-going entity would require a number of policy decisions to be made. It was for that reason that the COO invited the Principal Deputy Under Secretary to join the June 2018 meeting to discuss the orderly teach-outs, including potential reimbursements of certain expenses using LOC proceeds. It is noteworthy that the Acting COO identified the Principal Deputy Under Secretary as the person who should be responsible for making policy decisions related to this novel teach-out situation. In addition, when the Secretary of Education approved $50 million to be made available to reimburse Dream Center for certain teach-out costs, she directed the Principal Deputy Under Secretary to oversee these teach-outs and the release of funds. During the meeting with the Secretary to discuss the potential use of LOC proceeds to reimburse Dream Center for certain teach-out expenses, the Deputy COO stated that it should not be the FSA COO who signs off on these decisions given that they involve policy decisions. In addition, while the former FSA COO was originally determined to be the individual who would review the requests for reimbursement submitted by Dream Center, because of potential conflicts of interest, he could not serve in that role. In addition, because the release of funds involved both a financial review *and* acknowledgement from accrediting agencies that the schools were meeting the terms of the approved teach-out agreements, this required the engagement of the Department leader who had oversight of accrediting activities.

Finally, because successful closure of the 30 original teach-out campuses depended upon a high-quality teach-out plan being put in place, the Principal Deputy Under Secretary required that the Department review that plan and ensure that it was thorough and complete. FSA staff told the Principal Deputy Under Secretary that they lacked the experience or authority to approve a teach-out plan since this had traditionally been the responsibility of accrediting agencies. The Department admits that it took an unusual step in engaging directly in the review and approval of the teach-out plan, but the size and scope of this teach-out warranted such a review. However, because responsibility for the Department's review and approval of teach-out plans would fall to

the Principal Deputy Under Secretary and acting assistant secretary for the office of postsecondary education, only she would have the authority to sign off on agreements or the release of funds that required compliance with the terms of that plan.

The Department strongly disagrees with OIG's incorrect conclusions regarding who had the authority to sign off on the documents related to the orderly teach-out of the Dream Center campuses.

It is also important to point out (as has been done previously through documents, written submissions and interviews provided to the OIG) that during the prior administration, the Under Secretary -- rather than the FSA COO --took responsibility for making decisions and signing documents related to closures and transactions when higher risk closures or acquisitions were involved. The Department provided to the OIG copies of documents signed by the prior Under Secretary, including the documents that outlined the terms of the acquisition of Corinthian Colleges by ECMC. OIG appears not to have raised concerns about the prior Under Secretary's role in these matters.

OIG failed to note in its report that the Principal Deputy Under Secretary did not engage in, oversee, or approve the operations activities completed by FSA under its normal operating procedures. For example, the Principal Deputy Under Secretary did not engage in the oversight of HCM1 reviews or decisions. Only when the receiver failed to follow instructions related to accreditation requirements did the Principal Deputy Under Secretary direct FSA to deny the application of the remaining Dream Center schools to participate in title IV programs as non-profit institutions. However, this decision, like the other decisions she approved, was a policy decision directly linked to her review of accreditation requirements, and one that would have large impact on students and taxpayers, like the decisions the prior Under Secretary oversaw regarding ITT Tech and Corinthian Colleges.

Similarly, although the Principal Deputy Under Secretary required Dream Center to provide the Department with regular updates of its enrollments at each teach-out campuses, those documents were forwarded to FSA where the appropriate staff reviewed them. The Principal Deputy Under Secretary played no role in making decisions related to the administration of the ECARs for Dream Center schools, nor did the Principal Deputy Under Secretary engage in the review of the details of the proposed transaction between Dream Center and EPF. The Principal Deputy Under Secretary does not have expertise in reviewing financial transactions and deferred this review to the appropriately qualified staff in OGC and FSA.

At no time did the acting FSA COO ask to be the leader of this oversight effort or ask that the Principal Deputy Under Secretary not sign off on documents that required policy decisions to be made. To the contrary, it was the FSA COO and the Secretary of Education who decided, with the agreement of the Principal Deputy Under Secretary, that the Principal Deputy Under Secretary should be delegated the oversight and decision-making authority related to the Dream Center following the Secretary's 2018 decision that the Department should make up to $50 million in LOC proceeds available to Dream Center to cover certain expenses related to the orderly teach-out of these campuses.

When an institution engages in an orderly teach-out, there are expenses that exceed the normal operating expenses of an institution, and as a result of accreditation requirements (and in the best interests of students), the institution is required to maintain the same facilities and services throughout the teach-out as it had in place when the institution was fully operational. During a teach-out, it is in the best interest of students who cannot complete their program prior to the cessation of operations either withdraw and apply for a closed school loan discharge after the closure or to transfer to a new institution (either through a teach-out agreement or the student's own arrangements with a transfer school). In the case of Dream Center, the Department insisted that the Dream Center take aggressive action, including by hosting career fairs, to assist students in finding transfer institutions and to proactively seek teach-out agreements with other institutions. In fact, the Principal Deputy Under Secretary hosted a webinar to which all institutions within a certain geographic radius of ground-based campuses and who had comparable online programs were invited, and during which she reviewed each campus's academic programs and student enrollment numbers to encourage other schools to accept transfer students or engage in the development of teach-out agreements. As a result, the Department was requiring Dream Center to reduce its enrollment of students other than those who had elected to complete their program prior to the closure and had the ability to do so given where they were in their program. As enrollments decline, there are fewer students paying tuition, and yet accreditors require that these schools maintain pre-teach-out facilities and support services – and that they maintain the qualified teaching staff in sufficient numbers to provide the necessary courses (even when enrollments are down to just a few students, in which case the institution would otherwise cancel the class).

Given the unique demands of teach-out operations, coupled with the Department's insistence that Dream Center help students transition as quickly as possible to a new institution (unless the student elected to withdraw or could complete the program before the closure), it was in the best interest of students to reimburse the schools for certain expenses to ensure that students would have access to the educational and student support services they needed to succeed. In addition, by making reimbursements available to Dream Center, the Department retained a degree of leverage over the institutions to require them to comply with accreditor requirements. The Department provided the OIG with correspondence to prove that in several instances, it was this leverage that allowed the Department to demand that Dream Center take corrective action – which Dream Center showed it would not otherwise take.

The Department believed then and continues to believe now that the $38 million investment it made to ensure the successful orderly teach-out of 30 campuses was the right thing to do in that it served the best interests of students and taxpayers. By doing so, we ensured that students received accurate information and the opportunity to make their own decisions about whether to seek closed school loan discharge, complete their program, or transfer to a new institution. At all times, the Department's leaders made careful, risk-based decisions that considered the potential impact both on students and taxpayers.

The Draft Report completely ignores the alternative options and likely outcomes that were very much a necessary part of the Department's considerations. The decision to issue the pre-

acquisition response letter to Dream Center (not approving the acquisition but concluding that the Department did not see any current impediment to its approval of continued participation under Dream Center's ownership), seems to be only a tangential focus of this report, and was a decision made before the Principal Deputy Under Secretary joined the Department. However, once Dream Center notified the Department in June of its decision to teach-out 30 campuses, the Department's options included only engaging directly to oversee the quality of those teach-outs by working collaboratively with accrediting agencies or turning its back and hoping for the best and expecting the worst. We chose the former, and we believe that it would have been a dereliction of duty had we opted for the later. We can only imagine the criticism we would have received from the OIG, Congress and the public had we taken the "put our head in the sand" approach – an approach that would have harmed students and caused significant financial losses.

Similarly, when asked to make $75 million in LOC proceeds available to the Dream Center to support the cost of an orderly teach-out, the Department could have either reviewed that request and agreed to reimburse for reasonable teach-out expenses that were directly related to providing education and student support services to students, as it did, or it could have denied that request knowing that doing so would result in the precipitous closure of all Dream Center campuses. When the Dream Center requested these funds in June 2018, it represented that by an orderly closure of the teach-out schools it could redirect resources to the continuing schools to ensure their success. By providing reimbursements for reasonable teach-out costs, not only could we ensure that students at the teach-out schools would be well-served, but we could also reduce the negative impact on students at the continuing schools that cannibalization of the revenue to support teach-out costs would cause. Therefore, our decision to reimburse for certain legitimate teach-out costs benefited students enrolled at all the other schools. In addition, by agreeing to provide reimbursements for certain reasonable teach-out costs – an action that is allowed under the terms of the Letter of Credit – the Department had the leverage described above to ensure that the Dream Center provided a high-quality teach-out.

The Department engaged in three levels of review of requests for reimbursement submitted by Dream Center, and the Principal Deputy Under Secretary relied on the advice of an independent auditor, FSA staff, and OGC career staff to identify allowable versus unallowable expenses. Only when all three reviewers approved an expense and the accreditors reported that the schools were in compliance with the requirements of each agency did the Principal Deputy Under Secretary sign for the release of funds. In addition, on at least one occasion when an accrediting agency raised concerns about potential marketing expenditures on the part of the Dream Center, the Principal Deputy Under Secretary ordered FSA to cease releasing any reimbursements and asked OGC to investigate the concern and make a determination about its merits. Only after OGC investigated the concern and determined that any such expenditures were in the past and not part of the teach-out expenditures did the Principal Deputy Under Secretary permit FSA and OGC to resume their review of reimbursement requests.

Again, had we not decided to make up to $50 million available for the reimbursement of allowable teach-out costs, the only option would have been to bury our head in the sand and wait for the entire school group to implode. That option, while admittedly less work for the OUS,

FSA and OGC staff involved in this intensive undertaking, provided no benefits to students and taxpayers. Since we are sure that no matter what we did, there would inevitably be second guessing of each decision, we opted to make risk-based decisions based on what was best for students and taxpayers rather than what might have been the most politically expedient. However, had we taken a "look the other way" approach, we would have been criticized for that approach, and both students and taxpayers would have been harmed, as the financial condition of Dream Center and the eventual receivership provide evidence that a precipitous closure was otherwise inevitable.[1]

The next decision point came when Dream Center started threatening receivership and went so far as to introduce us to the person who declared that he would become the receiver. At that point, we had the choice of either sitting back to see if an acquisition ensued or engaging potentially interested parties to see if there really was the possibility that some of all of the schools could be put in the hands of responsible owners. It seemed highly unlikely that acquisitions would naturally work themselves out because we were receiving complaints from potential interested buyers that Dream Center was preventing them from performing due diligence. In addition, we could not get a straight answer from Dream Center about which potential buyers were qualified or whether written offers had been presented. Therefore, in late December 2018, at our invitation, all interested parties met in Washington. Our goal was to encourage these parties to engage with each other to see if there really were any potential transactions. We made ourselves available to answer regulatory questions but did not engage in negotiations between Dream Center and potential acquirors. As a result of this DC-based meeting, it became clear that at least one party was interested in acquiring some of the schools. These meetings gave us the chance to interview the interested party, learn more about the nature and extent of their due diligence, and probe the nature of their financial resources to see if they had any reasonable capacity to restore the schools to optimal operations. When given the choice to engage or ignore the evolving situation, we chose to engage and believe that the outcomes prove that we made the right decision since at least some of the schools now have new owners.

Finally, when faced with decisions about whether or not we would approve the transaction with EPF to move forward, we could either not engage and hope for the best, or demand a 25% LOC, knowing that either the transaction would not take place, or the new buyer would have fewer resources to devote to improving the schools and serving students. Or we could do what we did, which was to allocate a portion of the surety for any liabilities of the Art Institutes or South that

---

[1] In the case of the Receivership schools, the fact that the OUS, FSA and OGC team had been working so closely with the schools, as well as with states and accrediting agencies, not only were we able to identify the point at which the Receiver made decisions that required us to remove title IV participation, which we did swiftly, but we were able to ensure that students who were enrolled at those schools had transfer options available to them. States and the Department worked diligently to ensure that students could obtain their records, and PDUS worked directly with programmatic accreditors to ensure that new schools could accept those students into licensure programs, despite preexisting enrollment caps, and to ensure that those students would remain eligible for licensure. Had all of the schools gone into receivership at the same time, it is unlikely that we would have had the time to help so many students. But having built a strong team and having already established close working relationships with states and accreditors regarding DCEH teach-outs and closures, we were able to ensure that as many students would have options as possible, and that taxpayer liabilities would be minimized.

pre-dated the acquisition by EPF. OIG's second-guessing of this decision years after it took place completely ignores the fact that 12,000 students had the chance to continue their program, and the Department has received no student complaints about those schools. Therefore, any legitimate review should be informed in a significant respect at least by the outcome, which shows that 12,000 students retained the choice of completing their program, that EPF provided the financial support needed to keep the schools it acquired operating and to make sure that IT and phone services continued for all the schools and that all EDMC, Dream Center and EPF electronic student records were retained and made available to appropriate record custodians. And then EPF and Studio were required to engage in unexpected efforts following the receivership.

In other words, in this case the outcome very clearly demonstrates that despite our need to make quick decisions, without the benefit of hindsight, the decisions we made led to the best possible outcomes for 12,000 students and thousands of employees. It is hard to see how the OIG could come to a different conclusion, and it is noteworthy that while the Draft Report focuses on the decision to require a 10 percent letter of credit as opposed to a 25 percent letter of credit, which reduced the required LOC by approximately $42 million, it fails to explain that because those schools remain operational, that $42 million has not been needed to pay closed school loan discharges, and a larger $420 million potential CSLD liability was averted. The OIG Draft report also fails to explain that EPF continues to be under Department monitoring, and the schools continue to operate under a TPPPA, thus affording the Department ample opportunity to examine the schools over an extended period of time to be sure that the schools are operating well.

If the inference from the Draft Report Finding 1 is that the Department should not have allowed Dream Center to acquire the schools, that decision would have resulted in a precipitous closure of EDMC schools at a time when the Department was still struggling to manage the disaster caused by the Corinthian Colleges and ITT Tech closures – including that former ITT Students were unable to access any of their records, and thus were unable to transfer to new schools or sit for occupational licensure exams, and taxpayers were left with large CSLD liabilities, not to mention the financial losses suffered by students who could not get cash payments returned.

The Draft Report appears to ignore much significant and relevant information provided to it, and instead engages in many instances an often-incomplete exercise of (so -called) "Monday-morning quarterbacking" of the Department's decisions both in regard to Dream Center's acquisition of the schools from EDMC, the threatened closure of the entire chain by DCEH, and the acquisition by EPF. These events happened on the heels of the ITT and Corinthian closures, as the Department was still grappling with how best to serve students and "protect the fisc" in these types of very challenging situations. Although the OIG may not agree with all our decisions, we fully believe that the information provided to the OIG, when considered in its entirety, and with due regard for the circumstances as they played out in real time (and measured against the actual alternatives), demonstrates that the decisions made were very reasonable under all of the circumstances and were the right decisions that resulted in the best outcomes for students and the lowest possible financial risk to taxpayers.



February 16, 2021

TO:        Mr. Gary Whitman
           Regional Inspector General for Audit
           Chicago/Kansas City and Sacramento Audit Regions
           U.S. Department of Education
           Office of Inspector General

FROM:      Mark Brown
           Chief Operating Officer
           Federal Student Aid                    

**SUBJECT: Draft Report "Inspection of the Department's Activities Surrounding the Sale of Postsecondary Schools to Dream Center Education Holdings" Control Number ED-OIG/I05T0010**

Dear Mr. Whitman:

Thank you for the opportunity to review and comment on the statements and recommendations made in the Office of Inspector General ("OIG") Draft Report, *Inspection of the Department's Activities Surrounding the Sale of Postsecondary Schools to Dream Center Education Holdings* (I05T0010), dated January 15, 2021 ("Draft Report").

OIG presented four findings in the Draft Report, with three recommendations. FSA's response to the findings and recommendations are set forth below.

### Introduction

The Draft Report's primary criticism of FSA's actions in responding to the Dream Center Education Holdings ("DCEH", "Dream Center") situation is that those actions deviated from FSA "policy." FSA understands the reference to "policy" to mean FSA's internal procedures. To the extent that the Draft Report relies on FSA's internal procedures, those are neither regulations nor binding guidance. FSA adheres to its procedures to the maximum extent possible to ensure consistency, however not all situations can adequately be addressed simply by resorting to the procedures. Deviations from the procedures necessarily occur to address situations where flexibility is required. FSA's Financial Analysis Procedures cover page states:

> This document constitutes internal staff discussion and general procedures and does not create any procedural or substantive rights of institutions. This document contains general guidance



830 First Street, NE, Washington, DC 20202
StudentAid.gov

to the U.S. Department of Education's ("Department's") School Participation Division staff and is for internal use only. This document is not a regulation and is not intended to provide guidance binding upon the Department. The requirements that institutions must meet are set out in the regulations, and the internal staff procedures in this document neither supplement nor supplant pertinent statutory or regulatory provisions.

When FSA confronts unusual, complex, or exigent circumstances, it must be able to exercise flexibility and make a risk-based decision, even when that decision deviates from the internal procedures. Such flexibility was required in dealing with the Dream Center situation, and that flexibility was exercised with input from representatives from FSA, the Office of General Counsel ("OGC"), and the Office of the Under Secretary. At each decision point these Department employees considered both the potential harm to students as well as to taxpayers when assessing the very limited options they had.

The Draft Report organizes the Findings into three broad areas, which isolates events from their chronological context. As a result, the Draft Report does not fully reflect the context in which decisions were being made. It also does not reflect the limited options available to the Department as it evaluated potential risks, and what could be done to mitigate the risks of an abrupt closure of a large chain of schools educating many thousands of students. The Draft Report narrowly focuses on what actions the Department did not take and does not even mention, let alone discuss, the likely consequences of what would have happened if the Department had implemented those actions.

The Department's approach in managing the closure of the Dream Center schools blunted the impact of this school closure on students and taxpayers, and is consistent with the observations OIG provided in its February 24, 2017 report, *"Federal Student Aid's Processes for Identifying At-Risk Title IV Schools and Mitigating Potential Harm to Students and Taxpayers"* (A09Q0001). The OIG report cautioned the Department that unexpected or abrupt school closures can have significant adverse effects on large numbers of students, to include potentially being displaced from their educational program before completion, having credits that cannot transfer to another school, incurring significant student loan debt without obtaining a degree or certificate, and significantly diminished job prospects. The report noted that school closures can adversely impact students' job prospects because the students' education may end without a degree, and employers may question the quality of the educational programs that the students were enrolled in.

The February 24, 2017 audit report further noted that taxpayers are also adversely affected when these closures result in significant volume of loan discharges. "When Title IV schools unexpectedly or abruptly close, liabilities that include the costs of discharged student loans are established against the closed schools. The unpaid liabilities from those closed schools are ultimately covered by the taxpayers." The report also observes that FSA could do more to protect students and taxpayers from unexpected or abrupt school closures.[1]

---

[1] U.S. Department of Education Office of Inspector General, ED-OIG/A09Q0001, "Federal Student Aid's Processes for Identifying At-Risk Title IV Schools and Mitigating Potential Harm to Students and Taxpayers," Pages 7 and 9 (2017). https://www2.ed.gov/about/offices/list/oig/auditreports/fy2017/a09q0001.pdf

As a result of the Department's actions in managing the closure of the Dream Center schools, many students were able to complete their programs, many more students were able to continue their studies without interruption, and the Department protected taxpayers by decreasing the amount of loans that could have been subject to closed school loan discharges if the Dream Center schools had closed precipitously during the summer of 2018.

### FSA Response to Findings

**Finding 1: The Department's Involvement in Dream Center's Purchase of Postsecondary Schools from Education Management Corporation**

**FSA's Response**: FSA disagrees with the OIG's findings that responses to identified risks did not sufficiently protect student and taxpayers, and that nonprofit status was retroactively approved without ensuring the schools met the Title IV definition of nonprofit. OIG discusses a variety of issues in Finding 1, focusing on events during the preacquisition review process for the acquisition of the Education Management Corporation ("EDMC") schools by Dream Center and leading up to the receivership and closure of the schools.

A preacquisition review is not required, and a school can close on a change in ownership ("CIO") transaction without requesting such a review. The preacquisition review response letter does not provide a decision on whether the CIO application will be approved. Any guidance or indications of the Department's position in the response is preliminary and subject to a final determination when the Department conducts its review, following the closing of the CIO transaction. In its discussion of the preacquisition review process, the Draft Report focuses on the letter of credit ("LOC") requirement and the financing for the transaction.

*The LOC Requirement.* The Draft Report describes FSA's preacquisition decision to set the DCEH LOC at 10% as a "reduction" in the LOC amount required. Prior to the CIO, EDMC was required to post a 15% LOC ($194 million) due to the school's continued noncompliance with the financial responsibility regulations and risks specifically associated with EDMC's ownership of the schools (and most significantly, legal issues that were settled in 2015). The LOC requirement post-transaction is based on the institution's financial position under its new ownership. Although FSA was considering LOC amounts above 10%, an amount over 10% was not required to meet the standards of financial responsibility. *See* 34 C.F.R. § 668.175(f)(2)(i) (2016). The Department's decision to require a 10% LOC was fully compliant with the Department's regulations that were in effect at that time.

The day after the issuance of the preacquisition response letter, DCEH contacted the Department objecting to any LOC requirement and threatening to pull out of the deal. However, the Department held firm on the requirement for a 10% LOC. EDMC, DCEH and their counsel agreed that the Department would hold EDMC's LOCs to meet the post-transaction LOC requirement and DCEH was required to post a LOC or extend the EDMC LOCs by May 1, 2018 or the Department would draw down on EDMC's LOCs.

Page 4

***The Financing Change.*** The Dream Center-EDMC transaction closed on two dates – the CIO for nine schools occurred on October 17, 2017 and the CIO for the remaining four schools occurred on January 19, 2018. The Draft Report notes that an investor providing at least 50% of the capital withdrew its financial support shortly before the October transaction, but that despite concerns about this change, FSA issued temporary program participation agreements ("TPPPAs") to the nine schools on November 30, 2017, and the four schools on February 20, 2018. Once the CIO transactions closed, the Department had two choices: deny the CIO application, which would automatically terminate the school's participation in Title IV programs; or continue their participation on a month-to-month basis while FSA conducted its post-closing review of the CIO. There is no regulatory basis to deny continued participation following a CIO simply because financing for a transaction has changed. The impact of financing is reviewed as part of the review of the same day balance sheet which is submitted in accordance with 34 C.F.R. § 600.20(h)(3)(i). Depending on the results of the financial review, the Department can impose conditions on continued participation, including an LOC or enhanced reporting. Here, the Department had already included enhanced reporting in the preacquisition response letter, and there was already a 10% LOC in place.

The only requirements for issuing a TPPPA include a complete electronic application to participate in Title IV programs, pre-transaction accreditation and state authorization, and the submission of two years of financial statements for the institution and the new owner. *See* 34 C.F.R. § 600.20(g)(2). The temporary participation continues on a month-to-month basis if the institution complies with the requirements of 34 C.F.R. § 600.20(h)(3). DCEH complied with each of these requirements, and therefore, the Department issued the TPPPAs which allowed the schools to continue their participation on a month-to-month basis while FSA conducted a post-closing review of documentation, including DCEH's request for the schools to participate as nonprofit schools. If the Department had issued a denial of the CIO because the financing had changed, there can be no doubt that such an action would have triggered an immediate closure for all locations. This would have resulted in 34,000 students being unable to complete their education and the Department potentially discharging as much as $925 million in student loans.

***Other Events Discussed in Finding 1.*** On April 18, 2018, DCEH asked the Department to extend the May 1, 2018 deadline for posting a new LOC or extend the EDMC LOCs to May 17, 2018. The Department granted the extension. On May 1, 2018, DCEH asked the Department to reduce or eliminate the LOC requirement. The Department denied that request and after DCEH failed to extend or replace the EDMC LOC, the Department collected the EDMC LOC and placed the funds in escrow on May 25, 2018. Approximately three weeks later, DCEH representatives sought the Department's release of a portion of the LOC proceeds to assist it with the orderly closure of as many as 39 locations. DCEH representatives told the Department that DCEH needed that assistance because they discovered problems not anticipated with acquiring the schools from EDMC, and that it was not financially feasible to keep all the locations operational. The plan as presented was to close selected locations to prevent the precipitous closure of all the schools.

The Draft Report states that the Department did not implement more rigorous monitoring procedures for DCEH schools through the heightened cash monitoring 2 ("HCM2") method of payment in June 2018 after hearing that DCEH planned to close as many as 39 locations by the end of December 2018

because of financial difficulties. As FSA has previously indicated, it considered the potential harms to students and taxpayers and determined the best course of action was to assist the orderly closure of locations and to avoid creating further financial stress on the school's operations. If the Department had imposed HCM2, that action would have likely triggered an immediate closure for all locations – as it did once the receivership action was filed.

In Finding 1 OIG also discusses the Department's decision to grant temporary interim non-profit status to the Art Institute of Colorado and the Illinois Institute of Art. The Illinois Institute of Art and the Art Institute of Colorado schools were fully accredited by the Higher Learning Commission ("HLC") prior to the CIO. Two months prior to the January 20, 2018 closing of the transaction, on November 16, 2017, HLC issued a letter to the Institutes advising them that if they consummated the change of ownership, they would be transitioned to "change of control candidacy status" as of the date of the change ("11/16/17 HLC Letter"). FSA received a copy of that letter, and it did not fully explain what that status was, or what accepting it would mean to the schools or their students.  It did not state that the schools would no longer be accredited institutions, or that by accepting "change of control candidacy status" they would lose their fully accredited status. It should also be noted that FSA had not previously seen this type of outcome which would result in a loss of accreditation and therefore title IV eligibility, from HLC based on a change in ownership.

In early February 2018 FSA became aware that HLC was taking the position that the schools were not accredited. In mid-to-late February, there were internal discussions between FSA and OGC about what the candidacy status meant, and whether it meant that the schools had lost eligibility because they were in that status and their application to participate as nonprofits was still under review. By late February FSA and OGC considered whether the temporary approval for the schools could be modified to change their status (on a temporary interim basis) from proprietary to nonprofit. There again was another choice, one to refuse to issue the TPPPAs, or to issue them to allow the schools to continue on a month-to-month basis until FSA could sort out this issue. The Department decided to issue the TPPPAs to give it some time to figure out what was going on with HLC.

FSA was eventually able to schedule a conference call with an HLC representative in early March 2018. She described the "change of control candidacy status" as equivalent to a preaccreditation status, and acknowledged that HLC had never imposed the status on any other institution. Because a proprietary school cannot participate in preaccreditation status, following this call, it was decided that the best approach was to grant these two schools' temporary interim nonprofit status, as discussed internally a week or two earlier. The regulations provide at 34 C.F.R. §668.13 that institutions that have had a CIO receive provisional certification if they are approved to continue participating in the Title IV programs. Under the regulations of 34 C.F.R. 600.4(a)(5)(i), a private nonprofit institution may have preaccreditation status as a part of its required approvals and be eligible to participate in the Title IV programs. And although it may not have been done before, the regulations do not restrict the Department from approving an interim change in status for a proprietary, public, or nonprofit institution during the period where the initial temporary provisional approval is in effect. Because Dream Center had submitted a request to the Department for a preacquisition review in February 2017, the Department had, by March 2018, already spent months analyzing the CIO transaction and DCHE's request that the Institutes be accorded nonprofit status (as that term is defined in 34 C.F.R. §

Page 6

600.2). As stated in the preacquisition response letter, the Department had not found any impediment to continued participation following the change in ownership, or to the request to convert the Dream Center schools to nonprofit status. Due to their ownership by Dream Center, these two schools had tax exempt status from the Internal Revenue Service under 501(c)(3), which is one of the required elements under the Department's regulations.  See 34 C.F.R.  § 600.2 (definition of a nonprofit). In the intervening months since the preacquisition response had been issued, and at the time the Department made the decision to grant the schools' temporary interim nonprofit status, nothing had come to the Department's attention that would have suggested that either continued participation of the schools following the change of ownership or the request to convert to nonprofit status should have been denied. Indeed (as reflected on a video of the HLC site visit to the Art Institute of Illinois in July 2018), one of the HLC site visitors stated several times that the campus did not appear to be any different now than it was the day before the CIO, that based on their review the school would likely result in a positive accreditation decision, and that upon such a decision, which would be expedited, accreditation would be applied retroactive to the January 2018 CIO date. Notwithstanding these representations to the students, HLC took a different course.

Following the confusion and uncertainty associated with the HLC candidacy status, the Department was again faced with two choices, it could immediately cut off student aid in the middle of the semester and face a potential precipitous school closure, or it could grant interim nonprofit status which would permit students to continue to receive Title IV funds. The second option best served the interests of the students, and allowed the schools to continue to participate in Title IV programs while the Department completed its post-closing review of the change of ownership transaction.

OIG concludes that "even though the two schools neither had the accreditation status needed to continue participating as a for-profit school nor alternatively had approval to participate as nonprofit schools, the Department provided the Art Institute of Colorado with about $2.6 million in Title IV funds, and it provided the Illinois Institute of Art about $9.4 million in Title IV funds from January 21, 2018 through May 2, 2018." FSA disagrees with this conclusion. The letter it issued on May 3, 2018 that granted these schools temporary interim non-profit status was effective January 20, 2018 and served as evidence of the Department's approval.

FSA also notes that even if the Department had not granted temporary interim non-profit status, the institutions continued to provide instruction from January 21, 2018 through May 2, 2018, so most of the Title IV funds disbursed would have been permitted under 34 C.F.R. § 668.26(d).

**Recommendation 1.1: Ensure that records of decisions regarding changes in ownership, changes in accreditation status, percentage of required letters of credit, or heightened cash monitoring placement that deviate from the regulations or FSA policy are created and retained.**

**FSA's Response to Recommendation 1.1:** FSA disagrees with the premise of the recommendation that our decisions are not retained. The decisions at issue in this inspection involved a group of participants from FSA, OGC and the Principal Deputy Under Secretary. Although the Department does not formally memorialize every decision in a memorandum, all decisions are reflected in emails and letters sent to institutions, or other bodies which communicate and explain those decisions. FSA

will continue to prepare materials for escalation and approval by documenting deviations from FSA procedures or established practices.

**Recommendation 1.2: Design and implement policies and procedures for reviewing and approving schools' applications for conversions from for-profit to nonprofit status.**

**FSA's Response to Recommendation 1.2:** FSA agrees that its existing procedures should be updated to reflect its current review processes, which FSA has been enhancing since 2016 (in consultation with OGC) taking into consideration that each CIO transaction is unique and needs to be reviewed on a case-by-case basis. FSA also agrees the procedures should be expanded to cover circumstances in which a grant of temporary interim nonprofit status may be appropriate.

**Finding 2: The Department's Involvement in Dream Center's Sale of Postsecondary Schools to Education Principle Foundation.**

**FSA's Response:** FSA disagrees with the OIG's findings that the financial analysis procedures relevant to the sale of postsecondary schools were not followed, and that the policy for extending temporary provisional program participation agreements was not followed. In November 2018, DCEH management told the Department that it was planning to place the entire DCEH chain into receivership. In response to the threatened receivership, and as described in the response of the Principal Deputy Under Secretary to the Draft Report, a meeting was convened in Washington, DC in late December 2018. The meeting participants included Dream Center management, its lenders, and potential new owners. Following that meeting, and additional meetings, calls, and correspondence over the Christmas and New Year's holidays, Education Principle Foundation ("EPF") emerged as a viable party to acquire many of the remaining Art Institutes and South University, and negotiated an asset purchase agreement with Dream Center management to make the acquisition. However, EPF sought flexibilities from the Department to proceed with the transaction. Given that the alternative was having these schools put into receivership, the belief was that it was appropriate to exercise flexibility to try to transition the schools to new ownership if at all possible.

Relying on FSA's internal procedures, OIG criticizes the Department's decision to not require the submission of audited financial statements and same-day balance sheets from EPF, which was the highest level of ownership. As stated above, the procedures are not regulatory or binding. In this case, representatives from FSA and OGC, along with the Principal Deputy Under Secretary evaluated the risk in the context of potential harms to students and taxpayers. The choice was to exercise flexibility or create conditions that could cause the schools to close. The Department's January 7, 2019 letter documents that standard procedural requirements were considered, and that a management approved exception was given, which is permitted by the procedures. The Department agreed to accept and review the top-level Art Institutes ("AI") and South University ("South") entities to meet the two-year requirement for materially complete application, because, although EPF was an existing nonprofit, the information in the AI and South financial statements provided a better assessment of the financial picture of the institutions, even under the new ownership. In addition, the Department required AI and South to maintain 10% surety in the form of allocated LOC funds.

Page 8

As expected, the remaining Dream Center schools were placed into receivership by order of the U.S. District Court for the Northern District of Ohio less than two weeks after EPF acquired the South and AI schools. In early March 2019, the receiver announced the closure of the receivership schools except for the Art Institute of Las Vegas (which he subsequently closed in December 2019) and the Western State College of Law. As of February 20, 2020, the Department has granted $68.5 million in closed school loan discharges for the locations that the receiver closed in March 2019 and December 2019. If some flexibilities had not been allowed to facilitate EPF's acquisition, it could have resulted in an additional $300 million in potential closed school loan discharges.

The Department disagrees with OIG's conclusion that the four schools should have been deemed ineligible to participate in the Title IV program after February 28, 2019 because of a lack of accreditor approval of the acquisition by EPF. The schools purchased by EPF were all accredited by the Southern Association of Colleges and Schools ("SACS"). When the Department was engaged in discussions with representatives of EPF in late December 2018 to negotiate the conditions for continued participation of the institutions that EPF sought to purchase from DCEH, the Principle Deputy Under Secretary was also engaged in discussions with SACS and the state authorities about the urgency for the proposed transaction to proceed, given the situation with DCEH and its move towards receivership. The Department was assured that the involved states and SACS supported the transaction and would continue state authorization and accreditation through the change of control pending the final review and decision of the formal change of control application. FSA did not terminate these institutions' temporary program participation agreements which continued on a month-to-month basis, due to confirmation that no accreditor or state approvals would be withdrawn because of the change of ownership to EPF, and given that at the end of February 2019 the remaining locations were in receivership. Requiring EPF to delay the acquisition of these schools so that SACS and the states could provide formal approvals to meet the deadlines set forth in 34 C.F.R. § 600.20(h)(3)(ii) and (iii) would have left these schools subject to the receivership, which was filed about 12 days after the EPF transaction occurred, and where all but two locations were precipitously closed by the receiver in early March 2019. Or, even if the EPF transaction went ahead, the Draft Report seems to suggest that all of those schools should have been terminated when the 34 C.F.R. § 600.20(h)(3)(ii) and (iii) deadlines passed (at the end of February 2019) without the required approvals.

This action was taken to facilitate a transaction, which appeared to be the only available option for saving these schools from receivership or a precipitous closure. Actions were taken to prevent a disruption for the students and to protect taxpayers from more than $300 million in potential closed school loan discharges. Students are continuing to enroll in and graduate from the four institutions that are in operation. Every student who has continued and graduated is another student who was able to achieve their educational pursuit and will not be applying for a closed school loan discharge.

**Recommendation 2.1: OIG recommended that the Secretary of Education (including Acting or Designee) direct the Office of the Under Secretary to abide by the delegation of authority that pass directly from the Secretary to the Chief Operating Officer for FSA.**

**FSA's Response to Recommendation 2.1:** Recommendation 2.1 is addressed to the Secretary of Education. FSA does not have the authority to direct the Office of the Under Secretary ("OUS"). This recommendation should be responded to by the appropriate offices within the Department.

**Recommendation 2.2: Ensure that FSA creates and retains records explaining its decisions to deviate from prescribed policy for letter of credit requirements and temporary provisional program participation agreement extensions during a change in ownership and explaining how the interests of students and taxpayers are adequately protected.**

**FSA's Response to Recommendation 2.2:** FSA disagrees with the premise of the recommendation that our decisions are not retained. The decisions at issue in this inspection involved a group of participants from FSA, OGC and the Principal Deputy Under Secretary. Although the Department does not formally memorialize every decision in a memorandum, all decisions are reflected in emails and letters sent to institutions, or other bodies which communicate and explain those decisions. FSA will continue to prepare materials for escalation and approval by documenting deviations from FSA procedures or established practices.

**Finding 3: The Department's Drawdown and Application of Surety Funds from the Education Management Corporation Letters of Credit and How the Department Ensured the Surety Funds Were Used in Accordance with Requirements.**

**FSA's Response:** As noted in the responses to the Recommendations 2.1 and 3.1 of the Draft Report, FSA does not have the authority to direct the Office of the Under Secretary. FSA agrees that OUS was involved in the Department's administration of LOC proceeds. Approximately three weeks after the Department drew down the EDMC LOC funds, DCEH representatives sought the Department's release of a portion of the LOC proceeds to assist it with the orderly closure of as many as 39 campuses. DCEH representatives explained that they needed assistance because they discovered problems not anticipated with acquiring the schools from EDMC, and that it was not financially feasible to keep all of the locations operational. The plan was to close selected campuses to prevent the precipitous closure of all the schools. The precipitous closure of the entire chain (13 main OPEIDs, with approximately 80 campuses) would have resulted in 34,000 students being unable to complete their education, and the Department potentially discharging as much as $925 million in student loans.

As the Draft Report notes, DCEH requested $75 million in surety funds to cover the operating expenses from June 2018 through December 2018, for the orderly closure of as many as 39 campuses. When it was evaluating whether to allow the use of the LOC proceeds, the Department estimated that an immediate total closure of all 80 campuses would result in approximately $925 million in potential closed school loan discharges. However, if the LOC proceeds were used for an orderly closure of 39 campuses (with the rest staying open), the discharge exposure would be limited to approximately $168 million for students who would not complete their programs by the December 2018 closure date. After significant deliberation, the Department denied the request to release $75 million to DCEH, but agreed to release up to $50 million for reimbursement of specific teach-out related expenses (primarily rent and payroll) to allow for the orderly teach-out of the closing locations. The Addendums to the

Page 10

TPPPAs defined allowable expenses, and required an independent certified public accounting (CPA) firm to review and certify that the expenses were reimbursable under the terms of the Addendums. In addition to the CPA certification of the expenses, FSA conducted an extensive review of the expenditures to determine whether certain expenditures should be disallowed, because they did not meet the definition of a teach-out expense under the terms of the TPPPA Addendums. This information was provided to OGC and the Under Secretary to make the final determination regarding the release of funds.

FSA also notes, that although it agreed to release up to $50 million for teach-out related expenses, the Department only approved releasing a total of $39.6 million in surety funds based on the extensive review of the expenditures.

**Recommendation 3.1: OIG recommended that the Secretary of Education (including Acting or Designee) direct all Office of Under Secretary officials to adhere to the delegation of authority that pass directly from the Secretary to the Chief Operating Officer for FSA for decisions relevant to the management of letters of credit.**

**FSA's Response to Recommendation 3.1:** Recommendation 3.1 is addressed to the Secretary of Education. FSA does not have the authority to direct the Office of the Under Secretary. This recommendation should be responded to by the appropriate offices within the Department. In addition, at the time that the funds were released, they were comprised of proceeds, as the LOCs had been drawn.

**Finding 4: The Department's Actions to Ensure That Dream Center Complied with Requirements for Drawing Down and Disbursing Title IV Funds.**

**FSA's Response:** FSA agrees with the OIG's description of FSA's processes for monitoring payment requests for Title IV funds. FSA agrees in part that the monitoring processes did not prevent Dream Center from violating requirements for drawing down and disbursing Title IV funds. However, FSA used those same processes to ensure that Dream Center would comply with the requirements. FSA withheld funds following the receipt of student complaints indicating that Dream Center had failed to pay credit balances. FSA concurs that a school must hold Title IV funds in trust for the intended beneficiaries, and that as a trustee of those funds, a school may not use them for any other purposes or otherwise engage in any practice that risks the loss of those funds. Prior to the receivership, the DCEH schools were participating under heighted cash monitoring 1 ("HCM1"). FSA notes that according to ED's Cash Management Regulations, schools that receive funds under the HCM1 payment method submit a request for funds under the provisions of the *advance payment method*, except that the institution's request may not exceed the amount of the disbursements the institution has made to the students included in that request. Prior to submitting this request, an institution must have credited a student's ledger account for the amount of title IV, HEA program funds that the student or parent is eligible to receive, and have paid the amount of any credit balance due to the student or parent borrower. Therefore, they were required to credit a student's account for Title IV funds that the student was eligible to receive and pay any credit balance due to the student before requesting reimbursement. FSA was requiring DCEH to submit rosters of students for whom it was requesting

U.S. Department of Education
Office of Inspector General
ED-OIG/I05T0010

116

Page 11

funds and FSA's payment analyst was comparing the student rosters to the school's drawdown requests. Furthermore, when an institutional representative submits a payment request on behalf of an institution using the Department's G5 system, the representative certifies that the payment request is based on true, complete, and accurate information. The representative further certifies under pain of criminal, civil, or administrative penalties for fraud, false statements, false claims, or other violations that the expenditures and disbursements made with the requested funds are for the purposes and objectives set forth in the institution's Program Participation Agreement ("PPA"), and that the institution is and will remain in compliance with the terms and conditions of the PPA.

In late January 2019, after the remaining DCEH schools were placed in receivership, and those schools were promptly placed on heightened cash monitoring 2 ("HCM2"), FSA became aware that students were not receiving their credit balances. The Department tried to sort this out in February 2019 to determine whether there were any options available to the Department to work with the receiver to remedy the credit balance situation for the students. When it became clear that the receiver was unwilling or unable to remedy the situation, FSA cancelled the loans for the Spring 2019 semester. FSA also denied Argosy's pending CIO application, which resulted in an immediate loss of Argosy's eligibility to participate in the Title IV, HEA programs.